**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| John Brotherston and Joan Glancy, individually and as representatives of a class of similarly situated persons, and on behalf of the Putnam Retirement Plan,<br><br>                    Plaintiffs,<br>v.<br><br>Putnam Investments, LLC, Putnam Investment Management, LLC, Putnam Investor Services, Inc., the Putnam Benefits Administration Committee, the Putnam Benefits Investment Committee, Robert Reynolds, Ellen Neary, and John Does 1–30,<br><br>                    Defendants. | Case No. 1:15-cv-13825-WGY<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs John Brotherston and Joan Glancy ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the Putnam Retirement Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Plan's fiduciaries: Defendants Putnam Investments, LLC ("Putnam"), Putnam Investment Management, LLC ("Putnam Management"), Putnam Investor Services, Inc. ("Putnam Services"),[1] the Putnam Benefits Administration Committee ("PBAC"), the Putnam Benefits Investment Committee ("PBIC"), Robert Reynolds, Ellen Neary, and John Does 1–30.  As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing

---

[1] Putnam, Putnam Management, and Putnam Services are collectively referred to herein as the "Putnam Companies."

with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.  Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

2.      ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law."  *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 305 (D. Mass. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)).  Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

3.      Defendants do not act in the best interest of the Plan and its participants.  Instead, Defendants have used the Plan as an opportunity to promote Putnam's mutual fund business and maximize profits at the expense of the Plan and its participants.  Defendants loaded the Plan exclusively with Putnam's mutual funds, without investigating (until after this action was filed) whether Plan participants would be better served by investments managed by unaffiliated companies.[2]  The retention of these proprietary mutual funds has cost Plan participants millions of dollars in excess fees every year.  For example, in 2013, the Plan's total expenses were 66% higher than the average retirement plan with between $500 million and $1 billion in assets (the Plan had $589 million in assets as of the end of 2013), costing Plan participants at least $1.72 million in excess fees in 2013 alone.  Out of the 551 defined-contribution plans with between $500 million and $1 billion in assets, only 10 have higher costs than the Plan.  The Plan's high

---

[2] Defendants announced after the filing of this action that certain non-Putnam funds would be included in the Plan for this first time.  *See infra* at ¶¶ 99–103.  As explained below, this is a half measure at best.

costs can be attributed entirely to Defendants' selection and retention of high-cost proprietary mutual funds as investment options within the Plan.

4.      Defendants' mismanagement of the Plan extends beyond their failure to adequately control Plan costs.  Defendants also have failed to remove poorly performing investments from the Plan, in breach of their fiduciary duties.  Defendants have no *bona fide* process for selecting mutual funds for the Plan, indiscriminately adding every mutual fund that Putnam offers into the Plan.  Furthermore, Defendants have no meaningful process in place to monitor the Plan's investments and remove investments that have become imprudent.  As a result, Putnam's worst performing funds remain in the Plan, costing Plan participants millions compared to what they would have earned in prudent alternatives.

5.      To make matters worse, many of the funds included in the Plan have little or no track record.  Defendants have a pattern and practice of including new and unproven mutual funds as investment options within the Plan shortly after the new funds are launched to provide seed money for those funds.  For example, in March 2013, Putnam launched five new mutual funds, and on April 1, 2013, all five funds were included within the Plan.  While this may benefit Putnam, helping it to achieve economies of scale for new funds and to market those funds to other investors, it has not been beneficial for the Plan and the Plan's participants.  To the contrary, these new and untested funds have cost significantly more than alternative investment options, yet have performed poorly.

6.      Defendants' prioritization of Putnam's profits over prudent management of Plan assets constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

7. In addition, by retaining Putnam mutual funds as investment alternatives within the Plan, Defendants caused the Plan to pay unreasonably high fees and expenses to the Putnam Companies in transactions that were prohibited under 29 U.S.C. § 1106.

8. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), engaging in prohibited transactions with a party-in-interest (Count Two), engaging in prohibited transactions with a fiduciary (Count Three), failure to monitor fiduciaries (Count Four), and for equitable restitution of ill-gotten proceeds (Count Five).

## JURISDICTION AND VENUE

9. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10. This case presents a federal question and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiffs reside in this District.

## THE PARTIES

### PLAINTIFFS

12. Plaintiff John Brotherston resides in Westford, Massachusetts and is a participant in the Plan. From November 2009 to the present, Brotherston has been invested in 31 different

funds offered within the Plan, including several of the examples of imprudent investments identified herein.  All 31 of these funds were managed by Putnam.  Brotherston has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

13.     Plaintiff Joan Glancy resides in Peabody, Massachusetts and was a participant in the Plan until the first quarter of 2010, when her account balance was distributed from the Plan. Glancy is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described herein. Glancy was invested in 14 different funds offered within the Plan between November 2009 and March 2010, including several of the examples of imprudent investments identified herein.  All 14 of these funds were managed by Putnam.  Glancy has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

### THE PLAN

14.     The Plan was established on June 12, 1961.  Since January 1, 2006, the Plan has been known as "The Putnam Retirement Plan."  Prior to January 1, 2006, the Plan was known as "The Putnam Companies, Inc. Profit-Sharing Plan."

15.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

16.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

17.     The Plan has been amended twenty-six times since it was originally adopted, most recently on January 1, 2014.

18.     The Plan covers eligible employees and former employees of "Putnam

Investments, its directly and indirectly wholly-owned domestic subsidiaries and PanAgora Asset Management, Inc." Plan Document § 2.7, attached as **Exhibit A**.

19.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis. The employer often matches those contributions up to a certain percentage of the compensation contributed by the employee each pay period. Within the Plan, employees may defer anywhere from 1% to 100% of their compensation on a pre-tax basis (subject to annual contribution limits), and Putnam matches those contributions up to 5% of an employee's salary. 2015 Putnam Retirement Plan Summary Plan Description ("SPD") at 4–5, attached as **Exhibit B**. Putnam also makes discretionary contributions each year to eligible employees. *Id.* at 3.

20.     Participants in a defined-contribution plan are responsible for directing the investment of these contributions, choosing from among a lineup of options offered by the Plan. Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

21.     The Plan's investment options are governed by the Plan Document. Ex. A. § 8.1. The currently available options are: "All Putnam publicly offered, open-end, non-tax-exempt mutual funds"; "the Putnam Stable Value Fund, Putnam S&P 500 Index, and Putnam Bond Index Fund"; the PanAgora U.S. Large Cap Stock Selector Collective Fund;[3] and a self-directed brokerage option. Ex. B at 8; Ex. A § 8.1.[4]

---

[3] PanAgora Asset Management, Inc. is a majority-owned subsidiary of Putnam and is a Plan employer. Ex. A § 2.7.

[4] Defendants recently announced (after this lawsuit was filed) that these options will be expanded effective February 1, 2016 to include certain funds not affiliated with Putnam. *See infra* at ¶¶ 99–103.

**DEFENDANTS**

22.     Putnam is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Putnam is headquartered in Boston, Massachusetts.  Through its CEO and Board of Directors, Putnam has the authority to amend any or all provisions of the Plan. Ex. A §§ 11.1, 12.5(a).  In an exercise of this authority to amend the Plan, Putnam's CEO (Robert Reynolds) executed the most recent version of the Plan, which specifically outlines which investments may be made available within the Plan.  *Id.* § 8.1.  Pursuant to Sections 2(a) and 4(b) of the Plan's trust agreement with Putnam Fiduciary Trust Company, Putnam possesses the authority to select the investment options available to employees within the Plan.  Additionally, Putnam, along with its CEO, is responsible for appointing and removing the members of the PBAC and PBIC, and pursuant to that role, also has responsibility for monitoring the actions of the PBAC and PBIC to ensure that they are carrying out their fiduciary functions in compliance with ERISA.  Putnam also exercises authority over the PBAC and PBIC through its ability to terminate the employment of members of the committees.  These powers allow Putnam to exert discretionary authority and control over management and administration of the Plan, and specifically the management of the Plan's assets, rendering Putnam a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).  Additionally, Putnam is a fiduciary of the Plan pursuant to the actions of its CEO, board of directors, and employees serving on the PBAC and PBIC.

