## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John Brotherston and Joan Glancy, individually and as representatives of a class of similarly situated persons, and on behalf of the Putnam Retirement Plan,<br><br>                    Plaintiffs,<br><br>v.<br><br>Putnam Investments, LLC, Putnam Investment Management, LLC, Putnam Investor Services, Inc., the Putnam Benefits Investment Committee, the Putnam Benefits Oversight Committee, and Robert Reynolds,<br><br>                    Defendants. | Case No. 1:15-cv-13825-WGY<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR MODIFICATION OF CLASS CERTIFICATION ORDER** |

## TABLE OF CONTENTS

**PART ONE** ...............................................................................................................1

INTRODUCTION ........................................................................................................1

MATERIAL FACTS ....................................................................................................2

ARGUMENT ...............................................................................................................3

   I.   Standard of Review..........................................................................................3

   II.   Plaintiffs are Entitled to Partial Summary Judgment on Defendants' Twenty-First

       Affirmative Defense ..............................................................................................3

        A. Defendants Cannot Assert a Release Defense as to Absent Class Members for

           Whom They Have Not Produced Releases .........................................................3

        B. Defendants Cannot Assert this Defense as to Ms. Glancy or as to Mr. Brotherston

           After the Date He Signed His Release Agreement ...........................................5

   III.   THE COURT SHOULD AMEND ITS CLASS CERTIFICATION ORDER TO DISREGARD OR

       MODIFY THE SUBCLASSES ....................................................................................7

CONCLUSION ............................................................................................................8

**PART TWO** ..............................................................................................................8

INTRODUCTION ........................................................................................................8

MATERIAL FACTS ....................................................................................................9

ARGUMENT .............................................................................................................12

   I.   Standard of Review........................................................................................12

   II.   Plaintiffs are Entitled to Summary Judgment on Counts II and III ...................12

        A. Plaintiffs are Entitled to Summary Judgment as to Liability on Count II Because

           the Plan's Fiduciaries Caused the Plan to Engage in Prohibited Transactions with

           Parties in Interest ...........................................................................................13

B.  Plaintiffs are Entitled to Summary Judgment as to Liability on County III Because Putnam Engaged in Prohibited Self-Dealing ........................................................14

    1.  Putnam is a Fiduciary of the Plan ..................................................................15

    2.  Putnam Violated Section 1106(b)...................................................................16

C.  No Prohibited Transaction Exemption Applies .................................................17

    1.  Defendants Bear the Burden of Proof on Exemption Defenses.......................17

    2.  Defendants Have Failed to Raise a Genuine Issue of Material Fact Regarding PTE 77-3 ........................................................................................................18

    3.  Defendants Have Waived Right to Raise Other Prohibited Transaction Exemptions ....................................................................................................18

CONCLUSION ...........................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310 (4th Cir. 2001) ............................................ 6

*Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184 (D. Mass. 2015) ........................ 3, 4, 5

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009).................................................. 17

*Carpenters Local Union No. 26 v. U.S. Fidelity and Guar. Co.*, 215 F.3d 136 (1st Cir. 2000)... 19

*Cf. Nelson v. UBS Asset Mgmt. (Americas), Inc.*, 2005 WL 327034
    (N.D. Ill. Feb. 9, 2005) ........................................................................................................ 19

*Chao v. Graf*, 2002 WL 1611122 (D. Nev. Feb. 1, 2002) ........................................................... 13

*Conjugal P'ship  v. Conjugal P'ship*, 22 F.3d 391 (1st Cir. 1994) ............................................ 18

*Cutaiar v. Marshall*, 590 F.2d 523 (3d Cir. 1979)...................................................................... 15

*Elmore v. Cone Mills Corp.*, 23 F.4d 855 (4th Cir. 1994) .......................................................... 17

*Evicci v. Baker*, 190 F. Supp. 2d 233 (D. Mass. 2002) ................................................................ 3

*Facey v. Dickhaut*, 91 F. Supp. 3d 12 (D. Mass. 2014) ............................................................... 5

*Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State Street Bank & Trust Co.*,
    290 F.R.D. 11 (D. Mass. 2013)............................................................................................ 17

*Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156 (D. Conn. 2006)................................ 17

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000)......................... 12

*HipSaver Co. v. JT Posey Co.*, 497 F. Supp. 2d 96 (D. Mass 2007) ............................................. 5

*Hofstetter v. Chase Home Finance, LLC*, 2011 WL 1225900 (N.D. Cal. March 31, 2011) ......... 7

*Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996)......................................................................... 17

*In re Enron Corp.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) .......................................................... 15

*In re Northrop Grumman Corp. ERISA Litigation*, 2015 WL 10433713
    (C.D. Cal. Nov. 24, 2015).................................................................................................... 14

*Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132 (D. Mass. 2004) .................................. 15

*Klonoski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998) ........................................................ 4

*Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825 (D. Minn. Nov. 20, 2012)........................ 18

*LaPlante v. Mass. Dept. of Corr.*, 89 F. Supp. 3d. 235 (D. Mass. 2015) ........................ 3

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) ........................................................ 15

*Leimkuehler v. Amer. Utd. Life Ins. Co.*, 752 F. Supp. 2d 974 (S.D. Ind. 2010)........................ 17

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F2d 1209 (2d Cir. 1987) ............................ 14-15, 16, 17

*Moore v. Comcast Corp.*, 268 F.R.D. 530 (E.D. Pa. 2010) ........................................ 6, 7

*Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945 (C.D. Cal. 2016) ............................ 16

*Reighard v. Limbach Co.*, 158 F. Supp. 2d 730 (E.D. Va. 2001) ................................ 7

*Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009) ........ 7

*Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675 (6th Cir. 2013) .. 6

*Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3d Cir. 1981) ........................................ 15

*Sullivan v. AT&T, Inc.*, 2010 WL 905567 (N.D. Tex. Mar. 12, 2010) ............................ 7

*Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).................................................... 14

*Tussey v. ABB*, 746 F.3d 327 (8th Cir. 2014) .................................................... 16

*Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588 (1st Cir. 1995) ............................ 18

*Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288 (10th Cir.1991) .................................... 7

## Rules, Statutes, and Regulations

Fed. R. Civ. P. 23(c) ..........................................................................7

Fed. R. Civ. P. 23(c)(1)(C) ..................................................................7

Fed. R. Civ. P. 26(a) ..........................................................................4

Fed. R. Civ. P. 26(e) ..........................................................................4

Fed. R. Civ. P. 37(c)(1) ......................................................................4

Fed. R. Civ. P. 56(a) ..........................................................................3

29 U.S.C. § 1102 ........................................................................................... 13, 16

29 U.S.C. § 1106 ............................................................................................... *passim*

29 U.S.C. § 1108 ........................................................................................... 17, 19

29 U.S.C. § 1110 ................................................................................................... 6

42 Fed. Reg. 18743 (April 8, 1977) ................................................................. 18

## **Other Authorities**

Fed. R. Civ. P. 37 Advisory Cmte. Note (1993) ............................................ 4

Hess, Bogert, & Bogert, LAW OF TRUSTS AND TRUSTEES § 684, pp. 145–146 (3d ed. 2009) ...... 14

Plaintiffs respectfully submit this Memorandum of Law in Support of their Motion for Partial Summary Judgment and for Modification of Class Certification Order. Part I of this Memorandum is directed to Plaintiffs' summary judgment motion as it relates to Defendants' Twenty-First Affirmative Defense (release of claims), and to Plaintiffs' request for modification of the Court's Order granting class certification. Part II is directed to the summary judgment motion as it relates to Plaintiffs' prohibited transaction claims in Counts 2 and 3, and Defendants' fifth affirmative defense asserting a prohibited transaction exemption.

## PART ONE

### INTRODUCTION

In their Answer, Defendants have asserted that "[t]his action is barred, in whole or in part, by the doctrine of release and/or to the extent that any claims are subject to a covenant not to sue." *Answer to Second Amended Complaint ("Answer"), ECF No. 83, at Affirmative Defense No. 21.* However, Defendants cannot support this defense as to any absent class members because they have not produced any releases for any absent class members, and the discovery period has closed. Further, although Defendants produced Severance and Release Agreements for the named Plaintiffs, each of those Release Agreements states that "[t]his Agreement is not intended to and does not affect any rights or claims you may have arising after the date this Agreement is executed by you." *ECF No. 80-19 at ¶ 6(b); Richter Decl., Ex. A at ¶ 6(b).* It is obvious from this language that Ms. Glancy's release has no application to the claims in this case because her release was signed before the start of the class period, and Mr. Brotherston's release only applies at most for a few weeks of the putative class period. Presumably for this reason, Defendants did not reference Ms. Glancy's release in their opposition to Plaintiffs' Motion for Class Certification, and with respect to Mr. Brotherston, Defendants merely asserted that

"Brotherston has released some but not all claims that arose during the putative class period."

*ECF No. 78 at 15.* Accordingly, this Court should grant summary judgment on Defendants'

Twenty-First Affirmative Defense with respect to the claims of Plaintiff Glancy and the absent

class members, and with respect to Mr. Brotherston's claims after the date he signed his release.

In addition, Plaintiffs respectfully request that the Court modify its existing class certification

order to disregard the current subclasses, or alternatively, certify subclasses consisting of class

members who signed releases after the start of the class period and those who did not.

## MATERIAL FACTS

Defendants have asserted that "[t]his action is barred, in whole or in part, by the doctrine

of release and/or to the extent that any claims are subject to a covenant not to sue." *Pls'*

*Statement of Undisputed Material Facts ("SOF"), ¶ 2.* In support of this defense, Defendants

have produced a Severance and Release Agreement ("Release") for Plaintiff John Brotherston.

*Id., ¶ 3.* Mr. Brotherston signed this Release on January 1, 2010, shortly after the start of the

class period (which begins on November 13, 2009). *Id., ¶¶ 1, 3.* Defendants also have produced

a Release for Plaintiff Joan Glancy. *Id., ¶ 4.* This Release was signed by Ms. Glancy on April

30, 2008, over a year **before** the start of the class period. *Id.* Both Mr. Brotherston's Release and

Ms. Glancy's Release state that "this Agreement is not intended to and does not affect any rights

or claims you may have arising after the date this Agreement is executed by you." *Id., ¶ 5.*[1]

On March 16, 2016, Plaintiffs served their first set of Requests for Production of

Documents on Defendants. *Id., ¶ 6.* Among other things, Plaintiffs requested that Defendants

produce "All Documents reflecting releases of claims by putative class members that You intend

to use to support Your defense in this litigation." *Id.* In response to this request for production,

---

[1] The Releases further state they apply with respect to claims "existing, accruing, arising, or occurring at any time on or prior to the date you execute this Agreement." *Id.*

Defendants stated: "Defendants will produce any 'releases of claims by putative class members' that it [sic] intends to use in defense of this action to the extent that such documents exist and can be located after a reasonably diligent search for such documents." *Id., ¶ 7*. As of the date of this Motion for Summary Judgment, Defendants have not produced releases for any class members other than Mr. Brotherston or Ms. Glancy. *Id., ¶ 8*. Defendants also did not reference any release agreements of any class members in their Rule 26(a) initial disclosures. *Id., ¶ 9*. The fact discovery period in this action closed on October 28, 2016. *Id., ¶ 10*.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *LaPlante v. Mass. Dept. of Corr.*, 89 F. Supp. 3d. 235, 241 (D. Mass. 2015) (Young, J.) (quoting Fed. R. Civ. P. 56(a)). The moving party bears the burden of proving the absence of a genuine dispute over a material fact. *Id.* at 241 (citation omitted). If the moving party satisfies this burden, then "the nonmovant can only survive summary judgment by proffering evidence supporting the existence of a genuine issue of material fact to be resolved at trial." *Evicci v. Baker*, 190 F. Supp. 2d 233, 237 (D. Mass. 2002) (Young, J.) (citation omitted).

