UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOHN BROTHERSTON and JOAN GLANCY,)
individually and as representatives )
of a class of similarly situated )
persons, and on behalf of the   )
Putnam Retirement Plan,         )
                                )
          Plaintiffs,           )
                                )
     v.                         )          CIVIL ACTION
                                )          NO. 15-13825-WGY
PUTNAM INVESTMENTS, LLC,         )
PUTNAM INVESTMENT MANAGEMENT, LLC,)
PUNTNAM INVESTOR SERVICES, INC., )
the PUTNAM BENEFITS INVESTMENT   )
COMMITTEE, the PUTNAM BENEFITS   )
OVERSIGHT COMMITTEE, and ROBERT  )
REYNOLDS,                        )
                                )
          Defendants.           )
_____)
```

YOUNG, D.J.                                    March 30, 2017

**FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER FOR JUDGMENT**

## I.   INTRODUCTION

On November 13, 2015, John Brotherston ("Brotherston") and

Joan Glancy ("Glancy") (collectively, the "Plaintiffs"),

individually and on behalf of a class of similarly situated

persons and on behalf of the Putnam Retirement Plan ("Plan"),

brought this class action under section 502(a) of the Employee

Retirement Income Security Act of 1974 ("ERISA"), against the

Plan's fiduciaries: Putnam Investments, LLC, Putnam Investment
Management, LLC, Putnam Investor Services, Inc., the Putnam
Benefits Investment Committee, the Putnam Benefits Oversight
Committee, and Putnam's Chief Executive Officer Robert Reynolds
(collectively, the "Defendants"), for breach of the fiduciary
duties of loyalty and prudence in violation of 29 U.S.C. section
1104(a)(1)(A)-(B) (count I), prohibited transactions with a
party in interest in violation of 29 U.S.C. section 1106(a)(1)
(count II), prohibited transactions with a fiduciary in
violation of 29 U.S.C. section 1106(b) (count III), failure to
monitor fiduciaries in violation of 29 U.S.C. section 1109(a)
(count IV), and other equitable relief based on ill-gotten
proceeds in violation of 29 U.S.C. section 1132(a)(3) (count V).
Second Am. Compl. ("SAC") ¶¶ 117-48, ECF No. 73.

On January 9, 2017, the parties filed cross-motions for
summary judgment pursuant to Federal Rule of Civil Procedure
56(a), Pls.' Mot. Partial Summ. J. Modification Class
Certification Order, ECF No. 93; Defs.' Mot. Summ. J., ECF No.
89, along with supporting memoranda of law and statements of
facts, Mem. Law Supp. Pls.' Mot. Partial Summ. J. Modification
Class Certification Order ("Pls.' Mem."), ECF No. 94; Pls.'
Statement Undisputed Material Facts Supp. Pls.' Mot. Partial
Summ. J. ("Pls.' Facts"), ECF No. 95; Mem. Law Supp. Defs.' Mot.
Summ. J. ("Defs.' Mem."), ECF No. 90; Defs.' Statement Material

Facts ("Defs.' Facts"), ECF No. 91.  On January 30, 2017, the parties filed memoranda in opposition to each other's motions for summary judgment, Mem. Law Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 102; Defs.' Mem. Law Opp'n Pls.' Mot. Partial Summ. J. ("Defs.' Opp'n"), ECF No. 105, along with supplemental statements of facts, Pls.' Statement Material Facts Presenting Genuine Issue ("Pls.' Suppl. Facts"), ECF No. 103; Defs.' Resp. Pls.' Statement Undisputed Material Facts & Suppl. Statement Material Facts Dispute Opp'n Pls.' Mot. Partial Summ. J. ("Defs.' Suppl. Facts"), ECF No. 106.  On February 13, 2017, the parties filed reply briefs.  Reply Mem. Law Supp. Pls.' Mot. Partial Summ. J. Modification Class Certification Order ("Pls.' Reply"), ECF No. 112; Defs.' Reply Mem. Law. Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 110.  On that date, the Defendants also filed a new supplemental statement of material facts. Defs.' Resp. Pls.' Statement Material Facts Presenting Genuine Issue ("Defs.' Suppl. Facts II"), ECF No. 111.  The Defendants submitted a supplemental brief on March 6, 2017.  Defs.' Suppl. Br. Supp. Mot. Summ. J. Counts II and III ("Defs.' Suppl. Reply"), ECF No. 124.  The Plaintiffs also submitted a supplemental brief on March 8, 2017.  Pls.' Resp. Defs.' Suppl. Br. Supp. Mot. Summ. J. Counts II and III ("Pls.' Suppl. Reply"), ECF No. 127.

After carefully reviewing the record and hearing oral arguments, the Court concluded that there were genuine issues of material fact in dispute as to counts I, IV, and V, as well as the Defendants' fifth affirmative defense. On March 3, 2017, the Court issued an order denying summary judgment on these counts. Order, ECF No. 120. The Court also denied the Plaintiffs' request for modification of the class certification order. Id.

By agreement of the parties, the Court held a case stated hearing on February 28, 2017 on counts II and III.[1] It now makes the following findings of fact and rulings of law.

## II. FINDINGS OF FACT

### A. The Parties

Putnam Investments, LLC ("Putnam") is an asset management company located in Boston, Massachusetts. Defs.' Facts ¶ 1. Putnam is the sponsor of Plan. Pls.' Facts ¶ 11; Defs.' Facts ¶ 1. Putnam, through its Chief Executive Officer ("CEO") and Board of Directors, has the authority to amend any or all provisions of the Plan as well as to select the investment

---

[1] The case stated procedure allows the Court to render a judgment based on a largely undisputed record in cases where there are minimal factual disputes. In its review of the record, "[t]he [C]ourt is . . . entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).

options available to participants of the Plan.  Pls.' Facts
¶ 13; Defs.' Suppl. Facts ¶ 13.

Brotherston is a Westford, Massachusetts resident and a
participant in the Plan.  SAC ¶ 12; Defs.' Facts ¶ 8.  From
November 13, 2009 to the present ("Relevant Period"),
Brotherston has invested in over thirty different investment
options offered within the Plan.  SAC ¶ 12; Defs.' Facts ¶ 9.
