1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                          No. 1:15-cv-13825-WGY
                           Volume 1, Pages 1 - 80
4

5    JOHN BROTHERSTON, Individually and as Representative
     of a Class of Similarly-Situated Persons, and on
6    Behalf of the Putnam Retirement Plan,
                  Plaintiffs
7

8    vs.

9

10   PUTNAM INVESTMENTS, LLC, et al
                  Defendants
11

12                          * * * * * * * *

13

14
                      For Bench Trial Before:
15                    Judge William G. Young

16

17
                      United States District Court
18                    District of Massachusetts (Boston)
                      One Courthouse Way
19                    Boston, Massachusetts 02210
                      Wednesday, April 19, 2017
20

21                          * * * * * * * *

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                      Official Court Reporter
                     United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                        bulldog@richromanow.com
25

```
 1              A P P E A R A N C E S

 2

 3    JAMES H. KASTER, ESQ.
      PAUL J. LUKAS, ESQ.
 4    KAI H. RICHTER, ESQ.
      CARL F. ENGSTROM, ESQ.
 5       Nichols Kaster, PLLP
         4600 IDS Center
 6       80 South Eight Street
         Minneapolis, MN 55402
 7       (612) 256-3200
         Email: Kaster@nka.com
 8       For Plaintiffs

 9

10    JAMES R. CARROLL, ESQ.
      EBEN P. COLBY, ESQ.
11    MICHAEL M. HINES, ESQ.
      RAOUL D. KENNEDY, ESQ.
12       Skadden, Arps, Slate, Meagher & Flom, LLP
         500 Boylston Street
13       Boston, MA 02116
         (617) 573-4800
14       Email: James.carroll@skadden.com
         For Defendants

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X
 2
 3   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS
 4
 5   MARTIN SCHMIDT  (Continued.)
 6        By Mr. Lukas:        4              42
 7        By Mr. Kennedy:           23
 8
 9   STEVE POMERANTZ
10        By Mr. Kaster:     50
11        By Mr. Kennedy:
12
13                      E X H I B I T S
14
                          (None marked.)
15
16
17
18
19
20
21
22
23
24
25
```

1         P R O C E E D I N G S

2              (Begins, 9:00 a.m.)

3              THE COURT:  Please now remind the witness that

4    he is under oath.

5              THE CLERK:  I remind you that you remain under

6    oath.  Understood?

7              THE WITNESS:  Understood.

8              THE COURT:  Please be seated.

9              (Witness is seated.)

10             THE COURT:  And, Mr. Lukas, you may proceed.

11             MR. LUKAS:  Thank you, your Honor.

12

13   DIRECT EXAMINATION BY MR. LUKAS:  (Continued.)

14   Q.  Mr. Schmidt, let's start with the PBOC.  Were you

15   able to form an opinion with respect to whether the PBOC

16   met their fiduciary duty to the plan?

17   A.  I did.

18   Q.  And what was your opinion?

19   A.  That I didn't see any evidence that the PBOC had

20   given any meaningful direction or input to the actions

21   taken by the PBIC.

22   Q.  Can you give me some examples?

23   A.  Sure.  Based on my review of the material and the

24   meeting minutes, the majority of the, um, PBOC's actions

25   really entailed appointing new committee members for

1    both the PBIC and the PBAC and then also getting updates

2    on those meetings on a regular basis.  But there were

3    two areas, based on my review, that I had saw in the

4    meeting minutes and that, um, in 2009 --

5    Q.  Well, let me please stop you.  Before you start

6    there, Mr. Schmidt, let me ask you, was there any

7    indication or evidence of the PBOC taking any action or

8    considering removing any PBIC members?

9    A.  No, there was not.

10   Q.  Okay.  I'm sorry, go ahead, you're talking about

11   2009.

12   A.  Yeah, there were two, um, conversations that

13   happened in the, um, minutes over there that I looked at

14   over the years.  One was in 2009, um, there was a

15   discussion around having a preferred list of funds

16   within the plan.  The PBOC had some dialogue and, you

17   know, part of the -- a couple of the things that they

18   had talked about were issues related to adding the

19   preferred list of funds.

20   Q.  Well, let me stop you there, Mr. Schmidt.  Why don't

21   you turn in your binder to Exhibit 16.

22   A.  (Turns.)

23   Q.  And let me know when you're there.

24   A.  I'm there.

25   Q.  And this is the PBOC minutes from April 29th of

1    2009.  If you'd turn to the second page.

2    A.  (Turns.)

3    Q.  The second full paragraph, "A discussion followed."

4    Tell me when you're there?

5    A.  I'm there.

6    Q.  "A discussion followed about offering a preferred

7    list of funds, it was noted that this raised several

8    issues including an additional level of monitoring the

9    funds and an employee relations issue because we would

10   be recommending one employee/investors fund over

11   another."

12       Is this the meeting and the conversation you're

13   referring to?

14   A.  It is.

15   Q.  Okay, go ahead.

16   A.  Yeah, based on the discussion in the items that were

17   all in the meeting minutes it really, I think, addresses

18   two issues.  One, when they talk about the additional

19   level of monitoring required for the funds, that is an

20   indication then that there was no monitoring done for

21   the Putnam funds in the plan because, as the PBOC has

22   indicated, we now have to look -- we'll have to monitor

23   those preferred funds.

24   Q.  Okay.

25   A.  Secondly, um, the fact that they're addressing it,

1    it becomes an employee-relations issue.  Well, that's
2    where -- an indication that the business decisions are
3    -- there are business factors that are involved in
4    making that decision, that by being an employee-
5    relations issue, they're not wearing their fiduciary hat
6    at that point in time.
7    Q.  Okay, and those are the two examples that you're
8    talking about in this meeting with respect to -- well,
9    let me ask you this.
10        Is there any indication that any action was taken
11   with respect to a preferred list of funds or any
12   followed by the PBOC on this issue?
13   A.  Not on this issue at this time frame.
14   Q.  And what was the other example you were going to
15   share?
16   A.  There was another example, um, that happened in
17   2011, um, there were, um -- within two of the PBOC
18   meetings there was a discussion around having an
19   investment policy statement.  Now we had talked about
20   yesterday, I testified yesterday that an investment
21   policy statement is not required for the plan, but the
22   PBOC was having those discussions of whether it would be
23   prudent to add an investment policy statement.
24        At the second PBOC meeting, where the item was
25   discussed, it was mentioned that there would be a PBIC

1    meeting the next day where this topic would be

2    discussed.  Well, the topic was discussed, about having

3    an investment policy statement, at the PBIC meeting, but

4    there was no decision that was ultimately made.  And

5    following that, though, there's no follow-up in any of

6    the other PBOC meeting minutes of what that decision

7    was, whether it was decided to add an investment policy

8    or to not add it and if not, why not.

9          So that's just an example, I think, where a

10    prudent fiduciary would have really wanted to make sure

11    what was the conclusion for that process and why was the

12    decision made to add one or to not add an investment

13    policy statement.

14    Q.   And those are examples of why you reached the

15    conclusion that the PBOC did not meet their fiduciary

16    duty to the plan?

17    A.   Correct.

18    Q.   Let's turn back to the PBIC.

19          Did the PBIC consider and meet any, um, fund

20    rankings or other performance criteria?

21    A.   Um, yes, they did, they had access to what was

22    called the "AAG reports" that were initially

23    distributed, um, within the PBIC in the 2010 time frame.

24    Q.   Well, let me stop you there.

25          Would looking at performance rankings or using or

1    applying some criteria in ranking fund performance be

2    something that a prudent fiduciary would do?

3    A.   Yes, absolutely it's something that any fiduciary

4    would -- that a fiduciary would want to look at to make

5    sure how their funds are performing compared to others

6    in the market.

7    Q.   Okay, and what did you observe with respect to these

8    AAG reports?

9    A.   Well, based on the material that I had derived,

10   again through the meeting minutes, that the AAG reports

11   were distributed by or available from their recordkeeper

12   and -- which was at the time, I believe, Putnam, um, and

13   --

14   Q.   I'm sorry, who was the recordkeeper?

15   A.   I believe at that time it was Putnam who was the

16   recordkeeper.

17   Q.   Was the recordkeeper?

18   A.   Correct, Putnam was the recordkeeper for the plan at

19   that point in time, I believe.

20   Q.   Okay.

21   A.   And so those reports were distributed, um, and --

22   Q.   And who did these reports come from?

23   A.   Those reports came from a group that's called

24   "Advised Assets Group," which is a, um -- the investment

25   advisor for Great-West and Great-West is the sister

1    company for Putnam.  So they all fall under the same

2    corporate umbrella.

3    Q.  Okay.  Can you turn to Exhibit 32 and confirm for me

4    that this is one of the reports that you're talking

5    about?

6    A.  (Turns.)

7    Q.  Are you at 32?

8    A.  32?

9    Q.  Yes, 32.  Uh-huh.

10                THE COURT:  He's pausing perhaps because he

11   can't find it.

12                THE WITNESS:  Right, there is --

13                THE COURT:  I can't.

14   A.  Right, there is no 32.

15   Q.  32 is not in your binder?

16   A.  No.

17   Q.  Okay, I apologize.

18        Can you look on the screen, um, Mr. Schmidt, at

19   Exhibit 32 is the cover, and if we flip 4 pages in or 5

20   pages in, are these the AAG reports you're referring to?

21   A.  Yes, they are.

22   Q.  Okay.  So what did you observe with respect to --

23   now you said that these -- that the -- what did you

24   observe with respect to these reports?

25   A.  That this is really a tool that's utilized by AAG as

1    a way that they can rank the funds within the asset

2    class based on a risk-adjusted return over various

3    market conditions and time -- based on over market --

4    excuse me, based on over various market conditions.  So

5    within this report it's showing how certain funds, how

6    the Putnam funds are ranking, whether they're receiving

7    a passing grade or a failing grade or they're falling

8    above or below.

9    Q.  Okay, what would a prudent fiduciary do with these

10   -- with a report like this?

11              MR. KENNEDY:  Objection, lack of foundation.

12              (Pause.)

13              THE COURT:  No, overruled.  He may have it.

14   A.  A prudent fiduciary, what they would do is to, um,

15   understand the reports, understand what the reports are

16   really telling or the information that it's really

17   providing, and based on, um, the information it

18   provided, it's really to determine what are the next

19   steps, how will I utilize this information if I were to

20   utilize this information at all?

21   Q.  Okay.  And what did you observe with respect to

22   what, um, the PBIC did with these reports?

