UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 1:15-cv-13825-WGY
Volume II, Pages 81-153

JOHN BROTHERSTON, Individually and as Representative of
a Class of Similarly-Situated Persons, and on Behalf of
the Putnam Retirement Plan,
                Plaintiffs


vs.


PUTNAM INVESTMENTS, LLC, et al,
                Defendants



********



For Bench Trial Before:
Judge William G. Young



United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02110
Wednesday, April 19, 2017



********



REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
United States District Court
One Courthouse Way, Boston, MA 02110

1                        <u>APPEARANCES</u>

2      Representing the Plaintiffs:

3              NICHOLS KASTER, PLLP
               4600 IDS Center
4              80 South Eight Street
               Minneapolis, Minnesota 55402
5              (612)256-3200
               By:  James H. Kaster, Esq.
6                   kaster@nka.com
               By:  Paul J. Lukas, Esq.
7              By:  Kai H. Richter, Esq.
               By:  Carl F. Engstrom, Esq.

8

9      Representing the Defendants:

10             SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
               500 Boylston Street
11             Boston, Massachusetts 02116
               (617)573-4800
12             By:  James R. Carroll, Esq.
                    james.carroll@skadden.com
13             By:  Eben P. Colby, Esq.
               By:  Michael M. Hines, Esq.
14             By:  Raoul D. Kennedy, Esq.

15

16

17

18

19

20

21

22

23

24

25

```
                          I N D E X


WITNESS:                 DIRECT    CROSS    REDIRECT    RECROSS



STEVE POMERANTZ, Resumed

By Mr. Kaster:              84
By Mr. Colby:                       130



                    (No exhibits)
```

```
1                    P R O C E E D I N G S
2            THE CLERK:  Court is back in session.  You may be
3    seated.
4            THE COURT:  Proceed, Mr. Kaster.
5            MR. KASTER:  Thank you, your Honor.
6                    STEVE POMERANTZ, Resumed
7                    DIRECT EXAMINATION, Cont'd.
8    BY MR. KASTER:
9    Q.  Mr. Pomerantz, are you ready?
10   A.  Yes.
11   Q.  The Court asked you a question about the use of index
12   funds as a marker, and whether there was any literature on
13   that subject.  I want to direct your attention to page 14,
14   footnote 29 of your report, your initial report.  Can you
15   sum that up for the Court, and who is being referred to
16   there?
17   A.  This footnote refers to an article written by William
18   Sharpe.
19   Q.  Why don't you wait, Mr. Pomerantz, for the Court to get
20   there.
21   A.  Sorry.
22           THE COURT:  Yes, thank you.  And you were telling
23   me about this article.
24           THE WITNESS:  Sorry.  This is an article written
25   by William Sharpe, who is one of the founders of modern
```

1   portfolio theory.  He's a Nobel Prize-winning economist.

2   And this is an article that he wrote about portfolio

3   management.  And I quote from the article, "The best way to

4   measure a manager's performance is to compare his or her

5   return with that of a comparable passive alternative."

6   Q.   We were talking about the bond index before, the

7   duplicative bond index, the Putnam bond index and the BNY

8   Mellon bond index.  First of all, Dr. Pomerantz, before we

9   get there, let's give the Court some reference points for

10  what we were discussing before the break.  If you can go to

11  AG, page 9, footnote 9, is that a discussion of the various

12  indexes that you described?

13  A.   Yes.  These are -- this is basically a list of the

14  different BNY Mellon CIT products and what their respective

15  indices are.

16  Q.   Back to AG, page 19 and 20, of your initial report, is

17  that a discussion of the BNY Mellon aggregate bond index

18  fund and the Putnam bond index fund?

19  A.   Yes.

20  Q.   And if we go to your supplemental report -- I'm sorry,

21  your expert rebuttal report that is currently marked as AH,

22  on page 6, footnote 13, is that a reference to what is now

23  marked as Exhibit 200 in the trial?

24  A.   Yes.

25  Q.   Okay.  So let's go to the bond example that you were

1    talking about in terms of repetition or duplication.   So

2    describe that for us, please.

3    A.    I'm sorry.  Can you repeat that?

4    Q.    Okay.  The BNY Mellon bond fund?

5    A.    Yes.

6    Q.    And the Putnam bond fund, I think it's fund M or

7    something like that.  You are referring to those in your

8    report; correct?

9    A.    Yes.  Both of those are funds that are -- they're both

10   index funds.  They're both designed to track the same

11   underlying index, the Barclays Capital aggregate bond index.

12   They are different though.  They have different fees.  They

13   have different tracking errors with respect to that index.

14   But going back to what I was saying before, it's a very good

15   example of a situation where two funds are put into a plan

16   and that redundancy actually creates a higher cost.

17   Q.    And the redundancy and the higher costs, which fund has

18   the higher cost, by the way?  Do you recall?

19   A.    The Putnam bond index fund.

20   Q.    Do you recall how much higher?

21   A.    The numbers have varied over time, but the ratio is

22   anywhere from three to ten times higher for the Putnam index

23   fund.

24   Q.    But we've heard evidence in this case that since the

25   introduction of the BNY Mellon bonds, that particular bond

```
 1   fund, the one that tracks Barclays, that Putnam bond fund
 2   has done better.  Are you aware of that?
 3   A.   I'm aware of the testimony, yes.
 4   Q.   And so if they're the same, explain that.  How is that
 5   possible?
 6   A.   Bond index funds are not supposed to do better.
 7   There's no concept of "better" when it comes to evaluating
 8   the performance of an index fund.  An index fund is supposed
 9   to track an index, less the fee.
10        Now, there are things about an index fund that will
11   cause its tracking error to be higher for one fund than for
12   another.  Some index funds do a better job --
13   Q.   Let me stop you there.  Is tracking error either above
14   the index or below?  Can it be above or below?
15   A.   Tracking error is a measure of dispersion, it's a
16   measure of difference.  It doesn't know the difference
17   between up and down, above or below, it just knows -- it's a
18   measure of difference.  And not all index funds have the
19   same amount of tracking error.  Some have higher tracking
20   error, and some have lower tracking error, depending upon
21   how well they're being managed or the size of the particular
22   fund.
23   Q.   So the --
24             THE COURT:  Just to get it in language that I
25   think you've conceptualized, some have greater dispersion
```

1    off the actual index, and some have less dispersion off the

2    actual index?

3         THE WITNESS:  Yes.  Ideally for an index fund

4    you're looking for dispersion of one or two basis points.

5    So every quarter you're going to hit the return of that

6    index minus the fee with a little bit of noise.  And that

7    noise for a good index fund will be on the order of just a

8    few basis points, two or three or four.

9         There are index funds that have much higher

10    tracking error because they have difficulty doing their job,

11    basically.  They have difficulty tracking the index that

12    they're trying to mimic.

13    Q.   How much money is in the Putnam bond fund?

14    A.   The 2015 annual report for that fund indicated about

15    $50 million in assets.

16    Q.   How difficult would it be for that fund with $50

17    million in assets to track the index?

18    A.   To track it to the order of a few basis points would

19    probably be impossible.

20    Q.   Because?

21    A.   There are 5,000 securities in the index.  That

22    particular index fund is trying it track it with about 100

23    securities.  It's somewhere between incredibly difficult and

24    impossible to get a tracking error that low when you're only

25    sampling it with 100 securities.

1          MR. COLBY:  Objection, your Honor.

2          THE COURT:  No, that may stand.

3  Q.   Expenses, in terms of monitoring of expenses, how

4  should that be done?  If you're talking about -- so my

5  question is clear, the monitoring of expenses within a 401K

6  plan by the fiduciaries, how should that be done?

7  A.   Expenses are typically monitored in two ways.  They're

8  monitored in absolute terms, as in, What does this fund

9  cost?  What am I paying?  What is the expense ratio?

10  Because ultimately a fund is trying to do better than its

11  benchmark.  There's a fee, so how high is that fee?  What's

12  the hurdle that the portfolio management process has to

13  overcome in order to achieve its job.

14      So from that perspective, we look at the absolute level

15  of the fee.  But also one would look at the relative level

16  of the fee, which is how does that fee correspond to the fee

17  of other comparable funds, whether they be comparable

18  because of their investment style or because of their size

19  or because of who's invested in them.

20  Q.   Would a fiduciary want to review the market to see if

21  expenses have changed, come down, for example?

22  A.   I think it's incumbent on a fiduciary to evaluate the

23  fees of their investments at all times.  The thing about

24  mutual funds is that they're basically liquid.  You can

25  always get out of a mutual fund and go into another one.

1    That's an important part of the market.  It's a liberty.

2    It's an opportunity that's actually provided to participants

3    that they need to take advantage of.  So fiduciaries will

4    evaluate fees on a periodic basis.

5    Q.    How do chair classes fit into the equation of overall

6    fees?

7    A.    Well, some mutual funds have a variety of share

8    classes.  The only difference between the share classes is

9    the fee.  It's the same underlying portfolio of securities.

10   It's the same portfolio management process.  It's the same

11   adviser.  It's the same ownership.  Everything is identical

12   except for the fee and, ultimately, how the product gets

13   distributed.  The excess fee or difference in fees is there

14   to accommodate something.  It's either different because of

15   the way it's being distributed or it's different because of

16   the minimum size of the investors that are in it.  But the

17   only difference between share classes is the fee.

18   Q.    And 12b-1 fees, how do they fit into that?

19   A.    So a 12b-1 fee is basically a distribution fee that can

20   be added and is added on to certain share classes.  It will

21   increase the expense ratio or the cost of that share class

22   relative to other share classes of the same mutual fund.

23   Q.    When you're talking about distribution, does that

24   sometimes include commissions, for example, for sale?

25   A.    Yes.  I think "distribution" is a euphemism for

1   "commission."

