```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                             No. 1:15-cv-13825-WGY

 4

 5   JOHN BROTHERSTON, Individually and as Representative
     of a Class of Similarly-Situated Persons, and on
 6   Behalf of the Putnam Retirement Plan,
                  Plaintiffs
 7

 8   vs.

 9

10   PUTNAM INVESTMENTS, LLC, et al
                  Defendants
11

12                        * * * * * * * * *

13

14

15                    For Bench Trial Before:
                      Judge William G. Young
16

17                        Motion Session

18                    United States District Court
                      District of Massachusetts (Boston)
19                    One Courthouse Way
                      Boston, Massachusetts 02210
20                    Thursday, April 20, 2017

21
                          * * * * * * * *
22

23           REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
24                United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
25                    bulldog@richromanow.com
```

```
 1                    A P P E A R A N C E S

 2

 3   JAMES H. KASTER, ESQ.
     PAUL J. LUKAS, ESQ.
 4   KAI H. RICHTER, ESQ.
     CARL F. ENGSTROM, ESQ.
 5       Nichols Kaster, PLLP
         4600 IDS Center
 6       80 South Eight Street
         Minneapolis, MN 55402
 7       (612) 256-3200
         Email: Kaster@nka.com
 8       For Plaintiffs

 9

10   JAMES R. CARROLL, ESQ.
     EBEN P. COLBY, ESQ.
11   MICHAEL M. HINES, ESQ.
     RAOUL D. KENNEDY, ESQ.
12       Skadden, Arps, Slate, Meagher & Flom, LLP
         500 Boylston Street
13       Boston, MA 02116
         (617) 573-4800
14       Email: James.carroll@skadden.com
         For Defendants
15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2              (Begins, 9:00 a.m.)
 3              THE COURT:  Good morning, counsel.  I think to
 4    tee this up, um, it would be helpful to you if I said a
 5    few words at the outset.
 6         Now I know what my duty is under the rule in a
 7    jury-waived case such as this, but it will not be
 8    particularly helpful to listen to an hour, in the
 9    aggregate, of jury argument, and I'll tell you why.
10         One, I'm certainly going to allow the filing of
11    post-hearing briefs because necessarily I must turn my
12    attention to the trial of more than one criminal case
13    and that will give me a chance to carefully reflect on
14    what I've heard thus far.
15         But second, and this is where I'm trying to be
16    helpful to you.  I view this motion as closely akin -- I
17    know it's not, but as closely akin to the motion for
18    directed verdict in a jury case, and here's how and why.
19         What I'm looking for, candidly, is to see on the
20    record I have before me if the plaintiffs have a path to
21    victory.  Now if the plaintiffs have a path to victory,
22    then the better part of valor -- if that's even
23    debatable, the better part of valor is -- though I
24    welcome this argument, it will help me as we go forward,
25    but the better part of valor is to deny the motion, see
```

1     the full impact of Putnam's defense, its expert and the

2     like -- we haven't got that much longer in this case,

3     and then write an opinion.  I know how to do that.

4          On the other hand, if I don't see a way that the

5     plaintiffs can prevail here or it is so speculative that

6     I just can't get there from here, um, then, um, both

7     because it's a mercy and because my duty requires, that

8     I put an end to it.  So in my mind it's closely akin to

9     a motion for a directed verdict.

10          Now, I think a good way to set this up for

11     argument is to look at -- and I've read all of the

12     materials you've submitted and it's helpful, but look at

13     the defendants' memorandum and, um, their various

14     argument headings -- no mention is made here nor should

15     it be and I -- and it would be a waste to entertain any

16     argument and I'm not going to, um, excuse me, with

17     respect to the releases, but that's a matter on which

18     the defense bears the burden of proof and they haven't

19     had their chance.  We're going to talk about damages,

20     I'm sure, and while there's been reference to it here,

21     the, um, sort of off in the sidelines of the argument

22     that I'm entertaining today are the contributions that

23     Putnam itself made and whether those contributions are

24     entitled to be used as a setoff of any potential

25     damages?  That too is a matter for Putnam to prove on

1    which Putnam must prevail.  That's not for today.  We

2    haven't seen Putnam's evidence.  So I don't intend to --

3    I'm aware that that's there, but I don't intend to get

4    into that.

5         So here's the issues that I see before us and, um

6    -- well, I won't even say a "reaction," but where I

7    think we are.  And let's start with the duty of loyalty.

8         Now on the evidence that I have before me, I would

9    be warranted -- that's the language of a directed

10   verdict, but don't think I'm going there, but if it was

11   a directed verdict, I would be warranted to characterize

12   the evidence as the plaintiffs have spelled it out.  My

13   problem with that prong of the case is not so much that

14   there is some failure of proof about this "they only

15   offered Putnam funds, they didn't want to go outside,

16   drag their feet as to that," but with the legal aspect

17   of that, which I need your help, um, I think a rule or

18   sort of a per se rule that you violate the duty of

19   loyalty simply by offering your own funds is not

20   supported by the present legal framework.  I mean I'm

21   not citing First Circuit law here, so I suppose I have

22   some flexibility, but as I come to the bench, I don't

23   think it's supported by the present legal framework.

24        Probably the plaintiffs' strongest argument is the

25   one that the defendants have breached their duty of

1   prudence in the monitoring of plan investments.  Using

2   the same language, I would be warranted on this evidence

3   in so finding.  I've got some questions as we go along,

4   but I understand that argument.

5        And, um -- and then if that's so, we get to

6   damages, and I confess on damages I'm completely at sea.

7   That's not to say I don't understand the plaintiffs'

8   theory, I do understand it -- at least I understand it

9   in significant outline of, um -- well, I've got some

10  issue about these fee damages, but I understand that,

11  and in fact it's a simple theory.  At bottom -- it takes

12  a lot of work, but it's a simple theory.  I mean there's

13  parts of it that one might characterize as "elegant."

14  But it seems wholly inapposite to the trial of a class

15  action where the individual class members have

16  individual, um, plan holdings.  I'll ask questions about

17  that.  At the same time, were I to not accept that, then

18  there may well be evidence here from which one could

19  fashion a damage remedy, um, putting aside, as I want to

20  today, this issue of Putnam's own contributions and

21  whether they constitute a setoff.

22       Now, um, this is your argument, not mine, and I

23  speak only to be of assistance.  This is the plaintiffs'

24  motion, I set the plaintiffs' -- rather the defendants'

25  motion and the defendants may go first, so I'll hear

1    from the defense.

2              MR. CARROLL:  Thank you very much, your Honor,

3    thank you for those remarks, and for the time for

4    planning purposes, will your Honor entertain rebuttal as

5    well this morning?

