# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John Brotherston and Joan Glancy, individually and as representatives of classes of similarly situated persons, and on behalf of the Putnam Retirement Plan,<br><br>      Plaintiffs,<br><br>v.<br><br>Putnam Investments, LLC, Putnam Investment Management, LLC, Putnam Investor Services, Inc., the Putnam Benefits Investment Committee, the Putnam Benefits Oversight Committee, and Robert Reynolds,<br><br>      Defendants. | Case No. 1:15-cv-13825-WGY<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STANDARD OF REVIEW ...................................................................................4

ARGUMENT ........................................................................................................4

   I.   The Evidence at Trial Supports Plaintiffs' Breach of Fiduciary Duty Claim....................4

      A.   Plaintiffs Have Demonstrated a Breach of the Duty of Loyalty ............................5

         1.  Good Faith is Not a Defense................................................................8

         2.  "Good Deeds" Are Not a Defense ...................................................9

         3.  Prohibited Transaction Defenses Do not Apply to a Brach of Fiduciary Duty Claim................................................................12

      B.   Plaintiffs Have Demonstrated a Breach of the Duty of Prudence ........................13

         1.  The PBIC Did Not Have a Prudent Process for Managing the Plan's Investments ................................................................13

            a.   Automatic Inclusion of Putnam-Affiliated Investments by Fiat..........14

            b.   No Reasoned Decision-Making Process...............................................14

            c.   Failure to Monitor Investments............................................................16

            d.   No Consideration of Other Mutual Fund Alternatives ........................18

            e.   Lack of Cost-Consciousness..................................................................19

         2.  The Business Functions of Putnam's Investment Division Are Not a Substitute for a Prudent Fiduciary Process ..................................................21

         3.  Defendants' Imprudence Permeated the Entire Plan Lineup...........................23

         4.  Defendants' Other Defenses Fail ................................................................25

   II.   The Evidence at Trial Supports Plaintiffs' Claim for Failure to Monitor Plan Fiduciaries................................................................26

   III.   Plaintiffs Have Made a Prima Facie Case of Loss to the Plan.....................................27

i

A.     Dr. Pomerantz's Analysis Quantifies the Losses Suffered by the Plan, and Itemizes the Losses in Connection with Each Investment .....................................28

    1.    Dr. Pomerantz Properly Calculated Losses to the Plan as a Whole on a Portfolio-Wide Basis .....................................................................................28

    2.    Dr. Pomerantz Also Calculated Losses in Connection with Particular Investments.................................................................................................30

    3.    The Comparisons that Dr. Pomerantz Made Were Appropriate ...................31

      a.     The BNY Mellon Funds Constitute a "Prudent Alternative Portfolio" .........................................................................................31

      b.     Vanguard Index Funds Constitute a Prudent Alternative Portfolio ...33

      c.     Defendants' Objections to These Measures of Losses Are Unfounded .........................................................................................34

B.     It Is *Defendants'* Burden to Rebut Plaintiffs' Prima Facie Case of Loss by Showing That a Prudent Fiduciary "Would Have" Made the Same Investment Decisions Anyway .............................................................................................36

IV.     Putnam Must Disgorge the Fees It Received as a Result of Defendants' Fiduciary Breaches ................................................................................................................37

CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*A.F. v. Provience Health Plan*, 173 F. Supp.23 1061 (D. Or. 2016) ...............................................9

*Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*,
861 F.2d 1406 (9th Cir. 1988) ...............................................................................................38

*Andrews-Clarke v. Travelers Ins. Co.*, 984 F. Supp. 49 (D. Mass. 1997) ................................2, 24

*Bedrick by & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149 (4th Cir. 1996) ..........10

*Bendaoud v. Hodgson*, 578 F. Supp. 2d 257 (D. Mass. 2008)..........................................31, 32, 37

*Bona v. Barasch*, 2003 WL 21222531 (S.D.N.Y. May 27, 2003)...........................................3, 21

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009)................................................8, 20

*Bunch v. W.R. Grace & Co.*, 555 F.3d 1 (1st Cir. 2009) .........................................................11, 13

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000) ......................................................2, 7

*Chao v. Moore*, 2001 WL 743204 (D. Md. June 15, 2001)...........................................................28

*Chao v. Trust Fund Advisors*, 2004 WL 444029 (D.D.C. Jan. 20, 2004)....................................37

*Chao v. Wheeler*, 2007 WL 4233464 (N.D. Ind. Nov. 28, 2007)................................................25

*Cunha v. Ward Foods, Inc.*, 804 F.2d 1418 (9th Cir. 1986)..........................................................8

*Dardaganis v. Grace Capital*, 889 F.2d 1237 (2d Cir. 1989)......................................................29

*Dasler v. E.F. Hutton & Co., Inc.*, 694 F. Supp. 624 (D. Minn. 1988) ........................................33

*Degnan v. Publicker Indus., Inc.*, 42 F. Supp. 2d 113 (D. Mass. 1999) ........................................9

*DeMoulis v. Sullivan*, 1993 WL 81500 (D. Mass. Feb. 26, 1993)..................................................5

*DiFelice v. U.S. Airways*, 497 F.3d 410 (4th Cir. 2007)............................................................2, 8

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982)..................................................................7-8

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985)......................................................... *passim*

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) .........................................................2, 8

*Evans v. Akers*, 534 F.3d 65 (1st Cir. 2008) ............................................................ *passim*

*Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014)............................9, 25, 26

*Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State St. Corp.*,
2010 WL 1223777 (D. Mass. Mar. 25, 2010).................................................................31

*Fulton Nat'l Bank v. Tate*, 363 F.2d 562 (5th Cir. 1966) ...............................................8

*George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832 (N.D. Ill. 2011)...................16

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*,
325 F. Supp. 2d 841 (M.D. Tenn. 2004)........................................................................39

*Gilbert v. EMG Advisors, Inc.*, 172 F.3d 876 (9th Cir. 1999) .......................................33

*GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*,
895 F.2d 729 (11th Cir. 1990) ......................................................................28, 30, 37, 39

*Gipson v. Wells Fargo & Co.*, 2009 WL 702004 (D. Minn. Mar. 13, 2009) ................20

*Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 285 F.R.D. 169 (D. Mass. 2012) .............24

*Glass Dimensions, Inc. v. State Street Bank & Trust Co.*,
931 F. Supp. 2d 296 (D. Mass. 2013) ....................................................................2, 4, 7

*Goldenberg v. Indel*, 741 F. Supp. 2d 618 (D.N.J. 2010) ..............................................18

*Gonzalez-Rucci v. U.S. I.N.S.*, 539 F.3d 66 (1st Cir. 2008).............................................4

*Graden v. Conexant Sys., Inc.*, 496 F.3d 291 (3d Cir. 2007).....................................31, 32

*Gray v. Briggs*, 45 F. Supp. 2d 316 (S.D.N.Y. 1999)....................................................29

*Halpin v. Atkinson-Kiewit, J.V.*, 894 F. Supp. 486 (D. Mass. 1995) ..............................4

*Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007) ..........................................36

*Hecker v. Deere & Co*, 556 F.3d 575 (7th Cir. 2009)....................................................19

*In re Beck Indus., Inc.*, 605 F.2d 624 (2d Cir. 1979) .....................................................37

*In re Gen. Growth Properties, Inc.*, 2010 WL 1840245 (N.D. Ill. May 6, 2010) ........11

*In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005)...................................24

*In re Northrop Grumman Corp. ERISA Litig.*, 2011 WL 3505264 (C.D. Cal. Mar. 29, 2011).....24

*In re Stewart*, 2012 WL 5189048 (1st Cir. BAP Oct. 18, 2012) ................................................1, 4

*Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.*,
913 F. Supp. 541 (E.D. Mich. 1996)........................................................................................25

*Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184 (7th Cir. 1994) ....................................................10

*Jones v. Harris Assocs. L.P.,* 130 S.Ct. 1418 (2010)....................................................................22

*Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008) .........................................................24

*Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132 (D. Mass. 2004)....................................26

*Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825 (D. Minn. Nov. 20, 2012)................. *passim*

*Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470 (M.D.N.C. Sept. 17, 2015) .........................20

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) ..................................................................2, 7, 8, 39

*Liss v. Smith,* 991 F.Supp. 278 (S.D.N.Y.1998) ...............................................................26, 29, 30

*Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) ...............................................................28, 36, 39

*Maryland Elec. Indus. Health Fund v. MESCO, Inc.*,
2014 WL 853237 (D. Md. Feb. 28, 2014) ................................................................................25

*McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995) ...................................36

*Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544 (D. Md. 2003)....................................30, 33

*Moreno v. Deutsche Bank Americas Holding Corp.*,
2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ..........................................................................27

*Nedd v. United Mine Workers of Am.*, 556 F.2d 190 (3d Cir. 1977) ...................................2, 10, 39

*Ossey v. Marolda*, 1999 WL 731680 (N.D. Ill. Aug. 30, 1999) ....................................................38

*Pegram v. Herdrich*, 530 U.S. 211 (2000)......................................................................................5

*Reed v. Envirotech Remediation Services, Inc.*, 2010 WL 11469934 (D.Minn. Dec. 22, 2010)...25

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994)..........................................27, 36

*Salovaara v. Eckert*, 222 F.3d 19 (2d Cir. 2000).........................................................................37

*Schaefer v. Arkansas Med. Soc.*, 853 F.2d 1487 (8th Cir. 1992) ...................................................7

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) ...........................................................36

*Schleibaum v. Kmart Corp.*, 153 F.3d 496 (7th Cir. 1998) .........................................................25

*Severstal Wheeling, Inc. Retirement Comm. v. WPN Corp.*,
119 F. Supp. 3d 240 (S.D.N.Y. 2015) ....................................................................32, 37

*Solis v. Webb*, 931 F. Supp. 2d 936 (N.D. Cal. 2012) ...................................................26

*Stiso v. Int'l Steel Grp.*, 604 Fed. App'x 494 (6th Cir. 2015) .........................................................10

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) ...........................36

*Tatum v. RJR Pension Inc. Comm.*, 761 F.3d 346 (4th Cir. 2014) ........................................ *passim*

*Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013) ....................................................20

*Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015) ...........................................................16

*Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. Dec. 16, 2016) ...............................13, 19, 20, 21

*Trustees of Upstate N.Y. Engineers Pension Fund v. Ivy Asset Mgmt.*,
131 F. Supp. 3d 103 (S.D.N.Y. 2015) ...................................................................38

*Tussey v. ABB, Inc.*, 2007 WL 4289694 (W.D. Mo. Dec. 3, 2007) .........................................2, 24

*Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014) ...................................................25, 34

*Tussey v. ABB, Inc.*, 850 F.3d 951 (8th Cir. 2017) ............................................... *passim*

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,
2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ........................................................ *passim*

*Wildman v. Am. Century Services, LLC*, 2017 WL 839795 (W.D. Mo. Feb. 27, 2017) ........ *passim*

*Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401 (3d Cir. 1985) .................................................39

## Rules, Regulations, and Statutes

Fed. R. Civ. P. 52(c) ............................................................................. 1, 3, 4

42 Fed. Reg. 18,734 (1977) ...........................................................................3, 12

29 C.F.R. § 2250.404a–1(b)(1)(i) ...............................................................11

29 C.F.R. § 2509.75-8, FR-17 ..................................................................................................26

29 C.F.R. § 2550.404a-5(h)(4).................................................................................................25

29 C.F.R. § 2550.404c-1(d)(1)(iv)...........................................................................................11

29 U.S.C. § 1002(38).............................................................................................................3, 21