23.     Putnam Management is a subsidiary of Putnam, is a participating employer in the Plan, and at all relevant times has served as the investment manager to the Putnam funds held within the Plan.  Putnam Management provides investment management services for which it receives compensation that is unreasonably high and comes at the expense of the Plan and its participants.  Under 29 U.S.C. § 1002(21)(A), Putnam Management is a fiduciary of the Plan

because it exercises authority or control respecting management or disposition of Plan assets and because it renders investment advice for a fee or other compensation with respect to monies of the Plan. Additionally, because it provides services to the Plan, and because its employees are covered by the Plan, Putnam Management is a "party in interest" under 29 U.S.C. § 1002(14).

24.     Putnam Services is a subsidiary of Putnam, is a participating employer in the Plan, and at all relevant times has provided investor servicing agent functions to the Putnam funds held within the Plan. Putnam Services receives compensation for its investor servicing agent functions, which is unreasonably high and comes at the expense of the Plan and its participants. Because Putnam Services provides services to the Plan, and because its employees are covered by the Plan, Putnam Services is a "party in interest" under 29 U.S.C. § 1002(14).

25.     Defendant PBAC is the administrator of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). Ex. A § 12.1. The PBAC controls and manages the operation and administration of the Plan. *Id.* § 12.2.

26.     The PBAC is designated as a Plan fiduciary in Section 12.1 of the Plan Document, and therefore is a Plan fiduciary pursuant to 29 U.S.C. § 1102(a). *See* Ex. A § 12.1. Additionally, because it has discretionary authority and control respecting management and administration of the Plan, the PBAC is a fiduciary under 29 U.S.C. § 1002(21)(A). The current and former members of the PBAC are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 1–10.

27.     Defendant PBIC is responsible for managing the investments of the Plan. Ex. A § 13.2. Although the Plan Document largely dictates the investments available to Plan participants, the Plan Document gives the PBIC the authority to "designate other mutual funds or other collective investment vehicles . . . for investment of contributions under the plan." *Id.* §

8

8.1.  Furthermore, the PBIC was only obligated to follow the Plan Document "insofar as [plan] documents and instruments [were] consistent with the provisions of [ERISA]."  29 U.S.C. § 1104(a)(1)(D).

28.     The PBIC is designated as a Plan fiduciary in Section 12.1 of the Plan Document, and therefore is a fiduciary pursuant to 29 U.S.C. § 1102(a).  *See* Ex. A § 12.1.  Additionally, because it has discretionary authority and control respecting management and disposition of Plan assets, the PBIC is a fiduciary under 29 U.S.C. § 1002(21)(A).  The current and former members of the PBIC are currently unknown to Plaintiffs (with the exception of Defendant Neary), and those individuals are therefore collectively named as John Does 11–20.

29.     Defendant Robert Reynolds has been the Chief Executive Officer of Putnam Investments since 2008 and remains the company's CEO.  Pursuant to the Plan Document, as CEO, Reynolds has the authority to unilaterally amend or modify any or all provisions of the Plan. Ex. A § 11.1.  Approval of the Board of Directors for any such amendment or modification is only required "if necessary," though the Plan does not outline the conditions under which Board approval would be necessary.  *Id.*  Pursuant to this authority, Reynolds effectuated the most recent version of the Plan with his signature.  *See* Ex. A Signature Page (after § 14.11). The Plan Document outlines which investments must be included within the Plan.  Ex. A § 8.1. Therefore, throughout the statutory period, Reynolds had the authority to remove Putnam funds from the Plan, and failed to exercise that authority.  This authority gave him discretionary authority and control over Plan assets, rendering him a fiduciary.  29 U.S.C. § 1002(21)(A). Similarly, through his authority to amend the Plan Document, Reynolds could have cured the fiduciary breaches by the other Defendants, and failed to exercise his authority to prevent those breaches, subjecting him to co-fiduciary liability under 29 U.S.C. § 1105(a).  Additionally, in his

role as CEO of Putnam, Reynolds is responsible for appointing and removing members of the PBAC and PBIC, and accordingly was responsible for monitoring the conduct of the PBAC and PBIC to ensure that each committee was carrying out its fiduciary duties in compliance with ERISA.

30.     Defendant Ellen Neary is Head of Human Resources for Putnam and is Chair of the PBIC.  Neary has served as the Head of Human Resources for Putnam since 2010.  In 2013, Neary signed the Plan's Trust Agreement as Chair of the PBIC.  As a member of the PBIC, Neary had the authority along with other members of the PBIC to add or remove designated investment alternatives available to Plan participants.  Neary and other current or former members of the PBIC are therefore fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised authority or control respecting management or disposition of the Plan's assets.

31.     Under the Plan, Defendants have the authority to delegate their responsibilities to any other person or persons.  Ex. A § 12.7.  Any individual or entity to whom Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).  Because the individuals and/or entities that have been delegated fiduciary responsibilities by Defendants are not currently known to Plaintiffs, they are collectively named as John Does 21–30.

32.     Each Defendant is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties through its appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the

administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

33.      ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A)    For the exclusive purpose of
> >
> > > (i)      Providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)     Defraying reasonable expenses of administering the plan;
> >
> > (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

34.     "The fiduciary obligations of the [fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to the law." *Hill v. State Street Corp.*, 2011 WL 3420439, at *28 (D. Mass. Aug. 3, 2011) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

### DUTY OF LOYALTY

35.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id.* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must

11

ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .

A decision to make an investment may not be influenced by [other] factors unless the

investment, when judged *solely* on the basis of its economic value to the plan, would be equal or

superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-

16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

### DUTY OF PRUDENCE

36.     ERISA also "imposes a 'prudent person' standard by which to measure

fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v.*

*Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select

prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan]

investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's]

duty to exercise prudence in selecting investments."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823,

1828 (2015).  If an investment is imprudent, the plan fiduciary "must dispose of it within a

reasonable time."  *Id.* (quotation omitted).  Fiduciaries therefore may be held liable for either

"assembling an imprudent menu of investment options" or for failing to monitor the plan's

investment options to ensure that each option remains prudent.  *Bendaoud v. Hodgson*, 578 F.

Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3,

423–24 (4th Cir. 2007)).

37.     Failing to closely monitor and subsequently minimize administrative expenses

(by, for example, failing to survey the competitive landscape and failing to leverage the plan's

size to reduce fees), constitutes a breach of fiduciary duty.  *Tussey v. ABB, Inc.*, 746 F.3d 327,

336 (8th Cir. 2014).  Similarly, selecting and retaining higher-cost investments because they

benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available.  *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

38.     Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA.  29 U.S.C. § 1104(a)(1)(D).  "This provision makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."  *Dudenhoeffer*, 143 S. Ct. at 2468.

### SOURCE AND CONSTRUCTION OF DUTIES

39.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts."  *Tibble*, 135 S. Ct. at 1828.  Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."  *Id.*  In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law.  *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

40.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship."  Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").  The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but

> also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

41.     In considering whether a fiduciary has breached the duties of prudence and loyalty, "the court focuses not only on the merits of a transaction, but also on the thoroughness of the investigation into the merits of that transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008) (Young, J.) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## PROHIBITED TRANSACTIONS

42.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

14

(A)     sale or exchange, or leasing, of any property between the plan and a party in interest;

\* \* \*

(C)     furnishing of goods, services, or facilities between the plan and  party in interest;

(D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) further provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## CO-FIDUCIARY LIABILITY

43.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

44.     In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options.  29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).  Plan participants may invest in any of these "designated investment alternatives" that fiduciaries include within the Plan's menu of investment options.[5]  Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.  ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.  Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.  Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the default risk associated with the particular borrower.  Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.  Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.*

---

[5] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts."  29 C.F.R. § 2550.404a-5(h)(4).

growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks,  value stocks, and companies in between).  Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds.  Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

46.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.  For example, within each of the Putnam funds within the Plan, monthly management fees are paid to Defendant Putnam Management; quarterly sub-management fees are paid to Putnam's subsidiary Putnam Investments Limited ("PIL");[6] custodial fees are periodically paid to State Street; and investor servicing fees are paid periodically to Defendant Putnam Services.

46.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483,

---

[6] Putnam Management has assumed liability for all acts of PIL.  The annual report for each of the Putnam mutual funds states: "Because PIL is an affiliate of Putnam Management and Putnam Management remains fully responsible for all services provided by PIL, the Trustees have not attempted to evaluate PIL as a separate entity, and all subsequent references to Putnam Management below should be deemed to include reference to PIL as necessary or appropriate in the context."  2015 Putnam Multi-Cap Growth Fund Annual Report at 18 (June 30, 2015), *available                                                                                                     at* http://www.sec.gov/Archives/edgar/data/865177/000092881615001232/a_multicapgrowth.htm (last visited Jan. 13, 2016).