### II.   PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' TWENTY-FIRST AFFIRMATIVE DEFENSE

#### A.   Defendants Cannot Assert a Release Defense as to Absent Class Members for Whom They Have Not Produced Releases

It is axiomatic that Defendants cannot assert a release defense as to the absent class members where Defendants have failed to produce evidence of releases for those class members during the discovery period. "Rule 37 contemplates strict adherence to the discovery requirements." *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 199 (D. Mass. 2015).

Under this Rule, "if a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This is an "automatic sanction" that is specifically intended to apply on motions for summary judgment. *See* Fed. R. Civ. P. 37 Advisory Cmte. Note (1993) ("This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56."); *accord, Bern Unlimited*, 95 F. Supp. 3d at 199-200 ("'[T]he required sanction in the ordinary case is **mandatory preclusion**' of the untimely disclosed information.") (emphasis added) (quoting *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998)).

As noted above, Defendants failed to identify any release agreements in their list of documents relied upon in their Rule 26(a) initial disclosures. Further, Defendants failed to supplement their initial disclosures or discovery responses under Rule 26(e) by identifying or producing any release agreements other than the named Plaintiffs' Release Agreements. This failure was not substantially justified, given that Defendants expressly committed to "produce any 'releases of claims by putative class members' that [they] intend[ed] to use in defense of this action[.]" *Richter Decl., Ex. C at Response to Request No. 64.* Moreover, Defendants' failure to produce the releases was not harmless, as the release issue played a significant role at the class certification hearing, and certain questions posed by the Court were impossible to answer or could only be addressed by Defendants' counsel due to Defendants' non-production. *See, e.g., Tr. at 4:5-11* (THE COURT: "Well, how many of these releases are there?" MR. RICHTER: So -- the record doesn't reflect one way or the other, Your Honor. ... I think you'd have to ask the defendants that."); *id. at 5:1-2* ("MR. CARROLL: "I cannot tell you because we do not yet know

the exact number.") *id. at 5:8-10* (THE COURT: Are they -- are they – where do they exist [and] are they in the same form?  MR. CARROLL: General releases in form, yes.").

In light of Defendants' failure to produce releases for absent class members in discovery (and their failure to identify any releases in their initial disclosures), Defendants should not be allowed to introduce evidence of releases for absent class members to support their Twenty-First Affirmative Defense. *See Bern Unlimited*, 95 F. Supp. 3d at 201 (excluding declarations and testimony of witnesses not disclosed during discovery); *Facey v. Dickhaut*, 91 F. Supp. 3d 12, 23 (D. Mass. 2014) (declining to consider documents not produced during discovery on motion for summary judgment); *HipSaver Co. v. JT Posey Co.*, 497 F. Supp. 2d 96, 104 (D. Mass 2007) (excluding documents produced after close of discovery). In the absence of admissible evidence of such releases, Defendants' affirmative defense necessarily fails with respect to the class.

### B.      Defendants Cannot Assert this Defense as to Ms. Glancy or as to Mr. Brotherston After the Date He Signed His Release Agreement

Although Defendants did produce Release Agreements for the named Plaintiffs, those releases were signed either wholly before the start of the class period (in the case of Ms. Glancy) or substantially before the start of the class period (in the case of Mr. Brotherston).  This timing is significant because the releases state that they only apply to claims "existing, accruing, arising, or occurring at any time **on or prior to the date you execute** this Agreement[.]" *ECF No. 80-19 at ¶ 6(a); Richter Decl., Ex. A at ¶ 6(a)* (emphasis added). The Release Agreements further provide that "this Agreement is not intended to and does not affect any rights or claims you may have arising after the date this Agreement is executed by you." *Id. at ¶ 6(b)*.

In light of this language, Ms. Glancy's Release Agreement does not and cannot affect any portion of her claims because her Release Agreement was executed on April 30, 2008, over a year and a half before the beginning of the class period on November 13, 2009. This is

presumably why Defendants did not reference Ms. Glancy's release in their opposition to Plaintiffs' Motion for Class Certification. As for Mr. Brotherston, he signed his release on January 1, 2010, just weeks after the beginning of the class period. Thus, at most, he released his claims for only a small fraction (about 2%) of the class period.[2]   Once again, Defendants effectively conceded this point in their class certification brief, stating that "Brotherston has released some but not all claims that arose during the putative class period." *ECF No. 78 at 15.* Accordingly, Plaintiffs are entitled to summary judgment on Defendants' release defense to the extent that Defendants seek to apply this defense to Ms. Glancy's claims, or to Mr. Brotherston's claims regarding Defendants' mismanagement of the Putnam Retirement Plan after January 1, 2010. *See Moore v. Comcast Corp.*, 268 F.R.D. 530, 536 (E.D. Pa. 2010) ("[T]he releases made clear that '[t]his Agreement does not, however, release any rights or claims which may arise after the date on which you sign this Agreement ....' Thus, a participant was free to pursue recovery for rights or claims arising after the date his or her releases was executed.")