Glancy is a Peabody, Massachusetts resident and was a
participant in the Plan until the first quarter of 2010.  SAC ¶
13; Defs.' Facts ¶ 16.  Glancy invested in fourteen funds
offered by the Plan from November 2009 through March 2010.  SAC
¶ 13; Defs.' Facts ¶ 17.

The Plan is a 401(k) employee pension, defined-contribution
plan and is open to eligible current and former employees of
Putnam and its wholly-owned domestic subsidiaries.  Pls.' Facts
¶ 12; Defs.' Facts ¶ 25; Defs.' Suppl. Facts ¶ 12.  Plan
participants can invest a percentage of their pre-tax earnings,
and Putnam matches contributions up to five percent of the
participant's salary.  Defs.' Facts ¶ 47.

Putnam Investment Management, LLC ("Putnam Management"), a
wholly-owned subsidiary of Putnam, provides investment
management services to Putnam mutual funds.  SAC ¶ 24; Pls.'
Facts ¶¶ 28-29; Defs.' Facts ¶ 2.  Putnam Management is a
participating employer in the Plan.  Pls.' Facts ¶ 29; Defs.'

Suppl. Facts ¶ 29.  Putnam Investor Services, Inc. ("Putnam Services") is a wholly-owned subsidiary of Putnam and provides investor servicing functions to Putnam mutual fund investors. Defs.' Facts ¶ 3.  Putnam Services is a participating employer in the Plan.  Pls.' Facts ¶ 32; Defs.' Suppl. Facts ¶ 32.

The management of the Plan is assigned to a set of committees.  Pls.' Suppl. Facts ¶ 4; Defs.' Suppl. Facts II ¶ 4. The Putnam Benefits Investment Committee ("PBIC") is responsible for controlling and managing the investments made available by the Plan.  Pls.' Facts ¶ 15; Defs.' Suppl. Facts ¶ 15.  The Putnam Benefits Administration Committee ("PBAC") establishes procedures for Plan participants to determine the investment of their individual accounts.  Defs.' Suppl. Facts ¶ 15.  Both PBAC and PBIC are overseen by the Putnam Benefits Oversight Committee ("PBOC"), which has the authority to appoint and remove PBIC members.  Pls.' Facts ¶ 16; Defs.' Suppl. Facts ¶ 16.  PBOC members are appointed by and report to Putnam senior management. Pls.' Facts ¶ 17; Defs.' Suppl. Facts ¶ 17.  Robert Reynolds is Putnam's CEO.  Pls.' Facts ¶ 22.

### B.  Challenged Transactions and Fees

The Plan invests predominately in mutual funds owned and managed by Putnam.  Pls.' Facts ¶ 26; Defs.' Suppl. Facts ¶ 26. Between 2009 and 2015, over 85% of the Plan's assets were invested in Putnam mutual funds.  Pls.' Facts ¶ 26; Defs.'

[6]

Suppl. Facts ¶ 26. These Putnam mutual funds pay management fees to Putnam from the assets of each mutual fund as compensation for the provision of investment management services and as reimbursement for certain investment management-related expenses. Pls.' Facts ¶ 28; Defs.' Suppl. Facts ¶ 28.

The Plan invests in Putnam mutual funds by acquiring two distinct classes of shares: Y shares and R6 shares. Pls.' Suppl. Facts ¶¶ 72-73; Defs.' Suppl. Facts II ¶¶ 72-73. At the end of 2009, the Plan owned Y shares in almost sixty Putnam mutual funds. Pls.' Facts ¶ 34; Defs.' Suppl. Facts ¶ 34. On July 2, 2012, Putnam introduced an R6 share class for twenty Putnam mutual funds, and converted these twenty funds from class Y to class R6 shares effective April 1, 2013. Pls.' Facts ¶ 35; Defs.' Suppl. Facts ¶ 35. By the end of 2015, the Plan had converted its investments in twenty-five Putnam mutual funds from Y shares to R6 shares, the lower cost option of the two classes of shares. Pls.' Facts ¶¶ 36-37; Defs.' Suppl. Facts ¶¶ 36-37.

Both classes of shares charge the same investment management fees. Pls.' Facts ¶ 37; Defs.' Suppl. Facts ¶ 37. The difference in expense ratios between the two classes of shares is explained, in part, by certain servicing fees charged by R6 shares that are lower than those charged by Y shares. Pls.' Facts ¶ 37; Defs.' Suppl. Facts ¶ 37. The expense

difference between both classes of shares is also attributable, in part, to the fact that Y shares of Putnam mutual funds offer additional fee payments to certain financial intermediaries. Pls.' Facts ¶ 38; Defs.' Suppl. Facts ¶ 38. These additional fees charged by Y shares are often, but not always, in the form of revenue sharing payments. Pls.' Facts ¶ 38; Defs.' Suppl. Facts ¶ 38.

Revenue sharing refers to the practice by which investment managers might opt to compensate certain financial intermediaries, like record-keepers, in recognition of services provided that the investment managers would otherwise have to perform themselves. Pls.' Facts ¶ 39; Defs.' Suppl. Facts ¶ 39. Whether revenue sharing payments are made is contingent on a negotiated agreement between investment managers and financial intermediaries. Pls.' Facts ¶ 43; Defs.' Suppl. Facts ¶ 43. Revenue sharing payments can be made in one of three ways: (i) the payments can be applied directly to administrative expenses; (ii) the payments can be deposited in a plan expense account from which administrative expenses are paid, with the leftover paid to the plan's participants; or (iii) payments can be allocated to participant accounts and administrative expenses paid some other way, such as pro rata or as a per-participant fee. Pls.' Facts ¶¶ 45-47; Defs.' Suppl. Facts ¶¶ 45-47.