23   A.  Based on again a review of the meeting minutes, this

24   particular report was distributed to the PBIC, um, in

25   the 2010 time frame to all the committee members.  Um,

1   there was no discussion documented in the meeting

2   minutes in terms of what actions will be taken with this

3   particular report.  And then subsequent to that, while

4   those reports were provided to both I believe Mr. Mullen

5   and Mr. Goodfellow on an ongoing basis, I believe a

6   quarterly basis, those reports itself were not

7   distributed to the broader investment -- to the PBIC.

8   Q.  Did you find any evidence of an alternative report

9   being distributed to the PBIC?

10  A.  No, the PBIC did not have any monitoring process and

11  review process for the funds in the plan, based on

12  information that I reviewed, beyond what was available

13  through the AAG report.

14           MR. KENNEDY:  Move to strike everything after

15  the "No" as nonresponsive, your Honor.

16           THE COURT:  In the exercise of discretion,

17  that may stand.

18           MR. LUKAS:  Thank you, your Honor.

19  Q.  What would a prudent fiduciary do if they thought

20  this report was insufficient in some way?

21           THE COURT:  You know I do have some problem, I

22  let you have the earlier question, but now we're getting

23  into hypotheticals about, um, this "prudent fiduciary."

24  Now, um, I don't understand how he's got a model here of

25  particular behavior, um, I tell you candidly, um --

1          MR. LUKAS:  Okay.

2          THE COURT:  -- and I need to know the basis of

3    that if we're going to have some, um, explication of how

4    this fiduciary would react to specific hypotheticals.

5    It's one thing to say they were inadequately monitored.

6    I understand that.  That's my problem.

7          MR. LUKAS:  I understand, your Honor.

8    Q.  Mr. Schmidt, do you use these AAG reports in your

9    business?

10   A.  I do.

11   Q.  Okay, and how do you use these reports?

12   A.  Um, so I have a client where Empower is the

13   recordkeeper.  Empower is the recordkeeping arm now for

14   Great-West.

15   Q.  So it used to be -- AAG is now -- AAG used to

16   produce these reports and now Empower does?

17   A.  No, Empower is a combination of the existing Putnam

18   recordkeeping business at Great-West and JP Morgan.

19   Q.  I see.

20   A.  And AAG is still the investment advisor for

21   Great-West, which produces these reports.

22   Q.  I see.  So sorry for interrupting you.  Go ahead and

23   explain how you use these reports?

24   A.  So -- so for this particular report, um, with the

25   client that I work with, um, and meet with the

1    investment committee, we're going through a fund search

2    right now, for example.  So -- and this particular

3    client does not engage a 3(21) investment consultant,

4    I'm their consultant who would advise them, work with

5    them through the process.  So as we're going through the

6    analysis to determine which fund or funds we would want

7    to add to the plan, we're using this report as our

8    initial screening criteria to determine what type of

9    funds will we want to look at and do a more in-depth

10   analysis.  So this is really being utilized as a tool

11   just to do a preliminary screening before we would take

12   it to the next step for a more in-depth analysis.

13   Q.  And what's the next step?

14   A.  Based on what we would do to screen the funds, we

15   would then limit the number -- we would select a, um, a

16   limited number of funds that would go through to having

17   more in-depth review based on quantitative analysis and

18   then determine how we would ultimately select the fund

19   for the plan.

20            MR. KENNEDY:  I move to strike as beyond the

21   scope of his report.

22            THE COURT:  Yeah, where's that in the report?

23            MR. LUKAS:  Um, I don't believe that is in the

24   report, your Honor.

25            THE COURT:  The motion to strike is allowed.

1          MR. LUKAS:  Okay.

2    Q.  Mr. Schmidt, um, did you see any evidence of the

3    PBIC examining Lipper reports or any other kinds of

4    reports?

5    A.  No, I did not.

6    Q.  And when was the last you observed the use of these

7    AAG reports that the committee used?

8    A.  As I recall the last time that I saw it in the

9    committee meetings was in the 2010 timeframe.

10   Q.  Okay, thank you.

11         Mr. Schmidt, have you had the opportunity to form

12   an opinion with respect to whether or not the PBOC met

13   their duty of prudence with respect to taking advantage

14   of better share classes?

15   A.  (Pause.)  Can I just ask for a clarification?

16   Q.  Sure.

17   A.  You had mentioned the "PBOC," this is the "PBIC."

18   Q.  I'm sorry.  Yes.  Uh-huh.

19   A.  Yeah, um, I did.

20         THE COURT:  Well, now the clarification is

21   you're answering with respect to the "PBIC"?

22         THE WITNESS:  Correct.

23         THE COURT:  All right.  Now I'm oriented.

24         THE WITNESS:  Correct.

25         THE COURT:  Go ahead, you may answer.

1    Q.   And what opinion did you form with respect to the

2    PBIC's treatment of share classes?

3    A.   That for the initial share class conversion from the

4    Y shares to the R6 shares, that it took too long.

5    Q.   Okay, how long did it take?

6    A.   Um, from the time that the funds were announced,

7    which was in May, um, May, and then they were launched

8    in July -- they were available for, um, retail use in

9    July, they were ultimately added to the plan the

10   following April.  So at the point and the time the funds

11   were launched and added to the plan, it was 9 months.

12   Q.   And it's your opinion that was too long?

13   A.   Correct.

14   Q.   Does the fact that Putnam is a mutual fund company

15   with an investment division impact your opinions that

16   you've given the Court in this case?

17               MR. KENNEDY:  Lack of foundation, your Honor.

18               THE COURT:  No, overruled.

19   A.   No, it does not.

20   Q.   Why not?

21   A.   Um, because through this -- through my entire review

22   of the material it was apparent that there was no

23   process that was being utilized by the PBIC for

24   selecting the funds, monitoring the funds, and

25   ultimately replacing the funds.  So that would be the

1    first thing, there was no process that existed.

2          The second area, the second point is --

3    Q.  Well, how would that tie to whether or not they're a

4    mutual fund company?

5    A.  Well, it's just that -- it's more that because there

6    is no process that the PBIC, you know, is not really

7    taking into account, um, it's not taking into account

8    what the investment strength is or the investment

9    knowledge of the firm itself -- of Putnam itself.

10          THE COURT:  I guess I don't follow that

11    because, um, certain of their witnesses had been called

12    as adverse witnesses and they've testified, "Well, this

13    is our business," um, our, Putnam's business, and

14    therefore they've testified that the investment

15    committee relied upon that expertise because that's

16    their business as opposed to a widget company that has a

17    401K plan.  But you say the lack of process is to be

18    faulted whether it's a widget company or a mutual fund

19    company?

20          THE WITNESS:  Yes, and I was going to address,

21    from the second point then too where it's tied together,

22    that the -- that the investment division is not a

23    fiduciary to the plan.

24    Q.  Why does that matter?

25    A.  Because the fiduciaries for the plan are the ones

1    that should be making the investment decisions.  Now,

2    while there was investment committee members -- or if

3    there were investment people who were part of the PBIC,

4    there's no evidence that there was any discussion, any

5    process on how that would impact or influence the Putnam

6    funds in the plan.

7         So, one, it would be a lack of process, and, two,

8    it's that there is -- that they're not listed -- that

9    they're not a fiduciary for the plan, "they," meaning

10   the investment division, and, three, if anything I think

11   that it just makes sure that -- it's more incumbent

12   probably because they are a mutual fund company that

13   there is some type of process that's involved with it,

14   so that we can make -- so that Putnam or the PBIC can

15   make sure that, as decisions are being made, that those

16   decisions are being made with -- looking at it from a

17   fiduciary -- that the fiduciary hat's being worn and

18   that all of the decisions are being made on an unbiased

19   viewpoint, um, for the participants in the plan.

20   Q.  So why -- explain that to me further, why is it

21   important or why is the fact that they're a mutual fund

22   company make it more important that they have process?

23   A.  Because it's to make sure that the business

24   decisions are not being -- are not influencing which

25   funds ultimately make it into the plan.  So what would

1    need to happen is that process would very clearly define

2    again how funds are selected, how they're monitored, and

3    how they're ultimately removed from the plan.  By not

4    having a process, you really are not sure how those

5    decisions are ultimately made.

6    Q.   How about the fact that there was an SDBA added in

7    2008, does that affect your opinion with respect to the

8    lack of fiduciary duty by the PBOC and PBIC?

9    A.   No, the --

10   Q.   Why not?

11   A.   The SDBA is really just another option within the

12   plan and has nothing to do with the monitoring of the

13   Putnam funds in the plan.

14   Q.   Could you explain that further?

15   A.   Well, the SDBA is another investment vehicle that's

16   made up of, you know, a broad array of funds, nonPutnam

17   funds that the more sophisticated participant could

18   invest into.  That option was added by the PBIC back in

19   2008.  But within the Putnam funds within the plan,

20   there was no change in terms of how the monitoring --

21   there was no monitoring that was done and it didn't

22   influence any of the factors.

23   Q.   So all those Putnam funds stayed in the plan?

24   A.   Correct.

25   Q.   Okay, and it was your observation that those Putnam

1    funds stayed in the plan and weren't monitored even

2    without respect to whether SDBA was added or not?

3    A.   Correct.

4    Q.   Okay.  Can a -- well, let me ask it differently.

5         Could you turn to Exhibit 135 in the binder.

6    A.   (Turns.)  I'm there.

7    Q.   Okay, this is the meeting minutes from December 19,

8    2014 of the PBIC.  And if you could turn to the second

9    page, I believe this is the minutes where they're

10   discussing adding nonPutnam funds.

11        At the bottom of the big paragraph there that

12   starts "Mr. Goodfellow then reminded the committee" --

13   A.   Yes.

14   Q.   -- the last sentence says, "The DIAs would be

15   communicated to participants along with the

16   understanding that they also may invest in the other

17   investment options available under the plan, but that

18   such options were not reviewed by the committee."

19        Do you see that?

20   A.   I do.

21   Q.   And the DIAs are referring to the Mellon funds or

22   what eventually became the Mellon funds?

23   A.   Correct.

24   Q.   And the other investments are the Putnam

25   investments?

1    A.   Correct.

2    Q.   And then if you'd turn to Exhibit 146.

3    A.   (Turns.)

4    Q.   Let me know when you're there?

5    A.   I'm there.

6    Q.   Okay, that's the PBIC minutes from July -- the next

7    meeting, July 8th, 2015.  If you'd turn to the second

8    page.