2   Q.   I see.  Okay.

3        Has there been, over time, a trend in the market for

4   lower-class vehicles -- I'm sorry -- lower-priced vehicles

5   for ownership?

6   A.   In general I would say over the last ten years the

7   typical fee being paid by a mutual fund investor has been

8   coming down for a variety of reasons.

9   Q.   Have you outlined those reasons for us already?

10  A.   The reasons why that's happened are basically less

11  usage of classes that have 12b-1, less reliance on the 12b-1

12  for distribution, and so there are fewer share classes and

13  fewer assets relative to the industry that are paying 12b-1.

14       Administrative fees have also come down.  There's been

15  an introduction of share classes that are there to support

16  larger minimum sizes.  So people who have $10,000 to invest

17  in a fund can pay a lower fee than someone who has a

18  thousand dollars, with some advisers who have begun to

19  create share classes that respect different minimums.  And

20  people have taken advantage of that.

21       And the third component is that there has been a

22  migration from active to passive management in the last ten

23  years as a larger percentage of assets that are being

24  passively managed, and these three factors are what has

25  created the trend of lower fees in the industry.

```
 1    Q.   You talk in your report and there's been discussion in

 2    this case about the SDBA and whether it offers so-called

 3    institutional share classes or whether someone in the SDBA

 4    would have to buy a retail share class.

 5         Do you recall that discussion in your report?

 6    A.   Yes.

 7    Q.   All right.  I'm going to go to an exhibit that's in

 8    evidence in this case, which is Exhibit 187.1.  You have it

 9    in your binder.  And this is actually, if we look at the --

10    what is page 4, it's asset detail in the SDBA as of

11    12/31/2009; correct?

12    A.   Yes.

13    Q.   And if you go to page 5 and you look one, two, three,

14    four, five, six items from the bottom -- I'm actually

15    looking at page 5 in the upper right-hand corner.

16              MR. COLBY:  I would object on the grounds I'm not

17    sure this particular document was cited in Dr. Pomerantz's

18    report.  There may have been a different year or different

19    version, but -- I'm happy to be corrected but I don't

20    believe I've seen this cited in Dr. Pomerantz's report.

21              THE COURT:  Well, I haven't got a question before

22    me.  The document's in evidence.

23              MR. KASTER:  Your Honor, I would say this, that

24    Dr. Pomerantz reviewed the SDBA and all of the --

25              THE COURT:  Well, where does he say that?
```

```
 1            MR. KASTER:  He says that in his report at
 2   pages -- specifically page 21 of his initial report there's
 3   a discussion of the SDBA.
 4            THE COURT:  All right.  And so how does that
 5   relate here?
 6            MR. KASTER:  Let me back up and explain that with
 7   the witness, your Honor.
 8            THE COURT:  Go ahead.
 9   Q.   Dr. Pomerantz, you reviewed the holdings in the SDBA;
10   correct?
11   A.   Yes.
12   Q.   And did you have a view, based upon your review of the
13   holdings, of whether the people who had purchased through
14   the SDBA were receiving so-called retail share classes or
15   institutional share classes by and large?
16   A.   I would say most of the mutual funds in the SDBA were
17   offered through retail classes.
18   Q.   And why would that be?
19   A.   You'd have to ask Putnam why.
20   Q.   No, no, no, my question's a little different.
21        Is there something about minimum purchases that would
22   force people who bought through the SDBA to buy the highest
23   price retail share classes?
24   A.   Well, institutional share classes, some of them, most
25   of them, tend to have minimums.  If somebody is making an
```

1    investment of three or $400 or a thousand dollars, they

2    might be forced to go into a retail share class.

3    Q.    And in your review of the SDBA holdings, were the

4    shares in the SDBA holdings by and large retail share

5    classes?

6    A.    Yes.

7    Q.    And how would the Court, in looking at the evidence in

8    this case, know what you're seeing when you're seeing a

9    retail share class?  How is that denominated?

10   A.    If you look at Exhibit 187, there's a list of funds

11   that are shown.  You can usually tell from the name, without

12   doing much more research.  But any fund that has a letter at

13   the end, like an A, a B, a C or a D, is definitely a retail

14   class.   In fact, it's a class that's not just retail, but a

15   12b-1 fee attached to it.

16        Some of that nomenclature of A, B, C, D is pretty

17   standard within the industry.  You'll also notice some of

18   the Vanguard funds that are on this list end with INV.  And

19   INV is the distinction that's used by Vanguard to describe

20   the retail class of its shares.

21        So every adviser kind of has their own way of doing it,

22   but Vanguard uses INV for retail, and this usage of A, B, C

23   and D is pretty standard within the industry.

24   Q.    And speaking of Vanguard, in particular, what's the

25   difference in cost to a purchaser to buy an institutional

1  share class versus a retail share class?

2  A.   The retail classes will tend to be about four times

3  more expensive.  The retail classes, on average, are about

4  20 basis points.  Institutional classes will tend to be

5  around 5 basis points.

6  Q.   And if we look at page 5 in the top right of

7  Exhibit 187.1, did we see an exception to that.  If we go

8  down to Harbor -- something Harbor.  Do you see it at the

9  bottom?

10  A.   Yes.  Harbor is somewhat of an exception to a rule.

11  You'll notice the Harbor fund commodity real return strategy

12  is described as INST which stands for institutional.  It's

13  not really what I would think of as an institutional class.

14  It's actually more expensive than their regular class of the

15  fund.  But it's, I think, somewhat unique to that adviser to

16  basically use the word "institutional" in their description.

17  But it's not the cheapest share class for that particular

18  mutual fund.

19  Q.   You've talked about the trend in the market over the

20  past ten years for less expensive funds.  What effect does

21  cost have on performance?

22  A.   It's very significant.  You know, the research

23  basically shows that the gross return provided by mutual

24  funds is pretty much in line with the appreciation of the

25  capital markets.  And what that means is that whatever fee

1    you pay ultimately detracts from, on average, detracts from

2    the appreciation that the stock market is going to deliver.

3    So higher fees will tend to produce lower returns.  And

4    lower fees will tend to produce higher returns.

5         There's a very basic analysis that was performed by the

6    Department of Labor that looks at the effect of a 1 percent

7    difference in fee.  So you have -- imagine two investors

8    doing exactly the same thing, earning the same returns, but

9    one of those investors is paying 1 percent more than the

10   other in fees.  And what sounds like a small number,

11   1 percent, will actually translate over the investing

12   lifetime of that saver, of that participant, will translate

13   into 28 percent less wealth.  So you will retire with

14   $72,000 rather than $100,000, all things being equal.

15   Q.    What does that mean for fiduciaries?

16   A.    It means that fiduciaries need to take the role of fees

17   very seriously because it ultimately detracts from the

18   wealth that participants are going to accrue over their

19   lifetime.

20   Q.    What about good stock pickers?  Aren't there good stock

21   pickers?

22   A.    There might be good stock pickers.  I don't really have

23   an opinion on that.  But what I do have an opinion on is

24   that if there are good stock pickers, it has to be at the

25   price of bad stock pickers.  There's only so much

```
 1    appreciation that's going to occur in the stock market in a
 2    given year.  The market may be up 10 percent, that may
 3    translate to an increase of a trillion dollars or
 4    $10 trillion of wealth.  But that's all that there is.  If
 5    some people have done a good job they may have gotten a
 6    larger share of that appreciation, but it just has to come
 7    at the expense of somebody else who's earned less than their
 8    share of that appreciation.
 9    Q.   Does that mean that it's necessarily imprudent to hire
10    an active manager at a higher fee?
11    A.   I wouldn't say it's, per se, imprudent to do it.  It
12    just means that it's a reality that a fiduciary has to face.
13    And they need to have a process that provides them with the
14    comfort that the fee that they're paying is justified.
15    Q.   Let's turn to the Putnam plan in particular.  You've
16    examined how much revenue is generated by the plan for
17    Putnam, the institution; right?
18    A.   Yes.
19    Q.   And for the Court's benefit, how often -- I think it's
20    specifically in your supplemental report, the numbers, and I
21    think we're talking about page 3 of the supplemental report.
22    A.   The calculation that I performed over this period of
23    time, from December '09 through the first quarter of 2017,
24    the amount of revenue received by Putnam was $27.9 million.
25    If you include the compounding of that number, which is
```

1    either the opportunity cost that was paid by the participant

2    or perhaps Putnam's opportunity of having that money to

3    invest, when you present-value that, we get $37.3 million.

4    Q.    What about the fact that the plan pays all the

5    administrative expenses?

6    A.    I don't know that it's fair to say the plan pays all

7    the administrative expenses.  What you'll see is that a lot

8    of the holdings in the plan had 12b-1 fees attached to them.

9    Participants were paying that 12b-1 for the time period that

10    it's being charged by the plan or rather being charged by

11    Putnam.  That's revenue to Putnam that it then goes and uses

12    to pay for the administrative costs of the plan.

13        In some cases if you were not a Putnam plan, if you

14    were a -- if you were a non-Putnam plan, you might have been

15    able to arrange for that 12b-1 fee to be revenue-shared and

16    to basically be used to either partially or more than

17    adequately cover your administrative costs.

18        So I think you'd really have to do an appropriate

19    accounting to claim that Putnam was actually paying for that

20    administrative fee.  It looks a lot like they're just taking

21    the higher fee out of plan options and recycling that to pay

22    for the administrative cost.