6              THE COURT:  No.

7              MR. CARROLL:  Thank you.

8         So I want to try and have my remarks address those

9    things that are most interesting to the Court and what I

10   would do, subject to any questions from the Court, would

11   be just to give a brief overview of what I think the

12   evidence is about the plan, but then I think go directly

13   to two issues.

14        The first I think is the simplest and easiest

15   argument as to why there can be no path to victory here

16   as a matter of law, and you may call it "damages," I

17   characterize it as an "utter failure of proof with

18   respect to loss causation."  Then I would address, with

19   your Honor's lead, why it is the evidence before your

20   Honor fails -- the plaintiffs fail to meet their burden

21   with respect to the duty of monitoring.  And I'll take

22   it in any order you like, but in that regard just a few

23   remarks about the plan itself.

24        The evidence you've heard shows that this plan

25   works and you don't have to look beyond the

1    representative -- and I emphasize the word

2    "representative" -- the plaintiffs have chosen them,

3    plaintiffs to demonstrate that.  Both left Putnam with

4    substantial retirement balances attributable to Putnam's

5    significant contributions.

6         Ms. Glancy, after a long career at Putnam, leaves

7    with over 900 --

8              THE COURT:  Yes, I've listened to that, and,

9    um, much of this appears to be undisputed, so maybe I

10    have the bulk of this case, that's true, but, um,

11    that's -- and taking Ms. Glancy as an example, that's in

12    large measure due to the contributions that Putnam made.

13    I think, if anything, those things are a setoff.  And

14    while I'll certainly take them into account, I want to

15    hear, um, and not today, but after you've rested --

16    we're not there, this is not some substitute for the

17    final argument, but you're going to have to prove up

18    what the setoff would be assuming there's liability.  I

19    get that.  Or at least I get it theoretically.  Um, but

20    that's not for today.

21              MR. CARROLL:  Well, with great respect, your

22    Honor, I think the way in which, um -- and take

23    Ms. Glancy, for example, has behaved, also ties directly

24    into the point about loss causation, and here's why.

25         Ms. Glancy's remarkable success as a plan

```
 1   participant has been as a result not just of Putnam's
 2   voluntary contributions, but also of her successful
 3   utilization of the options within the plan.  And what
 4   are those?  Ms. Glancy actively managed Putnam mutual
 5   funds.  And the same thing with Mr. Brotherston, who
 6   availed himself of lots of those options, more than 30
 7   of them over the years.  And why does that matter?  It
 8   matters a lot because of the fundamental flaws with
 9   respect to the plaintiffs' damages theory, and this is
10   what I mean.
11        The plaintiffs, as part of their prima facie case,
12   they've got to prove that we had an investment option
13   that was imprudent, that it caused damages, the loss
14   causation piece, and then they have to prove damages in
15   some manner by suggesting some plausible alternative so
16   that there might be a measure of damages.  I'm skipping
17   ahead, but I'll come back.
18        The only evidence before your Honor is that of
19   Dr. Pomerantz with respect to this.  Dr. Pomerantz has
20   posited a plausible alternative of two, a model based on
21   some Vanguard passively-managed funds, and a model based
22   upon six BNY passively-managed CITs.  And there is no
23   evidence in this record, nor could there be, that those
24   are plausible alternatives for Putnam plan participants
25   because the alternatives have to fit the plan and the
```

1    participants who work inside and actively manage the

2    mutual fund company, and, during the class period, have

3    chosen, in the face of alternatives, to invest their

4    money, more than 96 percent, in actively-managed Putnam

5    funds just like Ms. Glancy and just like

6    Mr. Brotherston.

7              THE COURT:  But let me say it to you from the

8    plaintiffs' point of view, given how I'm analyzing it

9    here.  I suppose I would be warranted in finding the

10   following.  That the PBIC completely delegated their

11   duty -- they have the duty to monitor, to the investment

12   division, um, which has a somewhat different duty, it

13   seems to me, than the duty of the investment committee,

14   um, and that this monitoring was -- on the part of the

15   PBIC, was passive at best, um, they just -- if I draw

16   all inferences their way, things just rolled along, and

17   so, um, perhaps I can draw the conclusion that had they

18   monitored, they would have changed the family of funds,

19   dropped out the weakest producers, and then the -- those

20   who -- and further Ms. Glancy didn't actually go and --

21   she wasn't terribly accurate in picking her choices

22   there, some of the others may be, but she sort of went

23   along with what was offered, but what was offered would

24   have been better, and it wasn't, because they weren't

25   monitoring.

1     Now, um, and one could infer then that the spread

2  between what it was and what it could have -- should

3  have been -- no one says that it has to be the top

4  producing, these are investment decisions, but the

5  spread there, that's a damage to her.  Yes, she did very

6  well, but she should have done better.  That's their

7  argument.  Well, they can make it better than I just

8  did.  And that argument, um, I don't know whether

9  there's proof of that here, but that's their argument.

10          MR. CARROLL:  Okay.  And there are two

11  fundamental points that you've made and I want to

12  address them both.  The second part, in terms of this

13  alternative investment, what the money would have

14  otherwise been put in, I'll come back to it, but in

15  short you would have to do, as your Honor was just

16  struggling to do, speculate entirely about that.  The

17  plaintiffs had the burden to come forward with proof in

18  that regard, they have not done it.  And I'll come back

19  to that.

20      The first point, I'm hesitant to ever tell you

21  that you're wrong and I do so respectfully, but in this

22  you are.

23          THE COURT:  Don't ever be hesitant.  Go ahead.

24          MR. CARROLL:  And I can demonstrate it.  And

25  I've passed up -- and Mr. Hines will give it to the

1    Clerk, please, I passed up an exhibit to frame our

2    attention, it's Exhibit B to this book, your Honor, it's

3    in the --

4              THE COURT:  I've got it.

5              MR. CARROLL:  And I'm drawing your attention

6    to this, because I want to address very directly your

7    articulation that the PBIC has delegated to the others

8    in Putnam in the investment committee.  I understand why

9    you say that, that indeed has been the way in which the

10   facts have been portrayed by the plaintiffs.  The record

11   evidence, however, is distinctly to the contrary.  And

12   to understand how the PBIC operated and operates, you

13   need to understand who the PBIC is.  And we've had

14   testimony about this from the three HR people -- the

15   only folks the plaintiffs called were HR people, and

16   also from Mr. Lenhardt.