29 U.S.C. § 1104(a)(1)(A) ..........................................................................................................4

29 U.S.C. § 1104(a)(1)(B) ..............................................................................................4, 13, 22

29 U.S.C. § 1106.......................................................................................................................12

29 U.S.C. § 1106(b) ..................................................................................................................39

29 U.S.C. § 1108.......................................................................................................................12

29 U.S.C. § 1108(a) ..................................................................................................................12

29 U.S.C. § 1109.......................................................................................................................24

29 U.S.C. § 1109(a) .............................................................................................27, 37, 38, 39

29 U.S.C. § 1132(a)(2).............................................................................................................24

## Other Authorities

DOL Advisory Op. No. 88-16A, 1988 WL 222716 (Dec. 19, 1988) ........................................5, 18

G. Bogert and G. Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1978) ...........................38

G. Bogert et al., Law of Trusts and Trustees § 689 (3d ed. 2009).................................................16

Bogert & Bogert, *The Law of Trusts and Trustees* § 871 (2d rev. ed. 1995 & Supp. 2013) .........36

Restatement (Third) of Trusts § 78, cmt. c(8) ......................................................................13, 18

Restatement (Third) of Trusts § 90, cmt. b...........................................................................13, 19

Restatement (Third) of Trusts § 90, cmt. h(1) ......................................................................18, 34

Restatement (Third) of Trusts § 90, cmt. j.................................................................................23

Restatement (Third) of Trusts § 90, cmt. m...............................................................................19

Restatement (Third) of Trusts § 100 cmt. b(1) ..............................................................3, 28, 32, 33

Restatement (Third) of Trusts § 100, cmt. f (2012)......................................................................36

William F. Sharpe, *The Arithmetic of Active Management*, 47 J. Fin. Analysts 7, 9 (1991).........33

## <u>INTRODUCTION</u>

The question before the Court on Defendants' Rule 52(c) motion is whether Plaintiffs have presented sufficient evidence at trial to support their claims.[1] Based on the extensive record that has been developed over the course of the first seven days of trial, the answer is clearly "yes." Indeed, if any party would be entitled to findings in its favor at this stage, it is Plaintiffs.

During the hearing on the present motion, the Court explicitly stated that it "would be warranted on this evidence" in finding that "defendants have breached their duty of prudence in the monitoring of plan investments." *Tr. Tran. Day 8 p. 5:24 - 6:3.* Thus, Defendants' motion plainly should be denied as to Plaintiffs' breach of prudence claim.

With respect to Plaintiffs' loyalty claim, the Court also stated that there is "not … some failure of proof about this[.]" *Id. at 5:7-14.* Although the Court questioned the "legal aspect" of this claim, *id. at 5:16,* Plaintiffs respectfully submit that the Court has misapprehended the nature of their claim. Plaintiffs do not claim that there is a "per se rule that you violate the duty of loyalty by offering your own funds[.]" *Id. at 5:18-19.* Rather, Plaintiffs claim that Defendants violated the duty of loyalty by ***automatically*** including ***all*** of Putnam's open-end mutual funds in the Plan ***for the benefit of Putnam*** (from a financial, marketing, and HR standpoint), (1) without regard to whether this was in the best interest of Plan participants, (2) without giving any consideration to market alternatives from different companies, and (3) without engaging in any objective analysis as to the merit of those funds (while at the same time ignoring evidence that many of those funds were failing).[2] Given Putnam's financial stake in those funds and its

---

[1] *See In re Stewart*, 2012 WL 5189048, at *7 (1st Cir. BAP Oct. 18, 2012) (stating that "[a] court should … enter a judgment under Rule 52(c) when a party has finished presenting evidence and that evidence is … insufficient to sustain the party's position").

[2] "While [DOL] regulations permitted the Defendant[s] to select affiliated investment options for the Plan, the Defendant[s] still ha[d] a fiduciary duty to act with an 'eye single' towards the participants in the Plan[.]" *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *14-15 (D. Minn. Nov. 20, 2012).

inherently conflicted position, it was "obliged at a minimum to engage in an intensive and scrupulous independent investigation" of whether the Putnam funds were the best option among all available options for the Plan. *See Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 305 n.37 (D. Mass. 2013). In this respect, "[a] fiduciary's duty of care overlaps the duty of loyalty." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000).

Finally, as to damages, the Court stated that "there may well be evidence here from which one could fashion a damage remedy." *Tr. Tran. Day 8 p. 6:18 - 19.* Although the Court indicated that it had questions as to how aggregate damages might be allocated among individual participants, that is not a matter to be litigated in this proceeding. *See, e.g., Andrews-Clarke v. Travelers Ins. Co.*, 984 F. Supp. 49, 55 n.26 (D. Mass. 1997) (Young, J.) (noting that damages in ERISA actions "inure to the plan itself rather than to the individual beneficiary"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *5 (W.D. Mo. Dec. 3, 2007) ("*Tussey I*") ("If the Plaintiffs recover any damages on behalf of the Plan, it will be up to the Plan administrator to determine how those damages are to be distributed.").

For all of these reasons, the Court should deny the motion, and see if Putnam is able to defend Plaintiffs' claims in the remaining days of trial. As discussed below, each of the defenses it has raised so far is meritless:

- "Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty." *Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984); *see also DiFelice v. U.S. Airways*, 497 F.3d 410, 418 (4th Cir. 2007) ("Good faith does not provide a defense to a claim of a breach of these fiduciary duties"); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("Contrary to the appellees' contentions, this is not a search for subjective good faith—a pure heart and an empty head are not enough."); *Ameriprise*, 2012 WL 5873825, at *9.

- Putnam's contributions to participants' plan accounts are not a defense to Plaintiffs' breach of fiduciary duty claim. *See Nedd v. United Mine Workers of Am.*, 556 F.2d 190, 213–14 (3d Cir. 1977) ("Certainly a donor to an irrevocable trust could not set off his liability for participation in a breach of trust by the amount of his gift. Set-offs of trust funds are unavailable to trustees against their liability in another capacity.")

2

- The prohibited transaction exemptions are not a defense to a breach of fiduciary duty claim. *See* 42 Fed. Reg. 18,734 (1977) ("The fact that a transaction is the subject of an exemption granted under section 408(a)…does not relieve a fiduciary…from certain other provisions of the Act and the Code, including…the general fiduciary responsibility provisions of section 404 of the Act"); *Ameriprise*, 2012 WL 5873825, at *14-15; *Wildman v. Am. Century Services, LLC*, 2017 WL 839795, at *6 (W.D. Mo. Feb. 27, 2017); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016).

- As a general rule, "the investment of fund assets is a non-delegable function that must be performed by the trustees in their capacity as named fiduciaries of the plan." *Bona v. Barasch*, 2003 WL 21222531, at *9 (S.D.N.Y. May 27, 2003). Although a narrow exception to this rule applies where the Plan's fiduciaries delegate their responsibilities to an investment manager pursuant to ERISA § 3(38), an appointed investment manager must "acknowledge[] in writing that [it] is a fiduciary with respect to the Plan." 29 U.S.C. § 1002(38). There is no evidence of any such acknowledgement by Putnam's Investment Division.

- Plaintiffs are entitled to calculate losses to the Plan on a portfolio-wide basis. *See Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio.").

- In connection with this portfolio-wide analysis, it is appropriate to compare the performance of the Putnam-affiliated funds in the Plan to index funds[3] and the BNY Mellon collective investment trusts ("CITs") that both sides agree were prudent.[4] These are not apples to oranges comparisons for purposes of calculating damages from a fiduciary breach, but even if they were, this would not render Plaintiffs' damages analysis improper. *See Tussey v. ABB, Inc.*, 850 F.3d 951, 961 (8th Cir. 2017) ("*Tussey III*") (holding that "it is mistake to argue" that an ERISA damages analysis is "inappropriate because it 'involves an apples-to-oranges comparison.'").

- The burden is on Defendants to show that a prudent fiduciary "would have" included the same investments anyway if a prudent fiduciary process had been followed. *See Tatum v. RJR Pension Inc. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014); *Bierwirth II*, 754 F.2d at 1056.

Accordingly, Plaintiffs' respectfully request that the Court deny Defendants' Rule 52(c) motion.

---

[3] *See* Restatement (Third) of Trusts § 100 cmt. b(1) (one acceptable method for measuring damages to a trust is to compare the returns of "imprudent or otherwise improper investments" to "return rates of … suitable index mutual funds or market indices").

[4] *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("*Bierwirth II*") ("In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions.").

## STANDARD OF REVIEW

A court should only enter judgment Rule 52(c) "when a party has finished presenting evidence and that evidence is … insufficient to sustain the party's position." *In re Stewart*, 2012 WL 5189048, at *7. As discussed below, the evidence submitted to date overwhelmingly supports Plaintiffs' claims. Accordingly, the Court should "decline to render any judgment until the close of the evidence." *Gonzalez-Rucci v. U.S. I.N.S.*, 539 F.3d 66, 69 (1st Cir. 2008); *see also Halpin v. Atkinson-Kiewit, J.V.*, 894 F. Supp. 486, 494 (D. Mass. 1995) (declining to rule on Rule 52(c) motion).

## ARGUMENT

### I.    THE EVIDENCE AT TRIAL SUPPORTS PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM

The evidence at trial is more than sufficient to show that Defendants breached their fiduciary duties of loyalty and prudence under ERISA. These fiduciary duties are "the highest known to the law." *Glass Dimensions*, 931 F. Supp. 2d at 305. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar size and scope. 29 U.S.C. § 1104(a)(1)(B). Yet, the named investment fiduciary for the Plan, the Putnam Benefits Investment Committee ("PBIC"), did exactly the opposite: (1) it automatically included all open-end Putnam mutual funds in the Plan, without regard to their investment track record (or whether a track record even existed for new funds); (2) it only included Putnam-affiliated investment options in the Plan, without considering any market alternatives (until the addition of the BNY Mellon CITs in February 2016); (3) it failed to monitor the Putnam-affiliated investments in the Plan or establish criteria for how those investments should be monitored; and (4) it failed to remove any Putnam-affiliated investments, even though many of those investments were receiving failing grades on reports from one of Putnam's affiliates, Advised

4

Assets Group ("AAG"). Any one of these process-related failures would be sufficient to support a finding of liability in this case; taken together, they evidence a systematic abdication of fiduciary duties in favor of Putnam's business interests.

### A. Plaintiffs Have Demonstrated a Breach of the Duty of Loyalty

The duty of loyalty is a "strict standard." *DeMoulis v. Sullivan*, 1993 WL 81500, at *1 (D. Mass. Feb. 26, 1993). Plan fiduciaries must "exclude all selfish interest" and act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 224, 235 (2000). "[I]n deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider **only** factors relating to the interests of plan participants and beneficiaries ... A decision to make an investment may not be influenced by [other] factors unless the investment, when judged **solely** on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added). "This is a salutary rule because at the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer." *DeMoulis*, 1993 WL 81500, at *1.

The evidence at trial does not just "slightly suggest[]" that Defendants managed the Plan's investments in a self-interested manner. It leaves no other reasonable conclusion.