493 (2013).  By following this strategy, index funds produce returns that are very close to the market segment tracked by the index.  *Id.*  Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses.  *Id.*  Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection.  *Id.* at 485–86.  Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized).  U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

47.    In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds.  Ayres & Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c).  However, SDBAs have significant drawbacks.  Participants that choose to utilize an SDBA are typically assessed an account fee and a fee for each trade.  These fees often make an SDBA a much more expensive option compared to investing in the designated investment alternatives available within the Plan.[7] Costs are also higher because employees investing in mutual funds within an SDBA must invest in retail mutual funds, rather than lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets.  DOL Field Assistance Bulletin 2012-02R

---

[7] Investments available within a self-directed brokerage account are excluded from the definition of "designated investment alternative".  29 C.F.R. § 2550.404a-5(h)(4).  Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA.  *Id.* § 2550.404a-5(d).

(July 30, 2012), *available at* http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?, FIDUCIARY NEWS (June 11, 2013), *available at* http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Jan. 13, 2016). Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R. § 2550.404a-5(f), (h)(4).

48.     The existence of an SDBA option does not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of core investment options. For the reasons described above, "the performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, THE DAILY RECORD (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/; Dr. Gregory Kasten, Self-Directed Brokerage Accounts Reduce Success (2004), at 1, 13–14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of study showing that self-directed brokerage accounts lagged the performance of a model portfolio of the plan's designated investment alternatives by an average of 4.70% per year).

49.     In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options. Due to their high costs and administrative complexity, SDBAs are seldom used by

participants: only 2% of retirement plan assets are held in SDBAs. Investment Company Institute & Deloitte Consulting LLP, Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study").

## MINIMIZATION OF PLAN EXPENSES

50.    At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[8] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

---

[8] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Nov. 11, 2015).

51.    There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses.   ICI/Deloitte Study at 17. Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest."  *Id.*  On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees.  *Id*.

52.    Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing."   Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16.  These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula.   Though revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans."   U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

53.    The Plan uses a revenue-sharing system to pay the vast majority of its administrative expenses.  However, because Putnam and its affiliates perform all recordkeeping and trustee functions, and manage all of the core investments within the Plan, Putnam ultimately receives nearly all of the investment management revenue, and "shares" that revenue with itself.

54.     Fiduciaries exercising control over administration of the plan and the selection and monitoring of core investment options can minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options.  This task is made significantly easier the larger a plan gets.  Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis.  ICI/Deloitte Study at 7, 21.  Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors.  *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").  Empirical evidence bears this out.  In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets.  ICI Study at 41.

55.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans.  *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

### SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR THE PLAN

56.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan and monitoring the plan's existing investments.  The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

57.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler,

*Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).

58.    Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should.  John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

59.    For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

60.    The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees.  Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.  Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.  Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly*

*Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios.  On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

61.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").  Any sustainable ability to beat the market that managers might demonstrate is dwarfed by mutual fund expenses.  Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance.  Carhart, *On Persistence in Mutual Fund Performance*, at 57.   Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent

investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN

### I.   DEFENDANTS FAILED TO MINIMIZE PLAN COSTS

62.    To date, the only "core" investment options offered within the Plan have been investments managed by Putnam.

63.    For example, in 2010, Plan participants were offered 61 proprietary mutual funds, 3 proprietary collective trust funds, and an SDBA.  The "core" investment options included 10 target-date mutual funds, 6 balanced funds, 15 domestic equity funds (one of which was an index fund), 18 global/international equity funds, 12 domestic bond funds (one of which was an index fund), 1 international bond fund, 1 stable value fund, and 1 money market fund.  A list of investment options available in the Plan as of the end of 2010, taken from Putnam's Form 5500 filed with the Department of Labor, is attached as **Exhibit C**.

64.    By the end of 2013, the Plan had added two additional domestic equity funds, one additional global/international equity fund, two additional balanced funds, one additional domestic bond fund, and one additional global/international bond fund.  All of the new funds were proprietary Putnam funds, and none of the prior investment options had been removed from the Plan.  The Plan therefore offered 71 different core investment options within the Plan as of the end of 2013.  A list of the investment options within the Plan as of the end of 2013, taken from Putnam's Form 5500 filed with the Department of Labor, is attached as **Exhibit D**.

65.     By the end of 2013, the Plan had approximately $589 million in assets, consisting of $522 million in proprietary mutual funds, $51 million in proprietary collective trust funds, $8 million in SDBAs, and $8 million in Plan participant loans.

66.     Taking into account all administrative and investment expenses within the Plan, and using 2013 year-end balances (as reported on Form 5500 for 2013) and publicly available information regarding each investment's expenses, Plaintiffs estimate that total plan costs for 2013 were approximately $4,312,000, equal to 0.73% of the $589 million in Plan assets.  All but $4,000 of those fees were attributable to investment management expenses incurred within the Plan's investment options.

67.     This total plan cost of 0.73% is extremely high for a defined-contribution plan with over $500 million in assets.  In 2013, the average total plan cost for plans with between $500 million and $1 billion in assets was 0.44%.  ICI Study at 41.  Ninety percent of plans with between $500 million and $1 billion in assets had total plan costs of less than 0.63% in 2013. ICI Study at 42.  Indeed, among the 551 defined-contribution plans with between $500 million and $1 billion in assets as of the end of 2013, only 10 plans had total plan costs that were 0.74% or above.  Therefore, in 2013, the Plan was 66% more expensive than the average similarly-sized plan, and was as expensive or more expensive than 541 of the 551 defined-contribution plans with between $500 million and $1 billion in assets.

68.     Defendants' failure to rein in Plan costs caused significant losses to Plan participants.  Had the Plan limited its expenses to the average total cost of 0.44% for similarly-sized plans, Plan participants would have been saved approximately $1.72 million in fees in 2013 alone.

## II.   DEFENDANTS RETAINED HIGH COST PROPRIETARY FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

69.     The Plan's grossly excessive costs are entirely attributable to Defendants' selection and retention of high-cost, proprietary mutual funds managed by Putnam, Defendants' failure to remove these high-cost funds from the Plan, and Defendants' failure to investigate lower-cost, non-proprietary alternatives to the funds in the Plan.

70.     In 2012 (the most recent year this data is available), in plans with between $500 million and $1 billion in assets, the average expense ratio for domestic equity funds was 0.53%; for international equity funds it was 0.70%; for target-date funds it was 0.47%; for balanced funds it was 0.45%; for domestic bond funds it was 0.38%; for international bond funds it was 0.74%; for index funds it was 0.11%; and for money market funds the average was 0.16%.  ICI Study at 45.  No statistics were available for stable value funds.  *Id.*

71.     The expenses for funds within the Plan are significantly higher.  In 2013, the 16 actively-managed domestic equity funds in the Plan had expense ratios between 0.56% and 1.19%.  The global/international equity funds in the Plan had expense ratios between 0.88 and 1.30 percent.  The target-date funds had expense ratios of between 0.68 and 1.04 percent.  The balanced funds in the Plan had 2013 expense ratios of between 0.65% and 1.13%.  The 12 actively-managed domestic bond funds averaged between 0.30% and 0.92%, although every fund but one had expenses above the category average of 0.38%.  The international bond funds averaged between 0.75% and 1.00% in 2013.  The two index funds within the Plan had expense ratios of 0.08% in 2013.[9]  And the money market fund had expenses of 0.49%.  In conclusion, 67

---

[9] Prior to 2013, the expense ratio in each fund was 0.25%.  *See infra* at ¶ 76(b).

of the 70 designated investment alternatives within the Plan had above-average expenses, and many of those funds had expenses that were more than double the category average.