Aside from the fact that the Release Agreements did not waive claims arising after the date of execution, they legally could not have done so. ERISA provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under [the fiduciary responsibility sections] shall be void as against public policy." 29 U.S.C. § 1110(a). Consistent with this principle, federal courts across the country have held that future ERISA claims cannot be released or be the subjects of covenants not to sue.[3] The effect of such a prospective release would be "to grant the employer a

---

[2] Brotherston does not concede that he released any of his claims relating to the Putnam Retirement Plan. Aside from the time restriction referenced above, the release contains a substantive carve out for claims for "benefits to which [he] may be entitled from, under, or pursuant to any savings, stock, or retirement plan of the Company." *ECF No. 80-19 at ¶ 6(b).*

[3] *See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685 (6th Cir. 2013); *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 317 (4th Cir. 2001) (waiver of

license to violate ERISA in the future with impunity." *Reighard*, 158 F. Supp. 2d at 733.

"ERISA rights are too important to permit this result." *Id.*

### III. THIS COURT SHOULD AMEND ITS CLASS CERTIFICATION ORDER TO DISREGARD OR MODIFY THE SUBCLASSES

In its class certification order, the Court grouped the certified class into two subclasses: one for those with releases and one for those without releases. *ECF No. 88.* However, for the reasons discussed above, there is no need to divide the class in this manner because Defendants have failed to come forward with releases for any of the absent class members,[4] and the releases that Defendants did produce for the named Plaintiffs do not bar their claims. Accordingly, Plaintiffs respectfully request that the Court amend its class certification order pursuant to Rule 23(c). *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgement."). Specifically, Plaintiffs request that the Court amend its earlier order to disregard the existing subclasses, since "the issue of … release[s] is not likely to present a major focus of the litigation." *See Moore v. Comcast Corp.*, 268 F.R.D. 530, 537 (E.D. Pa. 2010).[5] In the alternative, the subclasses should be modified into a subclass

---

all claims that plaintiff had or may have against a plan administrator did not release administrator from claims arising from events that had not occurred when release was executed); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1293 (10th Cir.1991) (holding that a waiver of a right to sue was insufficient to release future ERISA claims); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628, 635 (W.D. Wis. 2009) ("[T]o the extent plaintiffs' releases could be construed as releasing defendant from this ERISA suit, the agreement would be unenforceable because agreements that waive future violations of ERISA are unenforceable."); *Reighard v. Limbach Co.*, 158 F. Supp. 2d 730, 733 (E.D. Va. 2001) (covenant not to sue cannot apply to future ERISA claims); *Sullivan v. AT&T, Inc.*, 2010 WL 905567, at *4 (N.D. Tex. Mar. 12, 2010) ("Although a[n ERISA] waiver may release known claims, it cannot release future, unknown claims.")

[4] *See Hofstetter v. Chase Home Finance, LLC*, 2011 WL 1225900, at *7 (N.D. Cal. March 31, 2011) (declining to consider deeds of trust that were not timely produced on motion for class certification, and indicating that such documents likely would be excluded at trial).

[5] To the extent that any issues may arise with respect to Mr. Brotherston's right to recover his losses for the short period from November 13, 2013 to January 1, 2010, that is a minor damages issue that does not defeat class certification or his adequacy as a class representative. *Id.*

consisting of persons who executed a release after the beginning of the class period (like Mr. Brotherston), and a subclass of those who did not (like Ms. Glancy).

## CONCLUSION

For the above reasons, the Court should grant Plaintiffs' motion for summary judgment as to Defendants' release defense and for modification of the class certification Order.

## PART TWO

### INTRODUCTION

Putnam Investments, LLC ("Putnam") is an investment management company that sponsors the Putnam Retirement Plan ("Plan") for its current and former employees. Putnam includes all of its proprietary mutual funds among the Plan's investments, and as a result, over ninety percent of the Plan's assets are held in Putnam mutual funds. Putnam, like many mutual fund companies, offers multiple classes of shares for each of its funds that differ only in the expenses that investors pay. From 2009 to the present, the Plan has principally held two share classes of Putnam funds—Y shares and R6 shares.

Y shares and R6 shares differ in only one respect—Y shares charge higher fees because Y shares pay revenue sharing, while R6 shares do not. Revenue sharing is a practice whereby mutual fund companies make payments to the administrator of a retirement plan that invests in the company's mutual fund, in recognition of recordkeeping and similar services the plan performs that would otherwise be the mutual fund company's responsibility. The plan can then use the payments as it sees fit—to reduce the plan's recordkeeping expenses, to pay for other plan services, or the payments can be credited directly to the participants invested in the specific mutual fund associated with the revenue sharing payment. Y shares of Putnam funds pay revenue sharing of up to 25 basis points, or 0.25%, of the total plan assets invested in the particular fund.

8

However, despite the hundreds of millions of dollars that the Putnam Retirement Plan has invested in Y shares over time, Putnam has never paid a dime of revenue sharing to the Plan.

By utilizing proprietary Putnam funds that systematically pay fees to parties in interest and ultimately to Putnam as a fiduciary of the Plan, Defendants have violated ERISA's prohibited transaction proscriptions in 29 U.S.C. § 1106(a) and (b). Defendants' Answer asserts only one exemption to these prohibitions: Prohibited Transaction Exemption 77-3 ("PTE 77-3"). However, that exemption does not apply here.