Great-West Life & Annuity Insurance Company ("Great-West") is responsible for providing recordkeeping services to Putnam on behalf of the Plan. Pls.' Facts ¶¶ 50-51; Defs.' Suppl. Facts ¶¶ 50-51. Pursuant to the 2008 contract between Putnam and Great-West, Putnam would not pay revenue sharing fees to Great-West. Pls.' Facts ¶ 50; Defs.' Suppl. Facts ¶ 50. Instead, Great-West would receive a yearly adjustable recordkeeping fee of $38.54 per participant, billable directly to Putnam.[2] Engstrom Decl., Ex. 38, Putnam Retirement Plan Recordkeeping Agreement Effective July 30, 2008, at 17, ECF No. 97-38. In 2013, Great-West contacted Putnam inquiring about revenue sharing payments related to Putnam funds held within the Plan. Pls.' Facts ¶ 53; Defs.' Suppl. Facts ¶ 53. Putnam concluded

---

[2] At the beginning of the Relevant Period, TD Ameritrade paid Great-West an annual fee of six basis points of Plan assets held in the Plan's self-directed brokerage accounts. Hines Decl., Ex. 37, Great-West Retirement Services Fee Disclosure 14, ECF No. 92-39. Great-West also charged Plan participants a $50 annual per-account fee in connection with the Plan's self-directed brokerage accounts. Engstrom Decl., Ex. 38, Putnam Retirement Plan Recordkeeping Agreement Effective July 30, 2008, at 18, ECF No. 97-38. In 2013, Putnam and Great-West negotiated a new arrangement, whereby Putnam now pays the annual self-directed brokerage fee (up from $50 per account to $120) that was previously charged to Plan participants. Hines Decl., Ex. 54, Great-West Retirement Services Amendment No. 4 to Great-West Life & Annuity Insurance Co. Services Agreement 2, ECF No. 92-56. In addition, Great-West now pays the 0.06% fee it receives from TD Ameritrade into an unallocated Plan account to be used for Plan expenses or other Plan purposes. Hines Decl., Ex. 62, Great-West Retirement Services Fee Disclosure 2015, at 15, ECF No. 92-64.

that paying revenue sharing fees to Great-West would constitute a prohibited transaction under ERISA due to Great-West's affiliation with Putnam.  Pls.' Facts ¶ 54; Defs.' Suppl. Facts ¶ 54.

Putnam currently pays revenue sharing of up to twenty-five basis points in connection with class Y shares of Putnam mutual funds held by third party plans, and has paid revenue sharing in that same range since 2009.  Pls.' Facts ¶ 48; Defs.' Suppl. Facts ¶ 48.  From 2009 to the present, Putnam has not made revenue sharing payments to the Plan or the Plan's record-keeper, Great-West, in connection with Y shares of Putnam mutual funds held by the Plan.  Pls.' Facts ¶ 51; Defs.' Suppl. Facts ¶ 51.  It is undisputed that the Plan does not receive revenue sharing payments from Putnam entities.  Pls.' Facts ¶ 61; Defs.' Facts ¶¶ 53-54; Defs.' Suppl. Facts ¶ 61.

## III. RULINGS OF LAW

The Plaintiffs claim that the payment of fees by Putnam mutual funds to Putnam constitutes a prohibited transaction under 29 U.S.C. section 1106 ("Section 1106").  SAC ¶¶ 124-134; Pls.' Mem. 13-14.  Count II is brought under various subsections of Section 1106(a)(1), which provides in relevant part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . .
> (C) furnishing of goods, services, or facilities

> between the plan and party in interest;
> (D) transfer to, or use by or for the benefit of a
> party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).   Count III is brought under Section

1106(b), which provides in relevant part:

> A fiduciary with respect to the plan shall not--
> (1) deal with the assets of the plan in his own
> interest or for his own account . . .
> (3) receive any consideration for his own personal
> account from any party dealing with such plan in
> connection with a transaction involving the assets of
> the plan.

29 U.S.C. § 1106(b).   The Defendants advance three

counterarguments: (i) the challenged transactions do not involve

"assets of the plan," as required by Section 1106(a)(1)(D) and

(b)(1), and therefore are not prohibited under ERISA; (ii) 29

U.S.C. section 1108 ("Section 1108") and Prohibited Transaction

Exemption 77-3 ("PTE 77-3") specifically exempt these

transactions from Section 1106's restrictions; and (iii) the

Plaintiffs' prohibited transaction claims based on seventy-two

investment options are barred by ERISA's three-year statute of

limitations.   Defs.' Mem. 14-18.   The Court now makes the

following rulings of law.

**A.   29 U.S.C. § 1106(a)(1)(D) & (b)(1) and "Plan Assets"**

Section 1106(a)(1)(D) and (b)(1) define certain prohibited

transactions involving ERISA retirement plan assets.   Section

1106(a)(1)(D) prohibits a fiduciary from effecting any

transaction that constitutes a "transfer to, or use by or for

the benefit of a party in interest, of any assets of the plan."
Section 1106(b)(1), in turn, prohibits a fiduciary from
"deal[ing] with the assets of the plan in his own interest or
for his own account." See Alves v. Harvard Pilgrim Health Care
Inc., 204 F. Supp. 2d 198, 214 (D. Mass. 2002) (Saris, J.)
(holding that "violations of 20 U.S.C. § 1106(b)(1) generally
involve an ERISA fiduciary's use of plan assets for personal
profit, gain or advantage"); see also Patelco Credit Union v.
Sahni, 262 F.3d 897, 911 (9th Cir. 2001) (finding Section
1106(b)(1) violation where ERISA fiduciary marked up premiums,
set administrative fees, and collected them himself from plan
assets); Srein v. Soft Drink Workers Union, Local 812, 93 F.3d
1088, 1097-98 (2d Cir. 1996) (finding breach of Section
1106(b)(1) where insurer paid broker's commission out of ERISA
reserve fund and withheld monies in reserve fund to extract
concessions from plan that would benefit it in litigation with
broker); Leigh v. Engle, 727 F.2d 113, 124 (7th Cir. 1984)
(finding Section 1106(b)(1) violation where ERISA fiduciaries
invested plan assets in firms involved in corporate control
contests that the fiduciaries were involved in).