9    A.   (Turns.)

10   Q.   The fifth paragraph down starting "Mr. Goodfellow

11   then noted."

12   A.   Yes.

13   Q.   About the middle of that paragraph, um, it is

14   repeated, "The DIAs would be communicated to

15   participants along with the understanding that

16   participants also may invest in any of the other

17   investment options available under the plan, but that

18   such options were not reviewed by the committee."

19        Do you see that?

20   A.   I do.

21   Q.   Do those indications or the discussion about not --

22   or advising the committee -- or advising the

23   participants, um, that the Putnam funds would not be

24   monitored, would that be any different from what you

25   observed in the record leading up to that time?

1    A.   Could you repeat your question?

2    Q.   Sure.

3         What Mr. Goodfellow is describing there as far as

4    advising the participants that, um, the Putnam funds

5    would not be reviewed, would that be a change from what

6    the PBIC was doing previously, according to your review

7    of the file?

8    A.   No, it would not be a change.

9    Q.   What if anything would be new about that?

10   A.   At this point there would be nothing new about that

11   process.

12   Q.   Okay.  Let's turn to Exhibit 157.

13   A.   (Turns.)

14   Q.   And let me know when you're there?

15   A.   (Turns.)  I'm there.

16   Q.   This is the announcement of the Mellon funds to the

17   participants in December of 2015.  If you'd turn to the

18   second page.

19   A.   (Turns.)

20   Q.   The bottom of the first paragraph -- and we've been

21   there before, but you and I haven't, um, starting with

22   -- the sentence that starts "Putnam fund window options

23   are."  Do you see that down there, about three-quarters

24   or two-thirds of the way?

25   A.   I do.

1  Q.  Okay.  "Putnam fund window options are automatically

2  offered under the plan's governing documents and you are

3  solely responsible for the selection and ongoing

4  monitoring of any investments utilized in the window."

5       Do you see that?

6  A.  I do.

7  Q.  From your review of the files, this is the first

8  that the participants were advised of this?

9  A.  Yes, based on information I reviewed, this is the

10  first time participants have been informed that there

11  would be no review of the Putnam funds.

12  Q.  Thank you, Mr. Schmidt.

13          MR. LUKAS:  Your Honor, I have no further

14  questions.

15          THE COURT:  Mr. Kennedy?

16

17  CROSS-EXAMINATION BY MR. KENNEDY:

18  Q.  Good morning, Mr. Schmidt.

19  A.  Good morning.

20  Q.  The opinions you've expressed are based on your

21  experience, correct?

22  A.  Correct.

23  Q.  And what you've done is you've taken your

24  experience, with regard to 401K plans, and tried to

25  apply those to the defendant's plan in this case,

1    correct?

2    A.   Correct.

3    Q.   And your experience didn't include working directly

4    for a mutual fund client, did it?

5    A.   No, it did not.

6    Q.   And the experience upon which you were basing your

7    opinions in this case did not include having worked with

8    a mutual fund's 401K plan, did it?

9    A.   No, it did not.

10   Q.   And your experience didn't include anything about

11   knowing the investment line-up offered by other mutual

12   funds in their 401K plans, did it?

13   A.   No, it did not.

14   Q.   And your litigation consulting experience that

15   you've told us about didn't include evaluating any

16   aspect of any mutual fund's 401K plan, did it?

17   A.   No, it did not.

18   Q.   And you haven't published anything about 401K plans

19   particularly with emphasis to mutual funds, have you?

20   A.   No, I have not.

21   Q.   And you yourself have never been a 401K plan

22   fiduciary, have you?

23   A.   No, I have not.

24   Q.   And your opinions are based on a combination of your

25   experience and materials that were provided to you by

1    counsel, correct?

2    A.  My opinions are based on 30 years of experience

3    within the retirement plan market and working with plan

4    sponsors with 401K plans --

5    Q.  And --

6    A.  -- and reviewing the materials.

7    Q.  Excuse me, sir?  I'm sorry.

8    A.  -- and reviewing the materials.

9    Q.  And those materials are set forth at Pages 22

10   through 24 of your report, correct?

11   A.  (Turns.)  Correct.

12   Q.  And those materials don't include any articles or

13   treatises or other writings dealing with how mutual

14   funds normally handle the choice or monitoring of

15   investments within their 401K plans, does it?

16   A.  No, it does not.

17   Q.  And the materials you've included don't include any

18   discussion of how any mutual fund, other than Putnam,

19   handles investments or monitoring of 401K plan

20   investments, correct?

21   A.  Could you repeat your question, please, again?

22   Q.  Sure.  I think I can do better.

23       The materials you reviewed in this case don't

24   include any survey concerning how other mutual fund

25   companies handle their 401K plans, do they?

1   A.   No, I don't think that's true.  To make sure I'm
2   answering your question right, the materials that I
3   reviewed did include, um, information from a survey
4   that, um, Putnam did perform in terms of whether an IPS
5   would be added with other -- with other fund companies.
6   Q.   And that was with regard to an investment plan,
7   correct?
8   A.   It was in regards, I believe, to an IPS.
9   Q.   Okay.  And you yourself didn't perform any survey of
10  mutual fund companies to see if they have an investment
11  policy?
12  A.   I did not.
13  Q.   Okay.  So other than the Putnam survey that dealt
14  with, what, four companies altogether regarding
15  investment fund policies, you haven't done any surveys
16  of other companies concerning investment fund policies,
17  correct?
18  A.   I have not done surveys for other companies -- um,
19  other -- but as I outlined in my report, that the use of
20  investment policy statements, there's a significant, um,
21  close to 90 percent of plan sponsors are utilizing
22  investment policy statements.
23  Q.   And your actual report itself doesn't include any
24  discussion of any practice or policy of any other mutual
25  fund company besides Putnam concerning 401Ks, does it?

1    A.   Correct.

2    Q.   And as you've told us, you've been around this

3    business for 30 years or so, correct?

4    A.   Correct.

5    Q.   And you could, if you'd wanted, have contacted

6    people in the business who actually served as

7    consultants to mutual fund 401K plans, couldn't you?

8    A.   I could have, what, in looking at the, um, in

9    forming my opinions for this particular case and looking

10   at -- this is a 401K plan and looking at it from a

11   fiduciary perspective and what would be prudent, whether

12   you're a mutual fund company or another type of

13   organization, it is a 401K plan and you need to have

14   prudent procedures on how you would really go through

15   the process for again selecting, monitoring, and

16   removing the funds from the plan.

17   Q.   But to answer my question, there was no prohibition

18   against your going and talking to some of your

19   colleagues who actually have mutual funds for clients to

20   see what they could tell you about the standards or lack

21   thereof, there was no prohibition against that, was

22   there?

23   A.   There was no prohibition.

24   Q.   And instead you decided entirely on your own that

25   the experience you'd had with nonmutual fund companies

1    applied equally with regard to mutual fund companies,

2    correct?

3    A.  I did not distinguish between a mutual fund company

4    and a nonmutual fund company in terms of how the -- what

5    would be prudent for, um -- with the plan.

6    Q.  And you have a copy of your report in front of you,

7    don't you?

8    A.  I do.

9    Q.  And Page 19, Paragraph 86, that's where you made

10   that determination, isn't it, where you said, "The

11   investment screening and monitoring process used by the

12   PBIC should have been no different from other plan

13   investment committees simply because Putnam is a mutual

14   fund company," that's what you said, correct?

15   A.  I just can't respond and read the paragraph.

16   (Reads.)  That's correct what you read.

17   Q.  And there's absolutely no citation of authority for

18   that sentence, is there?

19   A.  There is not.

20   Q.  Okay, and that's because you don't have any

21   authority to support that statement, do you, other than

22   your own opinion?

23   A.  It's based on my experience within the industry and

24   in working with plan sponsors.

25   Q.  It's based entirely on your own opinion, correct?

1    A.  It's based on my experience which forms my opinions.

2    Q.  As far as you know, the 7 billion people on the

3    planet, you're the first person to ever make that

4    statement, aren't you?

5    A.  I -- I can't comment on that one way or the other,

6    whether I am the first person to make that statement.

7    Q.  Well, you certainly haven't seen it made in writing

8    by anybody before you made it, have you?

9    A.  Um, I haven't looked to see -- I haven't seen a

10   writing, but I haven't looked to see whether it was in

11   writing before.

12   Q.  And you didn't include anything in your report to

13   try to show that that was based on something other than

14   your own opinion, did you?

15   A.  I did not.

16   Q.  Now, you talked a lot about documentation on direct

17   exam.

18        Other than for your report, is there any written

19   documentation for any of the criticisms you've voiced

20   about the defendants over the past two days?

21   A.  Are you referring to the lack of documentation for

22   the monitoring of the funds?

23   Q.  No, I'm referring to -- you've expressed opinions

24   here, if I wanted to go find written documentation of

25   any of your criticisms, is there any place other than

1    your report I could go to find it?

2    A.  Um, within -- no.

3    Q.  Okay.  And I take it we can agree that, as you're

4    sitting here now, you can't identify any group of mutual

5    fund companies that run their 401K plans in full

6    conformance with what you consider to be duties of

7    loyalty and prudence, can you?

8    A.  I did not compare it to the other 401K -- to other

9    mutual fund companies, no.

10   Q.  Changing topics.

11        As you told us in your deposition, if people at

12   Putnam, who were part of the PBIC, were also part of the

13   investment division and brought their investment

14   expertise to the PBIC, that would be a good thing,

15   correct?

16   A.  Absolutely.

17   Q.  Okay.  And you were here to listen to Mr. Lenhardt's

18   testimony last Friday, weren't you?

19   A.  I was.

20   Q.  And you heard him testify, you did, correct,

21   concerning what the folks with investment expertise do

22   when they're serving on the PBIC?

23   A.  I heard him outline the process for what the

24   investment division does.

25   Q.  Okay, and did you conclude that that would be a good

1    thing?

2    A.   Again I -- what the investment division is doing is

3    for the investment division and for business purposes

4    and is not related to what activity is taking place

5    within the PBIC.

6    Q.   Informing your opinions in this case, going back

7    before you heard Mr. Lenhardt, you made no attempt to

8    educate yourself about the work that the Putnam

9    investment division does, correct?

10   A.   I did not, they are not a fiduciary for the plan.

11   Q.   You're not a lawyer, are you?

12   A.   I am not.

13   Q.   Okay, so you're not offering a legal opinion here as

14   to who is and who is not a fiduciary, that's his Honor's

15   job, we can agree on that, can't we?