23    Q.    Let's just talk about the management of the plan lineup

24    in general.  Was there any investigation of the marketplace

25    that you saw before a new fund was introduced into the plan?

```
1    A.    No.

2    Q.    How important is a track record to the acceptance by a

3    401K plan of a new mutual fund?

4    A.    I think a track record is critical to a due diligence

5    process to evaluate a new fund.  You know, it's one thing to

6    have an idea of an investment strategy, it's another to kind

7    of pro forma trade that strategy on paper.  It's another to

8    even think that maybe you've purchased a strategy from

9    somebody else.  But there's nothing that really is

10   illustrative other than the actual experience and seeing

11   what happens when you take all of this intellectual capital

12   and convert it into a product, an investment strategy.  A

13   lot of due diligence processes will not even consider funds

14   that have less than some predefined period of track record.

15   Q.    And did you see any evidence of due diligence performed

16   by Putnam before a new fund was introduced into the plan?

17   A.    No.

18   Q.    Are there problems in particular --

19   A.    I'm sorry.  I would say a new Putnam fund.

20   Q.    A new Putnam fund.  Thank you.

21         Are there problems in particular that arise from using

22   a newborn fund?

23   A.    There are several possible problems.  The first is

24   operational, depending upon what that fund is and what it's

25   investing in.  You might be taxing the limitations of the
```

1    adviser.  You might be testing new procedures that have been

2    put in place by the adviser.  So there's certainly an

3    operational component.  From an adviser component, again,

4    you haven't really tested the strategy.  You don't know how

5    the strategy is going to perform relative to the market.

6        The other concern I could think of basically has to do

7    with fees.  New funds tend to be small because that's just

8    the way it is.

9    Q.   Why does that matter?

10   A.   Well, it matters because smaller funds tend to be more

11   expensive.  The data illustrates that larger funds tend to

12   be cheaper than smaller funds.  It's true for the industry

13   as a whole; it's true for Putnam in particular.  And so when

14   you are entering into a new fund, the odds are that new fund

15   will have a higher fee than a more established larger fund

16   that is comparable to it.

17       And as I said earlier, that fee ultimately is a

18   barrier.  It's ultimately a threshold for which active

19   management must exceed.  And it just makes it a little bit

20   harder.  It's just one more chip that you would need to

21   consider as part of due diligence.

22   Q.   All right.  We've talked about the lack of due

23   diligence as it relates to the introduction of new funds

24   into the plan.  Let's change a little bit to during the

25   course of a fund's existence in the 401K plan.  From your

1    review of the evidence, the documents, the depositions, was

2    there ever a review of the market to see if the plan could

3    do better, that you observed?

4    A.   No.

5    Q.   Why is this significant?

6    A.   Well, I think it's significant because it's incumbent

7    on a fiduciary to perpetually or with some regularity visit

8    the marketplace and see what's available and see if there

9    are new products, if there are new ideas, if performance is

10   in line with expectations, are fees declining, are there

11   cheaper options that are available.  These are just many

12   questions that a fiduciary would ask.

13   Q.   Was there ever a review by the PBIC -- and I'm going to

14   set aside whatever happened in May of 2010, which is the

15   meeting, the PBIC meeting where the AAG reports were passed

16   out.

17        Do you recall seeing minutes regarding that?

18   A.   Yes.

19   Q.   So set that aside.  Was there ever a review by the

20   committees of performance of the plan against benchmarks,

21   risk-weighted or not that you saw?

22   A.   No.

23   Q.   Was there any monitoring of expenses by the PBIC that

24   you observed?

25   A.   No.

1  Q.   How costly were these funds compared to market?  You

2  did -- you referred to the ICI study before; correct?

3  A.   Yes.

4  Q.   And if you look at page 42 of your original report, can

5  we see that study demonstrated there in the chart?

6  A.   Yes.  There was a survey that was prepared by ICI that

7  just looked at mutual funds that are used by defined

8  contribution plans.  And it broke up those funds and plans

9  by the size of the plan and the type -- a very broad

10  characterization of what the investment mandate was, whether

11  it was a stock fund or a bond fund or an international stock

12  fund.  And what you're referring to on the top of page 42 is

13  a summary of the average fee that was paid by participants

14  for their mutual fund options in the plan, and that's

15  represented in the column called "Putnam," and this is over

16  the entire time period and all of the plans, is 86 basis

17  points.

18      What I also did was use that ICI survey to ask the

19  question:  If a plan comparable in size to Putnam was

20  invested in these categories as described, and I used the

21  average fee that was being paid by a survey respondent, what

22  would that fee be?  And that's where I get the

23  59 basis-point value.

24  Q.   Okay.  So in terms of comprising the comparative ICI

25  value that we see on page 42 of your report, how did you do

1    that specifically?

2    A.   If you look -- if you look at page 36 of the report,

3    you'll see a chart that I copied from the ICI survey.  And

4    each of those columns represents a different type of

5    investment in mutual fund form.  The equity funds are broken

6    up into domestic and international.  There are balanced

7    funds, actually two different types of balanced funds.  And

8    then there are a variety of bond categories.

9         And so what I did was I looked at every single one of

10   the Putnam mutual funds and assigned it to one of these

11   categories based upon its mandate, based on its investment

12   mandate, and then used the value in this chart as the proxy

13   for what the average mutual fund fee is in the 401K

14   universe.

15            THE COURT:  Just so -- just so the record is

16   clear, we will understand that the charts and diagrams in

17   his various expert reports are being treated by the Judge,

18   by the Court, as demonstrative aids.  When he talks about

19   them, I will have reference to them.  If they're not

20   discussed, they may be demonstrative aids but I'm drawing no

21   conclusions from the data because they're not part of his

22   oral testimony, which is the record upon which I can make

23   findings.

24            Go ahead.

25            MR. KASTER:  Thank you, your Honor.

1    Q.   Pages 40 and 41 contain the data that underlie your

2    conclusions on page 42; is that correct?

3    A.   Yes.

4    Q.   All right.  And just so we're clear about this, the

5    average Putnam expense that you calculate is .86; right?

6    A.   Yes.

7    Q.   The ICI average, as you calculate it, is .59; correct?

8    A.   Yes.

9    Q.   You have a column here for Vanguard as well, which is

10   .15?

11   A.   Yes.

12   Q.   And the CIT column, which is .05; correct?

13   A.   Yes.

14   Q.   In terms of the dollar difference based upon this

15   study, how does this -- what is the equivalent amount of

16   dollars in terms of that difference between the ICI study

17   and the Putnam average expense ratio?

18          MR. COLBY:  Objection, your Honor.  I don't

19   believe that the report includes a dollar value calculation.

20          MR. KASTER:  It does not specifically have the

21   dollar, your Honor, it has all of the underlying data upon

22   which that calculation can be made.

23          THE COURT:  Well, then, you'll provide it in your

24   argument or briefs.  If it's arithmetic, you can help me

25   out.  But we need not take time on it now.

1          Go ahead.

2    Q.    Have you reviewed --

3          MR. KASTER:    Thank you, your Honor.

4    Q.    Have you reviewed how popular Putnam funds are with

5    other 401K plans around the country?

6    A.    Yes.

7    Q.    And is that demonstrated by the charts in your initial

8    report on pages 24, 25, and 26?

9    A.    Yes.

10   Q.    And can you explain how you went about doing this

11   review and survey?

12   A.    Yes.  What I did was I went through, for each of the

13   subject mutual funds, each of the Putnam funds, I went into

14   a database that would identify all other 401K plans that had

15   that particular mutual fund in its lineup.  But I restricted

16   myself to only looking at plans that held a minimum of

17   $250 million.

18   Q.    Why did you use that number?

19   A.    Well, I want to use some cutoff because I don't want to

20   compare the experience and decision-making of a $1 million

21   plan with a $1 billion plan.  A $1 billion plan is clearly

22   going to be larger.  It will be wealthier.  They will have

23   more resources to dedicate to due diligence.  A $1 million

24   plan can't perform due diligence, it just doesn't have the

25   money.  It might hire somebody, but even there there's a

1    limit because of its size on what it can afford to spend on

2    due diligence.  So I do want a cutoff point.

3        If you go back to the ICI chart that we were using

4    before as a demonstrative, you'll see that $250 million is

5    one of the cutoff lines in that analysis, and that's also a

6    level of assets that's actually below the assets that were

7    held by the Putnam fund.

8    Q.   Which was about how much?

9    A.   On average, about $500 million.

10   Q.   All right.  Let's go to page 24.  We summarize here

11   one, two, three, four, five, six, seven, eight, nine, ten,

12   eleven, twelve, thirteen, fourteen, fifteen, by my count,

13   Putnam funds from the absolute return to the Putnam fund for

14   growth and income.  And how many plans over $250 million on

15   those funds?

16   A.   None.

17   Q.   And on page 25 you have another series of Putnam funds,

18   looks like one, two, three, four, five, six, seven, eight,

19   nine, ten, eleven, twelve, thirteen, fourteen, fifteen,

20   sixteen, seventeen, eighteen, nineteen, twenty, twenty-one,

21   twenty-two, twenty-three, twenty-four, twenty-five,

22   twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty,

23   thirty-one.  And how many plans of $250 million or more on

24   those Putnam funds?

25   A.   None.

1    Q.   And we get down to the last page, page 26, we have one,

2    two, three funds, zero plans; correct?  At the top?

3    A.   There are five zeroes.

4    Q.   Five zeros.  Then go to small cap growth and the Putnam

5    strategic volatility equity with zero plans; correct?

6    A.   Yes.

7    Q.   Then we have one plan all the way through from Putnam,

8    American Government Inc. to Putnam small cap value -- or,

9    I'm sorry, to Putnam Voyager; correct?

10   A.   Yes.

11   Q.   And then two plans and then three plans, looks like the

12   Putnam Equity Inc. had 21 plans; right?

13   A.   Yes.

14   Q.   All the rest of the Putnam funds were owned by five

15   plans or less, mostly zero; correct?

16   A.   Yes.

17   Q.   Why does that matter?  Why does what other plans are

18   doing matter to a fiduciary?

19   A.   Well, earlier I testified that it's important that a

20   fiduciary act in accordance with the way that other people

21   performing a similar job are going to do.  There's somewhat

22   of a standard for the industry.  These are all 401K plans

23   that have performed their own due diligence process, and yet

24   as a result of that due diligence process, for a lot of

25   those processes, none of these funds were equity selected.