17       What this shows -- and there's particular

18   testimony in the record about Mr. Kea, Mr. Scanlon,

19   Dr. Van Harlow, Jeffrey Knight, and Andy Matteis, all of

20   those PBIC members at some point, all of them personally

21   responsible in the investment division at Putnam for

22   overseeing mutual funds themselves, in most respects

23   because they're portfolio managers who themselves run

24   the funds, and in other respects directly involved in

25   the monitoring.

1    So the record before your Honor does not permit an
2    inference that the monitoring efforts, which are
3    substantial and unrebutted -- Mr. Lenhardt's testimony
4    was unrebutted in terms of what happened, the record
5    doesn't permit an inference that this happens in some
6    distant part of the organization by other people, PBIC
7    members themselves, senior investment professionals, are
8    some of the people who actually engage in that daily,
9    weekly, quarterly monitoring, in the meetings with the
10   trustees, the risk meetings, all of that analysis that
11   Mr. Lenhardt talked about.  And we asked Mr. Lenhardt,
12   "Who does this work?"  And he said, "It's the senior
13   investment professionals," specifically mentioning the
14   current composition, Mr. Scanlon and Mr. Kea.  There is
15   no divide between the work of the monitoring that
16   happens within the investment division and the PBIC.
17        Now, to be sure, that monitoring does not happen
18   exclusively within the confines of a PBIC meeting, and,
19   to be sure, it's not robustly-reflected within the PBIC
20   minutes, of course not, that's not where it happens, but
21   there is no one-size-fits-all rule in ERISA dictating
22   that that work has to be done in the PBIC and such a
23   rule wouldn't make sense.
24        The PBIC, with its HR people, some business people
25   and investment professionals, in the context of those

1  meetings, could never replicate the full-time work of

2  dozens of investment professionals that Mr. Lenhardt

3  talked about in the investment division.  Putnam has to

4  sort out how to fulfill its duty to monitor in a way

5  that works best for it and for its plan participants.

6  It does so, as I submit it's perfectly permitted to do

7  under ERISA, in the way that allows it to take advantage

8  of its institutional resources.  And it does so, and the

9  record that it does so is unrebutted.  This is not

10  happening in a foreign venture, this is people on the

11  PBIC doing the work and bringing that knowledge and

12  experience into those PBIC meetings.

13           THE COURT:  But how about this?  It's the

14  investment committee that, under ERISA, has the duty to

15  monitor plan investments and, um, determine whether a,

16  um, mutual fund is specifically appropriate for the plan

17  and whether, as time goes on, it's performing in a way

18  that achieves the goals of the plan.  Those are duties

19  that are only in the PBIC.

20       These portfolio managers, when they have their

21  meetings with Lenhardt, and I'm struck by the level of

22  detail that is presented to the trustees as opposed to

23  what appears to go on in the PBIC meetings, um, in

24  the -- in the investment end of Putnam, they don't have

25  those obligations, that's not their obligation.  Their

1    goals are more business-driven, um, and perfectly

2    appropriate, but they're -- they may be overlapping, but

3    they are different from their duties as PBIC members.

4              MR. CARROLL:  So not as different, your Honor,

5    as you might suppose.  Those people in the investment

6    division are themselves fiduciaries and they're

7    fiduciaries to all of the shareholders in Putnam mutual

8    funds, whether those shareholders hold their fund inside

9    a 401K plan, Putnam's or anyone else's, or in some

10   retail account.  So they have got a fiduciary duty to

11   act in the best interests of the mutual fund

12   shareholder, and indeed that's why we belabored the

13   evidence with respect to how they're compensated,

14   because their compensation has nothing to do with sales

15   or profits or anything other than how those funds

16   perform over the long term.  So the duties are not as

17   distinct as one might suppose.

18         Separately, that the PBIC has those duties,

19   there's no dispute about that, but where there seems to

20   be a conflict in the lens through which the plaintiffs

21   and the defendants look at this case is how it is that

22   the PBIC must fulfill those duties?  We say they may

23   fulfill them in the way, in the exercise of their

24   fiduciary judgment, they think best, given the resources

25   that they have available to them.

1          Now I don't know precisely what defendants would

2    say, but if you consider the counterfactual hypothetical

3    that your Honor referenced earlier in the case, a widget

4    company.  A widget company doesn't have investment

5    professionals to rely upon, so what they do, the typical

6    widget company, I submit, what they will do is they'd

7    hire a third-party consultant who would come in once or

8    twice a year, look at what they have available, which is

9    historical performance data -- they don't have what

10   Mr. Lenhardt has, they don't have information about the

11   process and the risk and the guardrails and the

12   information ratios or any of that, and they'd come in

13   and say, "Here's how the funds have performed."  Maybe

14   they'd even use an AAG report.  All right?  That's

15   inferior to what Putnam has available to it.

16          You wouldn't ask a PBIC committee, as a committee

17   with HR people, for example, to try and replicate the

18   good work that happens in the investment division, and

19   rather I submit the case might be different if it were

20   as plaintiffs posit, that is to say the PBIC, sitting in

21   one part of the organization, relies blindly on the work

22   in the investment division in some other part of the

23   organization, but that's not what the evidence is.

24          THE COURT:  But we have evidence here, and

25   indeed the plaintiffs' experts seem to agree, that the,

1    um, committee, the PBIC, was fully compliant with ERISA

2    with respect to this, um, QDIA Putnam retirement-ready

3    funds and the DIA, the Mellon funds, um, what they did

4    there was fully compliant, but the record does seem

5    pretty clear that that's not what they did beyond those

6    two categories of mutual funds.  And why shouldn't it be

7    the same standard throughout?

8             MR. CARROLL:  So the record is indeed as you

9    say and here's why it's not the same standard.  Let's

10   take the BNY Mellon funds as an example, and the

11   plaintiffs correctly laud the procedural prudent process

12   they went through in that regard, why do it that way

13   with the BNY Mellon funds?  The answer is precisely

14   because, unlike the established Putnam mutual funds,

15   Putnam doesn't have the robust analysis and monitoring

16   going on in the investment division with respect to the

17   BNY Mellon funds, it doesn't have that resource, it has

18   to figure out a different way to do it.

19        But with respect to the established Putnam mutual

20   funds, ERISA doesn't require a reinvention of the wheel

21   when you have that robustibility, it is well within the

22   discretion of the fiduciaries to take advantage of it

23   and again I emphasize that the very people taking

24   advantage of it are themselves some of the ones who do

25   it.  We heard testimony about that with respect to

1    Mr. Scanlon, he's a senior member of the fixed-income

2    team, he's part of all those meetings that you heard

3    Mr. Lenhardt talk about, and he brings that to the

4    committee members when they meet.