- Putnam stood to gain financially from including Putnam-affiliated investments in the Plan, and received approximately $28 million in investment management fees from those proprietary investments during the class period. *Tr. Tran. Day 7 p. 97:19-98:3.*

- Putnam also derived a marketing benefit from including Putnam funds in the Plan, as it touted in its prospectuses that "Putnam employees and members of the Board of Trustees place their faith, confidence, and, most importantly, investment dollars in Putnam mutual funds." *Ex. 488 at 18; Ex. 489 at 18; Ex. 490 at 18; Ex. 491 at 17.*

5

- Defendants gave no consideration to adding alternative investments to the Plan (from which they did not stand to gain financially) until the BNY Mellon CITs were added to the Plan. *Tr. Tran. Day 2 p. 107:23-25* (Mr. Mullen testifying that the PBIC never considered an open architecture design for the Plan); *Tr. Tran. Day 4 p. 90:25-91:5* (Mr. Whalen testifying that the PBIC never considered non-Putnam funds for the Plan's qualified default investment alternative); *Tr. Tran. Day 5 p. 119:8-10* (Mr. Whalen acknowledging that new Putnam fund was added without considering non-Putnam alternatives); *Tr. Tran. Day 4 p. 59:2-5* (Mr. Goodfellow acknowledging that the PBIC did not look at alternatives to the underperforming Putnam Voyager Fund).

- Following the addition of the BNY Mellon CITs, Putnam retained all of the Putnam funds in the Plan, including the Putnam Bond Index Fund, even though it cost three times more than the BNY Mellon bond fund that tracked the same index. *See Tr. Tran. Day 1at p. 64:15-65:4* (Mr. Goodfellow stating that the PBIC relied on the Investment Division to close or merge imprudent funds); *Tr. Tran. Day 3 p. 60:4-9* (Mr. Mullen acknowledging that the PBIC never removed a fund that the Plan document called to be included); *Tr. Ex. 231 p. 7* (showing expenses of the Putnam Bond Index Fund and the BNY Mellon bond fund); *Tr. Ex. 155* (showing the index tracked by the BNY Mellon bond fund*); Tr. Ex. 127 p. 21* (showing the same index tracked by the Putnam Bond Index fund).

- Defendants had no objective basis for including Putnam-affiliated investments in the Plan because they lacked screening criteria for new investments, and simply included Putnam funds in the Plan by fiat pursuant to Section 8.1 of the Plan Document. *Tr. Tran. Day 3 p. 65:21-24* (Mr. Goodfellow acknowledging that new Putnam funds are added automatically to the Plan); *see also Tr. Ex. 157 p. 2* (memorandum to participants acknowledging same*); Tr. Tran. Day 1 p. 78:10-15* (Mr. Goodfellow testifying that the PBIC has never adopted standards for adding new funds to the Plan).

- The majority of the Putnam-affiliated investments in the Plan were not included in ***any*** other large retirement plans, and the remainder (with one exception) were included in at most a handful of other plans out of more than 2,600 plans with $250 million in assets or more. *Tr. Tran. Day 7 p. 106:10-107:16.*

- The Putnam-affiliated investments in the Plan were significantly more expensive than average for plans of similar size (based on Dr. Pomerantz's ICI analysis), and those costs were not justified by superior investment performance relative to market benchmarks. *Tr. Tran. Day 7 p. 104:4-8* (Dr. Pomerantz describing the funds' higher fees*); id. p. 120:1-123:2* (discussing the funds' underperformance*); Tr. Ex. AG p. 44* (graph discussed by Dr. Pomerantz showing the funds' underperformance).

- The PBIC did not adopt an investment policy statement ("IPS") with objective criteria for monitoring the Plan's investments, even though its own Charter called for an IPS, because it knew that it would not be able to comply with an objective IPS while maintaining a Putnam-only investment menu. *Tr. Ex. 10; Tr. Ex. 548* ("the only thing

worse than not having an IPS is having a written IPS and not following it."); *Tr. Tran. Day 2 p. 151:18* (Mr. Mullen testifying that the IPS died "a quiet death").

- The PBIC ignored a March 2010 report from AAG that gave many of the Putnam funds in the Plan a "Fail" grade, and subsequently stopped receiving such reports without ever adopting an alternative metric for reviewing the Plan's investments. *Tr. Tran. Day 1 p. 101:13-102:10, 104:20-105:1.*

- The PBIC left the Voyager fund in the Plan for years (until the Voyager fund closed), even though it was ranked in the bottom 1% of all funds according to the very Lipper data that Defendants featured at trial. *Tr. Tran. Day 4 p. 57:14-17.*

- The PBIC never removed any Putnam funds from the Plan, and wondered aloud at one PBIC meeting what would be enough for Putnam to remove one of its own funds from the Plan. *Tr. Ex. 31 p. 1* (May 2010 PBIC meeting minutes stating, "It is uncertain what would be enough for Putnam to remove one of its own funds from the Putnam Retirement Plan line up"); *Tr. Tran. Day 1 at p. 64:15-65:4* (Mr. Goodfellow stating that the PBIC relied on the Investment Division to close or merge imprudent funds); *Tr. Tran. Day 3 p. 60:4-9* (Mr. Mullen acknowledging that the PBIC never removed a fund that the Plan document called to be included).

- Defendants chose not to adopt preferred list of "core funds" for business reasons. *See Tr. Ex. 16* (expressing concern about "an employee relations issue because we would be recommending one employee/investor's fund over another's.").

- Putnam's CEO, Bob Reynolds, refused to approve low-cost R6 shares for the Plan at the time they became available in 2012. *Tr. Ex. 554.*

If these facts do not support a claim for breach of the duty of loyalty, then surely nothing does.

"Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries." *Glass Dimensions*, 931 F. Supp. 2d at 305 n.37 (D. Mass. 2013) (quoting *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir. 1984)); *see also Bussian*, 223 F.3d at 299 ("The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure their duty of loyalty is not compromised."); *Schaefer v. Arkansas Med. Soc.*, 853 F.2d 1487, 1492 (8th Cir. 1992) ("fiduciary with dual loyalties" must "make a careful and impartial investigation of all investment decisions"); *Donovan v. Bierwirth*,

680 F.2d 263, 276 (2d Cir. 1982) ("*Bierwirth I*") (conflicted fiduciaries must "take every feasible precaution to see that they had carefully considered the other side"). Unless a conflicted fiduciary can show that it did so, "the law presumes that the fiduciary acted disloyally." *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 571 (5th Cir. 1966); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009). Defendants' actions here do not remotely withstand scrutiny, let alone the sort of rigorous scrutiny that is warranted given their conflicts of interest. *See Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432 (9th Cir. 1986) ("[W]hen a fiduciary's actions that are taken in connection with the performance of his duties as trustee or administrator are in his own interest as well, we ***rigorously scrutinize*** the conduct.") (emphasis added).

### 1.    Good Faith Is Not a Defense

Faced with this overwhelming evidence of self-interested conduct, Defendants pivot and argue that they never "*intended to*" put their own self-interest ahead of Plan participants.  *Defs' Memo at 4* (emphasis in original). This argument plainly fails both as a matter of law and as a matter of fact.

Defendants grossly misstate the law in arguing that wrongful intent is an element of a breach of fiduciary duty claim. The law is clear that "disputed issues of credibility and subjective good faith simply do not come into play. ***Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty***." *Leigh*, 727 F.2d at 124; *see also DiFelice*, 497 F.3d at 418 ("Good faith does not provide a defense to a claim of a breach of these fiduciary duties"); *Cunningham*, 716 F.2d  at 1467 ("Contrary to the appellees' contentions, this is not a search for subjective good faith—a pure heart and an empty head are not enough."); *Ameriprise*, 2012 WL 5873825, at *9  (noting that "good faith does not provide a defense" to a breach of fiduciary duty claim against a financial services company for putting affiliated investments in its 401k plan

lineup). Indeed, even the case law cited by Defendants states that "[o]rdinarily, the fiduciary's good faith is not a defense to a claim of breach of fiduciary liability." *A.F. v. Provience Health Plan*, 173 F. Supp.23 1061, 1074 n.6 (D. Or. 2016).[5]

In any event, Defendants failed to act in good faith. To the contrary, they were on notice of the problematic nature of the Plan for years.

- As early as April 2009, before the start of the class period, "[a] question was raised as to the fiduciary obligations because of the fact that the retirement plan offers only Putnam funds as investment options." *Tr. Ex. 16.*

- At the March 2010 PBIC meeting, it was again noted that Putnam was "unique" in offering only its own funds, *Tr. Ex. 31*. PBIC Chair Donald Mullen's notes from this meeting state: "**Personal liability**" "**Fiduciary Policy ERISA**" and "**Should we purchase individual coverage**"? *Tr. Ex. 548.*

- A 2013 Fiduciary Responsibilities Review warned of "ERISA claims" in connection with the "use of proprietary investments." *Tr. Ex. 114 at 6.*

- A 2014 Fiduciary Responsibilities Update referenced the Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), and warned: "No presumption of prudence for use of employer securities" … "Terms of the plan do not excuse fiduciaries from ERISA responsibilities." *Tr. Ex. 302 at 5.*

- The July 2015 PBIC meeting minutes also noted that "a number of recent court cases and settlements by other mutual fund providers have highlighted that the mere fact that a plan document 'hard wires' in particular offerings, as in Putnam's case, may not eliminate the need for fiduciary review and monitoring." *Tr. Ex. 146 at 2.*

Moreover, at the time the BNY Mellon CITs were added to the Plan, Putnam issued an announcement ***admitting*** that it was not monitoring the Putnam funds in the Plan, and improperly attempted to shift that burden to Plan participants. *See Tr. Ex. 157 at 2.*

## 2.    "Good Deeds" Are Not a Defense

Defendants also cannot excuse their self-interested management of the Plan's investment lineup by arguing that Putnam made "generous" contributions to the Plan, or that certain other

---

[5] The other case cited by Defendants, *Degnan v. Publicker Indus., Inc.*, 42 F. Supp. 2d 113, 120 (D. Mass. 1999), does not articulate a different rule and is factually distinguishable because it dealt with a misrepresentation claim. Plaintiffs make no such claim here. Moreover, the court in *Degnan* actually ***denied*** a motion for summary judgment against the plaintiffs.

features of the Plan were benign. *See Defs' Memo at 19.* Decisions regarding plan contribution levels and plan structure are business decisions, not fiduciary decisions. *See Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) (Easterbrook, J.) ("Employers decide who receives pension benefits and in what amounts, ***select levels of funding***, [and] adjust myriad other details of pension plans…. In doing these things, we have held, they are no more the employees' 'fiduciaries' than when they decide what wages to offer or whether to close the plant and lay the workers off.") (emphasis added). Accordingly, plan sponsors like Putnam are not entitled to a "set off" for their plan contributions. *See Nedd*, 556 F.2d at 213–14 ("Certainly a donor to an irrevocable trust could not set off his liability for participation in a breach of trust by the amount of his gift. Set-offs of trust funds are unavailable …").

In any event, the fiduciary duty analysis is not a balancing test. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick by & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996). Thus, Defendants cannot justify their self-interested investment decisions by pointing to other Plan-related decisions, because "***all decisions*** regarding an ERISA plan" must be "made with an eye single to the interests of participants and beneficiaries." *Stiso v. Int'l Steel Grp.*, 604 Fed. App'x 494, 498 (6th Cir. 2015) (emphasis added).