72.    The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants.  The fees charged by the Putnam funds in the Plan were generally many times higher than the fees in comparable institutional mutual funds that were frequently used by other plans.  As shown by the chart below, the fees for funds within the Plan were *up to 50 times higher* than alternatives in the same investment style.  Indeed, for nearly[10] every fund in the Plan, there was a passively- and actively-managed fund available from outside the Putnam family with significantly lower expenses:

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Voyager R6 (PVOEX) | 65 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>American Funds Growth Fund of American R6 (RGAGX) | 6 bps<br><br><br><br>33 bps | Large Growth | 983%<br><br><br><br>97% |

---

[10] The only exceptions are several instances where the Putnam fund is invested in a sub-asset class in which no index mutual fund exists, and the Plan's two index funds.  There is no instance in which the Putnam fund represents one of the lowest-cost actively-managed investment options.

[11] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  The listed expenses figures are taken from each fund's most recent prospectus.

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Multi-Cap Growth Y (PNOYX) | 79 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>American Funds Growth Fund of American R6 (RGAGX) | 6 bps<br><br>33 bps | Large Growth | 1217%<br><br>139% |
| Putnam Equity Income R6 (PEQSX) | 56 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>American Funds American Mutual Fund R6 (RMFGX) | 6 bps<br><br>30 bps | Large Value | 833%<br><br>87% |
| Putnam Dynamic Asset Alloc Growth R6 (PAEEX) | 72 bps | Vanguard LifeStrategy Growth Inv (VASGX)<br><br>American Funds Growth & Inc Portfolio R6 (RGNGX) | 17 bps<br><br>39 bps | Aggressive Allocation | 324%<br><br>85% |
| Putnam Money Market A (PDDXX) | 49 bps | Oppenheimer Institutional Money Mkt E (IOEXX) | 10 bps | Money Market | 390% |
| Putnam Equity Spectrum R6 (PYSYX) | 101 bps | Fidelity Spartan Mid Cap Idx Advntg I (FSMDX)<br><br>DFA U.S. Core Equity II Portfolio I (DFQTX) | 4 bps<br><br>22 bps | Mid-Cap Blend | 2425%<br><br>359% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Fund for Growth & Income R6 (PGREX) | 56 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>American Funds American Mutual Fund R6 (RMFGX) | 6 bps<br><br><br>30 bps | Large Value | 833%<br><br><br>87% |
| Putnam International Capital Opportunities Y (PIVYX) | 103 bps | Vanguard FTSE All-World Ex-US Small Cap Idx I (VFSNX)<br><br>DFA International Small Cap Value I (DISVX) | 18 bps<br><br><br>68 bps | International Small/Mid Cap Value | 472%<br><br><br>51% |
| Putnam International Equity R6 (POVEX) | 86 bps | Fidelity Spartan Int'l Idx Advtg (FSPSX)<br><br>Dodge & Cox International Stock (DODFX) | 6 bps<br><br>64 bps | Foreign Large Blend | 1333%<br><br><br>34% |
| Putnam Capital Spectrum Y (PVSYX) | 100 bps | Fidelity Spartan 500 Index Advtg (FXAIX)<br><br>American Funds Fundamental Investors R6 (RFNGX) | 2 bps<br><br><br>31 bps | Large Blend | 4900%<br><br><br>223% |
| Putnam Investors R6 (PIVEX) | 64 bps | Fidelity Spartan 500 Index Advtg (FXAIX)<br><br>American Funds Fundamental Investors R6 (RFNGX) | 2 bps<br><br><br>31 bps | Large Blend | 3100%<br><br><br>106% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam RetirementReady 2030 Y (PRRTX) | 77 bps | Vanguard Target Retirement 2030 Fund Inv. (VTHRX) | 17 bps | Target Date 2026–2030 | 353% |
| | | American Funds 2030 Target Date Retire R6 (RFETX) | 41 bps | | 88% |
| Putnam RetirementReady 2040 Y (PRZZX) | 88 bps | Vanguard Target Retirement 2040 Fund Inv. (VFORX) | 18 bps | Target Date 2036–2040 | 389% |
| | | American Funds 2040 Target Date Retire R6 (RFGTX) | 42 bps | | 110% |
| Putnam RetirementReady 2045 Y (PRVYX) | 94 bps | Vanguard Target Retirement 2045 Fund Inv. (VTIVX) | 18 bps | Target Date 2041–2045 | 422% |
| | | American Funds 2045 Target Date Retire R6 (RFHTX) | 44 bps | | 114% |
| Putnam RetirementReady 2050 Y | 99 bps | Vanguard Target Retirement 2050 Fund Inv. (VFIFX) | 18 bps | Target Date 2046–2050 | 450% |
| | | American Funds 2050 Target Date Retire R6 (RFITX) | 44 bps | | 125% |
| Putnam RetirementReady 2055 Y | 104 bps | Vanguard Target Retirement 2055 Fund Inv. (VFFVX) | 18 bps | Target Date 2051–2055 | 478% |
| | | American Funds 2055 Target Date Retire R6 (RFKTX) | 47 bps | | 121% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam RetirementReady 2020 Y (PRRNX) | 71 bps | Vanguard Target Retirement 2020 Fund Inv. (VTWNX)<br><br>American Funds 2020 Target Date Retire R6 (RRCTX) | 16 bps<br><br>37 bps | Target Date 2016–2020 | 344%<br><br>92% |
| Putnam RetirementReady 2035 Y (PRRYX) | 75 bps | Vanguard Target Retirement 2035 Fund Inv. (VTTHX)<br><br>American Funds 2035 Target Date Retire R6 (RFFTX) | 18 bps<br><br>42 bps | Target Date 2031–2035 | 317%<br><br>79% |
| Putnam RetirementReady 2025 Y (PRRPX) | 73 bps | Vanguard Target Retirement 2025 Fund Inv. (VTTVX)<br><br>American Funds 2025 Target Date Retire R6 (RFDTX) | 17 bps<br><br>40 bps | Target Date 2021–2025 | 329%<br><br>83% |
| Putnam RetirementReady 2015 (PRRLX) | 68 bps | Vanguard Target Retirement 2015 Fund Inv. (VTXVX)<br><br>American Funds 2015 Target Date Retire R6 (RFJTX) | 16 bps<br><br>36 bps | Target Date 2011–2015 | 325%<br><br>89% |
| Putnam Retirement Income Lifestyle 1 Y (PRMYX) | 70 bps | Vanguard Target Retirement Income Fund Inv. (VTINX)<br><br>JPMorgan SmartRetirement Income R6 (JSIYX) | 16 bps<br><br>47 bps | Retirement Income | 338%<br><br>49% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Retirement Income Lifestyle 2 Y (PRLYX) | 75 bps | Vanguard LifeStrategy Income (VASIX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 14 bps<br><br>18 bps | Conservative Allocation | 436%<br><br>317% |
| Putnam Retirement Income Lifestyle 3 Y (PIIYX) | 86 bps | Vanguard LifeStrategy Income (VASIX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 14 bps<br><br>18 bps | Conservative Allocation | 514%<br><br>378% |
| Putnam Small Cap Value R6 (PSCMX) | 104 bps | Vanguard Small Cap Value Index I (VSIIX)<br><br>DFA US Targeted Value I (DFFVX) | 8 bps<br><br>37 bps | Small-Cap Value | 1200%<br><br>181% |
| Putnam Diversified Income Trust R6 (PDVGX) | 64 bps | Vanguard Total Institutional Bond Idx Inst. (VTIFX)<br><br>PIMCO Income I (PIMIX) | 12 bps<br><br>45 bps | Multisector Bond | 433%<br><br>42% |
| Putnam Global Health Care Y (PHSYX) | 85 bps | Vanguard Health Care Index Adm (VHCIX)<br><br>Vanguard Health Care Adm (VGHAX) | 12 bps<br><br>29 bps | Health Care | 608%<br><br>193% |
| Putnam Global Natural Resources Y (PGRYX) | 93 bps | Vanguard Materials Index Adm (VMIAX)<br><br>T. Rowe Price New Era I (TRNEX) | 12 bps<br><br>56 bps | Natural Resources | 675%<br><br>66% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Global Utilities Y (PUTYX) | 94 bps | Vanguard Utilities Index Adm (VUIAX)<br><br>Franklin Utilities R6 (FUFRX) | 10 bps<br><br>48 bps | Utilities | 840%<br><br>96% |
| Putnam Global Telecommunications Y (PGBYX) | 101 bps | Vanguard Telecom Services Index Adm (VTCAX)<br><br>T. Rowe Price Media & Telecom (PRMTX) | 10 bps<br><br>80 bps | Communications | 910%<br><br>26% |
| Putnam Global Technology Y (PGTYX) | 101 bps | Vanguard Info Technology Index Adm (VITAX)<br><br>Ivy Science & Technology R6 (ISTNX) | 10 bps<br><br>82 bps | Technology | 910%<br><br>23% |