PTE 77-3 exempts transactions involving a mutual fund company's proprietary fund within its own 401(k) plan, so long as four conditions are met. One of these conditions is that all of the plan's dealings with the mutual fund (and its adviser) must be on a basis no less favorable to the plan than such dealings are with other shareholders. Here, the record indisputably shows that the Plan was treated less favorably than other shareholders of Y-class shares of Putnam funds, because other retirement plans holding those funds received revenue sharing payments while the Plan, despite holding the exact same Y-share fund, did not. Accordingly, Plaintiffs are entitled to affirmative summary judgment on their prohibited transaction claims in Counts II and III, and as to Defendants' prohibited transaction defense (Affirmative Defense #5), with respect to all transactions involving Y shares of Putnam funds since November 13, 2009.

## MATERIAL FACTS

The Plan is a defined contribution plan sponsored by Putnam in which participants invest monies in their account within a menu of investments[6] designated by the Plan and its fiduciaries.[7]

---

[6] The Plan also offers participants the option of investing in a self-directed brokerage account ("SDBA"). *SOF* ¶ *14 n.1.*
[7] In establishing the Plan and enacting the Plan Document, Putnam designated the Putnam Benefits Investment Committee ("PBIC") as the committee responsible for controlling the Plan's investments. *SOF* ¶ *15.* The PBIC is overseen by the Putnam Benefits Oversight Committee

*SOF,* ¶¶ *11–14.* At all relevant times, the Plan has included all of Putnam's mutual funds other than tax-exempt funds as designated investments. *Id.* ¶¶ *14, 25.* As a result, more than 90% of the Plan's assets have been invested in Putnam funds. *Id.* ¶ *26.*

Putnam's mutual funds charge three different categories of expenses to fund shareholders: investment management fees, distribution fees, and investor servicing fees. *Id.* ¶¶ *27–28, 30–31.* The investment management fees are paid on a monthly basis to Putnam Investment Management, LLC ("Putnam Management"), a Putnam subsidiary and Plan employer. *Id.* ¶¶ *28–29.* The investor servicing fees are paid on a monthly basis to Putnam Investor Services, Inc. ("Putnam Services"), another Putnam subsidiary and Plan employer. *Id.* ¶¶ *31–32.* Although Putnam Management and Putnam Services are distinct legal entities, they operate as part of Putnam and their profits and losses are reported on Putnam's consolidated financial statements. *Id.* ¶ *33.* In fact, fees received by Putnam Services are booked directly as revenues taken in by Putnam. *Id.*

Putnam offers multiple share classes of each fund. *See id.* ¶ *37.* Between 2009 and the present, the Plan has principally held two share classes of Putnam mutual funds—Y shares and R6 shares. *Id.* ¶¶ *34–36.* Putnam's Y shares and R6 shares generally charge the same investment management fees as other share classes, and do not charge distribution fees; however R6 shares charge lower investor servicing fees than Y shares. *Id.* ¶ *37.* This difference is attributable to the fact that Putnam offers revenue sharing to plans holding Putnam Y shares, but offers no revenue sharing to plans owning Putnam's R6 shares. *Id.* ¶ *38.*

In the retirement plan market, revenue sharing is a practice in which a mutual fund company whose mutual fund is owned by a plan makes payments to a financial intermediary as a

---

("PBOC"), a committee that includes several members of Putnam's senior management, and that also reports to senior management, including Putnam's CEO Robert Reynolds. *SOF* ¶¶ *16–18.*

percentage of the plan assets held in the fund, in recognition of administrative services (such as recordkeeping) the plan performs for its participants that would otherwise be the mutual fund company's responsibility. *Id.* ¶ *39.* Discretion over how revenue sharing payments are used is left to the plan's recordkeeper and fiduciaries, who can (1) apply the payments directly to administrative expenses; (2) deposit the payments in a plan expense account from which administrative expenses are paid, with the leftover paid to the plan's participants; or (3) allocate the revenue sharing payments to participants' accounts (generally to the participants invested in the fund), paying administrative expenses through some other means. *Id.* ¶¶ *44–47.*

Putnam pays up to 25 basis points of revenue sharing on its Y shares, but the amount varies based on the particular deal Putnam has struck with the financial intermediary associated with the plan holding the Putnam Y-share. *Id.* ¶¶ *43, 48.* As an illustration, in 2012 the Major League Soccer 401(k) Plan had $827,526 invested in Y shares of the Putnam Equity Income Fund. *Id.* ¶ *41.* Because of the Plan's investment in the fund, Putnam paid the plan's recordkeeper 0.25% of the plan's investment in the Putnam Equity Income Fund (around $2,000) as revenue sharing. *Id.* ¶ *42.*

When the Putnam negotiated its recordkeeping contract in 2008 with Great-West, a Putnam affiliate, the contract provided that Putnam would not pay any revenue sharing to the Plan. *Id.* ¶ *50.* In August 2013, representatives at Great-West reached out to Putnam to discuss the lack of revenue sharing payments. *Id.* ¶ *53.* Putnam asserted that such payments to Great-West would be prohibited transactions because of Great-West's affiliation with Putnam; however, Putnam never considered paying revenue sharing to a plan expense account that could have allocated the monies into participant accounts. *Id.* ¶¶ *54, 56.* The conversation was abruptly

ended by Putnam CEO Robert Reynolds, who instructed employees that if Great-West had a problem with the Plan's operation they could talk to him. *Id. ¶ 55*.