The First Circuit has erected some guideposts in construing
whether assets are "plan assets" within the compass of Section
1106.  In Merrimon v. Unum Life Insurance Co. of America, 758
F.3d 46, 56 (1st Cir. 2014), the court adopted the Department of

Labor's interpretation that "the assets of a plan generally are
to be identified on the basis of ordinary notions of property
rights under non-ERISA law."[3]  Applying this principle, the First
Circuit recently adopted a narrow definition of "plan assets"
for the purpose of enforcing fiduciary responsibilities under
ERISA.  In re Fidelity ERISA Float Litig., 829 F.3d 55, 62 (1st
Cir. 2016) ("Cash held by a mutual fund is not transmuted into a
plan asset when it is received by an intermediary whose
obligation is to transfer it directly to a participant.").

The Defendants note that the challenged management and
servicing fees are paid out of mutual fund assets rather than
plan assets.  Defs.' Mem. 14-15.  The Plaintiffs do not contend
otherwise.  Pls.' Facts ¶¶ 28, 31.  Relying on In re Fidelity,
the Defendants argue that because cash held by mutual funds is
not an "asset of the plan" -- only the shares of the mutual
funds owned by the plan are plan assets within the scope of

---

[3] The Department of Labor has promulgated rules for
determining what constitutes "plan assets."  These regulations
provide that "assets of the plan include amounts (other than
union dues) that a participant or beneficiary pays to an
employer, or amounts that a participant has withheld from his
wages by an employer, for contribution . . . to the plan."  29
C.F.R. § 2510.3-102(a)(1).  In terms of plan investments, such
as in the mutual funds at issue here, "[g]enerally, when a plan
invests in another entity, the plan's assets include its
investment, but do not, solely by reason of such investment,
include any of the underlying assets of the entity."  29 C.F.R.
§ 2510.3-101(a)(2).

Section 1106(a)(1)(D) and (b)(1) -- the payment of fees is not a prohibited transaction under Section 1106.

The Plaintiffs, in turn, attempt to distinguish In re Fidelity as applying narrowly to "float interest"[4] on cash paid out by the mutual fund upon redemption.  Pls.' Opp'n 15 n.30. At the same time, the Plaintiffs argue that because the payment of management fees by Putnam mutual funds to Putnam reduced the value of Plan participants' shares, the payment of management fees constitutes "an indirect transfer of Plan assets to a party in interest."  Pls.' Mem 13.  The Plaintiffs contend that ERISA's overriding concern with protecting participants mandates a broad construction of "plan assets."  Pls.' Opp'n 15.  This position, however, runs squarely against the First Circuit's decision in In re Fidelity, which adopted a narrow, formal approach to identifying "plan assets" for the purposes of Section 1106.  829 F.3d at 62.[5]  The Plaintiffs' argument that

---

[4] "Float interest" or "float income" refers to the interest earned on cash paid out by the mutual fund upon redemption of shares.  See In re Fidelity, 829 F.3d at 59 n.5.

[5] The out-of-circuit case law that the Plaintiffs cite is given no weight in light of the First Circuit's express rejection of the principle on which those cases were decided.  See Shirk v. Fifth Third Bancorp., No. 05-cv-049, 2008 WL 4449024, at *16-17 (S.D. Ohio Sept. 26, 2008) (applying Ninth Circuit's functional test established in Acosta v. Pacific Enterprises, 950 F.2d 611, 620 (9th Cir. 1991)); Merrimon, 758 F.3d at 57 (explicitly rejecting the Ninth Circuit's "functional approach" to determining what assets are "plan assets" for the purpose of Section 1106).

the management fees paid from the mutual fund reduce the value of the mutual fund shares owned by the Plan (which are plan assets) is, therefore, precluded by First Circuit case law.

The Court, finding that the management fees are not paid out of plan assets, rules that the Plaintiffs' prohibited transaction claim fails as matter of law under Section 1106(a)(1)(D) and (b)(1).

**B.    29 U.S.C. § 1106(a)(1)(C) and Reasonableness of Fees**

Section 1106(a)(1)(C) does not hinge on the challenged transaction involving "assets of the plan" but simply prohibits a "direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). The Defendants, however, raise an affirmative defense under Section 1108, Defs.' Reply 12-13, which provides an exception to Section 1106 if the fees involved in the transaction are reasonable. In particular, Section 1108(b)(2) provides that Section 1106 does not apply to "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). Furthermore, Section 1108(c)(2) mandates that "[n]othing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable

compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan." 29 U.S.C. § 1108(c)(2).

The next step of the analysis, therefore, is to examine whether the management fees Putnam mutual funds paid to Putnam were reasonable. The Defendants bear the burden of proof on the reasonableness of the challenged fees. See Golden Star, Inc. v. Mass Mut. Life Ins. Co., 22 F. Supp. 3d 72, 79 (D. Mass. 2014) (Saris, J.); Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State Street Bank & Trust Co., 290 F.R.D. 11, 16 & n.18 (D. Mass. 2013) (Tauro, J.).

The record available to the Court indicates that the net expense ratios of the Plan's investments as of December 2011 ranged from 0.00% to 1.65%.[6] Hines Decl., Ex. 35, The Putnam Retirement Plan - 385008-01 Investment Performance as of 12/30/2011, at 2, ECF No. 92-37. The evidence does not show, and the parties do not argue, that the expense range was materially different during the Relevant Period. In fact, the

---

[6] The Defendants mistakenly claim that the range is 0% to 1.52%. Defs.' Facts ¶ 33. The Plaintiffs, in turn, question the low end of 0.00% as the accurate expense ratio for the Putnam Stable Value Fund. Pls.' Facts ¶ 61. Excluding Putnam Stable Value Fund from the analysis, the next "cheapest" Putnam mutual fund the Plan is invested in has a net expense ratio of 0.25%. Hines Decl., Ex. 35, The Putnam Retirement Plan -- 385008-01 Investment Performance as of 12/30/2011, at 2, ECF No. 92-37. That difference is not sufficient to change the conclusion the Court reaches below.

[16]

record reflects similar expense ratios in 2013 and 2015. Hines Decl., Ex. 37, Great-West Fee Disclosure 2013, at 9-13, ECF No. 92-39; Hines Decl., Ex. 62, Great-West Fee Disclosure 2015, at 10-14, ECF No. 92-64.