16   A.   I'm not offering an opinion -- correct, I'm not

17   offering an opinion as to who was a fiduciary.

18   Q.   And again in preparing your report, you did nothing

19   to try to understand what the investment professionals

20   at Putnam do with respect to monitoring investments

21   within the plan, did you?

22   A.   I did not.

23   Q.   Now, again you were here for Mr. Lenhardt's

24   testimony last Friday, correct?

25   A.   I was here for his testimony, correct.

1    Q.   And at least when I was speaking, I didn't see you

2    taking any notes.  Did you take any notes?

3    A.   I did not.

4    Q.   Because you had decided already that regardless of

5    what he said it wasn't going to affect your opinions,

6    correct?

7    A.   It did not affect my opinions.

8    Q.   And that was what you thought was going to be the

9    case when you sat down, didn't you?

10   A.   I didn't think of it, I didn't even know

11   Mr. Lenhardt was going to be testifying at that point in

12   time.

13   Q.   Now, you'd agree that there are prudent investors

14   who limit themselves to the funds offered by a

15   particular mutual fund company and diversify within

16   those offerings, correct?

17   A.   I think that there are some investors that do that,

18   correct.

19   Q.   And those include prudent investors, correct?

20   A.   They would be prudent investors.

21   Q.   Okay, so there's nothing imprudent about making your

22   investment choices solely within a family of mutual

23   funds, is there?

24   A.   No, there's nothing imprudent about investing it

25   within -- solely within a family, but again what we're

1    talking about, what I'm opining on in this case, is

2    really the process or lack of process for how funds get

3    into the plan and how they're monitored and are

4    ultimately removed.

5    Q.   In the course of reviewing the materials you were

6    provided in this case, did you find any instance where a

7    business person directed any PBIC member to take any

8    specific action that favored the business at the expense

9    of the plan participants, did you see that anywhere?

10   A.   Could you repeat your question again?

11   Q.   Sure.  Do you see any indication that anybody from

12   the investment division or elsewhere in Putnam was

13   trying to influence PBIC members to take action that

14   favored the company at the expense of the plan

15   participants?

16   A.   I would think, based on the testimony that we just

17   had, or about the conversations in the PBOC, about how

18   that would create employee relations issues, is an

19   example, where that's -- the business issues are really

20   driving whether we're going to add what was called at

21   that time the "preferred group of funds."

22   Q.   Now, your opinion that adding a new fund to a 401K

23   line-up is, without more, imprudent?

24   A.   Is it my opinion that -- well, could you repeat your

25   question?  It's --

1    Q.  Well, let me see if I can do that.

2                THE COURT:  Is it your opinion that adding a

3    new fund to a fund line-up is, without more, imprudent?

4    A.  And I'm just not sure what that last piece, "without

5    more imprudent"?

6                THE COURT:  Meaning that step, that choice --

7    as I understand your testimony, the decision, with some

8    exceptions, the -- but the general decision in the

9    overall plan documents was that all these open-ended

10   Putnam funds would be available to employees, they would

11   be part of the plan, have I got that right?

12               THE WITNESS:  That's correct.

13               THE COURT:  Okay.  Now, is it your opinion --

14   I'll ask, is it your opinion that putting that in the

15   charter so that that just happened, without more, is

16   that imprudent?

17               THE WITNESS:  I think that that's imprudent by

18   just saying "We're going to offer all of these funds

19   within the plan, all of these Putnam funds within the

20   plan," and yet they're not being monitored for the best

21   interest of the plan by the fiduciaries for the plan.

22               THE COURT:  All right.

23          Mr. Kennedy, pick up there.  Go ahead.

24               MR. KENNEDY:  Thank you.

25   Q.  Do you have any empirical evidence that new Putnam

1    funds don't fair as well as established funds?

2    A.   Um, I was engaged for this case to outline or

3    address the process or lack of process, I did not look

4    at individual funds in terms of how they performed

5    compared to other funds.

6    Q.   Okay, and that's true also as comparing new funds

7    with established funds, correct?

8    A.   That's correct.

9    Q.   Now, as you've told us, there is no one-size-

10   fits-all rule for retirement plans, is there?

11   A.   That's correct.

12   Q.   And, for example, the need for an investment policy

13   depends on the particular facts and circumstances?

14   A.   That's correct.

15   Q.   And just because a 401K plan fiduciary doesn't have

16   an investment plan doesn't mean that fiduciary is acting

17   imprudently, does it?

18   A.   No, it does not, and as I indicated in testimony

19   yesterday, an investment policy statement's not

20   required, but what an investment policy statement does

21   is that it really provides the guidelines and the form

22   of documentation for how the committee will operate in

23   their decision-making process.

24   Q.   Okay.  And when you were here on Friday you heard

25   Mr. Lenhardt testify that he had never even heard of the

1    AAG reports until he started preparing for this case,

2    you heard that testimony, didn't you?

3    A.   Yes, I did.

4    Q.   Okay, and you don't have any facts to contradict

5    that, do you?

6    A.   No.

7    Q.   Okay, and you haven't received any information in

8    the course of your work on this case that the investment

9    division was in fact using the AAG reports as part of

10   its evaluation, you don't have anything like that, do

11   you?

12   A.   I have not, I've seen no indication that the Putnam

13   investment division utilized the AAG reports.

14   Q.   (Pause.)  Do you have a copy of yesterday's

15   transcript there, have you been provided with that?

16   A.   No.

17           MR. KENNEDY:  Your Honor, with the Court's

18   permission may I put up a page from yesterday?

19           THE COURT:  Of course, he may be directed to

20   it.

21           MR. KENNEDY:  Your Honor, I'd request that we

22   show yesterday's transcript, Page 118, Line 17, through

23   Page 119, Line 5.

24           (On screen.)

25   Q.   And there you testified about two aspects of why you

1    thought keeping Putnam-only funds in the plan was a

2    breach of loyalty.  Do you see that testimony?

3    A.   I do.

4    Q.   First, that's beyond anything in your report, isn't

5    it?

6    A.   It was.

7    Q.   Okay.  And in addition, um, in the course of your

8    work have you found that there's some methodology by

9    which a mutual fund company can look at its array of

10   plans and say, "There's a good one that's going to

11   perform in the future and that's a bad one that won't"?

12   A.   It's not about identifying the funds that will

13   perform well in the future or the ones that don't, it's

14   about having a disciplined process on how you are

15   evaluating those funds so that you're ensuring that the

16   appropriate funds are getting into the plan.

17   Q.   And you told us they -- "They had not considered the

18   best funds in the industry, there are poor-performing

19   funds and there are well-performing funds in that

20   standpoint."

21         Looking ahead, how do I figure out what's a

22   good-performing and a bad-performing fund?

23   A.   Well, that's why you would want to have a process

24   that's in place so that you're able to have

25   some objective evaluation criteria on how funds are

1    going to be evaluated, and then based on that objective

2    evaluation criteria, make the decisions for what funds

3    are appropriate for the plan.

4    Q.   So what you need is an objective crystal ball, is

5    what you're telling us?

6    A.   No, I'm not saying it's an objective crystal ball,

7    I'm saying that from the PBIC perspective they would

8    need to set some standards in the objectives and what

9    the criteria would be used to evaluate the funds, and

10   based on the standards that the PBIC would set, then

11   they would make their decisions based on that criteria.

12   Q.   Turning your attention back to your criticism of the

13   conversion from the Y to R6 in connection with the new

14   share class, do you have that in mind?

15   A.   I do.

16   Q.   Okay.  You know nothing about the process for the

17   development of a new share class, do you?

18   A.   I do not.

19   Q.   But nonetheless you felt competent to opine on how

20   long it should take to convert from Y to R6, correct?

21   A.   I opined based on the reasonableness of when the

22   funds were available versus when they were eventually

23   added to the plan, and comparing that process then also

24   to when additional Y shares were converted to R6 shares

25   in the future.

1  Q.  In the course of working on this case, did you make

2  any attempt to survey how long it generally takes to get

3  from Y to R6?

4  A.  I -- based on my experience in working in the

5  industry and knowing what it would take from an

6  administrative and recordkeeping standpoint, I know how

7  long it would take from that point.

8  Q.  Even though you know nothing about the process for

9  the development of a new share class?

10  A.  I do not know the development of the share class,

11  but the shares itself were -- it was communicated, um, I

12  believe in May, that the new shares would be available,

13  um, for the industry -- um, for general market

14  consumption and they were ultimately launched in July

15  then.

16  Q.  Changing topics.

17       You're not saying that any plan participants have

18  been damaged, correct?

19  A.  No, I'm opining based on the process or lack of

20  process that was followed or not followed by the PBIC

21  and the PBOC.

22  Q.  But you're not opining on the consequences in terms

23  of damages in any as a result of those criticisms?

24  A.  No, I'm not opining on damages.

25  Q.  And you're not attempting to assess damages in this

1   case, correct?

2   A.  I am not.

3   Q.  Okay.  And you will agree with me that Putnam does

4   not make money off the plan, we can agree on that, can't

5   we?

6   A.  Um, again I think I testified to this within my

7   deposition testimony that Putnam is making money off the

8   plan based on the investments that are in the plan and

9   the asset management fee associated to it.

10  Q.  Didn't you testify that Putnam does not make money

11  off the plan?

12  A.  I believe I testified to what I just said.

13  Q.  Do you remember when your deposition was taken on

14  December 15th, 2016 in this case?

15  A.  I do.

16  Q.  Okay.

17          MR. KENNEDY:  Your Honor, I have a transcript

18  here.

19          (Hands transcript to witness.)

20          MR. KENNEDY:  And, your Honor, reading from

21  Page 1 -- 178, Line 7 through Line 18.

22      Question, "Do you acknowledge that the existence

23  of the Putnam 401K plan actually costs Putnam tens of

24  millions of dollars over the period of time that we're

25  looking at here when you factor in all of the

1    contributions that Putnam voluntarily makes into that

2    plan and that Putnam does not make money off of this

3    plan, it costs it money, correct?"  Answer, "Well, one,

4    Putnam should never make money off of the plan."

5    Question, "And it doesn't make money off of the plan,

6    correct?"  Answer, "Correct.

7    Q.  Those questions were asked and those answers given,

8    is that correct?

9    A.  Can you --

10              MR. LUKAS:  Your Honor, I would request that

11   the next page and a half be read in order to put this in

12   context, he's mischaracterized the testimony.

13              THE COURT:  Just a moment.

14              (Pause.)