1   And for some of these funds only a handful, at most 20 of

2   the due diligence processes being followed by somebody else

3   will basically conclude with the inclusion of one of these

4   funds.  A fiduciary has to ask themself why is nobody else

5   investing in this fund?

6   Q.   Let me turn to the subject of reliance on the Putnam

7   investment division for the fiduciary responsibilities of

8   the plan.  First of all, did you see any contemporaneous

9   evidence that that happened in this case?

10  A.   No.  No.

11  Q.   The investment division doing monitoring of the plan

12  investments, is there a problem with that?

13  A.   Well, these are Putnam funds.  I certainly hope that

14  the adviser, as a part of their job, monitors and does some

15  form of risk management on these funds.  But that's not

16  something that should be relied upon by a fiduciary.

17  Q.   Because?

18  A.   Well, if it's okay for a fiduciary, the natural

19  conclusion is that due diligence is a meaningless task.

20  Because every product, by definition, is being provided by

21  an adviser, if not Putnam then Fidelity.  And if not

22  Fidelity, a private equity firm or a venture capital firm.

23  Every product is, by default, being provided by an

24  investment adviser.  You can't as a fiduciary then just say,

25  Well, due diligence is not necessary because there's an

1    adviser that's overseeing these products.  Advisers oversee

2    all products, but there's a difference between the standards

3    of a fiduciary and the standard of a business.

4    Q.    Are the interests of the investment division and the

5    interests of the 401K plan participants aligned?

6    A.    No.

7    Q.    Explain that.

8    A.    Well, the business has many objectives.  It certainly

9    has an objective to deliver good performance.  But it also

10   has an objective to raise revenue, to stabilize revenue, to

11   grow its revenue, to have profitability, to attract talent,

12   to maintain a stable operation.  It has many, many

13   objectives.

14        The fiduciary of the plan has one objective, which is

15   to do the best thing for the investor, which is not

16   necessarily consistent with all of the business objectives

17   of an investment adviser.

18   Q.    Would you ever expect someone in the investment

19   division to expect, for example, removing one of their funds

20   from the plan and replacing it with an outside fund?

21   A.    Well, that couldn't happen in this plan, but I don't

22   think that that's likely to happen.

23   Q.    Did you ever see any evidence of review of marketplace

24   alternatives by anyone for any of the funds denominated as

25   failing funds by AAG?

1    A.    No.

2    Q.    The addition of the BNY Mellon funds that happened in

3    2015 and introduced in early 2016, do you -- what do you --

4    well, wait a minute.  We've heard testimony about the

5    process.  You agree that that seemed like a prudent process

6    that was used with BNY Mellon?

7    A.    Yes.

8    Q.    Okay.  CITs, were they a new product in February of

9    2016?

10   A.    No.  I would say as of 2008 there was about

11   $900 billion worth of CITs that were used in the

12   marketplace.  So the idea has been around for quite some

13   time.

14   Q.    Let me go to your overall opinions.  Did the plan

15   comply with its duty of prudence and loyalty regarding each

16   of the investments in the plan lineup related to, first,

17   admission of funds?

18            MR. COLBY:  Objection.

19            THE COURT:  Would you ask the question again?

20   That's my fault.

21            MR. KASTER:  Certainly, your Honor.

22   Q.    Did the plan comply with its duty of prudence and

23   loyalty regarding each of the investments in the plan lineup

24   related first to admission of new funds?

25            THE COURT:  And you object to that?

```
 1              MR. COLBY:  I do.
 2              THE COURT:  Overruled.  You may answer.
 3    A.    I don't believe that the fund acted prudently because
 4    of the way that, by fiat, it would just include these funds
 5    in the plan without any due diligence.
 6    Q.    Did the plan comply with its duty of prudence and
 7    loyalty regarding each of the investments in the plan lineup
 8    related to performance review or ongoing monitoring of the
 9    funds in the plan?
10    A.    No.
11    Q.    And how about with respect to the idea of removing
12    funds from the plan?  First of all, let me ask you this
13    question:  Did you ever see in the evidence, the
14    contemporaneous documentation, any discussion of removing a
15    fund from the plan?
16    A.    I don't think there was discussion about the removal of
17    a particular fund.  There was sort of an abstract comment
18    made about how it was unclear what the circumstances could
19    be that would eliminate a fund from the plan.
20    Q.    How about with respect to controlling expenses?  Does
21    the plan comply with its duty of prudence and loyalty
22    regarding each of the investments in the plan lineup related
23    to controlling expenses?
24    A.    There was no analysis of expenses.
25    Q.    In your professional opinion, did the plan show
```

1    improper preference for Putnam funds?

2    A.    Yes.

3    Q.    By the way, have you ever seen a plan like this one?

4    A.    I've never seen a plan that included all of the assets

5    of a given adviser by fiat.  There was some -- actually some

6    questioning a few hours ago about the prudence of an

7    individual having all of their money with a given adviser,

8    but that's not what's at issue here.  This is about a

9    fiduciary deciding, by fiat, to positively incorporate every

10   fund of an adviser.  And I've never seen that.

11   Q.    Have you evaluated the damages, if any, suffered by the

12   plan?

13   A.    Yes.

14   Q.    First, let's talk about the revenue.  You calculated

15   the revenue from the plan, which is over the period of the

16   statutory period, which is, I think, on page 3 of your

17   supplemental report; correct?

18   A.    Yes.

19   Q.    And that's the number that is -- I think you referenced

20   this earlier, the 27.9 million compounded to 37.3 million;

21   correct?

22   A.    Yes.

23   Q.    Have you reviewed the performance of this prudently

24   managed plan and compared it to the performance of a prudent

25   alternative?

1    A.    Yes.

2    Q.    What prudent alternatives did you use?

3    A.    I considered two alternatives.  The first somewhat

4    responsive to Dr. Sharpe's comment that I referred to

5    earlier was to basically consider what the performance would

6    be of a passive alternative to each of these funds.  And I

7    call that a Vanguard comparison.  But what I've done is

8    compare the performance of each fund to a corresponding

9    Vanguard passive investment that belonged in the same

10   Morningstar category.

11   Q.    And if we look at your supplemental report, your

12   supplemental report was provided to update the Court to the

13   present day; right?

14   A.    Yes.

15   Q.    And so if we look at your supplemental report,

16   Exhibits 4, the updated exhibit, 4 through -- it looks like

17   it skips from 4 to 6; right?

18   A.    Yes.

19   Q.    You talked about why you selected Vanguard as a prudent

20   alternative.  Why BNY Mellon?

21   A.    BNY Mellon is a much more restrictive collection of

22   funds.  But first of all it was the set of funds that were

23   selected by Putnam as the result of their process to find

24   alternatives.  And furthermore, this BNY collection looks a

25   lot like the government's TSP program that I talked about

1  earlier.

2  Q.    How did you go about -- describe your methodology to

3  the Court?

4  A.    So the methodology, there's kind of two steps to the

5  methodology.  The first step is to evaluate the performance

6  differential or the total return.  And what I do is I go

7  through quarter by quarter, I look at the amount of assets

8  that are in the plan, I look at the return that was earned

9  by the subject fund, by the Putnam fund, and I compare that

10 to the return of my comparator, the comparator being the

11 passive alternative.  And that difference in returns applied

12 to the prevailing level of assets is what I call a damage

13 for that particular quarter.  That number can be positive or

14 negative.  I'm just calling it a damage.  But it just

15 reflects the difference in returns applied to the level of

16 assets.

17      And then that calculation was done every single quarter

18 through the period, and then those numbers are -- those

19 quarterly numbers are then present-valued to produce a, what

20 I'm calling a total damage.

21      I go through a similar calculation from a methodology

22 standpoint, but I'm not looking at the return of Putnam's

23 fund versus the return of Vanguard, I'm looking at just the

24 fee being charged by Putnam and comparing it to the fee

25 charged by Vanguard.  I look at the difference in those two

1  numbers.  Again, I calculate it quarterly and present-value

2  it to come up with what my report refers to as a fee damage.

3  Q.   Okay.  But why is it fair to do an analysis of --

4  comparing a low-cost index fund to Putnam's funds which are

5  principally actively managed?

6  A.   Because the index fund is the benchmark.  That's

7  exactly the point that Sharpe was making in his article,

8  which is that the best way to evaluate the performance of an

9  active fund is to compare it to a passive alternative.  The

10  fee that's being paid is not the price of admission, it's

11  basically a hurdle that is imposed upon the portfolio

12  manager.  And an active fund will levy that fee, but there's

13  the expectation that the portfolio management process will

14  be able to surpass that hurdle.  That's why the benchmark is

15  what's actually in the prospectus.

16          THE COURT:  Let me see if I understand what you're

17  saying.

18          Your calculus of damages here, were liability

19  found, is to measure the actual performance of the family of

20  funds in the plan over the relevant period against a

21  benchmark.  So far I've got it; right?

22          THE WITNESS:  Yes.

23          THE COURT:  In order to find the true benchmark,

24  you have to calculate the -- if you're going to use Vanguard

25  as your benchmark, you have to strip out the fees that

1    Vanguard charges to get to your benchmark.  Is that right?

2            THE WITNESS:  That's not exactly the calculation

3    that I'm doing.

4            THE COURT:  Okay.  I lose you there.

5            THE WITNESS:  Okay.

6            THE COURT:  Do you see?  I see that you are saying

7    Vanguard's a benchmark.  And you're doubtless familiar with

8    my apples-to-oranges comment, but that was in another

9    context.  I recognize we're talking about damages here.  So

10   my mind is open at least as to what you're talking about but

11   I'm trying to get my hands around it.

12           So explain why we're getting into the fees.  All

13   right.  Go ahead.