5        This is why I emphasize the point that ERISA

6    doesn't require a one-size-fits-all methodology.  What

7    Putnam does a widget company couldn't do, and I would

8    respectfully submit that what Putnam does is far

9    superior to that which a widget company could do.  It's

10   different.

11       Similarly the plaintiffs -- and here I'm going to

12   blend over to an argument that I hope to get to on the

13   loss causation.

14            THE COURT:  You've got about 10 minutes left,

15   but go ahead.

16            MR. CARROLL:  Well, then I want to do it now.

17   And I'll direct your attention to my book briefly and

18   I'd ask your Honor to briefly look to Tab C if you

19   would, please.

20            THE COURT:  Yes.

21            MR. CARROLL:  And this is what you were

22   referring to, this is the testimony from Mr. Schmidt on

23   the 18th.  And Mr. Schmidt testifies, and I credit his

24   candor on this, "There was a prudent process filed in

25   terms of review and monitoring of the QDIAs."  Okay.  So

1    there's no breach of monitoring with respect to the

2    QDIAs.  And yet what does Dr. Pomerantz do?  He declares

3    it imprudent and throws it out.  How can that be?

4         Dr. Pomerantz's analysis assumes the imprudence of

5    every single investment option in the Putnam plan for

6    all time and for all participants.  No case has ever

7    done that.  There is no analysis in the record before

8    your Honor that any particular fund was imprudent or why

9    that particular fund was imprudent or when that

10   particular fund became imprudent.  There is no evidence

11   in the record before your Honor of this plausible

12   comparator talked about in the *Bierwirth* case and

13   others.  Part of the plaintiffs' prima facie case is

14   loss causation, which in this instance requires some

15   plausible evidence of an alternative investment for

16   purposes of being able to measure damages.  They haven't

17   met that alternative because the only thing that they do

18   is posit that which is exactly implausible, that this

19   population of employees of an active fund manager would

20   move all their retirement money into entirely passive

21   vehicles.  That's never been done and for good reason.

22        Where in the record is there any support for that?

23   And the answer is of course there's not.  And what is in

24   the record is the behavior of the very representative

25   plaintiffs themselves who predominantly invest in

1    actively-managed mutual funds, including Mr. Brotherston

2    at Putnam, actively-managed mutual funds, for one, and

3    then the testimony of what the other plan participants

4    do.  We got -- we have a few of them, 40 or so is the

5    record evidence, I believe, in the self-directed

6    brokerage option, less than 1 percent of the assets in

7    the plan are in the BNY Mellon funds and they've been in

8    now for over a year.

9            THE COURT:  Well, you're not, you know, fairly

10   actively encouraging people to use this self-directed

11   brokerage option?

12           MR. CARROLL:  That's right and we cite quite

13   appropriately it's for sophisticated investors.  But

14   nor, your Honor, are we discouraging it, nor did we do

15   anything to discourage the utilization of the passive

16   products, there's been Putnam passive products in the

17   line-up for the whole period, and the BNY -- the BNY

18   roll-out that happened in '16, after two years of study,

19   you heard Mr. Goodfellow talk about how that was

20   communicated to the plan participants.  It's simply not

21   a plausible alternative.

22       And if you compare it with the jurisprudence that

23   exists, even in the cases the plaintiffs cite, you're

24   talking about some cases where a company has done

25   something inappropriate, let's say with company-owned

1  stock, the *Bierwirth* case involved plaintiff fiduciaries

2  using plan assets to buy company stock to fend off a

3  hostile takeover, and you can posit a comparator there,

4  what would that money have been invested in?  Here the

5  only comparators posited are very much apples and

6  oranges.  It's not just apples and oranges as to fees,

7  it's apples and oranges as to the fundamental nature of

8  what these products are.  The people at Putnam are

9  active fund managers, that's what they believe in, you

10  heard Mr. Lenhardt in that regard, but the only evidence

11  here is entirely passive and it is entirely divorced

12  from any showing that any investment option is

13  imprudent.

14      Think about the testimony that Dr. Pomerantz gave

15  yesterday, he was being critical of the Voyager fund.

16  Now he never says when it was Voyager became imprudent

17  or why or what the standards were or for how long, even

18  though the performance has been up and down, he just

19  assumes it's imprudent for all of time, and then he

20  points out that there are many better-performing funds

21  so that he effectively nets out the positive returns of

22  those funds when he's looking as his damages analysis.

23  Well, why are those better-performing funds imprudent?

24  Dr. Pomerantz doesn't say.  And it's the plaintiffs'

25  burden to bring that evidence and they've closed and

1    they can't do it.

2         That's why I think the -- the clearest and easiest

3    reason why there can be no path to victory here is a

4    fundamental failure of proof with respect to both loss

5    causation, in and of itself, and fundamentally any kind

6    of plausible comparator.  It's not in the record and it

7    won't be.

8         So for that reason I think there's a clear legal

9    issue that the plaintiffs have, on the issue of the

10   monitoring, and this applies to -- they have several

11   flavors of that issue, if you will.

12             THE COURT:  5 more minutes.  Go ahead.

13             MR. CARROLL:  Thank you.

14        The monitoring arguments all depend on taking a

15   view of the evidence that says, "If it's not in the

16   minutes, it doesn't count."  No law supports that.  The

17   record evidence before your Honor is that this

18   monitoring happens.  Whether the minutes say "We don't

19   monitor" or the minutes say "We do," the record evidence

20   is that the monitoring happens, and at the risk of

21   belaboring it, that monitoring happens by human beings

22   who sit on that PBIC and themselves engage in that

23   monitoring.  And I think that also stomps out any

24   argument with respect to the failure of the duty to

25   monitor.  It's unrebutted.

1          Mr. Schmidt, on cross-examination, acknowledged

2     that he didn't even consider what happens in the

3     investment division, he didn't even think about it, it

4     didn't matter, for the purposes of his testimony,

5     because his testimony is based upon those meeting

6     minutes and the proposition unsupported by the law that

7     the monitoring has to happen within the confines of

8     those meetings.

9          In the widget company it probably does and it

10    would make sense that it does there.  At a mutual fund

11    company, it would make no sense, and I respectfully

12    submit those fiduciaries would be doing a disservice to

13    plan participants if they didn't avail themselves of the

14    very considerable resources that they have at their

15    disposal, and the record shows that they do.