Nor does a "totality of the circumstances" standard allow Defendants to avoid liability for fiduciary breaches by pointing to unrelated Plan features or decisions. *See Tussey III*, 850 F.3d at 957 ("The ABB fiduciaries stress that there was a great deal of other evidence too, and some of it showed them acting against Fidelity's interests in various ways. … However, their examples all relate to other investment decisions, not the Wellington–Freedom swap. The fact the ABB

10

fiduciaries apparently did not always favor Fidelity as much as they could, or seize every opportunity to send Fidelity more of the participants' money, does little to undermine the district court's finding about why they made the particular decisions at issue in this case."). As the First Circuit and the Department of Labor's own regulations interpreting ERISA make clear, the relevant inquiry is the circumstances surrounding the *challenged investment decision*. *See Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 6 (1st Cir. 2009) ("*Bunch II*") ("The district court noted that other courts faced with allegations similar to those of appellants in this case had looked at the totality of the circumstances ***involved in the particular transaction***.") (emphasis added); *In re Gen. Growth Properties, Inc.*, 2010 WL 1840245, at *6 (N.D. Ill. May 6, 2010) ("When evaluating whether a fiduciary has fulfilled its role or not, a court must look to the totality of the circumstances ***concerning the investment decision***.") (emphasis added); *Ameriprise*, 2012 WL 5873825, at *9; 29 C.F.R. § 2250.404a–1(b)(1)(i) (a fiduciary acts prudently when it gives "appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are ***relevant to the . . . investment course of action involved***") (emphasis added).

In any event, Defendants' acts of purported generosity are entirely consistent with Putnam's business interests. The company's discretionary contributions were set to the level deemed "competitively necessary" to attract and retain talented employees. *Tr. Exs. 551-52 at 2.* Putnam did not contribute more than necessary to the Plan, and in fact, contributed less than its competitors.[6] Further, although Putnam paid the Plan's recordkeeping expenses, the alternative would have been making revenue sharing payments to the Plan that would have cost Putnam $5 million more than simply paying for recordkeeping out-of-pocket. *Tr. Tran. Day 7 p. 98:4-22.*

---

[6] Putnam's out-of-pocket plan costs were 24% to 31% less than Fidelity, Wellington, and MFS. *Tr. Ex. 553 at 1.*

11

### 3. The Prohibited Transaction Defenses Do Not Apply to a Breach of Fiduciary Duty Claim

The prohibited transaction exemptions in PTE 77-3 and 29 U.S.C. § 1108 also are not a defense to Plaintiffs' breach of fiduciary duty claim. PTE 77-3 expressly states:

> The fact that a transaction is the subject of an exemption granted under section 408(a)…does not relieve a fiduciary…from certain other provisions of the Act and the Code, including…the general fiduciary responsibility provisions of section 404 of the Act….

42 Fed. Reg. 18,734 (1977). Section 1108 has a similar provision. *See* 29 U.S.C. § 1108(a) ("An exemption granted under this section shall not relieve a fiduciary from any other applicable provision of this chapter."). Thus, "[w]hile [DOL] regulations permitted the Defendant[s] to select affiliated investment options for the Plan, the Defendant[s] still ha[d] a fiduciary duty to act with an 'eye single' towards the participants in the Plan[.]"*Ameriprise*, 2012 WL 5873825, at *14-15; *see also Wildman*, 2017 WL 839795, at *6 ("PTE 77–3 is specific to prohibited transaction claims under 29 U.S.C. § 1106. It does not relieve a fiduciary from its duties of loyalty and prudence to a plan."); *Allianz*, 2016 WL 4507117, at *7 ("Defendants point to Prohibited Transaction Exemption 77-3, which provides that plans sponsored by mutual fund advisors and their affiliates may invest in affiliated mutual funds. However, this exemption is specific to prohibited transaction claims under 29 U.S.C. § 1106, which are not at issue here.").

PTE 77-3 is easily reconcilable with the fiduciary duty of loyalty. If a mutual fund qualifies for PTE 77-3, a mutual fund company may utilize its own fund within its employee retirement plan so long as it conducts a thorough and impartial investigation of the investment, including a comparison of the fund to alternative options in the marketplace, and concludes as part of an objective process that including the investment in the plan is in the best interests of participants.  Putnam did not do that here.

### B.  Plaintiffs Have Demonstrated a Breach of the Duty of Prudence

Plaintiffs also have shown that Defendants breached their duty of prudence under 29 U.S.C. § 1104(a)(1)(B).  Plaintiffs' experts both testified that the Plan's fiduciaries failed to meet the applicable standard of care.  Defendants' conduct also was inconsistent with the standards set forth in Putnam's own Fiduciary Planning Guide in several respects.  *See Tr. Ex. 15*. Further, the evidence at trial showed that other retirement plan fiduciaries do not construct their investment menus in remotely the same manner.[7] This evidence and the other evidence discussed below is more than sufficient to meet Plaintiffs' burden of proof.

### 1.  The PBIC Did Not Have a Prudent Process for Managing the Plan's Investments

As Defendants concede, "[t]he test of prudence … is one of conduct." *Defs' Memo at 6* (citing *Bunch II*, 555 F.3d at 7 ). "Procedure and process are the keys." *Tr. Ex. 15 at 9.* Among other things, retirement plan fiduciaries must (1) "employ appropriate methods to investigate the merits of an investment," (2) "engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity," and (3) "monitor the prudence of their investment decisions." *Tatum*, 761 F.3d at 358. This requires considering "other mutual fund alternatives." Restatement (Third) of Trusts § 78, cmt. c(8); *see also Tr. Ex. 15 at 10* ("Fiduciaries are required to perform the tasks a careful, deliberate, knowledgeable, diligent person would do, such as investigating facts, asking questions, consulting experts, ***considering alternatives***, etc.") (emphasis added). Moreover, prudent fiduciaries must carry out their functions in a "[c]ost conscious" manner. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 16, 2016) (*en banc*) ("*Tibble IV*") (quoting Restatement (Third) of Trusts § 90, cmt. b).

---

[7] Unlike Putnam, approximately 90% of retirement plan fiduciaries –  including fiduciaries of other mutual fund company 401(k) plans – use an investment policy statement ("IPS") to guide their investment decisions, *See Tr. Ex. 24*; *Tr. Tran. Day 7 p. 26:18-22.*  Moreover, as noted above, most Putnam funds are not included in ***any*** other retirement plans of similar size, yet every single one of Putnam's open-end, non-tax exempt mutual funds was included in the Plan.

13

In each and every one of these respects, Defendants breached the standard of care.

### a. Automatic Inclusion of Putnam-Affiliated Investments by Fiat

One of the most obvious ways that the PBIC breached its duty of prudence was by blindly adhering to Section 8.1 of the Plan Document, which provided that "**[a]ll** Putnam publicly offered, open-end, non-tax-exempt mutual funds" must be included in the Plan lineup, as well as the Putnam Stable Value Fund, the Putnam S&P 500 Index, the Putnam Bond Index Fund, and (as of 2014) the PanAgora U.S. Large Cap Stock Selector Collective Fund.[8] There is no evidence that the PBIC gave any consideration to the cost or performance of these investments. Indeed, the PBIC automatically included brand new funds that did not even have a performance track record. Further, the PBIC gave no consideration to redundancies in the Plan lineup, allowing the Plan menu to grow to over 70 affiliated investment products, even though Putnam's Fiduciary Planning Guide cautions against such bloated Plan lineups. *See Tr. Ex. 15 at 17* ("Too many funds can often end up increasing the exposure to fiduciary liability. A large number of funds may become too difficult for some investment committees to monitor adequately and too overwhelming for participants to use successfully."). The fact that the Putnam Bond Index Fund remained in the Plan even after the BNY Mellon bond fund was added (at one-third the cost) is a perfect example of this thoughtless approach.

### b. No Reasoned Decision-Making Process

With the notable exception of the BNY Mellon CITs, the PBIC also lacked a reasoned decision-making process for evaluating the investments in the Plan. As noted above, the PBIC never adopted an IPS (unlike the vast majority of other retirement plan fiduciaries), even though (1) the PBIC's Charter prior to 2013 required it to utilize a "Statement of Investment Policy" (*Tr. Ex. 10*); (2) Putnam's Fiduciary Planning Guide touted the benefits of an IPS, calling it the

---

[8] PanAgora is a subsidiary of Putnam. *Joint Uncontested Facts (Dkt. No. 145-1) ¶ 5.*

"hallmark of an active, engaged fiduciary" (*Tr. Ex. 15 at 23*); and (3) PBIC Chair Donald Mullen wrote that "Plan advisors, consultants and attorneys regularly counsel on the importance of a Plan having an Investment Policy Statement." *Tr. Ex. 548*. However, Putnam's lack of process went far beyond the absence of an IPS.  The evidence at trial showed that the PBIC had no quantitative or qualitative criteria whatsoever for evaluating the investments in the Plan.  Nor were particular investments ever discussed at Committee meetings, with the exception of the BNY Mellon CITs and the qualified default investment alternatives ("QDIAs").

Although Putnam's witnesses suggested that there were a myriad of offline conversations outside of meetings regarding PBIC matters, such water cooler talk (if it ever happened at all) is not evidence of a reasoned decision-making process – at best, it reflects an amateur and casual approach to fiduciary responsibilities.  Likewise, any suggestion that significant conversations during Committee meetings somehow failed to make the minutes (which were quite detailed), is not credible and not consistent with Putnam's Fiduciary Planning Guide, which discusses the importance of documenting fiduciary decisions.  *See Tr. Ex. 15 at 22* ("All decisions, including the investigation and facts that went into the decisions and reasoning behind the decisions, must be *documented.*") (emphasis in original).

The only time that the PBIC engaged in a reasoned decision-making process with respect to the Plan's investments was when the BNY Mellon CITs were added to the Plan lineup in February 2016. As part of that process, the PBIC researched options from three different third-party providers, and evaluated multiple criteria including: (1) the reputation and overall stability of each provider; (2) the relative importance of fees; (3) various factors that may lead to performance dispersion among index products; and (4) the most appropriate benchmarks to use. *Tr. Ex. 151 at 2*. All of this is documented in the PBIC minutes.  *Id.*  The fact that the PBIC did

15

not engage in a similar process with respect to the Putnam-affiliated investments demonstrates a clear lack of procedural prudence with respect to those investments.

### c. Failure to Monitor Investments

The evidence also reflects that the PBIC failed to satisfy its duty to monitor the Plan's investments.[9] The PBIC was obligated to "systematically consider all the investments of the [plan] at regular intervals to ensure that they [were] appropriate." *Tibble*, 135 S. Ct. at 1828 (citing G. Bogert et al., Law of Trusts and Trustees § 689, pp. 145–146 (3d ed. 2009)). However, the PBIC failed to do so.

The May 2010 PBIC meeting was the only time that the PBIC ever reviewed the performance of the Plan's investment lineup. At that meeting, PBIC members received a report from Advised Assets Group ("AAG"), one of Putnam's affiliates, which rated over 20 Putnam funds either "Fail" or "Below Average." *Tr. Ex. 32 at 5-6.* Yet, the PBIC took no action to remove any fund or place it on a watch list. The minutes reflect that the PBIC simply threw up its hands and concluded: "it is uncertain what would be enough for Putnam to remove one of its own funds from the Putnam Retirement Plan line up." *Tr. Ex. 31 at 1.*

After this May 2010 meeting, the PBIC stopped receiving these types of performance reviews, and never again reviewed or discussed the performance of the Putnam funds in the Plan (other than the QDIAs). This was a clear breach of its duty to monitor. Although Putnam's witnesses claimed that the AAG reports were flawed, no substitute report was ever utilized or obtained. Moreover, Mr. Mullen and Mr. Goodfellow continued to receive AAG reports for their

---

[9] "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2005); *Tatum*, 761 F.3d at 358. Thus, "a fiduciary's failure to review plan investments … can constitute a breach of fiduciary duty." *George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011).

own purposes (without sharing them with the Committee), *see, e.g., Tr. Ex. 55*, and Putnam directed Plan participants to AAG for investment advice. *See Tr. Ex. 223 at 4; Tr. Ex. 235 at 27.*

Further, at the time Putnam announced the introduction of the BNY Mellon Funds, it disavowed its monitoring duties, and claimed that participants are "***solely*** responsible for the selection and monitoring" of any Putnam investments in the Plan. *Tr. Ex. 157 at 2* (emphasis added). Although Mr. Goodfellow attempted to pass this off this language as mere poor draftsmanship, the PBIC meeting minutes contain similar language showing that Mr. Goodfellow meant exactly what he said. *See Tr. Ex. 135 at 2* ("The [third-party] DIAs would be communicated to participants along with the understanding that they also may invest in any of the other [Putnam-affiliated] investment options under the Plan but that such options were not reviewed by the Committee."); *Tr. Ex. 146* (same). Notably, Putnam has never issued a corrected announcement.