| Putnam Global Industrial Y (PGILX) | 102 bps | Vanguard Industrials Index Adm (VINAX)<br><br>Fidelity Select Industrials (FCYIX) | 10 bps<br><br>78 bps | Industrials | 920%<br><br>31% |
| Putnam Global Energy Y (PGEIX) | 102 bps | Vanguard Energy Index Adm (VENAX)<br><br>Vanguard Energy Adm (VGELX) | 10 bps<br><br>31 bps | Energy | 920%<br><br>229% |
| Putnam Global Consumer Y (PGCYX) | 101 bps | Vanguard Consumer Staples Index Adm (VCSAX)<br><br>Fidelity Select Consumer Staples (FDFAX) | 10 bps<br><br>77 bps | Consumer Defensive | 910%<br><br>31% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Global Financial Y (PGFYX) | 103 bps | Vanguard Financials Index Adm (VFIAX) | 10 bps | Financials | 930% |
|  |  | Davis Financial Y (DVFYX) | 70 bps |  | 47% |
| Putnam Global Sector Y (PPGYX) | 101 bps | BlackRock MSCI World Index K (BWIKX) | 14 bps | World Stock | 621% |
|  |  | DFA Global Equity I (DGEIX) | 31 bps |  | 226% |
| Putnam International Growth Y (PINYX) | 125 bps | American Funds Europacific Growth R6 (RERGX) | 49 bps | Foreign Large Growth | 155% |
| Putnam Dynamic Asset Allocation Balanced R6 (PAAEX) | 65 bps | Vanguard Balanced Index I (VBAIX) | 8 bps | Moderate Allocation / Balanced | 713% |
|  |  | Vanguard Wellington Adm (VWENX) | 18 bps |  | 261% |
| Putnam S&P 500 Index Fund M | 8 bps | Fidelity Spartan 500 Index Advtg (FXAIX) | 2 bps | Large Blend | 300% |
| Putnam Multi-Cap Value Y (PMVYX) | 82 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 9 bps | Mid-Cap Value | 811% |
|  |  | Vanguard Selected Value Inv (VASVX) | 39 bps |  | 110% |
| Putnam Capital Opportunities R6 (PCOEX) | 75 bps | Fidelity Spartan Small Cap Index Advtg I (FSSNX) | 5 bps | Small-Cap Blend | 1400% |
|  |  | DFA U.S. Small Cap I (DFSTX) | 37 bps |  | 103% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Global Equity R6 (PGLEX) | 86 bps | BlackRock MSCI World Index K (BWIKX)<br><br>DFA Global Equity I | 14 bps<br><br>31 bps | World Stock | 514%<br><br>177% |
| Putnam Small Cap Growth Y (PSYGX) | 96 bps | Vanguard Small Cap Growth Index I<br><br>Lord Abbett Developing Growth R6 (LADVX) | 8 bps<br><br>60 bps | Small-Cap Growth | 1100%<br><br>60% |
| Putnam High Yield Y (PHYYX) | 75 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | High-Yield Bond | 477% |
| Putnam High Yield Advantage Y (PHAYX) | 78 bps | BlackRock High Yield Bond K (BRHYX) | 52 bps | High-Yield Bond | 50% |
| Putnam Growth Opportunities R6 (PGOEX) | 69 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>American Funds Growth Fund of American R6 (RGAGX) | 6 bps<br><br>33 bps | Large Growth | 1050%<br><br>109% |
| George Putnam Balanced R6 (PGEJX) | 62 bps | Vanguard Balanced Index I (VBAIX)<br><br>Vanguard Wellington Adm (VWENX) | 8 bps<br><br>18 bps | Moderate Allocation / Balanced | 675%<br><br>244% |
| Putnam Convertible Securities Y (PCGYX) | 81 bps | Franklin Convertible Securities R6 | 51 bps | Convertibles | 59% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Absolute Return 700 R6 (PDMEX) | 92 bps | Vanguard Alternative Strategies Inv (VASFX) | 40 bps | Multi-Alternative Bond | 130% |
| Putnam Absolute Return 500 R6 (PJMEX) | 80 bps | Vanguard Alternative Strategies Inv (VASFX) | 40 bps | Multi-Alternative Bond | 100% |
| Putnam Absolute Return 300 R6 (PTREX) | 56 bps | JPMorgan Unconstrained Debt R6 (JSIMX) | 50 bps | Nontraditional Bond | 12% |
| Putnam Absolute Return 100 R6 (PRREX) | 40 bps | Vanguard Short-Term Bond Index I (VBITX)<br><br>DFA Short-Term Extended Quality I (DFEQX) | 7 bps<br><br>22 bps | Short-term Bond | 471%<br><br>82% |
| Putnam Income R6 (PINHX) | 51 bps | Fidelity Spartan US Bond Index Advtg Instl (FXNAX)<br><br>Metropolitan West Total Return Bond Plan Class (MWTSX) | 5 bps<br><br>39 bps | Intermediate-Term Bond | 920%<br><br>31% |
| Putnam Research Y (PURYX) | 89 bps | Fidelity Spartan 500 Index Advtg (FXAIX)<br><br>American Funds Fundamental Investors R6 (RFNGX) | 2 bps<br><br>31 bps | Large Blend | 4350%<br><br>187% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Europe Equity Y (PEUYX) | 116 bps | Vanguard European Stock Index I (VESIX)<br><br>Franklin Mutual European R6 (FMEUX) | 9 bps<br><br>89 bps | Europe Stock | 1189%<br><br>30% |
| Putnam US Government Income Y (PUSYX) | 62 bps | Vanguard Intermediate-Term Gov't Bond Index I (VIIGX)<br><br>DFA Intermediate Gov't Fixed Income I (DFIGX) | 7 bps<br><br>12 bps | Intermediate-Term Government | 686%<br><br>417% |
| Putnam Global Income R6 (PGGEX) | 75 bps | Vanguard Total Int'l Bond Index I (VTIFX)<br><br>Templeton Global Bond R6 (FBNRX) | 12 bps<br><br>51 bps | World Bond | 525%<br><br>47% |
| Putnam International Value R6 (PIGWX) | 91 bps | Schwab Fundamental Int'l Large Co. Index (SFNNX)<br><br>DFA International Core Equity I (DFIEX) | 35 bps<br><br>38 bps | Foreign Large Value | 160%<br><br>139% |
| Putnam Emerging Markets Equity Y (PEMYX) | 137 bps | Vanguard Emerging Markets Stock Index I (VEMIX)<br><br>American Funds New World R6 (RNWGX) | 12 bps<br><br>65 bps | Emerging Markets Equity | 1042%<br><br>111% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Dynamic Asset Allocation Conservative R6 (PCCEX) | 68 bps | Vanguard LifeStrategy Conservative Growth Inv (VSCGX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 15 bps<br><br><br>18 bps | Conservative Allocation | 353%<br><br><br>278% |
| Putnam Bond Index M | 13 bps | Fidelity Spartan US Bond Index Advtg Instl | 5 bps | Intermediate-Term Bond | 160% |
| Putnam Floating Rate Income Y (PFRYX) | 74 bps | RidgeWorth Seix Floating Rate High Income IS (SFRZX) | 47 bps | Bank Loan | 64% |
| Putnam Stable Value Fund | 16 bps | Fidelity Master Income Portfolio III | 10 bps | Stable Value | 60% |
| Putnam American Government Income R6 (PAMEX) | 54 bps | Vanguard Intermediate-Term Gov't Bond Index I (VIIGX)<br><br>DFA Intermediate Gov't Fixed Income I (DFIGX) | 7 bps<br><br><br>12 bps | Intermediate-Term Government Bond | 671%<br><br><br>325% |
| Putnam Dynamic Risk Allocation R6 (PDRGX) | 77 bps | Vanguard LifeStrategy Conservative Growth Inv (VSCGX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 15 bps<br><br><br>18 bps | Conservative Allocation | 413%<br><br><br>328% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Multi-Cap Core Y (PMYYX) | 90 bps | Fidelity Spartan 500 Index Advtg (FXAIX) | 2 bps | Large Blend | 4400% |
| | | American Funds Fundamental Investors R6 (RFNGX) | 31 bps | | 190% |
| Putnam Asia Pacific Equity Y (PAPYX) | 130 bps | Vanguard Pacific Stock Index I (VPKIX) | 9 bps | Asia/Pacific Equity | 1344% |
| | | T. Rowe Price New Asia I (PNSIX) | 82 bps | | 59% |
| Putnam Short Duration Income R6 (PSDQX) | 30 bps | SEI Inst'l Ultra Short Term Bond (SUSAX) | 12 bps | Ultrashort-term bond | 150% |
| Putnam Low Volatility Equity Y (PLVKX) | 96 bps | Fidelity Spartan 500 Index Advtg (FXAIX) | 2 bps | Large Blend | 4700% |
| | | American Funds Fundamental Investors R6 (RFNGX) | 31 bps | | 210% |
| Putnam Strategic Volatility Equity Y (PSVYX) | 102 bps | Fidelity Spartan 500 Index Advtg (FXAIX) | 2 bps | Large Blend | 5000% |
| | | American Funds Fundamental Investors R6 (RFNGX) | 31 bps | | 229% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[11] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Putnam Emerging Markets Income Y (PEMOX) | 100 bps | Vanguard Emerging Markets Government Bond Index Adm (VGAVX)  GMO Emerging Country Debt III (GMCDX) | 34 bps  56 bps | Emerging Markets Bond | 194%  79% |