Not long thereafter, in November 2013, Putnam negotiated an amendment to its recordkeeping contract to facilitate revenue sharing payments from the Plan's SDBA provider (TD Ameritrade) that would be paid into a plan expense account and could be used entirely at the Plan's discretion. *Id. ¶¶ 57–58*. In late 2014, a Great-West employee emailed a PBIC member a comparison of the expense disclosures for the Plan and Great-West's own plan. *Id. ¶ 62*. Great-West's disclosure showed that Great-West, like Putnam, had a number of proprietary funds within its own plan, but that Great-West was paying revenue sharing on many of those investments that was being credited ***directly to the participants of its plan***. *Id. ¶¶ 62–64*. Despite these various insights and opportunities, Putnam never attempted to renegotiate its recordkeeping contract to allow payment of revenue sharing, and still does not pay any revenue sharing on the Y shares held by the Plan. *Id. ¶¶ 51–52, 56, 61*.

## ARGUMENT

### I.   Standard of Review

The applicable standard of review is set forth above in Part One of this Memorandum. *See supra* at 3.

### II.   Plaintiffs are Entitled to Summary Judgment on Counts II and III

Section 406 of ERISA (29 U.S.C. § 1106) supplements a fiduciary's duty of loyalty "by categorically barring certain transactions deemed likely to injure the pension plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000). Prohibited transactions fall into two categories under Section 406: subsection (a) prohibits a fiduciary from causing a plan to engage in any of five different types of transactions with a party in interest, while subsection (b) prohibits acts of self-dealing by a fiduciary that involve the assets of the Plan.

12

**A.     Plaintiffs are Entitled to Summary Judgement as to Liability on Count II Because the Plan's Fiduciaries Caused the Plan to Engage in Prohibited Transactions with Parties in Interest**

29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows that such transaction constitutes a direct or indirect ... (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan...." There is no genuine issue of material fact as to any element of this claim.

First, as affiliated enterprises and employers to participants of the Plan, Putnam, Putnam Services, and Putnam Management are parties in interest. 29 U.S.C. § 1002(14).

Second, throughout the relevant period, Putnam Management performed investment management services for the mutual funds owned by the Plan, and Putnam Services performed investor servicing functions for the mutual fund shares owned by the Plan. This constitutes furnishing of services between the Plan and parties in interest under § 1106(a)(1)(C). *See Chao v. Graf*, 2002 WL 1611122, at *12 (D. Nev. Feb. 1, 2002) (finding violation of § 1106(a)(1)(C) based on provision of investment management services). Additionally, Plan assets were used to purchase and retain shares of Putnam mutual funds. Putnam Management and Putnam Services were then paid fees on a monthly basis as a percentage of the total value of the Putnam fund shares owned by the Plan, and the payment of these fees reduced the value of the Plan's shares. Because the Plan's ownership of Putnam mutual funds resulted in systematic payment of fees to parties in interest in transactions that reduced the value of the shares owned by the Plan, each of these monthly transactions constituted an indirect transfer of Plan assets to a party in interest under § 1106(a)(1)(D).

Third, the PBIC, PBOC, and Putnam are fiduciaries. The PBIC is the named investment fiduciary under the Plan Document, and therefore is a fiduciary pursuant to 29 U.S.C. § 1102(a).

13

Further, the PBIC is responsible for selecting, monitoring, and removing the Plan's investments, and is therefore functional fiduciary under 29 U.S.C. § 1002(a)(21)(A). The PBOC is also a fiduciary by virtue of its oversight authority over the PBIC. *SOF ¶ 16*. In addition, Putnam is a fiduciary for the reasons discussed in the next section.

Finally, the Plan's fiduciaries caused the Plan to engage in prohibited transactions by retaining Y-share Putnam mutual funds in the Plan, and by causing investment management fees and investor servicing fees to be paid to Putnam and its affiliates.[8]

### B.   Plaintiffs are Entitled to Summary Judgment as to Liability on Count III Because Putnam Engaged in Prohibited Self-Dealing

Putnam is also liable under 29 U.S.C. § 1106(b), which provides that "a fiduciary with respect to the plan shall not (1) deal with the assets of the Plan in his own interest or for his own account ... or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1), (3). The rules of § 1106(b) are to be construed broadly, and liability must be imposed even where there is "no taint of scandal, no hint of self-dealing, no trace of bad faith." *Lowen v.*

---

[8] These prohibited transactions continued throughout the class period. In *Tibble v. Edison Int'l*, the Supreme Court recognized a fiduciary obligation to monitor plan investments and remove imprudent ones, based upon the corresponding duty found in trust law. 135 S. Ct. 1823, 1828 (2015) ("[T]he trustee cannot assume that if investments are **legal** and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely.") (quoting Hess, Bogert, & Bogert, LAW OF TRUSTS AND TRUSTEES § 684, pp. 145–146 (3d ed. 2009)) (emphasis added). Undertaking a similar analysis, the court in *In re Northrop Grumman Corp. ERISA Litigation* held that "an ERISA fiduciary has a similar continuing duty not to engage in prohibited transactions." 2015 WL 10433713, at *26 (C.D. Cal. Nov. 24, 2015). The court first noted that the duty not to engage in prohibited transactions is derived from the duty of loyalty within the common law of trusts. *Id.* The court then noted that under trust law, the duty of loyalty continues "throughout the administration of the trust." *Id.* (quoting Bogart § 543). Bogart further notes that if a trustee learns of a conflicting personal interest or a conflict involving a third party, the trustee must either resign or remove the conflicting interest. *Id.* Thus, "even if the trustee 'cannot prevent the existence of the conflict of interest ... he can immediately remove it.'" *Id.* (quoting Bogart § 543). The *Northern Grumman* court concluded: "Given the fiduciaries' continuing duty to avoid transactions violating the duty of loyalty, plaintiffs can argue that *each payment* [that constituted a prohibited transaction] during the limitations period constituted a breach of fiduciary duty and a prohibited transaction." *Id.* (emphasis added).