The Defendants argue that the fees associated with Putnam-affiliated funds are within a range that other courts have found reasonable as matter of law. Defs.' Mem. 9, 16 (citing Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013) (rejecting excessive fee arguments where expense ratios varied from 0.03% to more than 2.00%), vacated on other grounds, 135 S. Ct. 1923 (2015); Renfro v. Unisys Corp., 671 F.3d 314, 319, 327-28 (3d Cir. 2011) (rejecting excessive fee claims where expense ratios for the plan's investment options ranged from 0.1% to 1.21%); Loomis v. Excelon Corp., 658 F.3d 667, 669-70 (7th Cir. 2011) (rejecting excessive fee claims where expense ratios ranged from 0.03% to 0.96%); Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) (rejecting excessive fee arguments where expense ratios varied from 0.07% to just over 1%)).[7] Importantly, all of the Putnam mutual funds the Plan invested in were also offered to investors in the general public, therefore, their expense

---

[7] The Plaintiffs' reply that these are "old cases" and, therefore, carry little weight, is without merit. Tr. Case-Stated Hr'g 17, 22, 34, ECF No. 122. Fewer than ten years have passed since the oldest of the cited cases was decided. Case law does not become outdated at the same rate as smartphones.

ratios were "set against the backdrop of market competition."
Hecker, 556 F.3d at 586.   "The fact that it is possible that
some other funds might have had even lower ratios is beside the
point; nothing in ERISA requires every fiduciary to scour the
market to find and offer the cheapest possible fund (which
might, of course, be plagued by other problems)."   Id.

The Plaintiffs argue that the management fees Putnam mutual
funds paid to Putnam were materially higher on average than the
investment fees paid by other funds.   Pls.' Opp'n 16.   On this
point, the Plaintiffs rely on their expert, Dr. Steve Pomerantz,
whose report compares Putnam mutual funds' average fees to
Vanguard passively-managed index funds' average fees.   Decl.
Steve Pomerantz Supp. Pls.' Mot. Class Certification, Ex. 1,
Expert Report Steve Pomerantz, Ph.D. 35-44, ECF No. 70-1.   Dr.
Pomerantz's comparison, however, is flawed.   Vanguard is a low-
cost mutual fund provider operating index funds "at-cost."   See
Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 345
(2d Cir. 2006) (rejecting comparison of expense ratios between
mutual fund and one Vanguard fund -- "a firm known for its
emphasis on keeping costs low").   Putnam mutual funds operate
for profit and include both index and actively managed
investment.   Dr. Pomerantz's analysis thus compares apples and
oranges.   Moreover, even if the Court were to accept the
Plaintiffs' account of the range of Putnam mutual fund expense

ratios or average management fees, the Plaintiffs cite no relevant case law holding that such ranges or averages are unreasonable as matter of law.

Accordingly, the Court rules that Putnam mutual funds pay reasonable management fees to Putnam, and the Defendants have carried their burden on their Section 1108 defense with respect to the challenged transaction under Section 1106(a)(1)(C). Therefore, the Plaintiffs' prohibited transaction claim fails as matter of law under Section 1106(a)(1)(C).

### C.   29 U.S.C. § 1106(b)(3)

The Plaintiffs further allege that the Defendants violated Section 1106(b)(3), which provides that "[a] fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Pls.' Opp'n 14.  Section 1106(b)(3) is not limited to transactions involving assets of the plan, but extends to transactions made "in connection with" assets of the plan. Courts have interpreted this distinction to mean that Section 1106(b)(3) covers a broader swath of conduct than 1106(b)(1). See Leimkuehler v. American United Life Ins. Co., 752 F. Supp. 2d 974, 986-87 (S.D. Ind. 2010) ("A violation of section 1106(b)(3) can occur in a less direct manner than self-interested dealing with plan assets proscribed in (b)(1).");

[19]

Haddock v. Nationwide Fin. Servs., Inc., 419 F. Supp. 2d 156, 171 (D. Conn. 2006) ("Violations of section 1106(b)(3) must relate to transactions involving assets of the plan, although the consideration received by the fiduciary need not itself constitute plan assets.").

It would seem, though, that such a broad reading of Section 1106(b)(3) would essentially swallow the remaining prohibited transactions provisions of Section 1106. Nevertheless, the First Circuit's ruling in In re Fidelity highlights the concerning nature of Putnam's structure, and sheds some light on the proper interpretation of 1106(b)(3). The intent of Section 1106 is to protect against the siphoning of plan assets by plan fiduciaries, hence the repeated reference to transactions involving "plan assets" in the prohibited transactions provisions of Section 1106(a)(1) and (b). See Vander Luitgaren v. Sun Life Assurance Co. of Can., 765 F.3d 59, 62 (1st Cir. 2014). Absent the protections of a broad reading of Section 1106(b)(3), a fiduciary could shield itself from liability under the First Circuit's narrow definition of plan assets by simply structuring its transaction to avoid paying fees to a related party, as Putnam has done here, directly out of plan assets. In an open-end mutual fund, shares are bought and sold directly from a fund, on demand, at their net asset value. Open-End Fund, Investopedia, http://www.investopedia.com/terms/o/open-

endfund.asp (last visited Mar. 28, 2017). Because the amount of management fees -- calculated as a percentage of assets invested in the mutual funds -- is directly tied to the purchase of plan assets, that transaction satisfies the "in connection with" requirement of section 1106(b)(3).