15              THE COURT:  Well, to save time I'll read and

16   include in the record the, um -- we'll go on in that

17   transcript for the rest of that page and the, um, down

18   through Line 15 of the next page.

19        And you can go from there, Mr. Kennedy.

20              MR. KENNEDY:  Thank you, your Honor.  No

21   further questions.

22              THE COURT:  Very well.

23        Any redirect?

24              MR. LUKAS:  Yes, your Honor.

25

1    REDIRECT EXAMINATION BY MR. LUKAS:

2    Q.  Mr. Schmidt, Mr. Kennedy asked you about, um, your

3    experience working directly with, um, 401K plans of

4    mutual fund companies, do you remember that line of

5    questioning?

6    A.  I do.

7    Q.  And yesterday when you testified with respect to the

8    growth of 401K plans, um, how many plans did you say

9    there were in the 2012 time period?

10   A.  Um, there was a significant --

11              MR. KENNEDY:  Objection, beyond the scope of

12   cross.

13              THE COURT:  It is beyond the scope.

14   Sustained.  He's testified.  I have it.  There's a great

15   number.

16   Q.  Do you have any idea, Mr. Schmidt, of how many -- of

17   the plans out there today and the assets out there

18   today, do you have any idea how many of those are

19   specific to mutual fund companies' employees 401K plans?

20   A.  I do not, but the number of mutual fund companies,

21   um, that offer 401K plans relative to the market is a

22   very small portion of the overall market.

23   Q.  Um, could you turn -- um, Mr. Kennedy asked you

24   about surveys that you either conducted or reviewed in

25   connection with your testimony.  Could you turn to

1    Exhibit 33 in your binder.

2    A.  (Turns.)  Okay.

3    Q.  This is a document that you reviewed in connection

4    with your report?

5    A.  (Looks.)  It is.

6    Q.  Okay.  And this is a survey conducted by Mr. Mullen

7    in connection with IPSs in the retirement or in the

8    financial mutual fund industry, correct, or at least

9    direct competitors of it?

10   A.  It is.

11   Q.  And in this survey, um, State Street, Fidelity, and

12   Wellington all reported, um, on the fourth line, that

13   they monitor investment performance of their plan's

14   investment options relative to industry benchmarks,

15   correct?

16   A.  It does.

17   Q.  And State Street said quarterly, Fidelity said

18   annually, and Wellington said annually, correct?

19   A.  Correct.

20   Q.  Let's turn to a survey that is Exhibit 24.

21   A.  (Turns.)

22   Q.  We've got testimony in this survey in the case and

23   this is specific to, um, investment policy statements

24   being utilized in the financial services area, on the

25   far right, and it indicates that 88.3 of large-sized

1    plans utilize, um, IPSs, correct?

2    A.  Correct.

3    Q.  And 93 percent of midsized, correct?

4    A.  Correct.

5    Q.  And that's consistent with what you found generally

6    in the market not being specific to the financial

7    services industry?

8    A.  Those numbers are very consistent with what I've

9    outlined in my report for the utilization of investment

10   policy statements for a 401K plan.

11   Q.  Are you aware, um, Mr. Schmidt, of any exception to

12   the duties of loyalty or prudence for mutual fund

13   companies?

14   A.  I am not.

15   Q.  Mr. Kennedy asked you -- and I don't remember the

16   exact phrasing, but something about "The billions of the

17   people on the planet, are you the first one to come to

18   these conclusions?"  Do you remember that?

19   A.  I do.

20   Q.  Would you turn to Exhibit 146.

21   A.  (Turns.)

22   Q.  But before we look at 146, um, did your review of

23   the file indicate that Putnam received, um, legal advice

24   from their counsel at these PBIC meetings?

25   A.  Yes, there was a, um, the secretary was typically

1    part of each of the meetings and -- yes, they were part
2    of each of the meetings.
3    Q.   In fact they were present at almost every meeting?
4    A.   Correct.
5    Q.   Okay, let's look at 146, which was July 8th, 2015 on
6    the first page, the bottom of the first larger
7    paragraph, Mr. Giorgi, who's a lawyer, states:  "He also
8    advised the committee that under ERISA acting prudently
9    requires adherence to prudent process, which would
10   include gathering of pertinent information, review,
11   analysis, discussion, and documentation of decisions."
12        Do you see that?
13   A.   I do.
14   Q.   Did you -- if you look down in the next paragraph,
15   the last sentence of that one, Mr. Giorgi says:  "The
16   Supreme Court confirmed that plan fiduciaries have an
17   ongoing duty to monitor a plan's investment line-up
18   under ERISA, but declined to provide any guidance on the
19   precise scope or contours of that duty, leaving
20   interpretation to the lower courts."
21        Do you see that?
22   A.   I do.
23   Q.   Did you see anywhere in the records that you
24   observed of the lawyers saying "unless you're a mutual
25   fund company" or that there's some mutual fund company

1    exception?

2    A.   I did not.

3    Q.   Okay, let's turn to the next page of this exhibit.

4    A.   (Turns.)

5    Q.   The third paragraph down begins "Mr. Tate."

6         "Mr. Tate stated that a number of recent court

7    cases and settlements by the mutual fund providers have

8    highlighted that the mere fact that a plan document

9    hard-wires in particular offerings, as in Putnam's case,

10   may not eliminate the need for fiduciary review and

11   monitoring of the line-up."

12        Do you see that?

13   A.   I do.

14   Q.   Did you see anywhere in the record where Putnam's

15   lawyers told them, um, "unless you're a mutual fund

16   company"?

17   A.   I did not.

18   Q.   So of all the billions of people on the earth, you

19   aren't the only one to have this opinion, correct?

20   A.   Correct.

21   Q.   You also were asked about the testimony of

22   Mr. Lenhardt, that you were here for, from the

23   investment division of Putnam?

24   A.   Yes, I was.

25   Q.   Were you here when Mr. Lenhardt told Mr. Kaster that

1    he didn't know what Mr. Kaster meant by a "fiduciary,"

2    um, to a 401K plan?

3    A.  I did.

4    Q.  And was, um, from your understanding from the

5    record, was Mr. Lenhardt ever a member of the PBIC?

6    A.  He was not or is not.

7    Q.  Okay.  And the investment division -- or

8    Mr. Lenhardt was never a fiduciary?

9    A.  He was not.

10   Q.  And not being a fiduciary and not being on the PBIC,

11   did it surprise you -- did it surprise you, when you

12   heard Mr. Lenhardt testify, that he never heard of the

13   AAG reports?

14              MR. KENNEDY:  Irrelevant.

15              THE COURT:  Yeah, what would surprise him is

16   irrelevant.  So sustained.

17              MR. LUKAS:  Okay.

18              (Pause.)

19              MR. LUKAS:  No further questions, your Honor.

20              THE COURT:  Nothing further for this witness,

21   Mr. Kennedy?

22              MR. KENNEDY:  Nothing further, your Honor.

23              THE COURT:  You may step down.  Thank you.

24              (Steps down.)

25              THE COURT:  Call your next witness.

1          MR. KASTER:  The plaintiff calls Steve

2    Pomerantz to the stand.

3          THE COURT:  Mr. Kaster, just to get a handle

4    on the schedule, is this going to be your last witness?

5          MR. KASTER:  It is.

6          THE COURT:  Thank you.

7          MR. KASTER:  He is, rather.

8          THE COURT:  Thank you.

9          (Pause.)

10          THE COURT:  And do I have a copy of his expert

11    report in this file?

12          MR. KASTER:  You do, your Honor, you have both

13    his expert -- you have three things, his expert, his

14    rebuttal, and his supplemental report.

15          THE COURT:  Thank you.

16          (Pause.)

17          MR. KASTER:  The witness has a poorly-timed

18    personal break, your Honor.

19          THE COURT:  No, no, I -- that's fine.  It's

20    perfectly fine.  When I have the jurors here, I tell

21    stories about the courtroom.  But you're too jaded to be

22    amused by them.

23          (Laughter.)

24          MR. KASTER:  I am easily amused, your Honor.

25          THE COURT:  Very well.

```
 1          It's -- I'm not seeking an answer here and, um,
 2     some of you practice in this courthouse, but for my
 3     money this is the finest courthouse in the United
 4     States.  I take no responsibility for it.  My colleague,
 5     Douglas Woodlock, in essence was the Clerk of the Works.
 6     This is a courthouse that, um -- well, this wonderful
 7     architecture was truly designed by a judge.  And very
 8     quickly, so I have something of substance.
 9          One of the remarkable things are the arches, you
10     don't see the arches in --
11               THE COURT:  (To the witness entering.)  We're
12     just telling stories.
13               THE WITNESS:  Please don't let me interrupt
14     you.
15               THE COURT:  You can come up to the witness
16     stand.
17          And very quickly, the arches -- while everything's
18     symbolic, the arches have some important symbolism.  The
19     arch over the doors is that this is a public courtroom
20     and the public is invited in here and of course
21     constitutionally has a right to be here.  The arch along
22     the wall to my right is for the jury in cases that are
23     triable to the jury, um, that portion of the public or
24     the jury sits.  This arch is for the judicial officer.
25     But most significantly for your purposes, the arch here
```

1    is for the legal profession, it's how the jury views the

2    courtroom.  This arch frames the table where you

3    attorneys, mediators, um, the advocates, um, practice

4    your profession, within the well of the courtroom.  It's

5    the other reason why the carpet is darker there, for the

6    trial advocates, that's where you practice your

7    profession.  Also we found the acoustics didn't work, so

8    they made them a little deeper and got a darker carpet,

9    and I gave it that meaning, that meaning to me.

10                (Laughter.)

11                THE COURT:  All right.  Times up.  Let's swear

12    the witness.

13                MR. KASTER:  Thank you, your Honor.

14                (STEVE POMERANTZ, sworn.)

15

16                * * * * * * * * * * * * * * *

17                STEVE POMERANTZ

18                * * * * * * * * * * * * * * *

19

20    DIRECT EXAMINATION BY MR. KASTER:

21    Q.  As a formality, Mr. Pomerantz, why don't you state

22    your full name for the record, please.

23    A.  Steve Pomerantz, P-O-M-E-R-A-N-T-Z.

24    Q.  And when were you retained by our firm in this case?

25    A.  About a year ago.

1  Q.  And what was the purpose for which you were

2  retained?

3  A.  Um, to evaluate the Putnam 401K plan.

4  Q.  And how are you being compensated?

5  A.  I'm paid hourly for my time.

6  Q.  And how many hours have you put in on this case so

7  far?