14           THE WITNESS:  Right.  There are several

15   calculations that are being performed.  Because to some

16   extent I think the appropriate measure belongs with your

17   Honor, not with me.

18           THE COURT:  Well, ultimately I have to do it and

19   then my duty is to explain it and we will see.  But go on.

20           THE WITNESS:  And so I'm providing several

21   different calculations here to simultaneously answer several

22   questions.  The first question, the primary question

23   basically goes back to the comment of Will Sharpe's which is

24   that the best way to evaluate an active fund or any fund,

25   the best way to evaluate it is to compare it to the -- a

1    passive alternative.  Because that's what's available to

2    you.  I could pick up the phone with no effort and I can buy

3    that.  Or I could create a due diligence process that

4    attempts to do better, and as part of that process will want

5    to justify why I'm going to pay more in order to perform

6    better.

7              But at the very top level, what is the investor's

8    expectation?  What is it that the prospectus says people

9    should think?  What is it that performance should be

10   measured against?  The prospectus puts the benchmark right

11   there.

12             I actually am being a little conservative and I'm

13   saying, Well, the benchmark's not very realistic without --

14   no complaint to the SEC, but you can't invest in the

15   benchmark.  I want to look for a mutual fund that will

16   provide returns that will mimic that of the passive index.

17   And that is the Vanguard fund.  It doesn't have to be

18   Vanguard, it could be Fidelity, it could be any of a number

19   of advisers.

20             THE COURT:  Of an index fund.  I interrupt,

21   because I really want to understand.  Because you could buy

22   that?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.

25             THE WITNESS:  And that, at heart, to me, is the

1    reason.  Because I can buy that.

2              THE COURT:  Yeah.  And since you can buy that, it

3    has a cost.

4              THE WITNESS:  It does have a cost.

5              THE COURT:  And so you -- I'm -- my word choice

6    may be wrong.  You're factoring that cost in?

7              THE WITNESS:  I am factoring that cost in, and

8    what I'm qualifying in this column that I call "fee damage"

9    is how much you have paid, how much has the fiduciary -- not

10   fiduciary, I'm sorry -- how much has the participant paid in

11   excess of that naïve choice, that choice to just go and buy

12   the index fund?  How much has the participant paid via the

13   decisions of the fiduciary?  How much have they paid in

14   excess because they purchased the fund that was in the plan

15   as opposed to just buying the index fund?  And that's the

16   value that I've calculated in this column called "fee

17   damage."

18             THE COURT:  Thank you.

19   Q.   All right.  Let's turn now to the fee damage that you

20   approximate, and the total damage, the so-called investment

21   damage as it relates to Exhibit 4.  Okay?  Because the Court

22   will not have this in evidence.  I will look to the bottom

23   column of Exhibit 4.  This is brought up to date; correct?

24   A.   Yes.

25   Q.   The total damage.  The total damage being $45,574,124;

1  correct?

2  A.   Yes.

3  Q.   And the fee damage is $31,684,793 of that number;

4  correct?

5  A.   Yes.

6  Q.   And the investment damage is $13,889,331; correct?

7  A.   Yes.

8  Q.   All right.  Now, the investment damage, if we look at

9  that in particular, $13,889,331?

10  A.   Yes.

11  Q.   If we go up the column, we're going to see Putnam

12  Voyager in the first line item of Exhibit 4; correct?

13  A.   Yes.

14  Q.   And that line item says $13,634,028?

15  A.   Yes.

16  Q.   So of the investment damage is the Voyager fund the

17  lion's share of it?

18  A.   I think you can look at it that way.  You basically can

19  say that that total is equal to, by coincidence, is equal to

20  the Voyager number and that all of the other numbers cancel

21  and add to zero.

22       This totaling on the bottom represents the sum of

23  everything above.  So it adds up all of the damages and then

24  it gives a credit back for all of the times where Putnam

25  outperformed its benchmark.

1    Q.   And so performance, in terms of these damages, you've

2    done an analysis both from a performance standpoint and

3    expense standpoint fund by fund; correct?

4    A.   Yes.

5    Q.   So to the extent that any of the Putnam funds have

6    outperformed the index, they get a credit for that; correct?

7    A.   Yes.

8    Q.   And the investment damage, do you agree with the

9    proposition that investment damages can change over time and

10   might be arguably fickle?

11   A.   Yes and no.  I think if you compare my report with my

12   supplemental report it actually -- it actually supports the

13   answer yes, in that the investment damage number has changed

14   from -- between my initial report and my supplemental

15   report.  So --

16   Q.   In what way?

17   A.   Well, if you go to my original report -- if you go to

18   my initial report in the Vanguard analysis, my investment

19   damage was $24 million.  And now my investment damage is

20   $13.9 million.  So the number can change.  And that

21   supports, you know, the "yes" part of the answer.  But

22   there's also a "no" because in this particular situation, as

23   you pointed out before regarding the Putnam Voyager fund,

24   that fund has been removed from the plan.  That

25   $13.6 million of loss due to the investment performance of

1  Voyager cannot come back because the fund is not in the plan

2  anymore.  That is a true loss.

3  Q.   Well, Dr. Sirri posits that performance from year to

4  year cannot be predicted, and that underperformance cannot

5  be assumed to reoccur next year.  Do you recall that part of

6  his analysis?

7  A.   Yes.

8  Q.   What can be predicted?

9  A.   What -- I agree with Dr. Sirri that performance cannot

10  be predicted, but what can be predicted is the fee

11  difference that you're going to pay because that is a known

12  quantity.  That's not subject to any variability or

13  randomness.  That's a known quantity.  That number is known.

14      And the other thing that's known, as I mentioned

15  earlier, is that that fee is actually a significant

16  component to what you can predict about performance.  I did

17  testify earlier, I think, that what research shows is that

18  the gross return of the mutual fund industry will perform in

19  line with the capital markets.  And it's what you see in my

20  supplemental report as well.

21      But the fees do become a cost that people are going to

22  pay, and that is not going to be recouped.  So, you know,

23  from that perspective that is something that is predictable.

24  Q.   And do you see a coincidence in this case that's

25  unusual?

1   A.   I would prefer to call it a textbook case rather than

2   to say it's unusual.  But if we look at the graph on

3   page 44, I think that that graph actually supports both the

4   point that Dr. Sirri's making as well as my point.

5   Q.   Page 44 of your initial report?

6   A.   Page 44 of my original report.  There are two lines on

7   this graph.

8            MR. KASTER:  If the Court is there.

9            THE COURT:  I am.

10  Q.   The two lines being the one squiggly line and the

11  straight line?

12  A.   There's a bolder squiggly line, and that line

13  represents the relative performance of the line to this

14  benchmark portfolio.  So it starts out at 1.  And when the

15  line is going down it means that the plan is

16  underperforming, and when the line is going up it means that

17  the plan is outperforming.  And you'll see that there are

18  periods where the plan does better and there are periods

19  where the plan does worse.

20       The thin line that's drawn there is -- was actually

21  just designed to be a regression.  I was just doing a very

22  simple regression of that bold line over time.  And what I

23  observe is that the slope of that line is approximately

24  70 basis points a year.  It is statistically significant.

25  And here's the coincidence, is that it's actually really

1    close to the difference in fee that's being paid by the

2    subject funds and the benchmark.

3        And so what the graph says is that, yes, there is

4    variability in the performance.  It's going to go up, it's

5    going to go down.  Fees are not just a likelihood, they

6    actually, in this case, are a perfect reality for how it's

7    going to perform.

8        The last comment I would make regarding this graph is

9    you'll notice that in this chart, which was done in December

10   of 2016, the thick line is actually below the regression.

11   And we've all heard the phrase "regression to the mean."

12   That would imply, without claiming to be a prognosticator,

13   that would actually imply that the line would return and it

14   would move back, the bold line would move back to that thin

15   line and that the plan would experience positive

16   performance.

17       And, in fact, if you compare the analysis in my

18   original report with the analysis of the supplemental

19   report, you see exactly that happening.  You see the

20   performance of the Putnam funds actually appreciating

21   relative to the market, moving back towards that thin line.

22   But you also see the thin line continue to decline because

23   that represents the fact that the plan is paying higher

24   fees.

25   Q.   All right.  You've talked about the Vanguard and the

 1   usage of Vanguard.  So what justifies the use of BNY Mellon

 2   in this case as a marker?

 3   A.   So, again, I view BNY as a prudent alternative to what

 4   could have been chosen.  Independent of Putnam actually

 5   having gone through a process and identifying this as the

 6   result of that process, I also think that it's a good choice

 7   as a proxy because it is a very simple, uncomplicated model

 8   for how a 401K plan can run, and is actually very comparable

 9   to the TSP plan that we've discussed.

10   Q.   And in particular, if we go to Exhibit 6 of your

11   supplemental report, this represents your calculation of BNY

12   Mellon damages; correct?

13   A.   Yes.

14   Q.   And in addition to the otherwise proper usage of this

15   as a prudent alternative, does the fact that through a

16   process, an actual due diligence process the fund chose

17   these funds as the core funds, does that support your use of

18   these funds?

19   A.   I think that's -- that's a -- yes, I would say that

20   that supports.

21   Q.   All right.  And in terms -- and again, did you go

22   through the same kind of mapping that you talked about with

23   the Vanguard fund?

24   A.   The mapping and the methodology is basically the same.

25   The only difference is that I now only have six funds to map

1    to.  In Vanguard I think there were about 40 distinct index

2    funds available.  Here I only have six funds.  But the idea

3    remains the same, which is to map every Putnam fund to an

4    associated BNY fund, which the expectation of the balanced

5    types of funds or the multiasset class funds like the TDFs

6    or like the balance funds, and these are being mapped into

7    linear combinations of the BNY funds.

8    Q.   And, again, did you provide a credit or offset to --

9    let me back up, ask a preliminary question.