16          Thank you, your Honor.

17               THE COURT:  Thank you.

18          Mr. Kaster?

19               MR. KASTER:  Good morning, your Honor.

20               THE COURT:  Could I ask you to start with a

21    question which does bemuse me, that Mr. Carroll posed,

22    and that is are you saying that the whole line-up is

23    imprudent or that certain funds are imprudent, and how

24    do I figure out which and when from the record I have

25    before me?  Even were I -- and we'll assume for our

1    discussion that I'm disposed to, I'm disposed to seek

2    out a plaintiffs' path to victory here, how am I to do

3    it?

4              MR. KASTER:  I'm sorry, was the Court

5    finished?

6              THE COURT:  That's it.  I'm done.

7              MR. KASTER:  Okay.

8         The action is on behalf of the plan.  To the

9    extent that there's a, um -- effectively the action for

10   damages is on behalf of the plan.  The Court need look

11   no further than our statement of legal issues attached

12   to the joint pretrial memo, Sections 5 and 6, you will

13   see that that's basically understood, and so we don't do

14   it there, we don't do a fund-by-fund analysis.  In fact,

15   under Dr. Pomerantz's analysis, they do get a credit.

16        And the case law on this is pretty clear, your

17   Honor.  First of all, I would cite to the Court *Evans*

18   *vs. Akers*, which is the First Circuit case, um, where

19   "Losses to a plan from breaches of duty of prudence may

20   be ascertained with the help of expert analysis by

21   comparing the performance of the imprudent investments

22   to the performance of a prudently-managed portfolio."

23   That's --

24             THE COURT:  So what are the imprudent

25   investments here?

1    MR. KASTER:  The imprudent -- well, first of

2    all what we have here, your Honor, is both a -- we have

3    a procedural breach.  They do not have a process.

4    THE COURT:  For purposes of our discussion,

5    because I really want to focus, um, all right, suppose

6    that's so?

7    MR. KASTER:  Then the procedural breach

8    arguably involves those funds that, um -- what we have

9    is an imprudent portfolio.  It's not a fund-by-fund

10    analysis --

11    THE COURT:  The whole portfolio?

12    MR. KASTER:  The entire portfolio is imprudent

13    because of a procedural breach, your Honor.  So you then

14    look -- and this is consistent with, um, this case,

15    "Where the breach relates to a pattern of investment and

16    not a specific security, you measure damages using a

17    portfolio-wide approach," that's **Dardagenous v. Grace**

18    **Capital,** which is 889 F.2d at 1237.  Frankly, your

19    Honor, this is consistent with -- so that's a Second

20    Circuit case from 1989.

21    But here's, um -- this is the pattern of the law,

22    it originates from the **Donovan vs. Bierwirth** case, which

23    matriculates up to the **Evans vs. Akers** case, through

24    another citation.  These cases -- this is an evolution

25    that begins, I think, in 1985 with the **Donovan v.**

 1    *Bierwirth* case --
 2              THE COURT:  So you seriously take the
 3    proposition here that because of the lack of process,
 4    this entire portfolio is imprudent and therefore --
 5              MR. KASTER:  We have -- to the extent that
 6    there are -- the portfolio is imprudent.  The 70 funds,
 7    that having all of those funds in the plan, the
 8    confusion created, the fact that they don't monitor, the
 9    fact that they don't have any standards for admission of
10    funds into the plan --
11              THE COURT:  And how are we to -- let's say --
12              MR. KASTER:  It's a pattern, your Honor.
13              THE COURT:  All right.  All right.  I hear
14    you.
15          How are we going to calculate Mr. Brotherston's
16    and Ms. Glancy's damages?
17              MR. KASTER:  The damages are, um --
18              THE COURT:  No, no, I've heard it in the
19    aggregate, but how are we going to calculate their
20    damages?
21              MR. KASTER:  The allocation is done with the
22    help of a fiduciary, your Honor.
23              THE COURT:  What do you mean?
24              MR. KASTER:  The damages are a composite
25    number, the allocation is done with the help of a

1    fiduciary.

2            THE COURT:  You're -- that's why I say I'm at

3    sea.  I imagine that, um -- there may be enough evidence

4    to do it here.  I'm not saying that you have to spell

5    out the specific damages of each class member at this

6    point in the case, I don't think in an equitable

7    proceeding such as this, but suppose I give you

8    everything here, suppose I adopt this entire analysis,

9    how are we going to figure out Mr. Brotherston's damages

10   and Ms. Glancy's damages?

11           MR. KASTER:  That allocation is done with the

12   benefit of a fiduciary.  You look at what their plan

13   assets -- I mean if you were to take Dr. Pomerantz's

14   analysis --

15           THE COURT:  Well, for our discussion we will.

16   So for a fiduciary, where is this -- who?

17           MR. KASTER:  Pardon me?

18           THE COURT:  Who?

19           MR. KASTER:  Who helps get it done?

20           THE COURT:  You know this is a trial.

21           MR. KASTER:  I understand.

22           THE COURT:  Trials lead to judgments.

23           MR. KASTER:  I understand.

24           THE COURT:  Judgments are supposed to be able

25   to be capable of execution.

1          Now, he comes up with all these big numbers, maybe

2     I buy that, maybe I don't, but for purpose of our

3     discussion, I adopt his analysis.  I can't say "I like

4     Pomerantz's analysis, judgment enters for the

5     plaintiffs," that's laughable, there has to be a

6     judgment, and one would imagine that Brotherston's

7     judgment is going to be different from Glancy's in some

8     respect.

9          You say, "Well, a fiduciary will help us."  What

10    fiduciary?  Who's going to pay for the fiduciary?  How

11    is the fiduciary going to work it?  And do I have

12    evidence in the record today from which that fiduciary

13    can work?

14         I've got the best you have here.

15              MR. KASTER:  I understand that.

16              THE COURT:  Just saying, "Well" -- we're not

17    interested in what cut the lawyers will get out of this

18    class action.

19              MR. KASTER:  I understand that, your Honor.

20              THE COURT:  All right.  So what's the answer

21    to my question?

22              MR. KASTER:  The action is effectively a

23    derivative claim on behalf of the plan pursuant to

24    1132(a)(3)(A), and the Court need look no further than

25    Section 6 of the joint pretrial memorandum and the Court

1  can see that the judgment is a totality judgment.

2       The allocation, if I were to speculate about this,

3  which I don't have to do at this point because what you

4  would do for Mr. Brotherston, on a microcosm level, is

5  exactly what Dr. Pomerantz does on a macro-level, and

6  that's how the allocation would happen.  But that

7  doesn't need to be --

8            THE COURT:  And the plan will do it?  In other

9  words your theory is that the way this works, under the

10 law you've just cited, is that I come up -- my findings

11 justify an additional benefit to the plan -- putting

12 aside this potential setoff, um, an additional benefit

13 to the plan, that's the judgment against the defendants,

14 and the defendants then, as fiduciaries, work it out, is

15 that right?