The Voyager fund is perhaps the most egregious example of this lack of monitoring. Mr. Lenhardt (who was not on the PBIC) testified that Putnam ***knew*** the Voyager fund was struggling. *Tr. Tran. Day 5 p. 74:13-23.* Indeed, the Lipper data reported to Putnam's Investment Division (but not the PBIC) showed that the Voyager fund was in the bottom 1% of its Lipper peer group, and was underperforming its benchmark index by a massive 6 to 7% for several years running. *Tr. Ex. 200 at 409.* Yet, the PBIC never discussed the poor performance of the Voyager fund, and never considered removing it from the Plan's investment menu. As a result, participants were left in the fund and suffered through its poor performance to the bitter end, until the fund was closed in 2016.

### d.  No Consideration of Other Mutual Fund Alternatives

The PBIC also failed to satisfy its duty of prudence by failing to consider any alternatives to Putnam-affiliated investments prior to the addition of the BNY Mellon CITs in February 2016. The duty to consider alternatives is well-grounded in the law, including:

- **DOL regulations**, *see* DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 ("a decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be **equal or superior to alternative investments** available to the plan.");

- **Caselaw**, *see Goldenberg v. Indel*, 741 F. Supp. 2d 618, 636 (D.N.J. 2010) ("The actual test of whether fees are excessive does not involve a categorical benchmark of whether the fees are above a certain amount. Whether an investment decision could have been the result of prudent investing depends on the **alternatives** available to the fiduciary to accomplish the same purpose, in light of all the other relevant information about the investments."); and

- **The Restatement of Trusts**. *See* Restatement (Third) of Trusts § 78, cmt. c(8) ("[T]he trustee must be sufficiently aware of overall costs associated with other mutual-fund **alternatives** to enable the trustee to fulfill its important responsibility to be cost conscious in managing the trust's investment program." ); Restatement (Third) of Trusts § 90, cmt. h(1) ("Investing in index funds that track major stock exchanges . . . is illustrative of an essentially passive but practical investment **alternative to be considered** by trustees ….").

Indeed, Putnam's own Fiduciary Planning Guide recognizes the importance of "considering alternatives." *Tr. Ex. 15 at 10.*

Despite this acknowledged responsibility, the PBIC selected and maintained an investment lineup that consisted exclusively of Putnam-affiliated mutual funds (until February 2016), without regard to whether other funds were available that offered better performance or lower costs.  This was a clear breach of the duty of prudence. The PBIC knew that it had the ability – and responsibility – to select a "best in class" lineup using "open architecture." *Tr. Ex. 547*. Yet, instead of picking an all-star team of funds from various mutual fund companies, Putnam only considered funds from its own "team." This guaranteed that the Plan would not

perform as well as it could. As even Mr. Lenhardt conceded, not all Putnam funds are the best in their class. Indeed, many of them were failures, as shown by the AAG reports (*see supra* at 16), Lipper peer group data (*see supra* at 17), and Dr. Pomerantz's comparisons to Vanguard index fund benchmarks.

### e.  Lack of Cost-Consciousness

Finally, the evidence shows that the PBIC breached its duty of prudence by failing to manage the Plan's investments in a cost-conscious manner. "Cost conscious management is fundamental to prudence in the investment function." *Tibble IV*, 843 F.3d at 1197-98 (quoting Restatement (Third) of Trusts § 90, cmt. b)). Thus, "it is important for trustees to make careful overall cost comparisons" when deciding which investments to include in a retirement plan. Restatement (Third) of Trusts § 90, cmt. m.

Although Defendants may not have been obligated to "scour the market" to find the cheapest possible funds, *see Hecker v. Deere & Co*, 556 F.3d 575, 586 (7th Cir. 2009), there is no evidence in this case that Defendants gave ***any*** consideration to the costs associated with Putnam's mutual funds before adding them to the Plan. This was a clear breach of the duty of prudence. *See Wildman*, 2017 WL 839795, at *7 ("Plaintiffs are not complaining that Defendants failed to find the lowest cost funds, rather, they allege Defendants [followed] a process that failed to consider lower-cost funds in favor of higher-cost American Century funds. These specific allegations regarding the excessive fees support an inference that the Plan's fiduciaries' process was deficient."); *Ameriprise*, 2012 WL 5873825, at *10 (plaintiffs stated claim for breach of fiduciary duty where they alleged that "Defendants chose to invest in [particular] mutual funds despite the fact that the fees charged for these funds were significantly higher than … comparable mutual funds in 401(k) plans").

Moreover, Putnam did not timely convert to low-cost R6 shares of 20 of its funds when they first became available. To the contrary, Putnam CEO Bob Reynolds initially nixed the idea. *See Tr. Ex. 554* ("The last time we spoke with Bob Reynolds he did not want to do R6 for the Putnam plan."). This also constituted a breach of the duty of prudence. *See Wildman*, 2017 WL 839795, at *8 ("delaying the transfer of Plan assets to a lower-cost share class" supports claim for breach of fiduciary duty); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137-39 (9th Cir. 2013) ("*Tibble II*") (finding "little difficulty" in holding that fiduciaries breached their duty of prudence by failing to use the least expensive share class available).[10]

As a result of this lack of cost consciousness, the fees associated with the funds in the Plan were significantly higher than the fees associated with comparable investments in other plans. According to Dr. Pomerantz's analysis, the average investment management fee was 86 basis points for the investments in the Plan, versus only 59 basis points for other Plans of similar size (controlling for investment mix), based on data from the Investment Company Institute ("ICI"). *Tr. Tran. Day 7 p. 102:1-23*.[11] This difference is not only statistically significant, but significant to participants' retirement accounts. *See Tibble IV*, 843 F.3d at 1198 ("As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised [18 basis points] to 1.18%, or [40 basis points to] 1.4%, the value of the investment at the end of the 40-year period

---

[10] *Accord*, *Braden*, 588 F.3d at 595-96 & n.5; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 476-78 (M.D.N.C. Sept. 17, 2015); *Ameriprise*, 2012 WL 5873825, at *10-11; *Gipson v. Wells Fargo & Co.*, 2009 WL 702004, at *5-6 (D. Minn. Mar. 13, 2009); *accord Tibble IV*, 843 F.3d at 1198 (remanding for "a new trial on the issue of whether [defendant] breached [its] fiduciary duties by providing as Plan investments … mutual funds in a share class that was more expensive than other share classes that were available to the Plan.").

[11] The difference is even more drastic when the Plan's investments are compared to the Vanguard index funds (which cost an average of 15 basis points) or the BNY Mellon CITs (5 basis points).

would decrease to $93,142 and $85,198, respectively.").  As Dr. Pomerantz explained, a 1% difference in fees can reduce the balance of a retirement account by 28% over the long term. *Tr. Tran. Day 7 p. 96:5-14.*

### 2. The Business Functions of Putnam's Investment Division Are Not a Substitute for a Prudent Fiduciary Process

Defendants' principal defense to Plaintiffs' breach of prudence claim is that Putnam's Investment Division monitors the performance of Putnam's investment products in the ordinary course of its business. *See Defs' Memo at 6-8.*  However, this defense fails for several fundamental reasons.

First, as a general rule, "the investment of fund assets is a non-delegable function that must be performed by the trustees in their capacity as named fiduciaries of the plan." *Bona v. Barasch*, 2003 WL 21222531, at *9 (S.D.N.Y. May 27, 2003). Thus, a claim for breach of fiduciary duty looks to what the fiduciaries did, not anyone else.

Second, although a narrow exception to this rule applies where the Plan's fiduciaries delegate their responsibilities to an investment manager pursuant to ERISA § 3(38), there is no evidence that the PBIC ever delegated its fiduciary responsibilities to the Investment Division. No such delegation is reflected in the PBIC Charter, the PBIC meeting minutes, or any other document.

Third, a § 3(38) investment manager must "acknowledge[] in writing that [it] is a fiduciary with respect to the Plan."  29 U.S.C. § 1002(38).  The Investment Division never entered into any such written acknowledgement.  To the contrary, the Chief Operating Officer of the Investment Division, Mr. Lenhardt, testified that he was not privy to any discussions regarding the Plan lineup, and at one point asked during his cross-examination: "What do you mean by 'fiduciary'?" *Tr. Tran. Day 7 p. 105:21.*

21

Fourth, as Plaintiffs' experts testified, the role of a mutual fund company is different than the role of a fiduciary investment committee such as the PBIC. *Tr. Tran. Day 7 p. 16:14-19:5; id. at 108:11-108:17*.[12] A mutual fund company is responsible for managing its own funds (and only its own funds), whereas the role of an investment committee is to consider alternatives from different reputable companies. Thus, a mutual fund company cannot be left with the responsibility for determining a prudent investment lineup for a retirement plan because it has only one lineup to offer – its own. Moreover, a mutual fund company's incentives are at odds with those of plan participants, because while the mutual fund company wants to maximize its profitability, participants are interested in paying as little fees as possible. The fact that a mutual fund company's fees must be approved by a Board of Trustees does not mean that a prudent fiduciary would necessarily choose that company's funds. As Plaintiffs' expert testified, the 15(c) process is very different from a prudent fiduciary process, *Tr. Tran. Day 7 p. 71:19-73:11*, and the standards for a claim under the Investment Company Act ("ICA") are also different than the standards for a claim under ERISA.[13]

Finally, although Defendants emphasize that certain members of the Investment Division served on the PBIC at various times, there is no evidence that the PBIC ever utilized their investment expertise in connection with the selection and monitoring of the funds in the Plan (aside from discussions relating to the BNY Mellon CITs and, to a lesser extent, the QDIAs). This worsens the fiduciary breaches, because more sophisticated fiduciaries are generally held to

[12] The Court also noted that the goals of portfolio managers are "more business driven" and are "different" from the duties of PBIC members. *Tr. Tran. Day 8 p. 14:25 - 15:3.*

[13] "[T]o face liability under [the ICA], an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.,* 130 S.Ct. 1418, 1426 (2010). The standard under ERISA is whether the fiduciary selecting the investment acted with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

a higher standard of care. As the Restatement explains, fiduciary standards do not permit "casual, inattentive behavior by trustees who can, because of their expertise, meet a higher than ordinary standard of conduct and competence." Restatement (Third) of Trusts § 90, cmt. j. "[T]he standards require fiduciaries possessing special facilities and skills to make those advantages available to the trust and its beneficiaries." *Id.*

### 3.  Defendants' Imprudence Permeated the Entire Plan Lineup

Defendants also attempt to excuse their imprudence by arguing that "The Plan's *Entire Lineup*" was not imprudently constructed. *Defs' Memo at 9* (emphasis in original). However, this argument ignores both the evidence in this case and the nature of this action.