73.     Despite the high cost of the proprietary investments within the Plan, Defendants failed to consider removing the high-cost proprietary mutual funds from the Plan in favor of lower-cost non-proprietary investments (*i.e.*, investment products not affiliated with Putnam) because this would have reduced the revenue received by the Putnam Companies.  This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

74.     Had Defendants prudently monitored the investments within the Plan to ensure that such investments did not have excessive fees, in a process that was not tainted by self-interest, Defendants would have removed the Plan's investments in favor of investments such as the funds listed above that offered similar or superior performance at significantly less expense.

75.     Given the excessive fees charged by Putnam's mutual funds and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to the Putnam Companies for their services to the Plan was unreasonably high.

76.     Defendants also failed to procure and maintain the lowest-cost share class of certain mutual funds in the Plan.  By way of background, most mutual funds offer multiple classes of shares that are targeted at different investors.  Generally, more expensive share classes

are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets (generally $1 million or more) and therefore greater bargaining power. There is no difference between share classes other than the costs. Thus, utilizing the cheapest share class provides an identical—but less expensive—version of the same investment, including the identical manager and an identical mix of investments within each fund. Given the Plan's size, it had sufficient bargaining power to obtain the lowest cost share class available, but the Plan failed to do so in several cases. For example:

a.    In early 2012, the least expensive share class offered by Putnam was Y shares, and every fund within the Plan was held in Y shares. On July 2, 2012, in twenty-two of Putnam's funds, Putnam introduced a new, less expensive share class called R6 shares, available exclusively within retirement plans. R6 shares were between 14 and 17 basis points less expensive than Y shares. Despite the availability of R6 shares on July 2, 2012, the Plan did not transfer out of Y shares into R6 shares in these 22 funds until March 31, 2013, almost 10 months after they were first offered.[12]

b.    Since 2009 or before, the Plan has offered two collective trust investments: the Putnam S&P 500 Index Fund and the Putnam Bond Index. Both funds offer three classes of shares: A Shares, Y Shares, and M Shares. M Shares are by far the least expensive class of shares. For example, the annual cost of A, Y, and M

---

[12] This ten-month lag in moving to R6 shares compares unfavorably to the time it took Putnam to make changes to the Plan that helped its bottom line. Between March 18th and March 27th of 2013, Putnam introduced five new mutual funds. By March 31, 2013, just days later, all five funds were available for purchase within the Plan, and an announcement regarding the new funds was put in every participant's quarterly account statement.

Shares of the S&P 500 Index Fund are 35 bps, 25 bps, and 8 bps, respectively. Similarly, M shares of the Bond Index Fund are approximately three times less expensive than Y Shares. Despite the availability of M Shares, until the first quarter of 2013, the Plan only offered participants the Y shares of the two funds.

77.     The Plan's failure to switch to R6 shares was particularly beneficial to Putnam Services. In connection with Y shares, Putnam Services charges investors an annual fee of 32 basis points for performing investor servicing agent functions. *See, e.g.*, Putnam Emerging Markets Income Fund Annual Report at 36 (May 31, 2015), *available at* http://www.sec.gov/Archives/edgar/data/1005942/000092881615000985/a_emergingmarkets.htm. Putnam Services performs the exact same functions for holders of R6 shares, but charges an annual fee of only five basis points, less than one-sixth the amount charged to holders of Y shares for the exact same services. *See, e.g.*, Putnam Fund for Growth & Income Annual Report at 46 (October 31, 2015), *available at* http://www.sec.gov/Archives/edgar/data/81260/000092881615001812/a_fndgroinc.htm.

78.     A prudent fiduciary would have transferred the Y-share mutual funds to R6 shares as soon as the R6 shares became available. Similarly, a prudent fiduciary conducting an impartial review of the Plan between 2009 and 2013 would have transferred the Plan's two collective trust investments from Y shares to M shares.

## III.   DEFENDANTS FAILED TO ADEQUATELY MONITOR PLAN INVESTMENTS AND REMOVE POORLY PERFORMING INVESTMENTS

79.     According to the Plan Document, the Plan's designated investment alternatives must include "[a]ll Putnam publicly offered, open-end, non-tax-exempt mutual funds." Ex. B at 8; *see also* Ex. A § 8.1. However, this "hard-wiring" of the Plan's investment options is subject

to the duties imposed on fiduciaries by ERISA. *See supra* at ¶ 38 (citing 29 U.S.C. § 1104(a)(1)(D); *Dudenhoeffer*, 143 S. Ct. at 2468).

80.     Defendants failed to monitor the Plan's investments, and failed to remove numerous funds that had become imprudent, in violation of their fiduciary duties under ERISA. This cost Plan participants millions of dollars due to these funds' underperformance compared with prudent investment alternatives. Though numerous funds within the Plan were imprudent and should have been removed from the Plan, the following examples highlight Defendants' failure to remove imprudent investments from the Plan.

### DEFENDANTS FAILED TO REMOVE THE PUTNAM VOYAGER FUND FROM THE PLAN

81.     By 2008, the Putnam Voyager Fund had amassed an abysmal track record. As the Boston Globe wrote in February of 2008, Putnam Voyager was the 176th-ranked large company growth mutual fund out of 188 funds over the previous five years, causing Putnam Voyager to fire its two managers. Steven Syre, *Problems, Problems*, BOSTON GLOBE (Feb. 14, 2008).[13]

82.     Putnam Voyager hired Nick Thakore to replace the two prior managers. Thakore was previously in charge of the American Express Growth Fund (a/k/a Riversource Growth Fund), which underperformed its benchmark index by a significant margin during Thakore's management tenure from 2002 to 2008. Based on Putnam Voyager's long track record of poor performance and the poor track record of its manager, it would have been prudent for Defendants to remove Putnam Voyager from the Plan in late 2009.

---

[13] Available at
http://www.boston.com/business/personalfinance/articles/2008/02/14/problems_problems/?page=full.

83.     At the very least, the need to remove Putnam Voyager from the Plan should have become readily apparent to Defendants in 2011, when the fund under-performed its benchmark index by 20%.   As of January 2012, Putnam Voyager had not only underperformed its benchmark index in 2011, it had trailed its benchmark over the prior 3- and 5-year periods.   A prudent fiduciary monitoring the Plan's investments in a process not tainted by self-interest would have removed the Putnam Voyager fund from the fund at that time.

84.     Similarly, as of January 2013, Putnam Voyager had significantly under-performed its benchmark index over the prior 1-, 3-, 5-, and 10-year periods by a significant margin.   Again, a prudent fiduciary reviewing the Plan at this time would have removed the Putnam Voyager fund.   But Defendants retained the Putnam Voyager fund, and continue to retain this fund in the Plan.

85.     Defendants' failure to remove Putnam Voyager from the Plan has been costly for Plan participants.   As of the end of 2009, the Plan had approximately $22.3 million invested in Putnam Voyager.   Had Defendants replaced Putnam Voyager at the end of 2009 with a comparable index fund such as the Vanguard Growth Index Fund, Plan participants would have accumulated at least $9.7 million in additional retirement benefits as of October 31, 2015.