14

*Tower Asset Mgmt., Inc.*, 829 F2d 1209, 1213 (2d Cir. 1987) (quoting *Cutaiar v. Marshall*, 590

F.2d 523, 528 (3d Cir. 1979)); *see also Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984).

### 1.    Putnam Is a Fiduciary of the Plan

Putnam is a fiduciary of the Plan. As outlined in Putnam's fiduciary guide, and as

multiple witnesses acknowledged, Putnam has ultimate authority over every aspect of the

administration and management of the Plan as plan sponsor, and therefore is a fiduciary of the

Plan. *SOF ¶¶ 18–22*. Through its authority to amend Section 8.1 of the Plan Document (which

required the Plan to offer all of Putnam's funds), Putnam also has control and authority over

management of the Plan's assets. *SOF ¶ 13*. Further, Putnam has authority to direct the Plan's

investments pursuant to both the Trust Document and the Plan's recordkeeping agreement. *SOF*

*¶¶ 19.*[9] Additionally, through its senior management, including its CEO,[10] Putnam has the

authority to add and remove members of the PBOC, and through the senior management on the

PBOC, had supervisory authority over the PBIC. *SOF ¶¶ 16–18*.[11] *See Kling v. Fidelity Mgmt.*

*Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (appointment authority confers fiduciary

status); *In re Enron Corp.*, 284 F. Supp. 2d 511, 552–53 (S.D. Tex. 2003) (same; collecting

cases). Finally, Putnam is vicariously liable for the actions of its committee-member employees

who were acting within the scope of an assigned job responsibility. *Kling*, 323 F. Supp. 2d at

142. For all of these reasons, Putnam is a functional fiduciary because it exercises "discretionary

---

[9] PBIC members recognized Putnam's authority over the Plan's investments and deferred to it; as the May 26, 2010 minutes stated, "it is uncertain what would be enough for Putnam to remove one of its own funds from the Putnam Retirement Plan line up." *SOF ¶ 25*.
[10] In 2013, Putnam's CEO prohibited Putnam employees from discussing with Great-West the possibility of making revenue sharing payments to the plan, then asserted his ultimate authority over major plan decisions by instructing employees that if Great-West has a problem with how the Plan is being operated they should contact him directly. *SOF ¶¶ 53–55*.
[11] *See Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 n.8 (3d Cir. 1981) ("Officers are able to make policy and generally carry authority to bind the corporation. Their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior.").

15

authority or discretionary control respecting management" of the Plan, and exercises "authority or control respecting management or disposition of its assets." *See* 29 U.S.C. § 1102(a)(21)(A).

### 2.  Putnam Violated Section 1106(b)

Putnam violated Section 1106(b)(1) by directing the investment of Plan assets into Putnam mutual funds in which it has a financial interest. In this regard, the present case is identical to *Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945 (C.D. Cal. 2016), where the court granted affirmative summary judgment on plaintiffs' § 1106(b)(1) claim based on City National's self-dealing within its own defined contribution plan. *Id.* at 946, 948. In *City National*, the court held that the plan sponsor and the fiduciary committee members (collectively referred to as "City National") dealt with the assets of the plan in their own interest by selecting mutual funds for the plan that would increase the compensation (and profits) City National would receive for administering the plan, in violation of § 1106(b)(1). *Id.*; *see also Lowen*, 829 F.2d at 1212 (finding that fiduciary investment management firm violated § 1106(b)(1) by directing the plan to invest in securities that then paid commissions and fees to the firm). This Court should reach the same result.

Putnam also violated Section 1106(b)(3) by receiving tens of millions of dollars in fees in connection with transactions involving the assets of the plan. Investment management fees were paid to Putnam Management and Putnam Services, and those fees were ultimately received by Putnam and reported on its consolidated financial statements. Because the fees were received on a monthly basis as a result of the Plan's purchase and retention of Putnam mutual funds, the consideration was received "in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Though the assets of a mutual fund are not Plan assets, Plan assets were used to purchase the *shares* of Putnam mutual funds (which themselves are Plan assets, *Tussey v. ABB*, 746 F.3d 327, 340 (8th Cir. 2014)), and because Putnam's receipt of fees would not have

16

occurred absent these purchases, the consideration was received *in connection with* the share

purchases. *See Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156, 166–67, (D. Conn.

2006) (noting that while § 1106(b)(3) must relate to transactions involving assets of the plan …

the consideration received by the fiduciary need not itself constitute plan assets"); *Leimkuehler v.*

*Amer. Utd. Life Ins. Co.*, 752 F. Supp. 2d 974, 986 (S.D. Ind. 2010).

## C.    No Prohibited Transaction Exemption Applies

Under 28 U.S.C. § 1108, transactions may be exempted from the provisions of § 1106(a)

(and in some cases both § 1106(a) and (b)) if the transaction falls within one of the twenty

statutory exemptions outlined in § 1108(b), or one of the more than fifty exemptions

promulgated by the DOL pursuant to § 1108(a) apply. Defendants' fifth affirmative defense

pleads such an exemption, and states: "This action is barred, in whole or in part, by ERISA §

408, 29 U.S.C. § 1108, and the exemptions promulgated thereunder by the Department of Labor,

including, but not limited to, PTE 77-3." *Defs' Answer to Second Amended Complaint, ECF No.*

*83 at p. 43.* However, as discussed below, transactions involving Y-share Putnam funds do not

qualify for PTE 77-3, and Defendants have failed to plead any other prohibited transaction

exemption with sufficient specificity to provide Plaintiffs with necessary notice of the defense.