### 1.   29 U.S.C. § 1108

The parties dispute whether Section 1108's safe harbor applies to Section 1106(b) prohibited transactions. Pls.' Opp'n 16; Defs.' Opp'n 8-9. The majority of courts have ruled that there is no "reasonableness defense" against self-dealing transactions prohibited under Section 1106(b). See, e.g., Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich., 751 F.3d 740, 750 (6th Cir. 2014); National Sec. Sys., Inc. v. Iola, 700 F.3d 65, 93-96 (3d Cir. 2012); Patelco, 262 F.3d at 910-11. But see Harley v. Minnesota Mining & Mfg. Co., 284 F.3d 901, 908-09 (8th Cir. 2002) (granting summary judgment in light of uncontroverted evidence that the challenged compensation was reasonable, stating "the plain language of [Section] 1108(c)(2) sensibly insulates the fiduciary from liability if the compensation paid was reasonable"). These courts rely on the Department of Labor's implementing regulations for that conclusion. In particular, the regulations state that "Section [1108](b)(2) of [ERISA] exempts from the prohibitions of section [1106](a) of the Act payment by a plan to a party in interest,

including a fiduciary, for office space or any service," 29
C.F.R. § 2550.408b-2 (emphasis added).  Given the weight of such
persuasive legal authority, the Court adopts the majority
approach to Section 1108 and holds that the Defendants may not
raise a reasonableness defense to the Section 1106(b)(3) claim.

### 2.  PTE 77-3

The Defendants further assert an affirmative defense under
PTE 77-3, which exempts transactions that otherwise fall within
Section 1106's prohibition.  Defs.' Opp'n 6.  PTE 77-3 states
that Section 1106 does not apply to plans investing in mutual
funds offered by the plan sponsor or affiliate where four
conditions are met.  Class Exemption Involving Mutual Fund In-
House Plans Requested by the Investment Company Institute, 42
Fed. Reg. 18,734 (Apr. 8, 1977).  The Plaintiffs challenge only
PTE 77-3(d), which requires:

> All other dealings between the plan and the investment
> company, the investment adviser or principal
> underwriter for the investment company, or any
> affiliated person of such investment adviser or
> principal underwriter, are on a basis no less
> favorable to the plan than such dealings are with
> other shareholders of the investment company.

Id. at 18,735.

The Plaintiffs first contend that the requirements of PTE
77-3 are not satisfied because Putnam made revenue sharing
payments in connection with Y shares of Putnam mutual funds to
third-party record-keepers, who rebated part of the revenue

[22]

sharing payments back to third-party plans.  Pls.' Mem. 18;

Pls.' Reply 16.  In untangling the elaborate facts of this case,

it becomes clear that the thrust of the Plaintiffs' prohibited

transaction claim is that Putnam's failure to give Plan

participants a revenue sharing rebate violates Section 1106.

Pls.' Suppl. Reply 5.  The result, the Plaintiffs contend, is

that Plan participants effectively paid higher expenses for the

funds relative to other non-Plan shareholders who received

revenue sharing rebates.  Id.

It is undisputed, and various Form 5500s from third-party

retirement plans show, that Putnam made revenue sharing payments

to third-party record-keepers.  Defs.' Suppl. Facts ¶ 48.  The

record also clearly shows that at least in some cases, revenue

sharing payments from Putnam were rebated, at least in part,

back to the other plans' participants.[8]  See Engstrom Decl., Exs.

---

[8] It is not clear, however, how often these revenue sharing
payments were rebated back to the third-party plans.  The fact
that many third-party record-keepers receive revenue sharing
from Putnam alone does not place Putnam's Plan participants at
disadvantage.  Rather, the Plaintiffs' argument requires that
the revenue sharing payments be rebated back to third-party plan
participants.  For example, Convergex's Form 5500 shows that
Putnam made revenue sharing payments of 0.25% to Convergex's
record-keeper, Engstrom Decl., Ex. 32, at 7, ECF No. 97-32, and
further reflects an entry of negative $71,712 under compensation
paid to the record-keeper by the plan, id. at 6, suggesting a
refund of revenue sharing payments to the Convergex Plan in that
amount, Pls.' Suppl. 9.  At the same time, ELGA Credit Union's
Form 5500, which also reflects revenue sharing of 0.25% paid by
Putnam, shows a positive $2,725 of compensation paid to the
record-keeper by the plan, which suggests no rebate.  Engstrom

30-35, ECF Nos. 97-30-97-35.  While the parties agree on these facts, they adopt significantly different interpretations of PTE 77-3.  There is little case law discussing PTE 77-3 in any depth.  The only court to do so interpreted PTE 77-3(d) as a reasonableness requirement mirroring that found in Section 1108, but did not discuss the scope of the exemption.  See Krueger v. Ameriprise Fin., Inc., No. 11-cv-02781 (SRN/JSM), 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012).  The Plaintiffs characterize PTE 77-3(d) narrowly as requiring the Defendants to "prove that not a single third-party retirement plan received more favorable treatment than the Plan due to revenue sharing from Putnam."  Pls.' Suppl. Reply 5.  The Defendants respond that PTE 77-3(d) does not apply to the challenged revenue sharing arrangements because they are not "dealings" within the meaning of the exemption, and in the alternative, that PTE 77-3(d) is satisfied because plan participants have received discretionary contributions far in excess of any rebate that the Plaintiffs are allegedly owed.  Defs.' Opp'n 8; Defs.' Suppl. Reply 3-4.  In essence, the Defendants focus not on the individual rebate transactions, but rather on the net position

---

Decl., Ex. 34, at 6, ECF No. 97-34.  The same ELGA document shows that Putnam was not the only fund that paid revenue sharing to the ELGA Plan.  Id. at 7.  The record therefore shows that, contrary to the Plaintiffs' assertion, some but not all third-party plans received revenue sharing rebates.

of the Plan participants vis-à-vis Putnam, as compared to third-party plan participants.

The Defendants first advance the argument that revenue sharing payments are not "dealings" within the meaning of the exemption because Putnam has no input in the amount of the rebate that is negotiated between third-party plans and their record-keepers. Defs.' Opp'n 8; Defs.' Suppl. Reply 3-4. There is no basis for such a narrow reading of the exemption. The Defendants' argument also plainly ignores the fact that the Plan sponsor, its record-keeper, and the investment manager are all Putnam entities. While it may be true that Putnam is not involved in determining the rebate negotiated between third-party bookkeepers and the plans they service, Putnam certainly is in the position to determine whether to give a rebate to its own plan participants. To allow Putnam to make revenue sharing payments to third-party record-keepers, then disclaim its involvement in the rebate transactions for the purposes of PTE 77-3, would undermine the exemption's protections against self-dealing. Indeed, such a rule would yield an untenable result, as any fiduciary could turn a blind eye to third-party dealings that place its own plan participants in an unfavorable position.