8  A.  Um, through the trial it would be approximately 200

9  hours.

10 Q.  Tell us about your educational background?

11 A.  I have a B.A. in math from Queens College at the

12 City University of New York and a PhD in math from UC

13 Berkley.

14 Q.  So the focus of your education was in mathematics?

15 A.  Yes, sir.

16 Q.  Okay.  Tell us about your teaching experience since

17 finishing your schooling?

18 A.  Um, I've had a number of adjunct positions at the

19 undergraduate and graduate level, um, teaching classes

20 in math, probability, statistics, operations research,

21 and finance.

22 Q.  You've also given seminars over the years, is that

23 correct?

24 A.  Yes.

25 Q.  And why don't you tell us the subjects of those

1    seminars?

2    A.   Those are seminars that I've delivered as either

3    part of my employment or consulting work in a variety of

4    investment-related issues, um, topics like asset

5    allocation, securities pricing, investment analysis, due

6    diligence, um, and performance attribution.

7    Q.   Have you also provided seminars on the subject of

8    portfolio management?

9    A.   Yes, and risk management.

10   Q.   How would you characterize the area of your work?

11   A.   Um, broadly speaking I would say "investment

12   management-related" or, um, the analysis of

13   publicly-traded securities, products based upon

14   publicly-traded securities, derivative transactions,

15   based on those types of securities, um, issues

16   pertaining to the investment management industry, more

17   business-related issues having to do with, um, contracts

18   or business plans or setting up businesses.

19   Q.   And in terms of the specific areas of your

20   employment or work over the years, how would you

21   describe those areas?

22   A.   I'm sorry, can you repeat that?

23   Q.   Sure.  The specific areas of your work?

24   A.   Um, I've worked as a portfolio manager, as a risk

25   manager, um, an asset liability manager, I've been a

1    trader, um, I've been a researcher, I've been a

2    structurer of products, um, I've --

3    Q.   Have you also worked in asset allocation?

4    A.   Yes.

5    Q.   And what specifically have you done in that area?

6    A.   Um, that's a pretty big component of most of the

7    jobs that I had, at one particular advisor I was the

8    chair of the asset allocation committee for the firm as

9    a whole.

10   Q.   Have you also worked as a primary fund advisor?

11   A.   I've worked as an advisor to separate accounts as,

12   um -- also for mutual funds, I've also worked as a

13   subadvisor to mutual funds and separate accounts for

14   both traditional and alternative products.

15   Q.   So let's frame this in terms of time.  When did you

16   finish your schooling?

17   A.   In 1986.

18   Q.   And, um, what firms have you worked for, um, did you

19   work for between 1986 and the time that you started your

20   consulting business in or around 2000?

21   A.   My first position was with Bank of America.  I then

22   moved on to Morgan Stanley, Citibank, Numora Securities,

23   and Weisbach & Greer, um, which will take us through the

24   year 2000.  At which point my work transitioned more on

25   a consulting basis and I worked for entities like New

1    York Life Investment Management, um, Galileo Capital,

2    Lotus Partners, Puller Partners, Global Asset

3    Management, Hunt Asset Management, and a variety of

4    consulting projects to define benefit plans, define

5    contribution plans, and insurance companies.

6    Q.   All right.  And you have also worked in the courts,

7    um, over the years, is that correct?

8    A.   Yes.

9    Q.   And when did you begin your work in the courts?

10   A.   Um, 2006 was the first, um, time that I worked as an

11   expert.

12   Q.   And, um, how would you frame broadly the topic of

13   your work in terms of subject matter?

14   A.   Pretty similar to my professional work, I would say

15   "investment management" very very broadly.  I would look

16   at issues pertaining to basically the management of

17   publicly-traded securities, and that could involve

18   business issues, contractual disputes, investment

19   management performance, performance attribution,

20   compensation, level of fees, um --

21   Q.   And over the years how many times have you testified

22   in courts or in deposition?

23   A.   Approximately 100.

24   Q.   Okay.  And any examples of cases close to this one?

25   A.   I think the two closest cases to this one, um, that

1    I have gone to trial, would be the *Tussey vs. ABB* case

2    and the *Tibble vs. Edison* case.

3    Q.  So *Tibble vs. Edison*, is that the case that went to

4    the U.S. Supreme Court?

5    A.  Yes.

6    Q.  And you were a testifying expert in that case?

7    A.  Yes.

8    Q.  By the way, did you testify for the plaintiff in

9    that case?

10   A.  Yes.

11   Q.  And how would you break down your work in terms of

12   work for plaintiffs or work for defendants?

13   A.  It's about 90 percent for plaintiffs.

14   Q.  *Tussey vs. ABB* is the other case that you

15   referenced, right?

16   A.  Yes.

17   Q.  And is that the subject of a recent court decision

18   by the Eighth Circuit Court of Appeals?

19   A.  Yes.

20   Q.  (Pause.)  When you were retained by our firm in this

21   case had you done any prior work for our law firm?

22   A.  No.

23   Q.  You have, um, summarized your work in terms of your

24   written reports, correct?

25   A.  Yes.

1    Q.  And I believe we have your written reports in this

2    case as, um -- in the binder as AG, as your initial

3    report.  Do you see that there?

4    A.  Yes.

5    Q.  AH as your expert rebuttal report.  Do you see that?

6    A.  Yes.

7    Q.  And DH as your supplemental expert report, correct?

8    A.  Yes.

9            MR. KASTER:  I offer AG, AH, and DH.

10            MR. COLBY:  Your Honor, we have an objection

11    to the reports and --

12            THE COURT:  Yeah, sustained.  We're not

13    receiving the reports in evidence, though I'm going to

14    use it as a way to, um, set boundaries on his testimony.

15            MR. KASTER:  Well, your Honor, my concern is

16    this precisely.  I'll be referring to charts and graphs

17    in the reports.  So if they can be received if only for

18    illustrative purposes so the witness -- it's helpful, I

19    think, to the Court and the witness and all of us to

20    follow his testimony.

21            THE COURT:  That's a different issue.  I'm

22    open to taking them, as we call them, as "demonstrative

23    aids" or "chalks," but they're not evidence.  But if

24    they help me understand the testimony of the witness,

25    um, on a proper foundation, of course.

1       MR. KASTER:  Fair enough.  Thank you, your
2   Honor.
3   Q.  I was asked -- or you were asked in this case to
4   look at several questions, correct?
5   A.  Yes.
6   Q.  And one of the questions was, "Was there prudent
7   management of the plan's investments?"  Correct?
8   A.  Yes.
9   Q.  And one was "Whether the fiduciaries gave improper
10  preference to Putnam?"  Do you recall that?
11  A.  Yes.
12  Q.  And one of the questions was "Whether the plan
13  suffered any losses because of the improper and disloyal
14  management of the plan's investments?"  Correct?
15  A.  Yes.
16  Q.  All right, we're talking about a defined
17  contribution plan, I think we all know that at this
18  point, and we've talked about -- and you were here for
19  Mr. Schmidt's testimony, correct?
20  A.  Yes.
21  Q.  The size of the plan, as described by him, um --
22  well, what's your understanding of the size of the plan
23  and why is that relevant?
24  A.  Um, the size of the plan is relevant because most of
25  the services that are being provided to a 401K plan, um,

1    benefit in some way from economies of scale and what

2    that means, in very simple terms, is that costs will

3    tend to go down as the size goes up.  There are a lot of

4    service providers to a 401K plan, but all of them will

5    benefit from size, whether it's an administrative or an

6    advisory function, there is benefit.  So what that

7    implies is that the overall fee for a 401K plan will be

8    dependent on the size of it and that becomes a factor in

9    the evaluation of a plan.

10    Q.  You mean the overall fee?

11    A.  Yes.

12    Q.  The investment line-up, how important is that in a

13    defined contribution plan?

14    A.  It's very important because ultimately that is what

15    defines what it is that people can invest in.  You can't

16    invest in something that's not in the plan and you are

17    constrained by the choices that are in the plan, and

18    will be motivated by what's in the plan.

19    Q.  And you're familiar with the standard of care for

20    fiduciaries for a 401K plan, correct?

21            MR. COLBY:  Objection, your Honor, that

22    question gets at one of the bases on which we've moved

23    to strike Dr. Pomerantz's --

24            THE COURT:  Well, we're certainly going to be

25    interested in his understanding.  It may not be

```
 1    determinative, but I will accept the answer to get some
 2    feel for what his understanding is, and compare it to
 3    the legal standard.
 4            You may answer.
 5    A.   I'm sorry, could you repeat the question.
 6                THE COURT:  What's your understanding of a
 7    fiduciary under a 401K plan?
 8    A.   The fiduciary of the plan has to make decisions for
 9    the plan solely to the benefit of the participants of
10    the plan and not for themselves.
11    Q.   And does that -- is there a piece of the standard
12    that also relates to prudence?
13    A.   Yes.
14    Q.   And how would you describe that?
15    A.   Um, prudence requires that the fiduciary of a plan
16    perform in a manner comparable to how other fiduciaries
17    are going to behave.
18    Q.   And as you understand the standard of care, does
19    each investment in the plan have to be prudent?
20    A.   Yes.
21    Q.   Let's talk about building and maintaining a prudent
22    line-up.  How do you go about doing that?
23    A.   Um, well, you kind of start off at the top, you have
24    to determine what asset classes you want represented.
25    Legally you're only obligated to offer three, a cash
```

1    investment, a bond, and a stock, um, but that would be a

2    very very simple plan.  But if it just had three

3    investments, each of those three categories then gets

4    further divided, um, according to industry

5    stratifications, and depending upon the complexity and

6    sophistication of the plan, it will begin to, um,

7    bifurcate those different asset classes into

8    subcategories.

9            So for a fixed-income investment, you might want

10   to offer a government bond investment or you might want

11   to offer mortgages or forfeits.  In the stock world, you

12   might want to differentiate between large cap and small

13   cap, you might want to differentiate between domestic

14   and international.  And so depending on the plan, you

15   can start to bifurcate into more pieces.

16   Q.  Can you give us an example of a prudently-designed

17   plan?

18   A.  I think a basic plan would be described by the U.S.

19   Government's TSP plan, which is a 401K plan.  It

20   basically consists of a money market option.  It has two

21   fixed-income options, one that's government only, and

22   the other extends out into other credit, um, issuers.

23   It has two domestic equity options, one that's large cap

24   and the other that completes the rest of the U.S.

25   market.  There's also an international equity option.