10       You did the analysis fund by fund; correct?

11   A.   Yes.

12   Q.   And did you provide a credit to Putnam for any

13   overperformance as against the benchmark that was used here

14   or the index -- or I'm sorry -- the BNY Mellon fund?

15   A.   Yes.

16   Q.   And otherwise, did you go through the same sorts of

17   analysis and calculations that you described earlier?

18   A.   Yes.

19   Q.   And so we have the totals.  The total damage, according

20   to your report, $44,291,949.  Do you see that?

21   A.   Yes.

22   Q.   And $35,148,585 happens to be the fee damage; correct?

23   A.   Yes.

24   Q.   And $9,143,364 is the investment damage; right?

25   A.   Yes.

1    Q.    Let's go back to Putnam Voyager, first item in the

2    column on page 8.  We have an investment damage here for

3    Putnam Voyager that actually exceeds the total investment

4    damage?

5    A.    Yes.

6    Q.    Right?  And it's $14,397,068.  So from an investment

7    perspective, the balance of the funds actually do better?

8    A.    Yes.

9    Q.    It's the fee differential that's most significant;

10   correct?

11   A.    Well, and also the fact that even in the CIT

12   comparison, that Putnam Voyager loss of 14 million is a

13   fixed quantity.  That number's not going to change.

14   Q.    Because they closed the fund?

15   A.    Because they closed the fund.

16   Q.    All right.  Let me ask you this question:  We're taking

17   the supplemental report through today -- right? -- through

18   the time of this trial?

19   A.    I believe I went through March 31st.

20   Q.    Okay.  A few days ago?

21   A.    Yeah.

22   Q.    All right.  Why carry it through today when the BNY

23   Mellon funds were introduced in February of 2016?  Why not

24   cut the damages off there?

25   A.    Well, again, I think ultimately the endpoints are in

1    the purview of the Court.  I do agree that there was a point

2    in time where those funds were introduced and, hence, are an

3    option and are actually being promoted by Putnam as options.

4    I don't know that it's realistic to expect people to move

5    from one day to the next, like overnight.  I think there's

6    an education process that's required.  There might be

7    operational issues.  I don't know, I can't speak to that.

8    But I certainly don't think that changing this overnight is

9    realistic from anyone's perspective.

10   Q.   Does the introduction of the BNY Mellon funds make the

11   balance of the Putnam funds, the 70 or so funds, prudent?

12   A.   No.  I think each fund has to stand on its own.  The

13   BNY is certainly a prudent collection of funds, but that

14   doesn't change anything about my opinion regarding the other

15   funds that are in the plan.

16   Q.   Some would say this is merely hindsight.  How do you

17   see that?

18   A.   I don't see this as hindsight.  I think these numbers

19   reflect what actually happened.  There is no hindsight

20   associated with the fact that there was no due diligence

21   process.  This is merely the result of not having the

22   process.

23        The market could have done whatever it did, the funds

24   could have done whatever they did.  This fee number that I

25   identify is not really variable.  That is going to be what

1    it's going to be.  And I probably could have forecast that

2    number in 2009.  As far as the investments are concerned,

3    they just are based on what they are.  They could have been

4    better, they could have been worse.

5    Q.   Just a couple of questions on the rebuttal report

6    before I finish, Dr. Pomerantz.  Your dispute with Dr. Sirri

7    really is over his use of Lipper and the peer groups that he

8    chose for his analysis; right?

9    A.   Yes.

10   Q.   And we've talked about the fact that from an expense

11   perspective he selected funds that just look a lot like

12   Putnam in terms of asset size for his comparisons; right?

13   A.   Yes.

14   Q.   And we talked about the fact that from a performance

15   standpoint he looked at all mutual funds that existed

16   anywhere and you chose the mutual funds that are selected

17   through a due diligence process by plan sponsors; right.

18   A.   Yes.

19   Q.   Have you rendered your opinions here today regarding

20   the damages suffered by the plan to a reasonable degree of

21   certainty?

22   A.   Yes.

23         MR. KASTER:  That's all the questions I have for

24   the witness.  Thank you, your Honor.

25         THE COURT:  Let's take a moment and just talk

1    procedure here.

2            Mr. Colby, I imagine you have some

3    cross-examination for this witness?

4            MR. COLBY:  Just a couple, your Honor.

5            THE COURT:  Just a couple?

6            THE WITNESS:  No, more than a couple.

7            THE COURT:  I thought you were being facetious,

8    and that's all right.

9            Here's what we're going to do.  Plaintiffs' case

10   is as good as it's ever going to get.  So we're not counting

11   tomorrow as time of the trial.  Don't anyone draw any

12   conclusions from this.  I imagine the defense wants to move

13   for -- I don't know what you call it in a jury-waived case,

14   but move for judgment at the close of plaintiff's case.

15   Right?

16           MR. CARROLL:  Yes.  And we'll be prepared to pass

17   in a brief, your Honor, today.

18           THE COURT:  I'm delighted to receive it.  I'm

19   going to get oral argument on that tomorrow morning.  That's

20   why I'm giving you the heads-up.  Half an hour a side.

21   We'll let the plaintiff go first because -- defense go first

22   because it's their motion, then the plaintiff can rebut.

23           Since, necessarily, we must stop because I have

24   criminal cases to go to, this gives me a chance to carefully

25   reflect on things.  In a jury-waived case you know what the

1    alternatives are.  They are simply to deny the motion -- my

2    mind is open -- the case can go on to conclusion.  I can

3    allow it in part or on theories or the like, and I'll have

4    the obligation to write that up, but that can narrow it

5    down.  And/or I could allow it in its entirety and we need

6    not go any further.

7            Well, you know that.  So I am going to -- I want

8    the oral argument because it will help me.  And necessarily

9    we're going to have this break while I go try some other

10   cases, and then I'll be back to you either with an order or

11   order and memorandum, and we'll go on with our further

12   proceedings if further proceedings are appropriate.

13           But, Mr. Colby, I don't want to -- I know you're

14   prepared so let's work until 1:00.

15                        CROSS-EXAMINATION

16   BY MR. COLBY:

17   Q.   Good afternoon, Dr. Pomerantz.

18   A.   Good afternoon, counsel.

19   Q.   Nice to see you again.

20   A.   Certainly.

21   Q.   You've offered a number of opinions today about whether

22   or not the Putnam fiduciaries breached their fiduciary

23   duties, but you have no legal training of any sort, do you?

24   A.   That's correct.

25   Q.   And your only informal legal training comes from being

1  an expert witness or other litigation-related activities;

2  correct?

3  A.    No.   I've been a fiduciary.   I've managed money for

4  defined benefit and defined contribution plans.   I have been

5  at the receiving end of due diligence many times by ERISA

6  clients.   I have also performed due diligence as an adviser

7  of money that is owned by ERISA clients in evaluating

8  investments that I am going to make.

9        So I have certainly performed a lot of the functions

10 that I have described, though I have no legal diploma.

11 Q.    Other than your general investment management

12 experience, do you believe that -- you believe that your

13 years of experience dealing with defined benefit and defined

14 contribution plans directly and indirectly give to you an

15 understanding of what are the responsibilities pursuant to

16 ERISA; correct?

17 A.    Well, again, I've been beholden -- I've been on the

18 receiving end of those responsibilities for many clients and

19 large sums of money.   I've certainly read the ERISA code

20 though I, again, don't claim to be a lawyer.   And I rely

21 upon my experience and education.

22 Q.    You've never served on a 401K plan investment

23 committee; correct?

24 A.    That's correct.

25 Q.    And you've never served as a fiduciary of a 401K plan;

1    correct?

2    A.    That's correct.

3    Q.    And you've never been responsible for drafting or

4    implementing an investment policy statement for a defined

5    contribution 401K plan; correct?

6    A.    I have not, but I have contributed in written policy

7    statements like that for defined benefit plans.

8    Q.    You have never been responsible for drafting an -- or

9    implementing an investment policy statement for a 401K plan;

10   correct?

11   A.    Yes.

12   Q.    And you have no experience with plan design on an

13   administrative level; correct?

14   A.    Correct.

15   Q.    You have never designed or implemented a monitoring

16   program for actively managed funds in a defined contribution

17   401K plan; correct?

18   A.    Not as the fiduciary.

19   Q.    Do you recall when I took your deposition in this case?

20   A.    Yes.

21   Q.    That was December; correct?

22   A.    Yes.

23   Q.    And do you recall when I asked you:

24        "QUESTION:  Other than an experience with an insurance

25   company where you said you monitored some passive funds,

```
 1   have you ever been responsible for designing and
 2   implementing a monitoring program for the investment options
 3   in a 401K plan?"
 4        And you answered:
 5        "ANSWER:  No.  I performed that function for defined
 6   benefit plans but never for a DC plan."
 7        Do you recall that?
 8   A.   Yes.  But I also, in that same deposition, talked about
 9   my experience in the monitoring of plans, the monitoring of
10   funds that were manufactured by the investment adviser,
11   Weiss Peck & Greer, and how those funds were included in the
12   401K plan.
13   Q.   Right, right.
14   A.   Of the adviser.
15   Q.   You were part of the investment management group at
16   Weiss Peck & Greer, and as such you worked on funds that
17   were offered in the 401K plan; correct?
18   A.   Yes.
19   Q.   But you never designed or implemented a monitoring
20   program for actively managed funds for a 401K plan; correct?
21   A.   That's correct.
22   Q.   And the only defined contribution monitoring experience
23   that you claim for a plan is for a -- is for index funds;
24   correct?
25   A.   Yes.
```

1  Q.   And you testified previously, I believe, that

2  monitoring index funds doesn't actually require a lot of

3  monitoring; correct?

4  A.   On a relative -- on a relative basis.  I mean, you have

5  to monitor that they are tracking the index that they are

6  beholden to, and then all of the administrative and

7  operational issues would still apply.