16           MR. KASTER:  The Court may engage a fiduciary

17 for the purpose of doing that allocation, and we would

18 do it under the Court's equitable powers of supervision,

19 and that allocation would have to be approved by the

20 Court as part of its equitable duties.  This is not --

21           THE COURT:  And that's all in the record now?

22           MR. KASTER:  Everything that is necessary is

23 in the record now in terms of the composite damages.

24       And I would say this, your Honor, that following

25 along on the damages issue, I have a couple more points

1    I'd like to make.

2         First --

3              THE COURT:  Yes, please.

4              MR. KASTER:  This damage theory that they are

5    creating or are trying to create for the Court, this --

6    you have to pinpoint specific investments within the

7    plan, is contrary also to the vast majority of cases

8    that have -- that have addressed this precise issue,

9    including a recent case from the Eighth Circuit Court of

10   Appeals, and I mean a 2017 case, *Tussey vs. ABB,* and

11   that this case says this, and I quote:

12        "If several alternative investment strategies are

13   equally plausible, the Court should presume that the

14   funds would have been used in the most profitable of

15   these.  The burden of proving that these funds would

16   have earned less than the amount is on the fiduciaries

17   found to be in breach of their duty."

18        So to the extent that they argue, although they

19   haven't argued it, that, "Well, really the damages would

20   have been less," that's their affirmative duty to prove

21   at this point.  And I'll leave that to them.  But that's

22   consistent with *Evans vs. Akers*, it's consistent with

23   *Donovan vs. Bierwirth*, it's consistent obviously with

24   *Tussey vs. ABB*, it's consistent with this *Dardagenous*

25   case that I talked about.  So that's how the damages are

1    addressed.

2          I would like to -- frankly, your Honor, I don't

3    think the issues related to monitoring are close at all,

4    but let me just summarize what we have here.

5          In a nutshell what we have is no criteria for

6    admission to the plan.  There's no track record.  And

7    this is now admitted by Mr. Whalen and Mr. Lenhardt for

8    any new fund.  The plan document says they come in, so

9    they come in, that's how they get admitted to the fund.

10   There is no due diligence done.  There's no monitoring.

11         In fact in October of 2011, in Exhibit 69, which

12   the Court will find in its binder, and I won't spend

13   time on it now, you will see Mr. Goodfellow and

14   Mr. McDermott planning that there will be no monitoring

15   of any funds except the QDIA funds going forward, and

16   the monitoring of the QDIA never considered a

17   fundamental point, which is marketplace alternatives.

18   That, as an essential part of an adequate monitoring

19   system, has to be considered.

20              THE COURT:  Why is it not --

21              MR. KASTER:  A marketplace alternative -- I'm

22   sorry, your Honor.  Go ahead.

23              THE COURT:  Why is it not, as a practical

24   functional matter, this mutual fund company, sufficient

25   that they have these skilled investment professionals on

```
 1   their PBIC and they rely upon their judgments, they do
 2   sit, as Mr. Carroll has properly argued, on these
 3   investment analyses that Mr. Lenhardt presents with the
 4   detail that is available there, so why under ERISA isn't
 5   that sufficient?
 6              MR. KASTER:  Frankly, your Honor, I think this
 7   answers the question, um, most precisely.  The idea that
 8   someone in the investment division who is making bonuses
 9   of 10 times their salary would consider taking one of
10   their funds out of the plan and replacing it with a
11   marketplace alternative is ludicrous.  Their laser-beam
12   focus is on their fund, that's where their focus is.
13              THE COURT:  They're making 10 times their
14   salary based upon performance.
15              MR. KASTER:  I understand that, your Honor,
16   but part of a duty of monitoring is considering what's
17   in the marketplace.  The Court needs to look no further
18   than --
19              THE COURT:  So do you -- is it your position
20   that it was imprudent not to, um, earlier or more in a
21   more encouraging way, um, offer options beyond the
22   Putnam plans?
23              MR. KASTER:  You have to look at the Putnam
24   plan on a composite level.  Frankly, your Honor, I think
25   the evidence is clear that even today it's not a prudent
```

1    plan simply because they offer these alternatives, which

2    by themselves might constitute a prudent portfolio, but

3    putting in 70 other funds by their own fiduciary guy is

4    not a good idea.  They violate their own standards for

5    how to set up a fund and suggest to the Court that the

6    standards that they suggest to everyone else don't apply

7    to them.  That can't possibly be right.  They don't have

8    even today a prudent portfolio.

9         Because -- and Mr. Brotherston, um, obviously, um

10   -- frankly, you know, John Brotherston is a great human

11   being, but I don't know that we would go to him

12   necessarily for investment advice.  Or Joan Glancy, for

13   that matter, obviously.  30 different choices over the

14   course of his time in the plan.  31, I think, or 32.

15   That is what a fiduciary is for, to make sure that those

16   things -- that someone doesn't just chase performance

17   from the last period of investment.

18        Joan Glancy thought she was diversifying by

19   getting 12 or 13 different funds, when the funds that

20   she has in her portfolio are essentially duplicative of

21   one another.  Not a diversification at all.  So the

22   notion that all of these people are sophisticated

23   investors and don't need a fiduciary, that's their

24   argument.  Their argument is that --

25             THE COURT:  I don't follow that.

1          MR. KASTER:  Their argument is --

2          THE COURT:  They recognize that the people in

3    the plan are not sophisticated investors, that's why in

4    this window they have the caution that it's only for

5    sophisticated investors.  This is a company.  They've

6    got IT people.  They've got salespeople.  They've got

7    people who perform a variety of necessary functions, but

8    are not themselves skilled investors.

9          MR. KASTER:  I understand that, your Honor,

10   but what they're asking the Court for is something --

11   and this is part of my legal framework.  First, under

12   *Tibble vs. Edison* they clearly don't have -- they don't

13   pass muster.  The idea that they have a prudent

14   investment strategy, or for the PBIC, that they're

15   following a prudent process, on this record frankly is

16   not even close.

17         THE COURT:  You don't say though -- and I just

18   want to be clear --

19         MR. KASTER:  Yes.

20         THE COURT:  You don't say the fact that they

21   did not have a written investment policy is itself a

22   violation of ERISA?