The evidence at trial conclusively shows that Putnam's entire lineup was, in fact, imprudently constructed because: (1) the lineup consisted entirely of Putnam-affiliated investments prior to February 2016; and (2) Defendants lacked a prudent and objective process for selecting those investments or monitoring those investments. Instead, Defendants automatically included and retained all of those Putnam-affiliated investments pursuant to Section 8.1 of the Plan Document. Having dumped Putnam's entire mutual fund lineup (consisting of approximately 70 mutual funds) into the Plan's investment lineup, Defendants can hardly argue that the "entire lineup" was not affected.

Plaintiffs are not required to prove, on a fund-by-fund basis, that "any individualized investment decision was imprudent" (*Defs' Memo at 10*) because no individualized investment decisions were made. Defendants decided, on a macro level, to retain all of the Putnam funds specified in Section 8.1 of the Plan Document without regard to the cost or performance of any of those funds, and it is the prudence of that decision that is at issue in this case. As another court recognized in a similar case, Plaintiffs' claims "relate[] to the Defendants' Plan management and

fund selection process as a whole rather than the unique factual nature of individual funds." *Allianz*, 2016 WL 4507117, at *5; *see also Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 285 F.R.D. 169, 175 (D. Mass. 2012) ("Plaintiff sues for breach of fiduciary duty, and alleges an injury rooted in Defendants' conduct in managing all 260 lending funds as a group.").

This is consistent with the nature of an ERISA action under 29 U.S.C. § 1132(a)(2). In an action such as this, the relevant question is whether there has been a fiduciary breach "with respect to a plan" under 29 U.S.C. § 1109, rather than any particular investment. Further, any monetary recovery will inure to the Plan as a whole. *See Andrews-Clarke*, 984 F. Supp. at 55 n.26 (noting that damages in ERISA actions "inure to the plan itself rather than to the individual beneficiary"); *In re Northrop Grumman Corp. ERISA Litig.*, 2011 WL 3505264, at *11 (C.D. Cal. Mar. 29, 2011) (the "action is brought on behalf of the Plan as a whole, not individual claimants. If recovery is received and paid to the Plan, it is the responsibility of the Plan fiduciaries to determine the manner in which such recovery will be applied.") (citation omitted).[14] Thus, it is appropriate and necessary to evaluate the prudence of Defendants' fiduciary processes with respect to the Plan as a whole.

### 4. Defendants' Other Defenses Fail

Finally, Defendants' other defenses to Plaintiffs' breach of prudence claim also fail. First, as noted above, the mere fact that a mutual fund company is not proscribed from including its own funds in its 401(k) plan does not mean that such funds may be automatically included, in the absence of an objective and prudent fiduciary process. *See supra* at 12.

---

[14] *Accord*, *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (N.D. Cal. 2008) ("The complaint is based on allegations and recovery that address the Plan as a whole, not individual claimants. If recovery is received and paid to the Plan, it is the responsibility of the Plan fiduciaries to determine the manner in which such recovery will be applied."); *Tussey I*, 2007 WL 4289694, at *5 ("If the Plaintiffs recover any damages on behalf of the Plan, it will be up to the Plan administrator to determine how those damages are to be distributed."); *In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434, 444 (D. Md. 2005).

24

Second, Defendants own witnesses acknowledged that the existence of the self-directed brokerage account ("SDBA") option does not excuse the Plan's fiduciaries of their duties with respect to the Plan's investment lineup. *Tr. Tran. Day 1 p. 61:5-8; Tr. Tran. Day 2 p. 15:1-4.* Nor could it. Investments offered through an SDBA do not qualify as "designated investment alternatives." *See* 29 C.F.R. § 2550.404a-5(h)(4)). Thus, as a matter of law, "the existence of the [self-directed] account option is irrelevant to determining whether Defendants used a disloyal and imprudent process to select the other investment options." *Wildman*, 2017 WL 839795, at *7; *see also Urakhchin*, 2016 WL 4507117, at *6. Moreover, the record reflects that the SDBA was used by only a miniscule portion of Plan participants, due to warnings that the SDBA was for "sophisticated investors," the investments in the SDBA were not being monitored, and anyone who used the SDBA would have to indemnify Putnam and TD Ameritrade. *Tr. Ex. 233.*

Third, the mere fact that participants exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any…designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv); *accord Tussey v. ABB, Inc.*, 746 F.3d 327, 336-37 (8th Cir. 2014) ("*Tussey II*").[15]

Lastly, Defendants cannot excuse their fiduciary breaches on the grounds that they were just following the Plan Document. This "hard wiring" defense was rejected by the Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014). In *Dudenhoeffer*, the Court held that ERISA's fiduciary duties "trump[] the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the

_____

[15] Nor is mitigation of damages a defense to a fiduciary breach claim. *See Schleibaum v. Kmart Corp.*, 153 F.3d 496, 502 (7th Cir. 1998) ("Requiring mitigation, in this instance, also seems inconsistent with the primary purpose of ERISA, which is to protect the interests of plan beneficiaries."); *Maryland Elec. Indus. Health Fund v. MESCO, Inc.*, 2014 WL 853237, at *9 (D. Md. Feb. 28, 2014); *Reed v. Envirotech Remediation Services, Inc.*, 2010 WL 11469934, at *5, n. 5 (D.Minn. Dec. 22, 2010); *Chao v. Wheeler*, 2007 WL 4233464, at *9 (N.D. Ind. Nov. 28, 2007); *Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.*, 913 F. Supp. 541, 546 (E.D. Mich. 1996).

contrary." *Id.* at 2468. The PBIC's own meeting minutes and other documents recognize this. *See Tr. Ex. 302 at 5* ("*Fifth Third Bank* – No presumption of prudence for use of employer securities – Terms of the plan do not excuse fiduciary responsibilities."); *Tr. Ex. 288 at 5* ("*Fifth Third Bank* – Terms of the plan do not excuse fiduciaries from ERISA responsibilities."); *Tr. Ex. 146 at 2* ("[T]he mere fact that a plan document 'hard wires' in particular offerings, as in Putnam's case, many not eliminate the need for fiduciary review and monitoring of the lineup.").

## II.    THE EVIDENCE AT TRIAL SUPPORTS PLAINTIFFS' CLAIM FOR FAILURE TO MONITOR PLAN FIDUCIARIES

The evidence at trial also demonstrates that Putnam, Robert Reynolds and the PBOC breached their duty to monitor their appointed fiduciaries.[16] "Implicit within the duty to select and retain fiduciaries is a duty to *monitor* their performance." *Solis v. Webb*, 931 F. Supp. 2d 936, 952-53 (N.D. Cal. 2012) (emphasis in original). "The duty to monitor carries with it the duty to take action upon discovery that the appointed fiduciaries are not performing properly." *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 140-43 (D. Mass. 2004) (ellipses omitted) (quoting *Liss v. Smith,* 991 F.Supp. 278, 311 (S.D.N.Y.1998)). This duty to monitor includes, among other things, a duty to "ensure that [the appointed fiduciaries'] performance has been in compliance with the terms of the plan and statutory standards[.]" 29 C.F.R. § 2509.75-8, FR-17; *see also Webb*, 931 F. Supp. 2d at 953-54.

The evidence at trial shows that the monitoring parties did not ensure that their appointed fiduciaries acted "in compliance with . . . statutory standards." *Id.* Among other things, they "fail[ed] to (a) monitor and evaluate the performance of their appointees, ... *fail[ed] to have a*

---

[16] The PBOC has authority to add and remove members of the PBIC and has supervisory authority over the PBIC. *Tr. Ex. 10 at 1; Joint Uncontested Facts (Dkt. No. 145-1), ¶¶ 9-12.* The PBOC, in turn, reports to Putnam senior management (including Mr. Reynolds), and its members are appointed by Putnam's Chief of Human Resources with the approval of Putnam senior management. *Id.*

*system in place for doing so*, and (b) fail[ed] to remove appointees who maintained imprudent, excessively costly, and poorly performing investments within the Plan ...." *Urakhchin*, 2016 WL 4507117, at *7 (emphasis in original); *see also Moreno v. Deutsche Bank Americas Holding Corp.*, 2016 WL 5957307, at *8 (S.D.N.Y. Oct. 13, 2016). The monitoring defendants do not assert—nor could they, based on the evidence—that they ever directed the PBIC to take any corrective action based on any perceived breach of fiduciary duty. They assert only that the PBOC met, reviewed PBIC minutes, appointed members, and reported to Mr. Reynolds. *See Defs' Memo at 17.* Given the fiduciary breaches reflected in the evidence submitted at trial, this superficial "monitoring" was wholly inadequate to fulfill the obligation of Putnam, Mr. Reynolds and the PBOC to ensure their appointees' compliance with ERISA.

## III.    PLAINTIFFS HAVE MADE A PRIMA FACIE CASE OF LOSS TO THE PLAN

ERISA requires fiduciaries "who breach[] any of the responsibilities, obligations, or duties" imposed by ERISA "to make good to such plan any losses to the plan" resulting from such breach. 29 U.S.C. § 1109(a). This involves a two-part, burden-shifting analysis. First, Plaintiffs must make "a prima facie case of loss," which is done "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Tatum*, 761 F.3d at 356-57; *Evans*, 534 F.3d at 74. Second, once Plaintiffs have made a prima facie case of loss, Defendants then have the burden of showing that "the loss would have occurred regardless of the fiduciary's imprudence," which they can prove by showing that "a hypothetical prudent fiduciary ***would have*** made the same decision[s] anyway." *Tatum*, 761 F.3d at 364 (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994)) (emphasis added). Contrary to Defendants' arguments, Plaintiffs have established a prima facie case of loss, and the burden now falls on Defendants to rebut that loss in the remaining days of trial.

### A.    Dr. Pomerantz's Analysis Quantifies the Losses Suffered by the Plan, and Itemizes the Losses in Connection with Each Investment

Consistent with the nature of this action (which is brought on behalf of the Plan) and the nature of Defendants' fiduciary breaches (which affected the Plan's entire investment lineup), Dr. Pomerantz calculated losses to the Plan on a portfolio-wide basis.  This type of expert analysis is precisely the type of analysis that the First Circuit approved in *Evans. See Evans*, 534 F.3d at 74 (holding that damages from a fiduciary breach are determined "with the help of expert analysis" through comparisons to "a prudently invested portfolio"); *accord*, *Bierwirth II*, 754 F.2d at 1056; *GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 733 (11th Cir. 1990) (affirming damages award based on difference between value of a "model portfolio[]" and the value of the investments defendants failed to prudently manage).

### 1.    Dr. Pomerantz Properly Calculated Losses to the Plan as a Whole on a Portfolio-Wide Basis

Although Defendants argue that it is improper to calculate losses "*for the entirety of the Putnam funds lineup*," *Defs' Memo at 13-15*, this argument is inconsistent with applicable law (which provides for portfolio-based comparisons) and ignores the fact that the fiduciary breaches in this case affected the Plan's entire investment menu.  In measuring losses to a plan, courts are required "to fashion the remedy best suited to the harm." *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992). Thus, "the method for ascertaining a loss to the plan should be tailored to the type of breach claimed." *Chao v. Moore*, 2001 WL 743204, at *7 (D. Md. June 15, 2001); *see also See* Restatement (Third) of Trusts § 100, cmt. b(1) (2012) (explaining that the hypothetical investments used to measure losses to a trust should depend on "the nature of the breach involved" and "other facts and circumstances of the case"). Accordingly, a portfolio-wide breach supports a portfolio-wide damages analysis.