### DEFENDANTS FAILED TO REMOVE THE PUTNAM FUND FOR GROWTH & INCOME FROM THE PLAN

86.     By 2008, the Putnam Fund for Growth & Income had amassed a terrible track record.   As the Boston Globe wrote in February of 2008, the Putnam Fund for Growth & Income was the 112th-ranked large company value mutual fund out of 118 such funds over the previous five years, causing the Fund to replace its manager.   BOSTON GLOBE, *Problems, Problems*, *supra* ¶ 81.

87.     Putnam hired Robert Ewing to run the fund.  Ewing was previously in charge of the American Express Large Cap Value Fund (a/k/a Riversource Large Cap Value), which had underperformed its benchmark index for five consecutive calendar years when Ewing was hired by Putnam.  Based on the Putnam Fund for Growth & Income's long track record of poor performance and the poor track record of its new manager, it would have been prudent for Defendants to remove the Putnam Fund for Growth & Income from the Plan in late 2009.

88.     The need to remove the Putnam Fund for Growth & Income should have become readily apparent by 2010.  As of April 30, 2010, the fund had under-performed its benchmark index by over two percent per year over the past ten years, and had underperformed its benchmark index over the trailing 1-, 3-, 5-, and 10-year periods.  A prudent fiduciary reviewing the Plan's investments in early 2010 in a process not tainted by self-interest would have removed the Putnam Fund for Growth & Income from the Plan.

89.     Defendants' failure to remove the Putnam Fund for Growth & Income from the Plan has been costly for Plan participants.  As of the end of 2009, the Plan had approximately $15.9 million invested in the Putnam Fund for Growth & Income.  Had the Plan removed the imprudent Putnam Fund for Growth & Income from the Plan at the end of 2009, and replaced it with a comparable index fund such as the Vanguard Value Index Fund, Plan participants would have accumulated at least $1.5 million in additional retirement benefits as of October 31, 2015.

### INCLUSION OF UNTESTED MUTUAL FUNDS WITHIN THE PLAN

90.     Mutual fund companies frequently launch new funds.  Often times these funds are needed to replace funds that have been closed or merged with other funds.  New funds also play a critical role in responding to a rapidly-changing and constantly-evolving investment marketplace.

91.     Introducing new mutual funds imposes a large burden on a mutual fund company. There are significant start-up costs.  Additionally, many of the expenses of running a mutual fund such as staff, marketing, and research are fixed overhead, and therefore account for a large percentage of a mutual fund's assets when the fund is new and still small.  Therefore, new mutual funds typically operate at a loss (to the fund company) until they have attracted sufficient assets to achieve adequate economies of scale.

92.     This presents three powerful incentives to attract assets to a newer fund.  First, additional assets help lower the fund's expenses as a percentage of total assets, allowing the fund to lower its expenses and thereby attract new investors.  Second, when a new fund attracts sufficient new assets, the mutual fund company no longer has to operate the fund at a loss. Finally, mutual funds require assets to manage.  Prudent investors, however, are typically wary of investing in new funds.  Therefore, attracting investors early in a fund's life is a difficult but critical task to the survival of the fund, since new funds that fail to attract sufficient assets are often closed.  *See* Todd Schlanger & Christopher B. Philips, *The Mutual Fund Graveyard: An Analysis of Dead Funds*, Vanguard Funds, at 4, 4 n.5, 7 (Jan. 2013), https://personal.vanguard.com/pdf/s362.pdf.

93.     New funds are generally imprudent investment options for a retirement plan for two reasons.  *First*, there is no track record of success that might justify inclusion within the plan.  *Second*, new funds are typically quite expensive.

94.     Defendants have improperly used the Plan as a vehicle for providing seed money for Putnam's newest funds, and have a pattern of including mutual funds in the Plan immediately after they are launched.

95.     For example, in December 2008, Putnam launched six sector funds.  Sector funds invest in a specific industry such as energy stocks or telecommunications stocks.  Sector funds are generally inappropriate holdings for a retirement plan because they are not well-diversified and are quite volatile.  Despite this fact, all six sector funds were added to the Plan immediately after they were launched.  These funds all have high costs, in excess of 1% per year, and have generally underperformed their benchmark indexes since inception.  For example, the Putnam Global Financial Fund, which Plaintiff Brotherston owned during the statutory period, has ranked in the bottom fifteen percent of its peer group over the past five years and has under-performed its benchmark index by approximately six percent per year over the past three- and five-year periods.

96.     Had Defendants monitored the Plan's investments in a prudent manner in a process not tainted by self-interest, they would have removed the sector funds from the Plan in late 2009 given their high costs, poor performance, and the inappropriateness of including sector funds within a defined-contribution plan.

97.     In March of 2013, Putnam launched five new funds.  Within days after they were launched, all five funds were added to the Plan.  These funds have high costs, and have generally underperformed their benchmark indices.

98.     Had Defendants selected and monitored the Plan's portfolio of investments in a prudent manner as part of a process that was not tainted by self-interest, they would not have included these new funds in the Plan, or would have removed them as part of a regular review of the Plan's portfolio at the earliest opportunity.

**IV.  DEFENDANTS HAVE ANNOUNCED SIGNIFICANT CHANGES TO THE PLAN IN RESPONSE TO THIS ACTION, BUT IN SO DOING, HAVE ABANDONED THEIR FIDUCIARY DUTY TO MONITOR THE PROPRIETARY INVESTMENTS WITHIN THE PLAN**

99.    In December 2015, two months after the initial filing of this action, Putnam sent a memorandum to Plan participants announcing several changes to the Plan effective February 1, 2016.  Retirement Plan Update (Dec. 2015), attached as **Exhibit E**.

100.    For the first time in the history of the Plan, effective February 1, 2016, six non-proprietary investment options will be added to the Plan.  Ex. E at 1.  The six investments are index funds offered by BNY Mellon that closely resemble investments that Plaintiffs have identified as prudent alternatives to Putnam's mutual funds.  *Compare* Ex. E at 1 (adding a "Bond Index Fund", "International Stock Index Fund", "Large Cap Growth Index Fund", "Large Cap Stock Index Fund", "Large Cap Value Index Fund", and "Small Cap Stock Index Fund" to the Plan) *with* Original Complaint, ECF No. 1 at ¶ 68 (suggesting that Defendants should have used large-cap growth, large-cap value, large-cap, small-cap, international-equity, and bond index funds as alternatives to the Plan's investments).

101.    Although the recently-announced changes to the Plan highlight the deficiencies in the existing Plan, they are a half measure at best.  There is no indication that any of the imprudent Putnam funds will be removed from the Plan or that any of the Plan's assets will be moved out of those proprietary Putnam funds.  This is insufficient as a matter of law.  As this Court has noted, "*each* available fund" must be prudent, and "a fiduciary cannot free himself from his duty to act as a prudent man [and remove imprudent funds] simply by arguing that other funds" are available within a plan.  *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass.) (Young, J.) (emphasis in original) (citing *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 418 (4th Cir.2007)).

102.   Further demonstrating the inadequacy of these changes, the December 2015 memorandum announced that the Plan's Putnam funds would now be accessible through a "Putnam Funds Window", and that participants would be "solely responsible for the selection and ongoing monitoring of any investments utilized in the [Putnam Funds] Window." Ex. E at 2. By making Plan participants solely responsible for monitoring Plan investments and removing assets from imprudent investments, Putnam and the other fiduciaries of the Plan have abandoned their fiduciary duty to monitor Plan investments and remove imprudent investments from the Plan.

103.   Moreover, Defendants have done nothing to remedy the damage that already has been done to the Plan, and have not offered to restore any monies to the Plan or provide any financial relief to the participants and beneficiaries of the Plan.

104.   Plaintiffs did not have actual knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, information regarding the availability of other classes of shares, and the other information set forth above) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  For purposes of their Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

105.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to

bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by

29 U.S.C. § 1109(a).  Plaintiffs seek certification of this action as a class action pursuant to this

statutory provision and Fed. R. Civ. P. 23.