Thus, Plaintiffs are entitled to summary judgment as to Defendants' Fifth Affirmative Defense as

it relates to Y-share mutual funds.

### 1.    Defendants Bear the Burden of Proof on Exemption Defenses

Prohibited transaction exemptions are affirmative defenses upon which defendants bear

the burden of proof. *Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State Street Bank &*

*Trust Co.*, 290 F.R.D. 11, 16 & n.18 (D. Mass. 2013) (citing *Braden v. Wal-Mart Stores, Inc.*,

588 F.3d 585, 601 (8th Cir. 2009)); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996);

*Elmore v. Cone Mills Corp.*, 23 F.4d 855, 864 (4th Cir. 1994); *Lowen*, 829 F.2d at 1215);

*Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012).
Defendants have not met and cannot meet their burden here.

> **2.      Defendants Have Failed to Raise a Genuine Issue of Material Fact Regarding PTE 77-3**

PTE 77-3 provides that the prohibitions of Section 1106 …

> shall not apply to the acquisition or sale of shares of an open-end investment
> company … by an employee benefit plan covering only … employees of the
> investment adviser … provided that the following [four] conditions are met:
> …
> (d) All other dealings between the plan and the investment company, the
> investment adviser or principal underwriter for the investment company, or any
> affiliated person of such investment adviser or principal underwriter, are on a
> basis **no less favorable to the plan than such dealings are with other
> shareholders** of the investment company.

42 Fed. Reg. 18743 (April 8, 1977) (emphasis added) (*attached as Engstrom Decl. Ex. 49*).

As discussed above, Putnam made revenue sharing payments where other retirement
plans held Y-shares of Putnam mutual funds, and rebated up to 0.25% of plan assets held in such
funds. As a result, these plans effectively paid lower expenses for the funds than the Putnam
Retirement Plan did. Thus, PTE 77-3 does not apply because the "dealings between the plan and
the investment company [or] investment adviser" were "less favorable to the plan than such
dealings [we]re with other shareholders of the investment company." PTE 77-3.

> **3.      Defendants Have Waived Right to Raise Other Prohibited Transaction Exemptions**

In their Fifth Affirmative Defense, Defendants failed to specify any other exemptions
they intend to assert. "Generally speaking, failure to plead an affirmative defense results in a
waiver of the defense and the exclusion of all evidence relevant to it." *Conjugal P'ship v.
Conjugal P'ship*, 22 F.3d 391, 400 (1st Cir. 1994). "[A] defendant who fails to assert an
affirmative defense at all, or who asserts it in a *largely uninformative way* [ ] acts at his peril."
*Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588, 593 (1st Cir. 1995) (emphasis added),

18

*abrogated on other grounds*, *Carpenters Local Union No. 26 v. U.S. Fidelity and Guar. Co.*, 215 F.3d 136 (1st Cir. 2000). In deciding whether "general, non-specific language in a defendant's answer … preserve[s] an affirmative defense," the court must "examine the totality of the circumstances and make a practical, commonsense assessment about whether Rule 8(c)'s core purpose—to act as a safeguard against surprise and unfair prejudice—has been vindicated." *Id.*

Here, Defendants' general pleading of all statutory and regulatory exemptions does not provide Plaintiffs with any notice of the defenses it will likely assert, given that § 1108 outlines twenty different exemptions to § 1106, and the DOL has promulgated more than fifty additional class exemptions. *See* Employee Benefits Security Administration, "Proposed and Granted Class Exemptions," www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/exemptions/class (last visited January 8, 2017). Each exemption has multiple elements, each of which requires discovery to properly address. *Cf. Nelson v. UBS Asset Mgmt. (Americas), Inc.*, 2005 WL 327034, at *2 (N.D. Ill. Feb. 9, 2005) (denying motion for leave to file prohibited transaction claims filed "on the eve of the close of discovery" because adding the claim "could manifest in pleading of affirmative defenses not already included, introducing areas not yet explored into which Plaintiffs would surely wish to delve into with the use of discovery tools."). Discovery in this case has closed. Permitting Defendants to assert any other affirmative defenses would both surprise and unfairly prejudice Plaintiffs, who would have no opportunity to conduct necessary discovery. The Court should therefore reject any argument for denial of summary judgment on the basis of Defendants' general assertion of statutory and regulatory prohibited transaction defenses.

## CONCLUSION

Because there is no genuine issue of material fact as to Defendants' liability under Section 1106 related to transactions involving Y-share Putnam mutual funds, and Defendants

pled defense under PTE 77-3 fails as a matter of law, this Court should grant Plaintiffs' motion for summary judgment as to liability on Counts II and III, and as to Defendants' Fifth Affirmative Defense.

Dated: January 9, 2017

Respectfully Submitted,

**BLOCK & LEVITON LLP**

Jason M. Leviton (BBO #678331)
Jacob A. Walker (BBO #688074)
Bradley J. Vettraino (BBO #691834)
155 Federal Street, Ste. 400
Boston, MA 02110
Telephone: (617) 398-560
Facsimile: (617) 507-6020
jason@blockesq.com
jake@blockesq.com
bradley@blockesq.com

**NICHOLS KASTER, PLLP**

By: */s/ Kai H. Richter*
James H. Kaster, MN Bar No. 53946*
Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
       *admitted *pro hac vice*
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
kaster@nka.com
krichter@nka.com
cengstrom@nka.com

**ATTORNEYS FOR PLAINTIFFS**

---

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2017, a true and correct copy of this Memorandum of Law In Support of Plaintiffs' Motion for Partial Summary Judgment and for Modification of Class Certification Order was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: January 9, 2017     /s/ Kai H. Richter

---