The Defendants' second argument is that PTE 77-3(d) is satisfied because Putnam made a total of $69.98 million in voluntary payments to Plan participants over the Relevant

Period.  Defs.' Facts ¶ 46.  With respect to the class
representatives, Putnam made voluntary contributions of
$207,501.19 to Glancy, id. ¶ 18, and $116,391.82 to Brotherston,
id. ¶ 10.  The Plaintiffs reply that the discretionary payments
are irrelevant to PTE 77-3 because the fourth condition of the
exemption "relates to how the Plan is treated as a shareholder
compared to other shareholders," and the voluntary contributions
are made to participants' accounts based on their status as
employees, not shareholders.  Pls.' Suppl. Reply 6.  This
argument appears to draw a distinction without a difference.  It
is undisputed that the Plan receives discretionary payments from
Putnam to its participants' accounts that other shareholders
clearly do not receive.  Defs.' Facts ¶ 46.  Indeed, a plain
reading of "all other dealings" requires that the Court examine
the totality of the economic relationship between the investment
manager and the Plan participants in order to determine whether
the fiduciary has placed its own Plan investors in an inferior
net position relative to third-party investors.

     This interpretation accords with the approach taken in this
Circuit with respect to enforcing a fiduciary's duties under 29
U.S.C. section 1104, which courts review "in light of 'the
totality of the circumstances.'"  Kenney v. State St. Corp.,
Civil Action No. 09-10750-DJC, 2011 WL 4344452, at *3 (D. Mass.
Sept. 15, 2011) (Casper, J.) (quoting Bunch v. W.R. Grace & Co.,

[26]

555 F.3d 1, 7 (1st Cir. 2009)).  Furthermore, this broader

construction of PTE 77-3(d) more faithfully respects the desire

of Congress "to ensure that plan funds are administered

equitably, and that no one party, not even plan beneficiaries,

should unjustly profit."[9]  Harris v. Harvard Pilgrim Health Care,

Inc., 208 F.3d 274, 279 (1st Cir. 2000) (quoting Martz v. Kurtz,

907 F. Supp. 848, 856 (M.D. Pa. 1995)); see also Provident Life

& Accident Ins. Co. v. Waller, 906 F.2d 985, 993 (4th Cir. 1990)

(finding strong statutory support for fashioning common law rule

of unjust enrichment allowing employers to recover erroneous

payments to pension funds); Carl Colteryahn Dairy, Inc. v.

Western Pa. Teamsters & Emp'rs Pension Fund, 847 F.2d 113, 122

(3d Cir. 1988) (same).  Allowing Plan participants to recover

for the lack of revenue sharing rebate when they have already

profited from Putnam's discretionary contribution to the Plan

would allow the Plan participants to be unjustly enriched.[10]

---

[9] Different courts have held that Congress, in enacting ERISA,
intended to give federal courts the authority to develop a body of
federal common law to supplement the statute's express provisions
whenever "necessary to effectuate the purposes of ERISA."  Harris
v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 279 (1st Cir.
2000); see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56
(1987); United McGill Corp. v. Stinnett, 154 F.3d 168, 171 (4th
Cir. 1998); Bollman Hat Co. v. Root, 112 F.3d 113, 118 (3d Cir.
1997); Weiner v. Klais & Co., 108 F.3d 86, 92 (6th Cir. 1997).

[10] The record reflects that Putnam opted not to pay revenue
sharing to Great-West as part of a risk-averse strategy to avoid
litigation, fearing that such payment might be challenged as an
ERISA violation given Great-West's affiliation with Putnam.  Hines

Accordingly, this Court finds that the PTE 77-3 requirement
that Putnam's dealings with Plan participants be on a "basis no
less favorable to the plan" than dealings with its other
shareholders is met.

### 3.    Statute of Limitations

The Plaintiffs also argue that the requirements of PTE 77-3
are not satisfied because Putnam introduced a lower cost R6
class of shares for twenty Putnam funds on July 2, 2012, but did
not convert the Plan's investments in Putnam mutual funds from
R6 to class Y shares until April 1, 2013.  Pls.' Opp'n 9, 11.
This is undisputed.  Defs.' Supp. Facts ¶ 35.  It is also
undisputed that R6 shares charge lower fees than Y shares.  Id.
¶ 37.  Indeed, the Plaintiffs seem to have the bulk of recent
ERISA cases implicating PTE 77-3(d) on their side here.  Other
courts have ruled that the exemption does not apply where an
investment company offered a lower-cost share class to other
employer-sponsored plans but failed timely to convert its in-
house Plan assets to the new lower-cost share class.  See, e.g.,
Wildman v. American Century Servs., LLC, No. 4:16CV-00737-DGK,
2017 WL 839795, at *10 (W.D. Mo. Feb. 27, 2017) (holding that
where an investment company fails timely to convert Plan assets

---

Decl., Ex. 23, Email Re: Putnam Retirement Plan-Follow Up (August
8, 2013) 2-3, ECF No. 113-23.  Because today's rulings do not
depend on the legality of revenue sharing payments to Great-West
by Putnam, the Court declines to draw any conclusions thereon.

to a lower-cost share class offered to other employer-sponsored
plans, PTE 77-3(d) is not met); _Moreno_ v. _Deutsche Bank Ams._
_Holding Corp._, 15 Civ. 9936 (LGS), 2016 WL 5957307, at *7
(S.D.N.Y Oct. 13, 2016) (same).

   The Defendants, however, argue that ERISA's statute of
limitations bars this aspect of the Plaintiffs' prohibited
transaction claims as to seventy-two investment funds.  Defs.'
Mem. 17-18.  29 U.S.C. section 1113 ("Section 1113") provides
that no action may be commenced after the earlier of:

> (1) six years after (A) the date of the last action
> which constituted a part of the breach or violation,
> or (B) in the case of an omission the latest date on
> which the fiduciary could have cured the breach or
> violation, or
> (2) three years after the earliest date on which the
> plaintiff had actual knowledge of the breach or
> violation;
> except that in the case of fraud or concealment, such
> action may be commenced not later than six years after
> the date of discovery of such breach or violation.