1    And then there are target-date funds that are created

2    off of those basic building blocks.

3    Q.  So that's an example of a prudently-designed plan in

4    your view?

5    A.  Yes.

6    Q.  Is there a problem or can there be a problem with

7    too many offerings?

8    A.  Yes.

9    Q.  Describe that, please.

10   A.  When you start to add options, there's the potential

11   for certain problems, you can create confusion amongst

12   your participants and that can lead to all types of

13   difficult behavior and problematic behavior.  So from a

14   qualitative perspective, I just think more options

15   create confusion.

16        From a quantitative perspective, the main problem

17   is that what research shows is that as you increase the

18   number of options in a plan, fees for the plan will tend

19   to increase, they just tend to increase merely because

20   you're adding more options.  You also can create

21   redundancy within the plan, that adding more options

22   does not necessarily create more diversification, you

23   actually can get to a point where you stop adding

24   diversification and you actually just start adding cost.

25   And these are well-documented problems that occur in

1    plans as the number of options increase.

2    Q.   Okay, well, let's talk about one of the exhibits in

3    this case, the Putnam Fiduciary Planning Guide that's

4    been offered and received as Exhibit 15, and I'll ask

5    you to go to -- it's in your binder there, and I'll ask

6    you to go to Page 17 of the guide, please.

7    A.   (Turns.)

8    Q.   Do you see in the bottom left-hand corner of the

9    document, um, the sentence that begins "Too many funds"?

10   A.   Yes.

11   Q.   It says here, "Too many funds can often end up

12   increasing the exposure to fiduciary liability, a large

13   number of funds may become too difficult for some

14   investment committees to monitor adequately and too

15   overwhelming for participants to use successfully."

16       Is that consistent with your understanding of some

17   of the problems that may arise as a result of having too

18   many funds?

19   A.   I think that's a good summary of what I just said.

20   Q.   Now, you mentioned that this inevitably leads to an

21   increase in cost.  Can you explain that using examples

22   of this plan?

23   A.   Um, a very good example in this plan would basically

24   be to compare, um, the S&P 500 -- the Putnam S&P 500

25   index fund and a recently added BNY large-cap index CIT.

1  Those are mutual funds -- well, one's a CIT, one's a

2  mutual fund, but they roughly do the same thing, and yet

3  their fee is different, their fee has to be different.

4          MR. COLBY:  Objection, your Honor, I move to

5  strike that answer as beyond the scope of

6  Dr. Pomerantz's report.

7          THE COURT:  Where in the report are we talking

8  about?

9          MR. KASTER:  Um, specifically this, um,

10 problem is outlined in both -- I believe in the initial

11 report.  I don't believe it's beyond the scope of the

12 report.

13         THE COURT:  Well, it's conclusory.  Where is

14 it?

15         MR. KASTER:  I don't have that page right in

16 mind, your Honor.

17         THE COURT:  Well, we'll strike it for now, you

18 can come back to it with specifics.

19      Go ahead.

20         MR. KASTER:  All right.  I will find it.

21         THE COURT:  Yes.

22         MR. KASTER:  Thank you.

23 Q.  Is there another example, um, on the bond side?

24 A.  There's also a Putnam bond index fund and a

25 comparable CIT offered by BNY.  Both of those products

1    exactly track the Barclay's aggregate index and yet

2    again there is a fee difference between them.  And so by

3    default somebody's paying more than somebody else.

4    Q.  And we talked about those two --

5                MR. COLBY:  Sorry.  I'm sorry, the same

6    objection, there's no discussion of that in

7    Dr. Pomerantz's report.

8                THE COURT:  Where is it in the report?  I mean

9    I'm going to hold him to the report and that's

10   important.

11               MR. KASTER:  Yes, and I understand that, your

12   Honor, and I -- and I know this discussion exists in the

13   report, but I don't have it in mind.

14               THE COURT:  All right, then I'm going to

15   strike it.  You can come back to it.

16               MR. KASTER:  All right, I'll come back to it.

17   Thank you.

18   Q.  Let's talk about, um, benchmarks.  What is a

19   "benchmark"?

20   A.  A "benchmark" is a collection of stocks or bonds

21   that are said to be representative of a particular

22   sector of the market, it is typically an unmanaged

23   collection of securities that provides a barometer or a

24   measure for the performance of the market as a whole.

25   When we say the "market," we're often referring to a

1    benchmark, like the S&P 500 or the Dow Jones or the

2    Barclay's capital aggregate bond index.

3    Q.   And, um, is it appropriate to measure, um, the

4    performance of actively-managed funds against index

5    funds?

6    A.   Yes.

7    Q.   And why?

8    A.   Well, first of all the primary way of measuring the

9    performance of any investment product is against a

10   benchmark, it's what investors use to set their

11   expectations, it's what portfolio managers use to set

12   their construction of a portfolio, it's what risk

13   managers use to control the behavior of a portfolio.

14   The largest criticism about index funds is that they're

15   not about indexes, they're not investable, you cannot

16   buy the Dow Jones, you cannot buy the S&P 500, and

17   that's true, but an index fund is something we can buy

18   and it will faithfully represent the behavior of an

19   index, if managed properly, and it will deliver the

20   returns of that index less the fee that has been levied.

21   Q.   So in terms of the index fund, it actually

22   represents what it takes to get into the index, so it

23   includes the cost of doing it?

24   A.   An index fund -- right, it will incorporate things

25   like commissions, and spreads, and market impacts, and

1    it adds a lot of things that turn a benchmark into a
2    reality.
3    Q.  Now, I want to take a look at Exhibit 200, Page 408.
4    A.  (Turns.)
5    Q.  And this is actually part of the evidence in this
6    case and it's the, um -- I think it was offered as
7    sections or pages of what is otherwise, um, a 600-page
8    report or thereabouts, but this is -- this is part of a
9    Lipper report.
10        Is that your understanding?
11   A.  Yes.
12        MR. COLBY:  Objection, your Honor, this is not
13   among the materials Dr. Pomerantz cited in any of his
14   reports and he has no discussion of it in any of his
15   reports.
16        MR. KASTER:  We're simply talking about the
17   indexes that are referenced here, your Honor, and, um,
18   that's what he's talking about in terms of benchmarks.
19        THE COURT:  And he has nothing to talk --
20   well, why don't you ask him a question.  He doesn't need
21   the document.  You never made reference to any document.
22        MR. KASTER:  Your Honor --
23        THE COURT:  What are you going to --
24        MR. KASTER:  I'm going to --
25        THE COURT:  Then move on.

1          MR. KASTER:  I'll put another question to the

2    witness.

3          THE COURT:  All right, you may.

4    Q.  The current external benchmarks that are referenced

5    on Page 408 of the document, are those the benchmarks

6    you were referring to?

7          MR. COLBY:  Objection.

8          THE COURT:  No, it's sustained on that

9    objection.  It's not in the report.  He never looked at

10   it.  We're sticking to the report.  That's vital.

11   Q.  Dr. Pomerantz, um, in terms of the -- we've heard

12   reference to the AAG reports in this case.  You've

13   reviewed those reports, correct?

14   A.  Yes.

15   Q.  Are those reports, um, sometimes used for due

16   diligence?

17   A.  Um, almost every due diligence process starts with a

18   report like that.

19   Q.  And you talk about those reports in your, um -- in

20   your, um, expert report, correct?

21   A.  Yes.

22   Q.  So let's talk about what's good about the reports

23   and, um -- those reports are not perfect, right?

24   A.  No, I mean no report's perfect, a report is always a

25   work in progress.

1   Q.  So what's good about those reports?

2   A.  Um, the best thing about those reports is that they

3   don't just provide data, they don't just calculate all

4   the metrics, returns, and standard deviations, and all

5   of the math and statistics, they do that but that's kind

6   of the -- that's kind of the baseline, that's the entry

7   for any report is to go through all of that analysis.

8   What that report does is it goes one step further, is it

9   basically will synthesize that information, it basically

10  says "Okay, what does that mean, can we actually take

11  all of these numbers and make a qualitative assessment

12  from them?  Can we say if a fund is good or a fund is

13  bad?  Can we identify red flags that are in the data

14  itself?"  And that report is good in that it does go to

15  that next step for due diligence purposes and it

16  actually starts to -- and successfully, um, provides

17  ultimately a grade, it basically says "yes" or "no,"

18  "good" or "bad."

19  Q.  So what are the, um, drawbacks, if any, of the

20  Lipper -- I'm sorry, of the AAG reports?

21  A.  Um, I would -- I've cited to two drawbacks in the

22  report.  One is I think it's a little clunky in terms of

23  looking at the returns of the funds and comparing them

24  to the returns of their benchmarks, it's not very

25  delineated exactly which fund corresponds to which

benchmark and how is the fund performing relative to the

benchmark.  It can be inferred from the report, but it's

not very easy.  And the other issue of concern for me

basically has to do with the, um -- the ranking of the

fund's fees in terms of the universe of other funds that

it's being compared to, and I have -- and I have an

issue with that comparison.

Q.  Explain that?

A.  Um, it's an issue that I actually have in -- I have

voiced many times in this case pertaining to other areas

as well where we have to keep an eye on what the purpose

of the analysis is.  This is a 401K plan, we're looking

at mutual funds that one can purchase for the 401K plan.

That is very different than the universe of mutual

funds.

        There are, at last count, about 60,000 mutual

funds out there.  We're not interested in 60,000 mutual

funds.  We're not interested in every share class.

We're not interested in mutual funds that only have $2

million or $5 million or even $100 million in them.

Q.  Because?  Why are we not interested in them?

A.  Why?  Well, for a variety of reasons.  I don't think

that it's wise for any investor to be a significant

percentage of any other fund, that's just bad practice.

So if I have a $30 million investment as a plan, I'm not

1    going to go find a mutual fund with $20 million and bump

2    their assets up from 20 to 50 by my inclusion, that's

3    not my goal.  I'm there basically to answer a simple

4    question, which is, "Can you guys handle $30 million?"

5    And I can't even begin to say "yes" until I see that

6    you've managed several hundred millions dollars.

7         So I don't care about mutual funds that have low

8    asset levels, I don't care about mutual funds that have

9    loads on them, or mutual funds that have other types of

10   fees that might be added.  I also don't care about

11   mutual funds that might universally not pass due

12   diligence performance by the collective of the industry.

13   There's actually only a small subset of funds that

14   ultimately are reasonable comparators for a given fund

15   that I would want to put into the plan.