8  Q.   Right.  Monitoring of index funds is just how market --

9  how markets performed, and that your funds performed in

10 line; correct?

11 A.   Yes.

12 Q.   Now, let's talk a little bit about the experience that

13 you cite as a basis for your opinions here.  You previously

14 worked at Bank of America; correct?

15 A.   Yes.

16 Q.   And at Bank of America you had no responsibilities for

17 the 401K plan?

18 A.   That's correct.

19 Q.   And at Bank of America you were not a fiduciary of the

20 401K plan?

21 A.   Correct.

22 Q.   And then you worked at Morgan Stanley; right?

23 A.   Yes.

24 Q.   And at Morgan Stanley you had no responsibilities to

25 the 401K plan?

1    A.    Correct.

2    Q.    And at Morgan Stanley you were not a fiduciary of the

3    401K plan?

4    A.    Correct.

5    Q.    And you worked at Citibank; correct?

6    A.    Yes.

7    Q.    And at Citibank you had no responsibilities for the

8    401K plan?

9    A.    Yes.

10   Q.    And at Citibank you were not a fiduciary of the 401K

11   plan?

12   A.    Yes.

13   Q.    You went to Nomura Securities; right?

14   A.    Yes.

15   Q.    And at Nomura you had no responsibilities for the 401K

16   plan; correct?

17   A.    Correct.

18   Q.    And at Nomura you were not a fiduciary of the 401K

19   plan?

20   A.    Correct.

21   Q.    And you then went to Weiss Peck & Greer; correct?

22   A.    Yes.

23   Q.    And at Weiss Peck & Greer, you've testified, you didn't

24   know who the named fiduciaries of the Weiss Peck 401K plan

25   were; right?

A.    Yes.

Q.    And you didn't know who comprised the 401K plan's
investment committee at Weiss Peck; correct?

A.    Correct.

Q.    Now, as you said a minute ago, you contributed to some
of the products that were part of the Weiss Peck 401K plan;
right?

A.    Yes.

Q.    But you don't know whether or not you were a fiduciary
of the Weiss Peck 401K plan; correct?

A.    Well, I believe I'm a fiduciary -- I was a fiduciary to
the extent that I was an owner of the company.  And as an
owner, not as an employee, I viewed myself as the fiduciary
to every transaction that the firm underwent.

Q.    At Weiss Peck you don't know whether or not you were
responsible for selecting the 401K plan's investment lineup;
correct?

A.    I'm sorry.  Could you please repeat that?

Q.    Yeah.  I believe you've testified that at Weiss Peck
you don't know whether or not you were responsible for
selecting the 401K plan's investment options?

A.    That's correct.

Q.    And you don't know who was responsible; correct?

A.    That's correct.

Q.    You testified you didn't know who was formally

 1   responsible because it was just something that happened;

 2   correct?

 3   A.   That's correct.

 4   Q.   Then you spent some time at Duff & Phelps; right?

 5   A.   I was an employee at Duff & Phelps for about a year.

 6   Q.   And at Duff & Phelps you had no responsibilities for

 7   the 401K plan?

 8   A.   That's correct.

 9   Q.   And at Duff & Phelps you were not a fiduciary of the

10   plan?

11   A.   Correct.

12   Q.   And at your deposition I believe you told me you had

13   positions with a couple of other companies that aren't

14   listed on your CV.  Specifically, you referenced firms

15   called QED, and another one called Lotus Partners.  Do I

16   have that right?

17   A.   Yes.

18   Q.   And you also referenced being an employee and a

19   consultant of New York Life Management; right?

20   A.   Yes.

21   Q.   And you weren't a fiduciary for any of the -- for any

22   401K plan at QED because they didn't have a 401K plan;

23   correct?

24   A.   Correct.

25   Q.   And that same is true with respect to Lotus?  You were

1    not a fiduciary for any 401K plan at Lotus, were you?

2    A.    No.

3    Q.    You had no responsibilities for any 401K plan at either

4    of those two firms?

5    A.    Neither of those firms had 401K plans.

6    Q.    And at New York Life you were not a fiduciary for the

7    401K plan; correct?

8    A.    That's correct.  I was involved in the management of

9    portfolios and mutual funds that were in the plan, but I was

10   not involved with the plan.

11   Q.    Are you sure about that?

12   A.    Yes.

13   Q.    Okay.  Do you recall in your deposition when you

14   testified that you managed some products but you didn't know

15   whether or not they were in the 401K plan?

16   A.    Well, there were alternative products that we managed,

17   but they were also -- there were also two mutual funds that

18   the group that I was with managed that were in the New York

19   Life 401K plan.

20   Q.    So in your deposition I asked you:

21         "QUESTION:  Were you a fiduciary with respect to the

22   New York Life 401K plan?"

23              MR. KASTER:  Could we have a page and line,

24   please?

25              MR. COLBY:  Sure.  Page 44, line 18.

```
 1   Q.   "QUESTION:  Were you a fiduciary" --
 2           MR. COLBY:  Would you like to follow along,
 3   Dr. Pomerantz?
 4   A.   No -- well actually, yes, please.
 5           (Handing document.)
 6   Q.   "QUESTION:  Were you a fiduciary with respect to the
 7   New York Life 401K plan?"
 8   A.   I'm sorry.  What page?
 9   Q.   44, line 18.
10   A.   Yeah, and my testimony is my contribution there was to
11   the management --
12   Q.   Let me read it first, please.
13           "QUESTION:  Were you a fiduciary with respect to the
14   New York Life 401K plan?
15           "ANSWER:  No, my responsibility there was -- because I
16   was an employee, my responsibility was to the management of
17   particular funds but that was about it.
18           "QUESTION:  Were those funds offered as options in the
19   New York Life 401K plan?
20           "ANSWER:  I actually -- I don't even know.  I don't
21   know."
22           MR. KASTER:  I object to this as not impeaching,
23   your Honor.
24           THE COURT:  No, overruled.  He may have it.
25   A.   Actually, if you go back a page, I basically said my
```

1    contribution there was to the management of some funds that

2    were in the plan, but I don't really know anything about the

3    company as a whole.

4    Q.   Uhm-hmm.  And --

5    A.   I mean, I may have misunderstood what you were asking

6    but, you know, but I certainly answered in the affirmative

7    just one page before which -- where I say that the funds

8    that -- some of the mutual funds that I managed were in the

9    plan.

10   Q.   Right.  And when I followed up, you said, "Actually --

11   I don't know.  I don't know."  Correct?

12   A.   Apparently.

13   Q.   The next question was:

14       "QUESTION:  So you don't know whether or not you had

15   responsibilities at all with respect to -- with respect to

16   the New York Life 401K plan?

17       "ANSWER:  You know, right, I don't know."

18       That was your answer?

19   A.   Yes.

20   Q.   Now, your work at your current firm is about 90 percent

21   litigation consulting; correct?

22   A.   Yes.

23   Q.   And at your deposition you identified your current

24   litigation engagements, and this is as of December 21st, as

25   a case relating to -- known as Picard, the Federal Home Loan

1    Bank, Fidelity, Principal, Great-West, this case, Putnam,

2    Russell, and JP Morgan; right?

3    A.    Okay.

4    Q.    We can look but --

5    A.    No, I recognize all of those.

6    Q.    Okay.  And other than Picard and the Federal Home Loan

7    Bank, all of the other cases that you identified in that

8    list as your current litigation engagements are against

9    investment advisers, mutual fund companies; right?

10   A.    Those are not all mutual fund cases.  The subjects of

11   those funds are not all mutual funds, but they're all

12   money-management firms.

13   Q.    Money management.  Those cases are all against

14   money-management firms; correct?

15   A.    Well, Chase is a little bit more than a

16   money-management firm.

17   Q.    Sure.  And you represent the plaintiffs in all of those

18   cases; correct?

19   A.    Yes.

20   Q.    And you've testified in another -- a number of

21   so-called 36(b) excessive fee cases over the years, haven't

22   you?

23   A.    Yes.

24   Q.    And the two dozen or so Section 36(b) cases for

25   excessive fees that you have testified in, those were all

1    engagements for plaintiffs against fund companies; correct?

2    A.    Yes.

3    Q.    Now, since your deposition you submitted a preliminary

4    report in a case against Allianz Asset Management; correct?

5    A.    Yes.

6    Q.    And is that an ERISA case against an asset manager?

7    A.    Yes.

8    Q.    And you were retained by the plaintiffs in that case as

9    well; correct?

10   A.    Yes.

11   Q.    And the plaintiffs there are also represented by the

12   Kaster firm?

13   A.    Yes.

14   Q.    You've also submitted a report in a case against

15   Deutsche Bank; correct?

16   A.    Yes.

17   Q.    And that's an ERISA action against a mutual fund

18   company; correct?

19   A.    Yes.

20   Q.    And you were retained by plaintiffs in that case;

21   correct?

22   A.    Yes.

23   Q.    And the plaintiffs there are represented by the Kaster

24   firm; correct?

25   A.    Yes.

1    Q.   You've submitted a report since your deposition in a

2    case against Prudential Retirement Insurance and Annuity

3    Company; correct?

4    A.   Yes.

5    Q.   And that's an ERISA action against Prudential; correct?

6    A.   That's not a mutual fund case, but correct.  Correct.

7    Q.   Understood.  But it's an ERISA action against

8    Prudential; correct?

9    A.   Yes.

10   Q.   And you were retained by plaintiffs in that case?

11   A.   Yes.

12   Q.   You've also submitted a declaration in a case against

13   BNY Mellon; correct?

14   A.   Yes.

15   Q.   And that's a breach of fiduciary duty action against

16   BNY Mellon; correct?

17   A.   As a trustee.

18   Q.   It's a breach of fiduciary duty case against BNY

19   Mellon; correct?

20   A.   Yes.

21   Q.   You were retained by plaintiffs in that case?

22   A.   Yes.

23   Q.   Now, you have testified this morning about your

24   testifying experience in about 100 other cases; correct?