23         MR. KASTER:  Well, I do not say that, your

24   Honor, although what they say in their fiduciary guide

25   is that having a written IPS is a "hallmark of an

1    engaged fiduciary."  And they don't have what is key.
2    Mr. Goodfellow admits this, and frankly everyone admits
3    this, that they have no qualitative or quantitative
4    standards for monitoring, none, there is no fund that
5    fails too miserably.
6        The Court will see in one of the exhibits, Exhibit
7    200, which I won't stop and look at right now, but
8    you'll see that the Voyager Fund, for example, failed in
9    their -- and they tout the Lipper analysis.  Those pages
10   from Exhibit 200 are the Lipper analysis.
11       The fund underperforms its benchmark for 5 years
12   running by 6.7 percent.  And what did they do?  They
13   fold it into their only other similar fund, which I
14   think is Growth Opportunities, which also is
15   underperforming its benchmark according to their Lipper
16   reports.  The Court need not look further than Page -- I
17   think it's 9, of Exhibit 200, and you'll see this at the
18   bottom.  But my point is this, they don't have
19   standards.  And the investment division can ride along.
20       But what I asked Mr. Lenhardt was this --
21   Mr. Lenhardt who said this to me, asked me a question,
22   "What is a fiduciary?"  And that question I think speaks
23   volumes.  But while the -- but while the investment
24   division is riding the roller coaster of the Voyager
25   Fund, which causes substantial damages, their -- 14

1    million according to one of our analyses, there is no

2    separate conversation ever about whether or not that

3    fund belongs in the 401K, even while they know that that

4    fund is so problematic -- they replaced one investment

5    manager, another investment manager.  They're not

6    looking at it with the eye toward -- as a fiduciary

7    would look at it, because they have no standards, there

8    are no standards at all.  You cannot possibly have a

9    prudent process with no standards.  And they never --

10    and whether you're talking about the QDIA or anything

11    else, they never evaluate marketplace alternatives with

12    an eye towards "Let's take this fund out of the plan."

13    In fact they won't even allow it.

14             THE COURT:  Your own people would say that

15    that QDIA was appropriately vetted, that's what my notes

16    show?

17             MR. KASTER:  Um, there was vetting of the

18    QDIA, against their own funds, but there was never a

19    consideration of marketplace alternatives, your Honor,

20    and that's what I think the state of the record is and I

21    think that's admitted.  We called their people in our

22    case.

23             THE COURT:  Oh, I know it.

24             MR. KASTER:  Yeah.  Anyway, um, if we can move

25    on.

1          On the issue of loyalty, which the Court seems to

2     be concerned about, and obviously we didn't hear about

3     it today, but we've heard repeatedly a chorus about

4     their contributions, um, again and again, as if it

5     excuses breaches of fiduciary duty.  But let me ask this

6     question --

7               THE COURT:  Well, I don't think it does, so,

8     um, let's accept that, it's not for today.  Understand

9     that I'm not trying to get us into final argument here,

10    you technically haven't rested and we'll see what the

11    cross-examination opens up and the like, and they

12    haven't put on their case.  I'm using this as an

13    opportunity to see whether I ought to call a halt to

14    this, and I have come out here and tried to say, as

15    transparently as I know how, that I would be very

16    cautious about doing that and no one ought to -- and if

17    I deny this motion, no one ought to take particular

18    comfort.  But you people are very skilled, and I'm

19    appreciative, and I am aided by your argument.  So go

20    ahead.

21              MR. KASTER:  Thank you, your Honor.

22         Let me address one point, which I think is that we

23    have before the Court Exhibit, um -- one of the exhibits

24    is the Restatement of Trust.  The Restatement of Trust

25    has two important points which I'd like to talk about

1   for a moment.  One is found in Section 78, um, in that

2   paragraph, that (c)(8) of Section 78, and this deals

3   with essentially proprietary mutual funds, and it says

4   that "Having proprietary mutual funds does not relieve

5   the trustee of its normal duty to exercise prudence

6   including compliance with a prudent investor rule."

7   Then it goes on at the bottom and says, "The trustee

8   must be sufficiently aware of overall costs associated

9   with other mutual fund alternatives to enable the

10  trustee to fulfill its important responsibility to be

11  cost-conscious in managing the trust investment

12  program."

13              THE COURT:  About 10 more minutes.  Go ahead.

14              MR. KASTER:  Thank you, your Honor.

15      As it relates to the issue of loyalty, which the

16  Court asked particular questions about.

17      The issue really is 0 or 28 million.  If Putnam

18  takes its plan and puts it with an outside entity, they

19  get zero in terms of investment management fees on that.

20  That's what should have happened, they should have had

21  an actual fiduciary, somebody who signed on and

22  exercised those responsibilities.

23              THE COURT:  You have no case that tells me

24  that that's what's required.

25              MR. KASTER:  I understand that, your Honor,

1    but we are not saying --

2              THE COURT:  And you want me to say that?

3              MR. KASTER:  I do not, your Honor.  But that's

4    the difference in revenue.

5         We are not saying that it is per se imprudent to

6    put your own funds in the plan.  We're not saying that.

7    It is imprudent to put your funds and only your funds

8    and all of your funds in the plan and not to monitor

9    them and not to hold them to standards like everyone

10   else's funds should be held to.

11             THE COURT:  I get that argument.  I guess they

12   separated it in their argument headings and I guess I

13   bit on that because that's where I started reading last

14   night.

15        It's hard for me to see some sort of conflict of

16   interest here.  With respect to prudence, I hear your

17   argument there, and that's why I say I would be

18   warranted in finding -- and I'm not saying I will, but I

19   would be warranted in finding that they were, um --

20   they, Putnam, was hostile to going outside its own

21   family of mutual funds, it didn't encourage it, it

22   dragged its feet, et cetera.  But I'm not sure where

23   that gets you?

24             MR. KASTER:  That by itself would be a breach

25   of the duty of loyalty, your Honor.

1          THE COURT:  Why?

2          MR. KASTER:  Because they don't -- they aren't

3    considering the exclusive benefit of the plan

4    participants.

5          For example, the PBOC itself is talking about the

6    fact that they can't come up with core funds, they can't

7    come up with core funds because of an employee relations

8    issue, that is directly speaking to the conflict, your

9    Honor.  And there are other facts that speak very

10   directly to that conflict.

11         THE COURT:  Doesn't that though lead me to

12   sort of a per se -- and this is my problem, a per se

13   rule that you can't just offer your own funds when

14   you're a mutual fund company, you can't just offer your

15   own funds to your people?

16         MR. KASTER:  You can't not, by fiat, offer

17   each and every fund with no standards for introduction,

18   no standards for monitoring, and never ever a discussion

19   of removal of those funds.  You cannot do, by fiat, what

20   they did.