For example, in *Dardaganis v. Grace Capital*, the Second Circuit upheld the district court's use of a portfolio-wide method of measuring damages where "the breach arises from a pattern of investment rather than from investment in a particular stock." 889 F.2d 1237, 1244 (2d Cir. 1989).[17] Similar to Putnam, the defendants argued that "the Court must look at specific investment decisions and determine whether the [Plan] lost any money as a result of those particular decisions." *Id.* at 1243. However, the Second Circuit affirmed the district court's "decision not to require inquiries into specific investment decisions"). *Id.* at 1244.

The court's opinion in *Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) is also instructive. In *Liss*, the plan's fiduciaries breached their fiduciary duties by, among other things, failing to "implement an investment policy," "properly investigate Fund investments," and "monitor" the plan's investments. *Id.* at 294. Based on these breaches, the court held that plaintiffs' expert properly stated a "prima facie case of loss" by comparing the plan's investment returns to the returns of other similar pension plans. *Id.* at 295. The court held that this was a proper method for measuring losses "where, as here, the allegations of fiduciary breaches relate to the overall investment strategy of the Funds (or the lack thereof) as opposed to the wisdom of a single transaction or investment." *Id.* The court elaborated:

> In a case such as this, where all the investments are alleged to have been improper, the "alternatives" to which the Fund must be compared are other properly managed funds. Thus, the only manner in which plaintiffs can show loss is to establish what a reasonable investor would have done and how such investments would have performed. Such a measure of loss has been repeatedly recognized as legitimate.

*Id.* at 295 (citing *Dardaganis*, 889 F.2d at 1243; *Bierwirth II*, 754 F.2d at 1056).

---

[17] *Accord*, *Gray v. Briggs*, 45 F. Supp. 2d 316, 327–28 (S.D.N.Y. 1999) ("[W]here allegations focus on [a] pattern of investments and overall strategy, plaintiff must only show that a reasonable investor's strategy would have profited the plan more than that of the fiduciary.").

The fiduciary breaches in the present case strongly resemble those in *Liss*. Thus, the proper method for measuring the Plan's prima facie loss is to compare the performance of the Putnam investments in the Plan to a "prudently invested portfolio." *See Evans*, 534 F.3d at 74; *accord*, *GIW Indus.*, 895 F.2d at 733 (measuring damages through comparison to a "model portfolio"); *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 573 (D. Md. 2003) (measuring damages by comparing overall returns of the plan to that of an "asset mix" that a "prudent fiduciary would have maintained" for the plan in question).

### 2.    Dr. Pomerantz Also Calculated Losses in Connection with Particular Investments

In any event, Dr. Pomerantz did provide specific measures of loss for each and every one of the Putnam investments in the Plan, as shown in Exhibits 4 and 6 to his Expert Report (which have been admitted for illustrative purposes). For example, Dr. Pomerantz calculated that the total losses associated with the Voyager Fund were in excess of $14 million during the class period when compared to an analogous Vanguard index fund (the Vanguard Growth Index Fund) or analogous BNY Mellon CIT (the Large Cap Growth CIT).[18] Dr. Pomerantz then repeated this analysis for each and every one of the Putnam funds in the Plan; his portfolio-wide damages calculations are simply an aggregation of these fund-by-fund comparisons. Thus, even if individualized comparisons to "particular investment[s]" were required, *see Defs' Memo at 14*, Dr. Pomerantz has made such comparisons. Indeed, Dr. Pomerantz's analysis is actually ***more favorable*** to Defendants than their suggested model (which would look only at investments that underperformed instead of the entire portfolio of investments) because Dr. Pomerantz's analysis gives Defendants an offset for any over-performance with respect to particular investments. *Tr. Tran. Day 7 p. 119:16-25.*

---

[18] Exhibits 3 and 5 to Dr. Pomerantz's report show which Vanguard index funds and which BNY Mellon CITs Dr. Pomerantz used as comparators for each Putnam fund.

### 3.    The Comparisons that Dr. Pomerantz Made Were Appropriate

There is no question that the comparators used by Dr. Pomerantz were appropriate. The relevant test for purposes of these comparators is whether they constitute "prudent investment alternatives" to the investments in the Plan. *See Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 301 (3d Cir. 2007); *accord, Evans*, 534 F.3d at 74 (citing *Graden*).[19]  As discussed below, it is uncontested that the BNY Mellon funds constituted prudent investments for the Plan, and index funds are also widely recognized as prudent investments.  Although Defendants contend that Plaintiffs are making "apples to oranges" comparisons because most of the Putnam funds are actively-managed, *Defs' Trial Brief, ECF No. 159, at 1*, that is not a proper basis for objecting to Plaintiffs' damages analysis. *See Tussey III*, 850 F.3d at 961. The fact that other actively-managed funds may be prudent alternatives to the Putnam funds does not mean that Vanguard index funds or the BNY Mellon CITs are not prudent alternatives, and among these various prudent alternatives, Plaintiffs are entitled to pick the "most profitable" alternative portfolio for purposes of calculating losses to the Plan. *See Graden*, 496 F.3d at 301 ("Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.") (quoting *Bierwirth*, 754 F.2d at 1056); *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 273 (D. Mass. 2008).

### a.    The BNY Mellon Funds Constitute a "Prudent Alternative Portfolio"

In *Graden*—the case principally relied upon by the First Circuit in *Evans*—the Third Circuit held that "[i]n determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Graden*, 496 F.3d

---

[19] *See also Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State St. Corp.*, 2010 WL 1223777, at *6 (D. Mass. Mar. 25, 2010).

at 301 (quoting *Bierwirth*, 754 F.2d at 1056).[20] Thus, one presumptively appropriate measure of damages is to compare the returns of the investments that were imprudently selected and retained with any investments that were prudently selected and retained. *See Graden*, 496 F.3d at 301 ("[I]f Graden succeeds on the merits, the District Court will look to the prudent investment alternatives that the Conexant plan offered during this period to determine what the Conexant Stock Fund B investors would have earned but for Conexant's breach."); Restatement (Third) of Trusts § 100, cmt. b(1) ("Depending on the type of trustee and the nature of the breach involved… the projected returns on indefinite hypothetical investments during the [damages] period may appropriately be based, *inter alia*, on: the return experience (positive or negative) for other investments, or suitable portions of other investments, of the trust in question").[21]

This is precisely what Dr. Pomerantz did by comparing the net performance of the Putnam investments in the Plan to the BNY Mellon Funds. The PBIC meeting minutes and the testimony of Defendants' own witnesses establish that the BNY Mellon CITs were prudent investment alternatives. *Tr. Ex. 151 at 2* (Sept. 3, 2015 PBIC meeting minutes noting that the BNY Mellon CITs "can be used as basic 'building blocks' for interested participants looking to craft a diversified portfolio of lower cost index products rather than active options.'"); *Tr. Tran. Day 1 p 50:1-3* (Mr. Goodfellow testifying that the BNY Mellon funds are a prudent portfolio); *Tr. Tran. Day 5 p. 133* (Mr. Whalen testifying that the BNY funds allow for "basic well-diversified portfolios as a designated investment alternative for plan participants").[22]  Although

---

[20] "While the First Circuit has never examined [*Bierwirth*], it endorsed the same sort of comparative approach in *Evans.*" *Bendaoud*, 578 F. Supp. 2d at 273.

[21] *Accord, Severstal Wheeling, Inc. Retirement Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 268-69 (S.D.N.Y. 2015) (holding defendants liable for the difference between the returns of the imprudently managed "Severstal Trust" and the returns of the "Combined Trust," a prudently-managed portfolio also managed by defendants).

[22] In fact, as Dr. Pomerantz testified, a plan consisting of the BNY Mellon CITs would closely resemble the federal government's Thrift Savings Plan, the largest defined contribution plan in the country. *Tr. Tran. Day 7 p. 123:25-124:9.*

Defendants argue that "institutional" shares of the BNY Mellon CITs were not available prior to 2015, *Defs' Memo at 14 n.13*, Dr. Pomerantz accounted for this in his analysis, assuming higher costs for the BNY Mellon CITs in years prior to 2015 to mirror marketplace trends in mutual fund fees. *Pomerantz Report, Tr. Ex. AG, at 51*.[23] Dr. Pomerantz's testimony establishes that had the Plan's assets been invested in comparable BNY Mellon CITs between December 2009 and the first quarter of 2017, rather than the Putnam funds in the Plan, the Plan would have had approximately $44.2 million more in assets. *Tr. Tran. Day 7 p. 124:10-125:21*. This constitutes not only prima facie evidence of a loss, but a very substantial loss.

### b. Vanguard Index Funds Constitute a Prudent Alternative Portfolio

There is also substantial support in the law and academic literature for measuring investment losses or performance based on comparisons to index fund alternatives. *See* Restatement (Third) of Trusts § 100 cmt. b(1) (explaining that one acceptable method for measuring damages to a trust is to compare the returns of "imprudent or otherwise improper investments" to "return rates of … suitable index mutual funds or market indices"); William F. Sharpe, *The Arithmetic of Active Management*, 47 J. Fin. Analysts 7, 9 (1991) ("The best way to measure a manager's performance is to compare his or her return with that of a comparable passive alternative.").[24] Indeed, numerous courts have used similar analyses to measure losses attributable to a fiduciary breach. *See Gilbert v. EMG Advisors, Inc.*, 172 F.3d 876 (9th Cir. 1999) (measuring damages by comparing imprudent investments to returns of Lehman Government Index-Aggregate); *Meyer*, 250 F. Supp. 2d at 573–74 (measuring damages by using prudent mix of stocks and bonds, as measured by S&P 500 and Lehman Aggregate Bond Index);

---

[23] Dr. Pomerantz will testify to this when Defendants' criticisms of his analysis are addressed on redirect.

[24] As Dr. Pomerantz noted during his testimony, William Sharpe is a Nobel Prize winning economist, and the father of modern portfolio theory. *Tr. Tran. Day 7 p. 84:11-85:5*.

*Dasler v. E.F. Hutton & Co., Inc.*, 694 F. Supp. 624, 634 (D. Minn. 1988) (measuring damages through comparison of "plan's actual earnings" to "earnings which would have been reasonable" absent the fiduciary breach, as measured by the returns of the S&P 500 Composite Index).

Consistent with this accepted methodology, Dr. Pomerantz also measured the losses to the Plan by comparing the performance of the Putnam funds in the Plan to a portfolio of Vanguard index funds. Dr. Pomerantz testified that if the monies invested in Putnam funds during the relevant period had been alternatively invested in a portfolio of comparable Vanguard index funds, the Plan would have had approximately $45.5 million in more in assets. *Tr. Tran. Day 7 p. 118:19-24.* This constitutes further evidence of loss to the Plan.

### c.    Defendants' Objections to These Measures of Losses Are Unfounded

Defendants' criticisms of Dr. Pomerantz's methodology are unfounded. Defendants can hardly argue that the BNY Mellon Funds are not prudent alternatives, or were "cherry picked" by Plaintiffs, where Defendants themselves selected the BNY Mellon Funds for the Plan. Similarly, Defendants have no legitimate basis for arguing that index funds are not prudent investment alternatives, where the Restatement expressly states that index funds are a "practical alternative to be considered by trustees." Restatement (Third) of Trusts § 90, cmt. h(1).