106.    Plaintiffs John Brotherston and Joan Glancy assert their claims in Counts I–V on

behalf of a class of participants and beneficiaries of the Plan defined as follows:[14]

> All participants and beneficiaries of the Putnam Retirement Plan at any
> time on or after November 13, 2009, excluding Defendants, employees
> with responsibility for the Plan's investment or administrative functions,
> and members of the Putnam Investments, LLC Board of Directors.

107.    <u>Numerosity</u>:    The Classes are so numerous that joinder of all Class members is

impracticable.  The Plan has had approximately 3,300 to 6,700 participants during the applicable

period.

108.    <u>Typicality</u>:    Plaintiffs' claims are typical of the Class members' claims.  Like

other Class members, Plaintiffs are current or former participants in the Plan who have suffered

injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs

consistently with other Class members with regard to the Plan.  Defendants managed the Plan as

a single entity, and therefore Defendants' imprudent decisions affected all Plan participants

similarly.

109.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the

Class.  Plaintiffs' interests are aligned with the Class that they seek to represent, and they have

---

[14] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion
for class certification or subsequent pleadings in this action.

retained counsel experienced in complex class action litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

110.  <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

     a.  Whether Defendants are fiduciaries of the Plan;

     b.  Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

     c.  Whether Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1104.

     d.  Whether Putnam and Reynolds breached their duty to monitor other Plan fiduciaries;

     e.  The proper form of equitable and injunctive relief;

     f.  The proper measure of monetary relief.

111.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

112.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan

fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

113. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

114. Defendants Putnam, Putnam Management, PBAC, PBIC, Reynolds, and Neary are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

115. 29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

116.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA.    Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.    This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]"    *Tibble*, 135 S. Ct. at 1829.

117.    As described throughout the Complaint, Defendants selected and retained investments with expense ratios far in excess of other options available to the Plan.    Defendants also failed to implement a process to monitor the Plan's proprietary mutual funds, to ensure that they remained prudent investments for the Plan.    Additionally, Defendants retained investments that were imprudent because of poor performance history, unqualified investment managers, or a total lack of performance history.    In doing so, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants, and instead made investment decisions that would drive revenues and profits to the Putnam Companies.    Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

118.    Defendants failed to implement a process to monitor the investments within the Plan and remove those investments that had become imprudent.  Defendants selected and retained high-cost proprietary mutual funds, when at all relevant times, much less expensive options of similar or superior quality were available to the Plan.  Defendants also neglected to remove poorly-performing funds from the Plan and failed to consider better-performing alternatives that were readily available to the Plan.  In so doing, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

119.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

120.    Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge their own duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Prohibited Transactions with Party in Interest**
**29 U.S.C. § 1106(a)(1)**

121.     As Plan employers and/or fiduciaries, the Putnam Companies are parties in interest under 29 U.S.C. §§ 1002(14).

122.     As described throughout the Complaint, Defendants caused the Plan to exclusively utilize high-cost investments managed and otherwise serviced by the Putnam Companies that generated revenue for the Putnam Companies. On a monthly and quarterly basis throughout the statutory period, the Putnam Companies performed various services for the Plan and were paid unreasonably high fees and expenses from the assets being held for the Plan. Accordingly, these transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a direct or indirect transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1).

123.     Based on the foregoing facts and the other facts set forth in this Complaint, Putnam, the PBAC, the PBIC, Reynolds, and Neary knowingly caused the Plan to engage in prohibited transactions with the Putnam Companies, who are all parties in interest, in violation of 29 U.S.C. § 1106(a)(1).

124.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management fees and other expenses in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

125.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and

disgorge all revenues received and/or earned by the Putnam Companies in connection with the services they performed for the Plan for more than reasonable compensation.

## COUNT III
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)

126.    As described throughout the Complaint, Putnam and Putnam Management are fiduciaries of the Plan as that term is used in 29 U.S.C. §§ 1002(21) and 1106(b)(1).

127.    Putnam and Putnam Management dealt with the assets of the Plan in their own interest and for their own accounts when they caused the Plan to pay investment management fees and expenses to Putnam and Putnam Management out of Plan assets, in violation of 29 U.S.C. § 1106(b)(1).

128.    Putnam and Putnam Management received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan.  These transactions took place on a monthly and quarterly basis when fees and expenses were deducted from assets being held for Plan participants in exchange for services performed by Putnam Management and by Putnam.  Accordingly, payments to Putnam and to Putnam Management constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

129.    Based on the foregoing facts and the other facts set forth in this Complaint, Putnam, the PBAC, the PBIC, Reynolds, and Neary knowingly caused the Plan to engage in prohibited transactions with Putnam and Putnam Management, both fiduciaries of the Plan, in violation of 29 U.S.C. § 1106(b).

130.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees to

Putnam and Putnam Management, in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

131.     Pursuant to 29 U.S.C. §§ 1109(a),1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by Putnam and Putnam Management resulting directly or indirectly from the above-mentioned prohibited transactions.   Plaintiffs also are entitled to appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

**COUNT IV**
**Failure to Monitor Fiduciaries**

132.     As alleged throughout the Complaint, Putnam and Reynolds (among others) are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

133.     Putnam and Reynolds are responsible for appointing and removing members of the PBAC and PBIC, appointing and removing trustees, and for appointing and removing the Plan's recordkeeper.

134.     Given that Putnam and Reynolds had overall oversight responsibility for the Plan, and the explicit fiduciary duty to appoint and remove members of the PBAC and PBIC, Putnam and Reynolds had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the PBAC and the PBIC.

135.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

136.    To the extent that Putnam or Reynolds' fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

137.    Putnam and Reynolds breached their fiduciary monitoring duties by, among other things:

  a.   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

  b.   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in clear violation of ERISA;

  c.   Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

138.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Putnam and Reynolds discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan, the named Plaintiffs, and other Class members lost millions of dollars of retirement savings.

139.    Putnam and Reynolds are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.   Each such Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus Putnam and Reynolds are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

### COUNT V
**Other Equitable Relief Based on Ill-Gotten Proceeds**
**29 U.S.C. § 1132(a)(3)**

140.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA.  A defendant may be liable under that section regardless of whether it is a fiduciary.  A non-fiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

141.    Pursuant to 29 U.S.C. § 1132(a)(3), the Putnam Companies should be required to disgorge all Plan assets they have received as revenues/profits as a result of their self-dealing. These assets should be restored to the Plan under principles of equitable restitution.  Plaintiffs also seek any other equitable relief the Court deems appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets in Putnam mutual funds to prudent alternative investments; removal of Plan fiduciaries deemed to have breached

their fiduciary duties and/or engaged in prohibited transactions; and imposition of a constructive trust as necessary for administration of some or all of the aforementioned remedies.

142.    The Putnam Companies knew or should have known that the use of Putnam proprietary mutual funds and services in the Plan allowed the Putnam Companies to benefit financially through the excessive fees paid by the Plan and at the expense of the Plan's participants.  The Putnam Companies also knew or should have known that the act or practice of using proprietary Putnam funds and services in the Plan and accepting periodic compensation in connection with the management and servicing of those funds constituted a prohibited transaction with a party-in-interest under 29 U.S.C. § 1106(a)(1) and a prohibited transaction with a fiduciary under 29 U.S.C. § 1106(b).

143.    Accordingly, each of these Defendants participated in the fiduciary breaches described throughout the Complaint, participated in the prohibited transactions described above, and knowingly received excessive fees paid from Plan assets.

144.    Therefore, to the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to restore these monies to the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Brotherston and Glancy, individually and as representatives of the Class defined herein, and on behalf of the Putnam Retirement Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A declaration that Defendants have breached their fiduciary duties under ERISA;

D.      A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

E.      A declaration that Defendants Putnam and Reynolds breached their fiduciary duty to monitor the PBAC and its members as well as the PBIC and its members;

F.      An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

G.      An order requiring the Putnam Companies to disgorge all revenues received from, or in respect of, the Plan;

H.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

I.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

K.      An award of pre-judgment interest;

L.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

M.      An award of such other and further relief as the Court deems equitable and just.

Dated: January 19, 2016

**NICHOLS KASTER, PLLP**

By: /s/ Kai H. Richter

Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
  *admitted *pro hac vice*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com

**BLOCK & LEVITON LLP**
Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
Bradley J. Vettraino (BBO #691834)
155 Federal Street, Ste. 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jason@blockesq.com
bradley@blockesq.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2016, a true and correct copy of the foregoing FIRST AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Kai H. Richter