29 U.S.C. § 1113.  In response, the Plaintiffs contend that:
(i) they did not have "actual knowledge" of the claimed breaches
more than three years prior to filing suit and that Putnam had
fraudulently concealed its breaches by claiming that its
transactions were exempted; and (ii) the six year statute of
repose bars actions filed not more than six years after the
"last action which constituted a part of the breach or

violation," id. § 1113(1), which in this case is the monthly receipt of fees. Pls.' Opp'n 16-19.[11]

A plaintiff has "actual knowledge" when he or she knows "the essential facts of the transaction or conduct constituting the violation." Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 142 (1st Cir. 2005) (quoting Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1086 (7th Cir. 1992)). Here, the Plaintiffs argue that they lacked knowledge of many "essential facts," including knowledge regarding the Defendants' decision-making processes with respect to the Plan, as well as knowledge of facts negating possible exemptions. Pls.' Opp'n 18-19. The Defendants respond that all of the relevant information was clearly disclosed in the Plan's enrollment kit, and the Plaintiffs cannot argue that they were unaware of facts comprising defenses based on Section 1108 and PTE 77-3, on which the Defendants bear the burden of proof. Defs.' Reply 13-14.

Courts have rejected the argument that knowledge of facts negating possible affirmative defenses on which the Defendants

---

[11] The Plaintiffs' reliance on Tibble v. Edison International, 135 S. Ct. 1823, 1826 (2015), is misplaced. The Supreme Court held that claims based on alleged breaches of the continuing duty to monitor are subject to the six year statute of limitations. Id. at 1829. The decision did not, however, address Section 1113's three year statute of limitations that applies where plaintiffs have actual knowledge of the violation, which is the core of the Defendants' statute of limitations challenge to counts II and III.

[30]

bear the burden of proof is necessary to establish "actual knowledge." See Krueger v. Ameriprise Fin., Inc., No. 11-cv-02781 (SRN/JSM), 2014 WL 1117018, at *12 (D. Minn. Mar. 20, 2014). Indeed, the First Circuit in Edes found actual knowledge where the "Plaintiffs' claim of breach of fiduciary duty arises not from an intricate financial transaction . . . but from [the defendant's] decision to hire Plaintiffs without rendering them eligible to participate in its ERISA plans."[12]  417 F.3d at 142. Similarly, the underlying challenged transaction in this case is not so intricate as to impede the Plaintiffs from having actual knowledge.  The Plaintiffs were well aware that the parties involved were all Putnam entities.  As a result, the actual knowledge requirement is satisfied, and the three-year statute of limitations bars the Plaintiffs' prohibited transactions claims based on seventy-two investment funds.[13]

---

[12] Other circuits are split on the precise scope of the "actual knowledge" requirement.  While the Third and Fifth Circuits have required both a knowledge of the events that constitute the breach and knowledge that those events support a breach of fiduciary duty or violation of ERISA, the Sixth, Seventh, Ninth, and Eleventh Circuits require only knowledge of the events or facts underlying the breach.  See In re Northrop Grumman Corp. ERISA Litig., CV 06-06213 MMM (JCx), 2015 WL 10433713, *18-19 (C.D. Cal. Nov. 24, 2015) (collecting cases). The First Circuit has not spoken on this precise issue.

[13] The Plaintiffs further point out that Putnam's disclosures stated that the challenged transactions were "exempt party-in-interest transactions," apparently arguing that such statements render the three year statute of limitations inapplicable because of "fraud or concealment," 29 U.S.C.

Accordingly, the Court rules that the Plaintiffs'
prohibited transaction claim fails under Section 1106(b)(3).

### D.   Modified Class Definition

In light of the above rulings, it has come to the Court's
attention that its previous class definition fails to include
important elements of this case.   The Court, therefore, adopts
the following modified class definition:

> All participants and beneficiaries of the Putnam
> Retirement Plan who received discretionary
> contributions in excess of any unpaid revenue sharing
> rebate at any time on or after November 13, 2009,
> excluding Defendants, employees with responsibility
> for the Plan's investment or administrative functions,
> and members of the Putnam Investments, LLC Board of
> Directors.

This Court's decision is limited to the class of plaintiffs
that received discretionary payments from Putnam.   It is
undisputed that Putnam has made a voluntary contribution to
eligible participants in every year of the Relevant Period.
Defs.' Facts ¶ 46.   The record also shows, however, that in each
year, fewer Plan participants were eligible for discretionary
contributions than received matching contributions, suggesting
that there is a class of Plan participants that did not receive
their share of the nearly $70 million in discretionary payments.
See, e.g., Hines Decl., Ex. 56, ECF No. 92-58 ("For 2010, 1,671

---

§ 1113(2).   The Plaintiffs have not brought a fraud claim, and
the Plaintiffs make no effort to show why such statements by the
Defendants rise to the level of fraud or concealment.

participants are eligible for a discretionary contribution while
2,001 employees received matching contributions . . . .").
Because Brotherston and Glancy both received discretionary
payments, and the record is incomplete as to the number of class
members who may not have been eligible for discretionary
contributions, this Court makes no determination as to the
prohibited transaction claims with respect to this last group of
individuals.  The Court therefore enters judgment with respect
to the modified class.  See, e.g., Powers v. Hamilton Cty. Publ.
Def. Comm'n, 501 F.3d 592, 619 (6th Cir. 2007) (describing
courts' broad discretion to modify class definitions); In re
Monumental Life Ins. Co., 365 F.3d 408, 414 (5th Cir. 2004)
("District courts are permitted to limit or modify class
definitions to provide the necessary precision.").

## IV.  CONCLUSION

For the foregoing reasons, the Court finds and rules that
the Plaintiffs' prohibited transactions claims under Section
1106 fail.  Judgment will enter for the Defendants on counts II
and III.

**SO ORDERED.**

_William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

[33]