16   Q.  And what are those comparators?

17   A.  Um, well, in my report I sort of offer two types of

18   comparators.  The first would basically be an index

19   fund, um, or similar to that, um, a collective

20   investment trust like BNY.  The other -- the other type

21   that's offered in my report actually derives from a

22   survey that was performed by ICI where what ICI is doing

23   in that survey is they're restricting their attention to

24   mutual funds that are used by the 401K industry.

25   Q.  And do you think of those as being of a separate

1    quality than the vast array of 60,000 mutual funds out

2    there?

3    A.   Um, well, yeah, I mean I couldn't blanket

4    acknowledge 60,000 funds as being prudent, um, but what

5    we know about ICI's survey is that all of those funds

6    are in a plan so that presumably all of those funds had

7    actually passed through a due diligence process.

8    Q.   And that's meaningful to you?

9    A.   Um, it's key.

10   Q.   Well, let's talk about Lipper because, um, one of

11   the things that is the subject of, um, a rebuttal report

12   that you've provided here is the difference between

13   Dr. Syrie's analysis and your own, which centers in part

14   on Lipper, correct?

15   A.   Yes.

16   Q.   All right.  So what is "Lipper"?

17   A.   "Lipper" is an independent third-party provider of

18   data and analysis of the mutual fund industry.

19   Q.   And what is Lipper typically used for?

20   A.   Um, well, it probably has a lot of applications, the

21   one that's most relevant here is to contribute to the

22   15C process for an investment advisor, they often

23   prepare an annual report for investment advisors.

24   Q.   And, um, what is the 15C process, can you explain?

25   A.   Um, briefly the 15C process is a requirement of the

1    Investment Act of 1940 that is used to facilitate the

2    negotiation between the board of directors of a mutual

3    fund and the investment advisor of the mutual fund in

4    establishing the fee for the mutual fund.  The fee is

5    ultimately the result of a negotiation and the Lipper

6    15C report provides analysis to aid in that negotiation.

7    Q.  How does Lipper determine its peer groups?

8    A.  Well, one of the primary issues that's raised by the

9    '40 Act is an issue that has to do with economies of

10   scale and the so-called *Gartenberg* standard, which

11   basically means that investment advisors have to

12   determine if they have economies of scale in their

13   investment process, and to the extent that they do, is

14   it being shared with participants?  And because I

15   mention the word "economies of scale," it means that the

16   size of the fund becomes relevant.  The cost of managing

17   a $5 billion fund bears no measure to the cost of

18   measuring a $5 million fund.  So what Lipper does, in

19   their 15C report, is they immediately will bracket the

20   size of mutual funds that they're going to be using for

21   comparison purposes.

22          So if we're conducting a negotiation on a mutual

23   fund that has a billion dollars in assets, Lipper is

24   going to define a pool of other mutual funds that have

25   assets in a comparable range to even begin its analysis.

1    Q.  Is that a relevant inquiry, in your view, in a

2    fiduciary context, in a 401K context?

3    A.  It's irrelevant.

4    Q.  Why?

5    A.  Because as a fiduciary you shouldn't limit yourself

6    to the size of the fund, it doesn't do you any benefit,

7    in fact it harms you.  One thing that we know is that

8    fees in general within the industry go down as assets go

9    up.  So to truncate the size of a mutual fund that

10    you're going to look at is to immediately ignore all

11    funds that are larger and that will be cheaper.

12    Q.  So we've talked about the --

13              MR. COLBY:  I'm sorry, objection, your Honor,

14    I'll move to strike the portion of the answer that

15    relates to what a prudent fiduciary would do on the

16    grounds that Dr. Pomerantz is not qualified to opine on

17    the fiduciary standards as they're practiced in the

18    industry.

19              THE COURT:  Overruled.  That may stand.

20    Q.  We talked about the peer group for the purpose of

21    expenses, let's talk about the peer group that is used

22    by Lipper for the purpose of a performance analysis.

23    Explain that?

24    A.  Um, again, um, Lipper does create a kind of a

25    composite return for a category.  Just to pick an

1    example, the Putnam Voyager Fund is a large growth

2    equity mutual fund and there is a large growth equity

3    category within Lipper, and Lipper will calculate a

4    return for that category.  That return actually suffers

5    from two problems, it's not asset-weighted, it pays as

6    much attention to large funds as it does small funds,

7    and second of all it includes small funds.

8         As I mentioned a few minutes ago, the performance

9    of a small fund -- the performance of a fund that is not

10   even an option for a plan, that a plan wouldn't even

11   consider including, the performance of it should not be

12   relevant to your evaluation of how the subject mutual

13   fund performs.

14   Q.  So, um, in terms of looking at performance of a

15   fund, what do you think the peer group should be?

16   A.  In the --

17   Q.  In the 401K.

18   A.  I mean ultimately the peer group ultimately is an

19   index fund or is a benchmark, it is how the portfolio

20   manager thinks about his portfolio, it's how the risk

21   manager controls what goes on in the portfolio, it's

22   what sets the expectation for the investor about how

23   you're going to perform.

24   Q.  You've looked at the prospectuses for the various

25   Putnam mutual funds in this case, right?

1    A.  Yes, some of them.

2    Q.  And do they talk about the index in terms of setting

3    performance expectations?

4    A.  Every prospectus must include a benchmark by law and

5    the reason it does is for exactly that purpose, to set

6    an expectation for an investor of how this fund will

7    perform.

8    Q.  AAG reports, going back to those, are they used from

9    time to time for due diligence by 401K fiduciaries?

10   A.  Um, yes.

11   Q.  And, um, Lipper, this Lipper report, these sections

12   of the Lipper report, are those typically used for due

13   diligence by a fiduciary, in your experience?

14   A.  Well, those particular reports we're referring to

15   are provided pursuant to 15C, so a fiduciary does not

16   request that type of a report, doesn't get that report.

17   I believe that Lipper can contribute to the fiduciary

18   responsibilities of a plan sponsor, they're certainly

19   capable of doing it, but you would have to ask them to

20   do that.

21   Q.  Did you see any evidence in this case of --

22            THE COURT:  Excuse me, let me just ask a

23   question here.

24        On the -- I'm beginning to understand your

25   approach to why you would use index funds here as

1    benchmarks.

2         Is there any support in the literature for

3    approaching it this way?

4              THE WITNESS:  Um, well, I think that

5    literature talks about due diligence, talks about

6    evaluation --

7              THE COURT:  No, but this is, um -- yes, it

8    does, but my question's a more precise question.

9         You've given me an analytic route here.  That's

10   helpful.  It's helpful because, if I've got a benchmark,

11   I can look at actual performance and I can derive other

12   things, and we all understand that, because if other

13   parts of this case fall into place in the plaintiffs'

14   way, then maybe I can figure something out.  I'm not

15   suggesting anything by this.

16        But I pause to ask you, any support for this

17   analytic approach in the literature beyond your -- it's

18   your approach and I'm allowing you to give it, but what

19   supports this approach?

20             THE WITNESS:  I actually think there's legal

21   support.  I don't know that there's support in the

22   literature, but I think there is support legally for

23   what constitutes damages.  But I would ask my counsel to

24   speak to that.

25             THE COURT:  And so will I.

1          Go ahead.  Go ahead, Mr. Kaster.

2               MR. KASTER:  Thank you, your Honor.

3    Q.  One more question about the Lipper reports in

4    general and I'm going to ask you specifically about the

5    one that's in evidence here.

6          Did you see any evidence that the PBIC relied on

7    Lipper in your review of documents or things or

8    depositions in this case?

9    A.  No.

10   Q.  (Pause.)   And I want you to go to Exhibit 200, Page

11   9.

12   A.  (Turns.)

13              MR. COLBY:  The same objection, your Honor.

14              THE COURT:  Yeah, 200 is not something he

15   every looked at, so we're not going to 200.

16              MR. KASTER:  Okay.

17              (Pause.)

18              MR. KASTER:  Your Honor, I'm told by my

19   learned colleague that the Exhibit 200 is discussed at

20   length in the, um, at Page 4 to 6 of the rebuttal

21   report.

22              THE COURT:  All right, let me take a look at

23   it.  The rebuttal report is, um --

24              MR. KASTER:  I believe it's AH.

25              THE COURT:  AH.  Thank you.

1              (Looks.)

2              THE COURT:  Yes.  All right.  What he says

3       there, um, subject to attacking his qualifications, he

4       may say here.  You go ahead.  But let's have reference

5       to his rebuttal report, that's the source.

6              MR. KASTER:  Okay.

7       Q.  And talking about, um, the Lipper report then, um,

8       that's -- or the segments of the Lipper report that are

9       in evidence, you discuss that at Pages 4 through 6 of

10      your rebuttal report?

11             MR. COLBY:  I'm sorry, just a clarification,

12      Mr. Kaster.  I don't see a specific reference to that

13      document in there.

14             THE COURT:  Well, now just a minute.  I'll

15      preside here.  Don't talk directly to him.

16             MR. COLBY:  My apologies.

17             THE COURT:  And whether or not there is a

18      reference to that specific document, I haven't let him

19      refer to that specific document, but there surely is

20      references to the Lipper expense here through.  He may

21      testify in accordance with what's in the rebuttal

22      report.  Now, it's a line that I've followed before and

23      I understand how to follow it.

24          Go ahead.

25      Q.  You mentioned the Putnam Voyager Fund,

1    Dr. Pomerantz, um, do you recall that, um, earlier?

2    A.  Yes.

3    Q.  Is the Putnam Voyager Fund found in the Lipper

4    reports that you have reviewed in this case?

5    A.  Yes.

6    Q.  And were they a part -- were they a part of --

7              THE COURT:  My -- my face probably shouldn't

8    be so expressive, Mr. Kaster --

9              MR. KASTER:  But I heard it.

10             THE COURT:  You did.  It's time for the

11   morning recess.

12             MR. KASTER:  Very good.

13             THE COURT:  And, Mr. Kaster, also you seem to

14   be shifting gears, so this will give you a chance to do

15   precisely that.

16         We'll take the recess for one half hour.  We'll

17   recess.

18             (Recess, 10:45 a.m.)

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4

5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6    do hereby certify that the foregoing record is a true

7    and accurate transcription of my stenographic notes

8    before Judge William G. Young, on Wednesday, April 19,

9    2017, to the best of my skill and ability.

10

11

12

13

14    /s/ Richard H. Romanow 04-19-17
      _____
15    RICHARD H. ROMANOW    Date

16

17

18

19

20

21

22

23

24

25