25   A.   Yes.

1    Q.    And among those you gave testimony in a case against

2    AXA Equitable Life?

3    A.    Yes.

4    Q.    And in that case the Court gave little weight to your

5    testimony due to inconsistencies, oversimplifications, and

6    sarcastic demeanor; correct?

7    A.    Yes.

8    Q.    You've given testimony in a case against Kraft Foods;

9    correct?

10   A.    Yes.

11   Q.    And the Court excluded your testimony or at least some

12   of it in the Kraft Foods case; correct?

13   A.    Yes.

14   Q.    And one of the bases for that exclusion was that your

15   description of what the prudence requirement would say or

16   would require was incorrect as a matter of law; right?

17   A.    I don't recall specifically.

18   Q.    Okay.  And the Court also excluded portions of your

19   report that suggested that the defendants in that case acted

20   with a particular state of mind; correct?

21   A.    Again, I don't recall the specifics.

22   Q.    In the Picard case that you mentioned earlier, the

23   judge in the Picard case excluded some of your testimony as

24   well; correct?

25   A.    Yes.

1    Q.   And among the reasons was that the Court was doubtful

2    about the relevance of your methodology and experience;

3    correct?

4    A.   I -- I don't know.  I don't -- actually, I don't know

5    that to be a fact.  I thought there were other issues, but I

6    don't know about that.

7    Q.   Okay.  And you've given testimony in a case against the

8    National Football League Players' Association; right?

9    A.   Yes.

10   Q.   And in that case the judge found that you were not an

11   expert on the topic on which you purported to opine;

12   correct?

13   A.   I don't recall the specifics.

14   Q.   You don't recall that the Court said that you didn't

15   really understand the legalities of applicable SEC guidance?

16   A.   I was not there to testify as an attorney.  I don't

17   really understand any of that.  I was there to discuss due

18   diligence and what's involved in due diligence.

19   Q.   You don't recall the Court stating that you didn't

20   really understand the legalities of the applicable SEC

21   guidance?  You don't recall that?

22   A.   I don't recall the specifics.

23   Q.   You also testified in a case against Federated

24   Investors; right?

25   A.   Yes.

1  Q.   And there your opinions were excluded because they did

2  not employ the rigor one would expect from an expert in your

3  field, nor reasoned manipulation of numbers; correct?

4  A.   Yes.

5  Q.   And you were aware at the time of your deposition in

6  this case that the Court had excluded your opinions in

7  Federated; correct?

8  A.   Yes.

9  Q.   And when I asked you in what other matters your

10  opinions have been excluded, in your deposition, you didn't

11  identify the Federated case, did you?

12  A.   Actually, I -- at the time, I think I even said in my

13  deposition that that case was under appeal.  I don't know

14  the status of that case.

15  Q.   Right, right.  But at the time an opinion had been

16  rendered that struck some of your opinions in that case;

17  correct?

18  A.   I did not know that at the time of the deposition.  The

19  only thing I knew was that the case was under appeal.

20  Q.   So you only heard about that from me at your

21  deposition?  You hadn't heard about it prior to that?

22  A.   That's correct.

23  Q.   Now, I'll talk a little bit about your work in this

24  case.

25       Other than publicly available information, everything

1    that you know about this case comes through plaintiffs'
2    counsel; correct?
3    A.    Any private material comes through plaintiffs' counsel.
4    Public information is available.
5    Q.    Yes.  And no one other than plaintiffs' counsel has
6    assisted you with this engagement in any way?
7    A.    Correct.
8    Q.    And plaintiffs' counsel provided you with responses to
9    everything that you requested; correct?
10   A.    Yes.
11   Q.    But what you received from plaintiffs' counsel wasn't
12   necessarily what you expected to get; correct?
13   A.    I don't understand your question.  I don't know what
14   you mean by "expected to get."  I mean, for example, I asked
15   counsel for the profitability reports and they gave me
16   something that looked exactly like what a profitability
17   report would look like.
18   Q.    I'm just confirming something you told me in your
19   deposition.
20   A.    I don't understand your question.
21   Q.    Sure.  The question was, in your deposition:
22        "QUESTION:  Were there any other materials that you
23   requested from counsel that you did not receive?
24        "ANSWER:  No.  I didn't.  I don't re -- they provided
25   me" --

1              MR. KASTER:  Can I have the page and line, your

2      Honor?

3              THE COURT:  Yes, absolutely.

4              MR. COLBY:  Page 77, line 12.

5      Q.   "QUESTION:  Were there any other materials that you

6      requested from counsel that you did not receive?

7          "ANSWER:  No, I don't -- I don't re -- they provided me

8      with responses to everything that I asked for.  They weren't

9      necessarily things that I expected to get, but they were --

10     they were things."

11          That was the question and answer in your deposition;

12     correct?

13     A.   Yes.  And let me just -- let me clarify.  What this

14     means is not that they gave me things that I didn't expect,

15     but that I had no expectations of what it was that they were

16     going to give me.

17     Q.   Now, when you asked for due diligence and analysis

18     documents from the plaintiffs, they selected and sent to you

19     what they thought was responsive; correct?

20     A.   Yes.

21     Q.   A couple of things I just want to confirm about the

22     scope of your opinions in this case, Dr. Pomerantz.

23          You have no opinion in this case about the

24     characterization of payments that Putnam makes to its 401K

25     plan; correct?

```
 1              THE COURT:  I'm not sure I understand the
 2   question.  He may, but I don't know what you mean by
 3   "characterization of payments."
 4              MR. COLBY:  Sure.
 5   Q.   So, for example, the -- Dr. Pomerantz, so we're on the
 6   same page, the voluntary payments that Putnam makes to the
 7   participants in the retirement plan, or to the retirement
 8   plan, do you understand what I'm talking about?
 9   A.   Yes.  I see those as payments consistent with the labor
10   market.  There was testimony earlier that compared those
11   types of payments to what other money managers in the Boston
12   area pay.  I see that as kind of the cost of Putnam's doing
13   business.
14   Q.   But you're not offering an opinion in this case about
15   the characterization of those payments, are you?
16   A.   I don't characterize them.  They are the -- basically
17   money that's being paid to participants, presumably pursuant
18   to the labor market mechanics.
19   Q.   Okay.  Do you recall -- we can go to page 86 of your
20   deposition, line 24.
21       "QUESTION:  Do you or do you not have an opinion about
22   the characterization of Putnam payments to its 401K plan?
23       "ANSWER:  I don't think my report has an opinion about
24   that.
25       "QUESTION:  Okay.  So you're not offering an opinion in
```

1    this case about the characterization of the payments that

2    Putnam makes to its 401K plan?

3         "ANSWER:  I have no opinion about that."

4         Was that the --

5    A.   At the top of page --

6    Q.   I'm sorry.  Let me ask the question.

7         Was that the question or questions that you were asked

8    and the answers that you gave in your deposition?

9    A.   This is a correct recitation of my deposition.

10   Q.   Now, you have no opinion about whether the plan

11   fiduciaries had the required expertise for the investment or

12   the administrative aspects of running the plan; correct?

13   A.   I'm sorry.  Do they --

14   Q.   You're not questioning the -- whether or not the Putnam

15   plan fiduciaries had the required expertise for the

16   administrative or investment aspects of running the plan,

17   are you?

18   A.   They may have had.  I don't know.

19   Q.   You're not rendering an opinion on their

20   qualifications; correct?

21   A.   Well, only to the extent that were they qualified I

22   believe that there would be certain output, and that output

23   is missing.  And in the absence of that output, in the

24   absence of due diligence reports and due diligence analysis,

25   I would question the qualifications.

```
 1              THE COURT:  All right.  Wait a minute.  It's 1:00.

 2   So we'll stop at this time.

 3              We'll have the argument that I've limited tomorrow

 4   commencing at 9:00, half an hour a side.  The time will not

 5   count.  And then, unfortunately, we're going to have to take

 6   a recess in this case.

 7              Total elapsed time out of the six days available

 8   for the plaintiffs at the close of -- well, if they haven't

 9   rested, they get redirect, but they have used up now

10   four days, two hours, 40 minutes.  Out of the five days

11   available to the defense it has used up two days 50 minutes.

12              We'll recess until 9:00 tomorrow morning.  We'll

13   recess.

14              THE CLERK:  All rise.

15              MR. CARROLL:  Your Honor, we have just filed

16   electronically our motion, and courtesy copies will be en

17   route also.

18              THE COURT:  Thank you.

19              (Whereupon counsel conferred.)

20              MR. KASTER:  Your Honor, could we clarify one

21   thing?  I'm confused.  Are we taking testimony tomorrow?

22              THE COURT:  No.  We're just going to have

23   argument.

24              MR. KASTER:  That was my impression.

25              THE COURT:  The time doesn't count.
```

1          MR. KASTER:  Mr. Carroll and I were discussing --

2          THE COURT:  I must go on to other things.  When we

3    resume -- we'll say it that way -- when we resume we'll pick

4    up right here.  You've not rested.  It's just the way I read

5    the rule, and I think I read it correctly.  You told me

6    you're done with the direct of your last witness, and the

7    scope of redirect has to be within the scope of cross, and

8    so I think that I can profitably get your argument and I'm

9    eager to hear it.  So --

10         MR. KASTER:  Thank you.

11         THE COURT:  It will give me a chance to think

12   about things.

13         MR. KASTER:  Thank you.

14         THE COURT:  Thank you all.  We'll recess.

15         THE CLERK:  All rise.

16

17         (Proceedings adjourned.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing

pages are a true and accurate transcription of my

shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




        /s/ Cheryl B. Palanchian 4-19-17
             CHERYL B. PALANCHIAN

           Registered Merit Reporter
          Certified Realtime Reporter
         Realtime Systems Administrator