21         No one -- do they wonder aloud, "What would it

22   take?"  Those minutes are significant because the words

23   are significant, "What would it take for Putnam to

24   remove one of its funds?"  The PBIC is wondering aloud,

25   "What would it take for Putnam to remove a fund?"  No

1    one is willing to have a conversation with Mr. Reynolds

2    apparently saying, "You know, Bob's fund isn't doing

3    very well, we need to get his fund out of the plan."

4    That never happens.  That is a conflict, that failure to

5    have that conversation.

6         THE COURT:  I will tell you that I'm having

7    problems -- I understand what you just argued, but, um,

8    you start out with the idea that this whole plan, its

9    entire investments, are imprudent, and then, through

10   Mr. Pomerantz, you match it to these index funds and

11   that's how you derive your damages.  I follow that.  But

12   you come to these arguments that, "Well, they didn't

13   have this discussion and they didn't take out a fund."

14   I'm not clear what fund, um, and I'm not clear what the

15   standards were or what you say they should be, because

16   you never go anywhere with that, it's just the whole

17   thing is imprudent.

18        MR. KASTER:  What I'm saying, your Honor, is

19   this, so I'm not saying -- to the extent that there are

20   investments in the plan that work, they're given a

21   credit for those, but just like under the *Dardagenous*

22   case, which I cited, "When a breach relates to a pattern

23   of investment and not a specific security," that's what

24   we're talking about, introducing Putnam funds into the

25   plan by fiat, having no standards for introduction, no

1    standards for monitoring, and never a whisper about

2    removal.

3              THE COURT:  *Dardagenous* was not factually

4    similar to this case, but maybe that's not significant.

5              MR. KASTER:  The point that I'm making, your

6    Honor, is also borne out in *Tussey* and frankly, um, in

7    the *Evans vs. Akers* case, that where you're dealing with

8    a breach which we -- as I said, the Court asked me this

9    question in opening statement essentially, where the

10   breach is proven, and we've proved the breach, then you

11   go to Stage 2 and you analyze damages, and you look at

12   the performance of this portfolio against a prudent

13   alternative.

14             THE COURT:  5 more minutes.

15             MR. KASTER:  I would also address the issue of

16   damages, your Honor, in this way, by citing to another

17   section of the Restatement of Trusts, "Investing in

18   index funds" -- and I'm looking at Section 90, and this

19   is tabbed in the Court's, um -- this is tabbed in the

20   Court's, um, binder as well, "Passive strategies."

21   "Investing in index funds that track matching -- major

22   stock exchanges or widely-publicized listings of

23   publicly-traded stocks is illustrative of an essentially

24   passive but practical investment alternative to be

25   considered by trustees seeking to include corporate

1    equity in their portfolios."

2        The Court asked, during Dr. Pomerantz's testimony,

3    "Is there legal authority for this being a prudent

4    alternative?"  There the Restatement of Trust says so.

5    In fact the Restatement of Trust reminds fiduciaries

6    that if you're going to use something else in Section

7    78, like your own investments, you have to mind them

8    carefully, which did not happen here.  So we're dealing

9    with that as a breach.

10        And what do we have here in terms of our damages?

11    We have, um, an index fund, which essentially is the

12    market, it's the market plus the cost of getting in and

13    getting out, that's why you use the index fund, the

14    Vanguard, it's what's in their prospectus, it's what's

15    in their IPS that they never adopted, and we'll look at

16    this, we'll measure this against the index.  And it's

17    what's in the Restatement.

18        What we have in terms of the BNY Mellon

19    alternative is that once -- for one time they engaged in

20    a prudent process, what they created was this portfolio,

21    and that's -- and what we look at in the alternative is

22    that portfolio, if they had done that, um, using that as

23    an alternative.  It's not only a prudent alternative,

24    it's their prudent alternative.  It's the only one that

25    they testified to as a prudent portfolio, according to

1    their DIAs and how they examined this question.

2          On the -- unless the Court has other questions,

3    I'd just like to, um, finish with a couple more points

4    on loyalty, if I may?

5              THE COURT:  Yes, quickly.

6              MR. KASTER:  Um, they only take action to

7    bring in BNY Mellon when the legal environment demands

8    it.  They ignore their own charter on the IPS because

9    they could not follow it.  Better not to have one than

10   to have one which you do not follow.  There's no other

11   funds using these Putnam funds.  The PBOC talks about an

12   employee relations issue.

13         Personal liability insurance.  When they face the

14   prospect of a third of their funds failing, what do they

15   focus on?  Personal liability insurance.  That is --

16   that speaks volumes.

17             THE COURT:  Am I even entitled to consider

18   that?

19             MR. KASTER:  I certainly think you are, your

20   Honor.

21             THE COURT:  Under the Federal Rules of

22   Evidence, isn't that excluded?

23             MR. KASTER:  The issue of considering

24   insurance -- the fact of insurance might be, um, subject

25   to the rule.

1              THE COURT:  Well --

2              MR. KASTER:  Consideration in those

3    circumstances, your Honor, I think is relevant evidence

4    because it shows what they were focused on was not what

5    *Donovan vs. Bierwirth* says you have to be focused on,

6    which is solely the plan participants, they were

7    concerned about their personnel exposure.

8          That's all I have, your Honor.

9              THE COURT:  Thank you.

10         All right, I'm taking the motion under advisement.

11   I truly regret that we, um, really have to stop.  I'm

12   going to be trying two tax-evasion cases.  Unless one of

13   them folds, and I doubt that, that will probably take me

14   through May.  I regret this.  I will be working on this

15   motion.

16         It's fair to say, um, how much I respect you all.

17   This has been well-presented, um, and it is a

18   challenging and worthwhile endeavor.

19         Ms. Gaudet -- you have the right to file post-

20   hearing briefs.  I'm not setting up any schedule.

21   You'll understand I'm working on the issues.

22         Ms. Gaudet will inform you of further times for

23   hearing.  Should you settle the case, a simple phone

24   call to her is all that's required.  Thank you all very

25   much.

1          We'll take this motion under advisement and we'll

2    see how further proceedings play out.

3          Thank you.  We'll recess.

4               (Adjourned, 10:15 a.m.)

```
 1              C E R T I F I C A T E

 2

 3

 4

 5         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 6    do hereby certify that the foregoing record is a true

 7    and accurate transcription of my stenographic notes

 8    before Judge William G. Young, on Thursday, April 20,

 9    2017, to the best of my skill and ability.

10

11

12

13
      /s/ Richard H. Romanow 04-20-17
14    _____
      RICHARD H. ROMANOW    Date
15

16

17

18

19

20

21

22

23

24

25
```