In support of their "plausibility" argument, Defendants rely almost exclusively on the Eighth Circuit's opinion in *Tussey II*, 746 F.3d 327 (8th Cir. 2014). *See Defs' Memo at 17.* However, Defendants' reliance on that case is problematic at best. The portions of the decision quoted by Defendants were vacated in the Eighth Circuit's subsequent opinion in *Tussey III*, which held that those sections were not the "law of the case" given the "tentative, qualifying terms." 850 F.3d at 958. Leaving no doubt that the portions of the opinion quoted by Defendants are no longer good law, the Eighth Circuit held that "[t]he district court .... should have

considered other ways of measuring the plans' losses from the ABB fiduciaries' breach, as well as the participants' contentions about why … our proposal [in *Tussey II*] was misguided and contradicted persuasive authority and the trust-law principles that generally inform ERISA decisions." *Id.* (emphasis added).

In *Tussey III*, the Eighth Circuit explicitly held that a damages analysis is not "necessarily inappropriate because it involves an 'apples-to-oranges comparison'" between funds that "choose their investments differently":

> [I]t is a mistake to argue, as the [defendants] do, that measuring any portion of the losses by comparing the returns from the [Plan] Funds with what the plans would have earned from the [proposed alternative] Fund[s] is necessarily inappropriate because it involves "an apples-to-oranges comparison." True, the funds are designed for different purposes and thus choose their investments differently, so there is no reason to expect them to make similar returns over any given span of time. But the point of the comparison here would just be to determine, as a factual matter, the effect of owning one fund rather than the other. The *reason* for any difference in returns would be immaterial.

850 F.3d at 961. Thus, the Eighth Circuit's analysis in *Tussey* does not support, but rather undercuts, Defendants' argument that comparisons between actively-managed and passively-managed funds are improper.

Moreover, even if this criticism had any merit (which it does not), Dr. Pomerantz's ICI analysis was not limited to index funds, and found that the expenses of the Putnam investments in the Plan were significantly higher than average for similarly-sized plans in a similar mix of investments. *See supra* at 20. This constitutes still further evidence that the Plan suffered a loss from Defendants' fiduciary breaches.

In summary, Plaintiffs have provided ample evidence of losses to the Plan through three separate sets of comparisons to (1) the BNY Mellon Funds, (2) Vanguard index funds, and (3) the expense averages reported by ICI. Nothing further is required to establish a prima facie case of loss.  Plaintiffs' loss calculations need not be exact. *See Evans*, 534 F.3d at 74 ("[T]here is

35

nothing in ERISA to suggest that a benefit must be a liquidated amount to be recoverable.")

(quoting *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804, 807 (7th Cir. 2007) (Posner, J.)).

Instead, "it will be enough if the evidence show the extent of the damages as a matter of just and

reasonable inference, although the result be only approximate." *Tussey III*, 850 F.3d at 960–61

(quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

> **B.    It Is *Defendants'* Burden to Rebut Plaintiffs' Prima Facie Case of Loss by Showing That a Prudent Fiduciary "Would Have" Made the Same Investment Decisions Anyway**

"[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case

of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the

fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach

of duty." *Martin*, 965 F.2d at 671. As the Fourth Circuit explained in *Tatum*:

> Generally, of course, when a statute is silent, the default rule provides that the burden of proof rests with the plaintiff. *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 56 (2005). But "[t]he ordinary default rule ... admits of exceptions," *id.* at 57, and one such exception arises under the common law of trusts. "[I]n matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." *Restatement (Third) of Trusts* § 100, cmt. f (2012) (internal citation omitted); *see also* Bogert & Bogert, *The Law of Trusts and Trustees* § 871 (2d rev. ed. 1995 & Supp. 2013) ("If the beneficiary makes a prima facie case, the burden of contradicting it ... will shift to the trustee.").

761 F.3d at 362 (citations omitted).

Although Defendants argue that the First Circuit has not explicitly adopted *Tatum*'s

analytical framework, *see Defs' Memo at 16*, several other courts have done so.[25] There is no

---

[25] *See McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) ("To establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of fiduciary duty and a prima facie case of loss to the Plan. Once the plaintiff has satisfied these burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by… the breach of duty.") (quotation omitted); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 920 (8th Cir. 1994) ("[O]nce the plaintiff shows a breach of duty and a prima facie case of loss to the plan, the trustee then has the burden of persuasion to show that the loss was not caused by the

reason to reach a different result here. "Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979). Thus, "[w]hen a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable." *Tatum*, 761 F.3d at 366.

Under this burden-shifting approach, "a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails unless the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary *would have* made the same decision[s] anyway." *Tatum*, 761 F.3d at 364 (emphasis in original); *see also Bierwirth II*, 754 F.2d at 1056 ("The burden of proving that the funds *would have* earned less than that amount [i.e., the "most profitable" amount proposed by plaintiffs] is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.") (emphasis added); *Bendaoud,* 578 F. Supp.2d at 273 (same). Whether Defendants can meet this burden remains to be seen. They will have their opportunity to present their own damages analysis during the remainder of the trial.

## IV.    PUTNAM MUST DISGORGE THE FEES IT RECEIVED AS A RESULT OF DEFENDANTS' FIDUCIARY BREACHES

In addition to restoring losses to the Plan, fiduciaries are required under Section 1109(a) "to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a). This includes any investment management fees attributable to the breach of fiduciary duty. *See GIW Indus.*, 895 F.2d at 731, 733; *Severstal*

---

breach."); *Salovaara v. Eckert*, 222 F.3d 19, 26 (2d Cir. 2000) (explaining that under "Second Circuit precedent, a plaintiff must demonstrate both breach of fiduciary duty and a prima facie case of loss to the fund before the burden shifts to the defendant on the issue of causation of loss"); *Chao v. Trust Fund Advisors*, 2004 WL 444029, at *6 (D.D.C. Jan. 20, 2004) ("[O]nce the Secretary has proven a breach of fiduciary duty and a prima facie case of loss to the plan, Defendants must then prove that the loss was not caused by their breach of fiduciary duty.").

*Wheeling, Inc. Retirement Comm.*, 119 F. Supp. 3d at 269; *Ossey v. Marolda*, 1999 WL 731680, at *1 (N.D. Ill. Aug. 30, 1999).

Dr. Pomerantz testified that Putnam has earned over $27 million in investment management fees from the Putnam funds in the Plan since December 2009, and those fees have a present value of $37.3 million given the compounding that would have occurred absent payment of those fees. *Tr. Tran. Day 7 p. 97:19-98:3*. Thus, there is no question that Putnam has profited off of the Plan's investments, and it is obligated to disgorge these monies in the event of a finding of liability on Plaintiffs' underlying claims.

Although Putnam argues that this would result in an "unjust windfall" to Plaintiffs, *see Putnam Memo at 20*, the opposite is actually true. If Putnam is allowed to retain monies that received as a result of fiduciary breaches, it is Putnam that will be unjustly enriched. The purpose of the disgorgement remedy is not to reimburse Plaintiffs or the Plan, but rather to deter wrongful conduct. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1414 (9th Cir. 1988) ("[W]hether beneficiaries have been financially damaged by the breach is immaterial. Rather, the objective is to make 'disobedience of the trustee to the [duty of loyalty] so prejudicial to him that he and all other trustees will be induced to avoid disloyal transactions in the future.'") (quoting G. Bogert and G. Bogert, *The Law of Trusts and Trustees* § 543, at 217-18 (2d ed. 1978)). Thus, Plaintiffs are not required to demonstrate that they suffered a loss in order to obtain disgorgement. *See Trustees of Upstate N.Y. Engineers Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 128 (S.D.N.Y. 2015). Similarly, the fact that Plaintiffs may recover damages does not preclude them from seeking disgorgement; these remedies are cumulative under ERISA. *See* 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities obligations, or duties imposed

upon fiduciaries by this subchapter shall be personally liable to ***make good to such plan any***

***losses*** to the plan resulting from each such breach, ***<u>and</u>*** to ***restore to such plan any profits*** of

such fiduciary which have been made through use of assets of the plan by the fiduciary"); *GIW*

*Indus., Inc.*, 895 F.2d at 731, 733 (ordering "disgorgement of management fees" of $17,031.54,

and increasing a $537,000 damage award to total judgment of $554,031.54).

To the extent that Putnam argues that some portion of the investment management fees

do not represent profits to the Company, it bears the burden of proof on this issue and may

present evidence of its internal accounting during the remainder of the trial. *See Martin*, 965 F.2d

at 671 (holding that "once the ERISA plaintiff has proved a prima facie case of … ill-gotten

profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that … his profit

was not attributable to the breach of duty"); *Leigh*, 727 F.2d at 138 (explaining that defendants

should not escape disgorgement "simply because the defendants have made it difficult to

disentangle commingled profits").[26] However, the mere fact that it made contributions to the

Plan or paid certain administrative expenses is not a defense. *See Nedd*, 556 F.2d at 213–14.

Finally, it is absurd for Putnam to argue that it did not receive these monies "through use

of assets of the plan." 29 U.S.C. § 1109(a). The phrase "through use of" in section 1109(a) is

similar to the phrase "in connection with" in section 1106(b) that the Court already has

---

[26] In ERISA cases, when calculating the amounts subject to disgorgement, courts are encouraged to rely upon the substantial case law from the area of copyright infringement, where the remedy for copyright infringement is disgorgement of all profits earned as a result of the infringement. *Leigh*, 727 F.2d at 138. Under copyright infringement law, while it is appropriate to deduct variable costs from the total amount of revenue received, fixed costs may not be deducted. *See Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1412 (3d Cir. 1985) (rejecting inclusion of fixed expenses as a cost in calculating costs because "they do not necessarily bear such a direct relationship to any individual transaction to be considered a cost factor in the computation of lost profits"); *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841, 853 (M.D. Tenn. 2004) (rejecting deduction of fixed costs because "[t]he guiding principle must always be ... that the patentee recover every dollar of advantage realized by the infringer from the infringement"). Thus, Defendants may not set off their fixed costs associated with managing the Putnam funds—overhead, personnel, research costs, etc.—against the fees they received as a result of the Plan's investment in Putnam-affiliated investments.

determined to be sufficiently broad to encompass payment of investment management fees for mutual fund shares held by the Plan. *See ECF No. 158 at 20-21.*

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Judgment on Plaintiffs' remaining claims should be denied in its entirety.

Dated: April 26, 2017                                    Respectfully Submitted,

**BLOCK & LEVITON LLP**                            **NICHOLS KASTER, PLLP**
Jason M. Leviton (BBO #678331)              By: */s/ Kai H. Richter*
Jacob A. Walker (BBO #688074)               James H. Kaster, MN Bar No. 53946*
Bradley J. Vettraino (BBO #691834)          Paul J. Lukas, MN Bar No. 22084X*
155 Federal Street, Ste. 400                       Kai H. Richter, MN Bar No. 0296545*
Boston, MA 02110                                     Carl F. Engstrom, MN Bar No. 0396298*
Telephone: (617) 398-5600                        Jacob T. Schutz, MN Bar No. 0395648*
Facsimile: (617) 507-6020                          *admitted *pro hac vice*
jason@blockesq.com                                 4600 IDS Center, 80 S 8th Street
jake@blockesq.com                                   Minneapolis, MN 55402
bradley@blockesq.com                             Telephone: 612-256-3200
                                                                Facsimile: 612-338-4878
                                                                kaster@nka.com
                                                                lukas@nka.com
                                                                krichter@nka.com
                                                                cengstrom@nka.com
                                                                jschutz@nka.com

                                                                **ATTORNEYS FOR PLAINTIFFS**

---

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2017, a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: April 26, 2017          /s/ Kai H. Richter

---