UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                   )
JOHN BROTHERSTON and JOAN GLANCY,  )
individually and as representatives)
of a class of similarly situated   )
persons, and on behalf of the      )
Putnam Retirement Plan,            )
                                   )
            Plaintiffs,            )
                                   )
       v.                          )        CIVIL ACTION
                                   )        NO. 15-13825-WGY
PUTNAM INVESTMENTS, LLC,           )
PUTNAM INVESTMENT MANAGEMENT, LLC, )
PUNTNAM INVESTOR SERVICES, INC.,   )
the PUTNAM BENEFITS INVESTMENT     )
COMMITTEE, the PUTNAM BENEFITS     )
OVERSIGHT COMMITTEE, and ROBERT    )
REYNOLDS,                          )
                                   )
            Defendants.            )
_____)
```

YOUNG, D.J.                                        June 19, 2017

## FINDINGS OF FACT, RULINGS OF LAW, & ORDER

## I.    INTRODUCTION

On November 13, 2015, John Brotherston ("Brotherston") and

Joan Glancy ("Glancy"), individually and on behalf of a class of

similarly situated persons and the Putnam Retirement Plan

("Plan") (collectively, the "Plaintiffs"), brought this class

action under section 502(a) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C.

§§ 1001-1461, against the Plan's fiduciaries: Putnam

Investments, LLC, Putnam Investment Management, LLC, Putnam Investor Services, Inc., the Putnam Benefits Investment Committee, the Putnam Benefits Oversight Committee, and Putnam's Chief Executive Officer Robert Reynolds (collectively, the "Defendants"), for breach of the fiduciary duties of loyalty and prudence in violation of 29 U.S.C. § 1104(a)(1)(A)-(B) (count I), prohibited transactions with a party in interest in violation of 29 U.S.C. § 1106(a)(1) (count II), prohibited transactions with a fiduciary in violation of 29 U.S.C. § 1106(b) (count III), failure to monitor in violation of 29 U.S.C. § 1109(a) (count IV), and other equitable relief based on ill-gotten proceeds under 29 U.S.C. § 1132(a)(3) (count V). Second Am. Compl. ("SAC") ¶¶ 117-48, ECF No. 73.

Following a case stated hearing[1] on March 30, 2017, this Court entered judgment for the Defendants on counts II and III. Order, ECF No. 158. A bench trial on the remaining counts commenced before this Court on April 7, 2017. Upon the conclusion of the Plaintiffs' final witness, the Defendants moved for judgment on partial findings pursuant to Rule 52(c) of

---

[1] The case stated procedure allows the Court to render a judgment based on a largely undisputed record in cases where there are minimal factual disputes. In its review of the record, "[t]he [C]ourt is . . . entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).

the Federal Rules of Civil Procedure.  Defs.' Mot. J. Partial

Findings Fed. R. Civ. P. 52(c), ECF No. 167.  The parties

briefed the issues.  Pls.' Mem. Opp'n Defs.' Mot. J. Partial

Findings Fed. R. Civ. P. 52(c) ("Pls.' Opp'n"), ECF No. 189;

Mem. Supp. Defs.' Mot. J. Partial Findings Fed. R. Civ. P. 52(c)

("Defs.' Mem."), ECF No. 168; Defs.' Suppl. Br. Supp. Mot. J.

Partial Findings Fed. R. Civ. P. 52(c) ("Defs.' Suppl. Br."),

ECF No. 190.  Having heard oral argument on the Defendants'

motion, this Court now makes the following findings of fact and

rulings of law.

## II.  THE LEGAL FRAMEWORK

### A.  Judgment on Partial Findings

A Rule 52(c) motion for judgment on partial findings is the

analogue of a Rule 50(c) motion for directed verdict in a jury

trial.[2]  See Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st

Cir. 2007); Northeast Drilling, Inc. v. Inner Space Servs.,

Inc., 243 F.3d 25, 37 (1st Cir. 2001) (characterizing

---

[2] Federal Rule of Civil Procedure 52(c) provides in relevant part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue . . . . A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

defendant's motion for judgment after plaintiff rested at bench trial as a motion for judgment on partial findings, rather than as a motion for judgment as a matter of law under Rule 50(c)). A court should enter a judgment under Rule 52(c) only "[w]hen a party has finished presenting evidence and that evidence is deemed . . . insufficient to sustain the party's position." Morales Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir. 2004); see also Halpin v. Atkinson-Kiewit, J.V., 894 F. Supp. 486, 494 (D. Mass. 1995) (Collings, M.J.) ("Rule 52(c) plainly permits the court to decline to render any judgment until the close of all the evidence.").

This rule promotes efficiency. If a party bearing the burden of proof fails to persuade the court once it has been fully heard on a crucial issue, the court need not forge ahead to finish the case, but may make its findings on that issue against the party and thus dispose of the case. While this makes eminent sense, it places the court in the somewhat awkward position of making factual findings absent a complete evidentiary record developed by the contending parties.

## B.    The Substantive Legal Framework

This is an equitable action to charge a group of trustees. Like its closest analogue -- an action at law to recover for a statutory tort -- it requires proof of three matters, viz.: 1) a

violation of a statutory duty, 2) loss causation, and

3) damages.[3]  The Court considers these issues in turn.

---

[3] This parallelism and the extraordinary money damages
sought by the Plaintiffs' counsel on behalf of the class leads
one to wonder why they did not demand a jury in this case where
they assert a plan-wide ERISA fiduciary breach claim for money
damages.  See Great-West Life & Annuity Ins. Co. v. Knudson, 534
U.S. 204, 210 (2002).  After all, this is precisely what the
defense bar fears.  See, e.g., James P. Baker, The Jury Trial,
the Magna Carta, and ERISA, 22 Benefits L.J. 1, 6 (2009).

As will be seen, however, this action to charge the
trustees historically sounds in equity and has significant
differences from the usual statutory tort claim.  The most
thorough scholarship confirms that no constitutional right to a
jury trial attaches under the Seventh Amendment.  See Note, The
Right to Jury Trial in Enforcement Actions Under Section
502(a)(1)(B) of ERISA, 96 Harv. L. Rev. 737, 750-56 (1983); see
also Denise Drake Clemow & Lisa Hund Lattan, ERISA Section 510
Claims: No Right to a Jury Trial Can be Found, 73 Neb. L. Rev.
756, 774-78 (1994); David M. Cook & Karen M. Wahle, Procedural
Aspects of Litigating ERISA Claims 53-56 (2000).

It need not be this way, of course.  Congress could
certainly extend the citizens' rights to the adjudication of
this action.  Indeed, while Congress may not -- though it
frequently does -- constrict the reach of the Seventh Amendment,
it possesses the undoubted power to extend adjudication by the
American jury beyond that Amendment's historical reach.

An instructive example is found in legislative proposals
seeking to restore to litigants the right to have access to the
federal courts and, whenever appropriate, to adjudication by
jury in Securities Exchange Commission proceedings.  Both the
Due Process Restoration Act, H.R. 3798, 114th Cong. (2015), and
the Financial CHOICE Act, H.R. 10, 115th Cong. (2017), seek to
provide a mandatory right of removal to federal court to certain
respondents in administrative proceedings.  See Joseph A.
Grundfest, Fair or Foul? SEC Administrative Proceedings and
Prospects for Reform Through Removal Legislation, 85 Fordham L.
Rev. 1143, 1149-50 (2016); see also Securities Exch. Comm'n. v.
EagleEye Asset Mgmt., 975 F. Supp. 2d 151, 155 (D. Mass. 2013).
While an excellent argument can be made in the SEC context that
the Seventh Amendment guarantees such access whenever fines and
monetary damages (i.e., legal remedies) are sought to be
exacted, see Suja A. Thomas, The Missing American Jury:

## 1. Statutory Duties Under ERISA

### a. Duty of Loyalty

Under ERISA, retirement plan trustees are fiduciaries who owe a duty of loyalty to plan participants.  29 U.S.C. § 1104(a)(1)(A); Bunch v. W.R. Grace & Co. (Bunch I), 532 F. Supp. 2d 283, 288 (D. Mass. 2008) ("ERISA fiduciaries owe participants duties of prudence and loyalty." (citing Moench v. Robertson, 62 F.3d 553, 561 (3d Cir. 1995)), aff'd, 555 F.3d 1 (1st Cir. 2009).  The duty of loyalty requires fiduciaries to administer the plan "solely in the interest of the [plan] participants and beneficiaries" and "for the exclusive purpose" of providing them with benefits.  Bunch I, 532 F. Supp. 2d at 291-92; see also Pegram v. Herdrich, 530 U.S. 211, 224 (2000); Vander Luitgaren v. Sun Life Assurance Co. of Can., 765 F.3d 59, 65 (1st Cir. 2014); Glass Dimensions, Inc. ex rel. Glass

---

Restoring the Fundamental Constitutional Role of the Criminal, Civil, and Grand Juries 169-72 (2016), the point here is that the Congress can at will extend this aspect of direct popular democracy.  Indeed, that the SEC would be reticent to submit itself to the judgment of the very people on whose behalf it purports to be regulating is especially disquieting.  See generally Gretchen Morgenson, In S.E.C.'s Streamlined Court, Penalty Exerts a Lasting Grip, NY Times (May 4, 2017), https://www.nytimes.com/2017/05/04/business/sec-internal-court.html?_r=0.  But see Stephen Hall, The Shameless Wall Street Double Standard, Law360 (June 12, 2017), https://www.law360.com/articles/930747 ("[T]here is a double standard at work when industry clamors for access to the federal courts while denying that very same right to their customers and relegating them to arbitration.").

Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 304-05 (D. Mass. 2013) (Tauro, J.); Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198, 214 (D. Mass. 2002) (Saris, J.), aff'd, 316 F.3d 290 (1st Cir. 2003).

It is well-established that under ERISA, "a fiduciary does not breach its duty of loyalty solely by conducting other activities that relate to or impact the Plan." Bunch I, 532 F. Supp. 2d at 291 (citing Hughes Aircraft Co. v. Stanley Jacobson, 525 U.S. 432, 443-46 (1999)). Accordingly, identifying a potential conflict of interest alone is not sufficient to establish a breach of the duty of loyalty. See Pegram, 530 U.S. at 225 (2000) ("Under ERISA, . . . a fiduciary may have financial interests adverse to beneficiaries."); DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 421 (4th Cir. 2007). Nor is it sufficient merely to point to a defendant's self-dealing, such as the investment of plan assets in their own mutual funds. See Dupree v. Prudential Ins. Co. of Am., No. 99-8337, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 10, 2007) ("Simply because [the plan sponsor] followed such a practice . . . does not give rise to an inference of disloyalty, especially where these practices are universal among plans of the financial services industry."). In fact, the Department of Labor explicitly allows, and courts have upheld, financial services institutions' practice of

offering their own investment products to their own sponsored plans. See, e.g., Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) (finding "no statute or regulation prohibiting a fiduciary from selecting funds from one management company"); Participant Directed Individual Account Plans, 56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991) (to be codified at 29 C.F.R. pt. 2550) (noting that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor").

In order to prevail on a claim for breach of the duty of loyalty, the Plaintiffs must show by a preponderance of the evidence that the Defendants, while wearing their ERISA fiduciary hats, failed to "'discharge [their] duty with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.'" Bunch I, 532 F. Supp. 2d at 291 (quoting 29 U.S.C. § 1104(a)(1)(A)). In making this inquiry, courts take into consideration "the totality of the circumstances." See Bunch v. W.R. Grace & Co. (Bunch II), 555 F.3d 1, 7 (1st Cir. 2009) (citing DiFelice, 497 F.3d at 418; Keach v. U.S. Tr. Co., 419 F.3d 626, 636-37 (7th Cir. 2005)); Kenney v. State St. Corp., No. 09-10750-DJC, 2011 WL 4344452, at *3 (D. Mass. Sept. 15, 2011) (Casper, J.).

The "Exclusive Benefit Rule" of section 1104(a)(1)(A) is rooted in the trust law duty of loyalty. Peter J. Wiedenbeck, ERISA in the Courts 155 (2008). The trust law duty of loyalty, however, is governed by an objective test, Restatement (Second) of Trusts § 170, whereas courts have held that "the Exclusive Benefit Rule looks to the fiduciary's subjective motivation in determining whether the fiduciary is in compliance with the rule," A.F. v. Providence Health Plan, 173 F. Supp. 3d 1061, 1073 (D. Or. 2016) (citing Wiedenbeck, supra, at 156); see also Varity Corp. v. Howe, 516 U.S. 489, 506 (1996); Perez v. First Bankers Tr. Servs., Inc., 210 F. Supp. 3d 518, 534 (S.D.N.Y. 2016) ("[T]he duty of loyalty is grounded in the motivation driving a fiduciary's conduct, and liability will not lie where a fiduciary's decisions were motivated by what is best for the [plan], even if those decisions also incidentally benefit the fiduciary."); Degnan v. Publicker Indus., Inc., 42 F. Supp. 2d 113, 120 (D. Mass. 1999) (Garrity, J.).

The Plaintiffs' burden, therefore, is to point to the Defendants' motivation behind specific disloyal conduct. In re McKesson HBOC, Inc. ERISA Litig., 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005) ("[T]he duty of loyalty requires fiduciaries to refrain from actual disloyal conduct, not simply running the risk that such behavior will occur."). Examples of disloyal conduct might include "mislead[ing] plan participants about the

operation of a plan," <u>Adamczyk</u> v. <u>Lever Bros. Co., Div. of</u>
<u>Conopco</u>, 991 F. Supp. 931, 939 (N.D. Ill. 1997), or "receiv[ing]
commissions from insurance companies," <u>Patelco Credit Union</u> v.
<u>Sahni</u>, 262 F.3d 897, 911 (9th Cir. 2001).

### b. Duty of Prudence

ERISA fiduciaries also owe participants a duty of prudence,
according to which they must "act with the care, skill,
prudence, and diligence under the circumstances then prevailing
that a prudent man acting in a like capacity and familiar with
such matters would use."  29 U.S.C. § 1104(a)(1)(B); <u>see also</u>
<u>Tibble</u> v. <u>Edison Int'l</u>, 135 S. Ct. 1823, 1828 (2005) ("[A]
trustee has a continuing duty to monitor trust investments and
remove imprudent ones."); <u>Bunch II</u>, 555 F.3d at 7; <u>Beddall</u> v.
<u>State St. Bank & Tr. Co.</u>, 137 F.3d 12, 18 (1st Cir. 1998).

A prudent fiduciary need not, however, follow a uniform
checklist.  <u>See</u> <u>Tatum</u> v. <u>RJR Pension Inv. Comm.</u>, 761 F.3d 346,
358 (4th Cir. 2014).  Instead, a variety of actions can support
a finding that a fiduciary acted with prudence.  <u>Id.</u>  In
general, "ERISA requires fiduciaries to employ 'appropriate
methods to investigate the merits of the investment and to
structure the investment' as well as to 'engage[] in a reasoned
decision[-]making process, consistent with that of a 'prudent
man acting in [a] like capacity.'"  <u>Id.</u> (quoting <u>DiFelice</u>, 497
F.3d at 420).  "[T]he test of prudence . . . is one of conduct,

and not a test of the result of performance of the investment."
Bunch II, 555 F.3d at 7; see also Donovan v. Cunningham, 716
F.2d 1455, 1467 (5th Cir. 1983).  A breach of the duty of
prudence, therefore, "cannot be measured in hindsight."
DiFelice, 497 F.3d at 424; see also Roth v. Sawyer-Cleator
Lumber Co., 16 F.3d 915, 917–18 (8th Cir. 1994) ("[T]he prudent
person standard is . . . a test of how the fiduciary acted
viewed from the perspective of the time of the [challenged]
decision rather than from the vantage point of hindsight."
(alteration in original) (quoting Katsaros v. Cody, 744 F.2d
270, 279 (2d Cir. 1984)) (internal quotation marks omitted)).
Rather, the appropriate test is whether the fiduciary behaved
like "a prudent investor [would have behaved] under similar
circumstances," Hecker, 556 F.3d at 586, given "the totality of
the circumstances involved in the particular transaction," Bunch
I, 532 F. Supp. 2d at 288.  The crucial question is whether the
defendants "took into account all relevant information in
performing [their] fiduciary duty under ERISA."  Id.
Importantly, ERISA does not require a fiduciary to maximize the
value of investments or "follow a detailed step by step process

to analyze investment options." Id. at 287 (citing Roth, 16
F.3d at 917–18).[4]

## 2. Loss Causation

ERISA requires plaintiffs to prove losses to the plan for
any breach of fiduciary duty claim. Evans v. Akers, 534 F.3d
65, 74 (1st Cir. 2008) ("ERISA § 409 . . . requires fiduciaries
who breach their duties 'to make good to such plan the losses to
the plan resulting from such breach.'" (citing 29 U.S.C. §§
1109(a), 1132(a)(2))). Section 1109(a) provides that "[a]ny
person who is a fiduciary with respect to a plan who breaches
any of the responsibilities, obligations, or duties imposed upon
fiduciaries by this subchapter shall be personally liable to
make good to such plan any losses to the plan resulting from
each such breach." 29 U.S.C. § 1109(a). Section 1132(a)(3)
further allows the Court to award "other appropriate equitable
relief" for ERISA violations. 29 U.S.C. § 1132(a)(3).

Courts have consistently ruled that plaintiffs bear the
burden of persuasion to establish loss to the plan as a result

---

[4] Because the Plaintiffs have consistently framed the
failure to monitor as a theory of breach of fiduciary duty, this
Court treats the duty to monitor claim (count IV) as subsumed
within count I. Indeed, courts have consistently held that
failure to monitor claims are dependent upon breach of fiduciary
duty claims. See, e.g., Krueger v. Ameriprise Fin., Inc., No.
11-cv-02781 (SRN/JSM), 2012 WL 5873825, at *18 (D. Minn. Nov.
20, 2012) ("[T]here can be no liability for failure to monitor
without an underlying breach of fiduciary duty.").

of the breach.  Circuits split, however, on whether this burden
shifts upon a plaintiff's prima facie showing.  The Fourth,
Fifth, and Eighth Circuits, applying trust law principles, have
held that the fiduciary bears the burden of disproving loss
causation once a plaintiff shows breach of a fiduciary duty.
Tatum, 761 F.3d at 363 (4th Cir. 2014); McDonald v. Provident
Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995); Martin
v. Fellen, 965 F.2d 660, 671 (8th Cir. 1992).  In contrast, the
Second, Sixth, Ninth, Tenth, and Eleventh Circuits have all
refused to adopt burden shifting in ERISA breach of fiduciary
duty claims.  Pioneer Centres Holding Co. Emp. Stock Ownership
Plan & Tr. v. Alerus Fin., N.A., No. 15-1227, 2017 WL 2415949,
at *10 (10th Cir. June 5, 2017); Silverman v. Mutual Benefit
Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998); Wright v. Oregon
Metallurgical Corp., 360 F.3d 1090, 1099 (9th Cir. 2004); Kuper
v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995), abrogated on
other grounds by Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct.
2459 (2014); Willett v. Blue Cross & Blue Shield of Ala., 953
F.2d 1335, 1343-44 (11th Cir. 1992).  The First Circuit has not
yet addressed this issue.

### 3.  Damages

Because this is an equitable action to charge the trustees,
the Plaintiffs need only to prove the aggregate loss to the
Plan.  See Cal. Ironworkers Field Pension Tr. v. Loomis Sayles &

Co., 259 F.3d 1036, 1047 (9th Cir. 2001) ("[A] fiduciary is liable for the total aggregate loss of all breaches of trust and may reduce liability for the net loss of multiple breaches only when such multiple breaches are so related that they do not constitute separate and distinct breaches." (citing Restatement (Third) of Trusts § 213)). Conceptually at least, with liability established, there would be no problem with requiring the Defendants to sort out damages to each class member, potentially off-setting any voluntary contributions or other payments the class member received from the Defendants. See In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 135 (D. Mass. 2015) ("[Had] liability been established, my idea was to shift to the Defendants the burden of going forward with evidence of lack of injury to particular class members, while leaving the [] Plaintiffs with the ultimate burden of persuasion as to the damages suffered by particular claimants."), aff'd, 842 F.3d 34 (1st Cir. 2016); see also Evans, 534 F.3d at 74 ("'[T]here is nothing in ERISA to suggest that a benefit must be a liquidated amount in order to be recoverable.'" (quoting Harzewski v. Guidant Corp., 489 F.3d 799, 807 (7th Cir. 2007))).

III. FINDINGS OF FACT

    A.    The Putnam Retirement Plan

    Putnam Investments, LLC ("Putnam") is an asset management company located in Boston, Massachusetts, and the sponsor of the

Plan, a 401(k) profit-sharing retirement plan.  Parties' Joint

Pretrial Mem., Ex. 1, Stipulated Facts ¶¶ 1-2, ECF 145-1.  The

Plan covers eligible current and former employees of Putnam, its

directly and indirectly wholly-owned domestic subsidiaries, and

PanAgora Asset Management, Inc. ("PanAgora").  Id. ¶ 4.  From

November 13, 2009, to the present ("Relevant Period"), Putnam

has managed the Plan through three committees: the Putnam

Benefits Investment Committee ("PBIC"), which is responsible for

selecting, monitoring, and removing the Plan's investments; the

Putnam Benefits Administration Committee ("PBAC"), which is

responsible for the administration of the Plan; and the Putnam

Benefits Oversight Committee ("PBOC"), which oversees PBIC and

PBAC.  Id. ¶ 9.  All three committees are fiduciaries of the

Plan.  Id.

The Plan's governing documents provide that the available

investments under the Plan include, among other options, "any

publicly offered, open-end mutual fund (other than tax-exempt

funds) that are generally made available to employer-sponsored

retirement plans and under written or managed by Putnam

Investments or one of its affiliates."  Id. ¶ 23.

From the beginning of the class period through January 31,

2016, all of the designated investment options available under

the Plan's investment menu were affiliated with Putnam.[5]  Id.
¶ 28.  With the exception of certain categories of funds, i.e.,
close-end mutual funds, hedge funds, and tax-exempt funds, all
Putnam open-end mutual funds were added to the Plan lineup upon
launch, as required by the Plan Document.  4/12/17 Trial Tr.
33:1-12;[6] Trial Ex. 1, Putnam Retirement Plan Document 19.  Up
until early 2016, non-affiliated investments were offered
exclusively through the Plan's self-directed brokerage account
option ("SDBA").[7]  Stipulated Facts ¶ 28.  Starting on February
1, 2016, the Plan's investment menu included six BNY Mellon
collective investment trusts ("CITs").  Id. ¶ 30.

### B.  Plan Monitoring

PBIC, the Plan's named fiduciary, meets on a regular basis
to monitor the Plan's investment options.  4/7/17 Trial Tr.

---

[5] Brotherston has been invested in thirty-five of the Plan's
available investments throughout the Relevant Period.
Stipulated Facts ¶¶ 16-17.  Before leaving the Plan around March
of 2010, Glancy was invested in approximately fourteen of the
Plan's available investments.  Id. ¶¶ 18-19.

[6] The trial transcript spans multiple docket entries labeled
ECF Nos. 172 through 185.  The transcript for each day is
divided into multiple files.  For the sake of simplicity, this
Court cites to the daily, continuously paginated transcripts and
omits references to specific ECF numbers.

[7] Since 2008, the Plan has offered participants the
opportunity to invest in a self-directed brokerage account.
Stipulated Facts ¶¶ 31-32.  Approximately two percent of the
Plan's assets were invested in the SDBA option during the class
period.  Id. ¶ 34.

67:3-21; Trial Ex. 10, PBIC Charter 1-2. The committee is composed of an evolving group of senior level employees from different Putnam groups, including equity, fixed income, risk or investment products, defined contribution, treasury/finance, human resources, and marketing communications. 4/11/17 Trial Tr. 25:3-15; Trial Ex. 546, PBIC Membership Demonstrative 2. In recruiting new members for the committee, the role was advertised as not "requir[ing] a lot of 'heavy lifting.'" Trial Ex. 549, Apr. 20, 2010 E-mail from Donald Mullen to Kelly Marshall. Each member of PBIC was considered an expert in their area, and was expected to share that expertise in the discharge of the committee's duty. 4/11/17 Trial Tr. 94:12-22.

For a period of time, PBIC reviewed reports compiled by the Advised Asset Group ("AAG Reports"), a subsidiary of Great-West. 4/7/17 Trial Tr. 101:15-102:20. The AAG Reports showed that a number of Putnam funds were given "fail" ratings. Trial Ex. 32, March 2010 AAG Report 5-6. After internal discussions, PBIC determined that the AAG Reports did not provide an accurate indication of fund performance. 4/11/17 Trial Tr. 139:16-140:5. Nevertheless, Putnam recommended the AAG Reports as a source of investment advice to Plan participants on their account statements. 4/18/17 Trial Tr. 16:11-18.

The Plan maintains a number of Qualified Default Investment Alternative ("QDIA") funds, also known as the Retirement Ready

Funds, which are default elections for participants who do not actively make fund selections from the Plan lineup.  Trial Ex. 113, Sept. 17, 2013 PBIC Meeting Minutes 1.  PBIC regularly reviews the QDIA funds for risk-adjusted returns, costs, asset allocation, and performance as compared to competitors.  4/13/17 Trial Tr. 78:25-79:4; see Trial Ex. 91, Aug. 14, 2012 PBIC Meeting Minutes 1.  It is undisputed that PBIC followed a prudent process in reviewing and monitoring the QDIA funds. 4/18/17 Trial Tr. 119:18-23.

Around 2014, PBIC began exploring the idea of adding a "core lineup" of passive index funds into the Plan.  Trial Ex. 135, Dec. 19, 2014 PBIC Meeting Minutes 2.  These Designated Investment Alternatives ("DIA") would be presented to participants as the building blocks of a diversified portfolio. 4/13/17 Trial Tr. 13:11-17.  Because Putnam did not offer these products, PBIC considered various low cost index ETFs available in the SDBA, funds managed by PanAgora, and other third party products.  Trial Ex. 147, July 8, 2015 PBIC Meeting Minutes 2-3. After carefully considering the appropriate asset class lineup and the different fund options, incorporating input from Putnam's investment professionals, and reviewing various performance metrics, PBIC voted to offer six BNY Mellon CITs. Trial Ex. 462, Sept. 3, 2015 PBIC Meeting Minutes 5-7; Trial Ex. 291, Sept. 2015 Index Options Presentation.

In contrast to the review process applied to the QDIA and DIA funds, PBIC appeared to rely entirely on the expertise of the investment division to determine whether a fund was failing and needed to be shut down. 4/11/17 Trial Tr. 43:24-44:7, 44:23-25. As a result, PBIC did not seem to have independent standards or criteria for monitoring the Plan investments. Trial Ex. 31, May 26, 2010 PBIC Meeting Minutes 1 ("It is uncertain what would be enough for Putnam to remove one of its own funds from the Putnam Retirement Plan line up."); Trial Ex. 21, Aug. 28, 2009 PBIC Meeting Minutes 2 ("[T]arget date funds are sold as a group so it is not clear what to do if one fails."). In fact, PBIC never once removed a fund from the Plan lineup.[8] 4/11/17 Trial Tr. 44:8-15. Perhaps most importantly, there seems not to have been separate discussion within the investment division as to whether a particular fund was appropriate for the Plan.[9] 4/14/17 Trial Tr. 90:6-9, 101:11-17.

---

[8] A fund was removed from the Plan lineup only if merged or closed, a decision made entirely by professionals in the investment division. 4/14/17 Trial Tr. 72:15-73:6. With respect to one particular underperforming fund, the Putnam Voyager Fund, Putnam's investment professionals closely monitored the performance of the fund, made changes directed toward improving performance, and ultimately replaced the portfolio manager. Id. at 76:4-13.

[9] This arrangement contrasts with Putnam's recommendation to other plan sponsors. In its own published advisory material, Putnam strongly recommended that other plan sponsors adopt Investment Policy Statements ("IPS"), which document qualitative

**IV. RULINGS OF LAW**

**A.   Duty of Loyalty**

The Plaintiffs argue that the Defendants violated the duty of loyalty by "stuffing the Plan's investment lineup with all of Putnam's publicly-offered mutual funds, as well as other Putnam affiliated investments, without regard to their expenses, track record, or other objective criteria."  Pls.' Trial Br. 7, ECF 164; SAC ¶¶ 119-120.  In response, the Defendants contend that they "did not exploit the Plan to serve [their own] interests, but rather, voluntarily took actions that cost [Putnam] considerable money and significantly dwarf[ed] any revenue received from the Plan."[10]  Defs.' Mem. 5.  In particular, the

---

and quantitative criteria for monitoring and removing funds from 401(k) plans.  Trial Ex. 23, Putnam 401(k) Investment Policy Statement Checklist and Sample 6; Trial Ex. 15, Fiduciary Planning Guide 22-23 ("Having an IPS is a hallmark of an active, engaged fiduciary.").  An earlier version of PBIC's Charter, the committee's governing document, listed "[a]pprove, review annually, and monitor compliance with 'Statements of Investment Policy'" under "Duties & Responsibilities."  Trial Ex. 10, PBIC Charter 1.  After discussion between various members of PBIC and the Legal Department, the committee concluded that a written IPS would be redundant, given the investment division's procedures for monitoring the performance of its funds.  4/7/17 Trial Tr. 85:8-11.  The Legal Department also expressed concern about being able to follow an IPS.  Trial Ex. 51, May 11, 2011 E-mail from Pamela Fleming to Donald Mullen.  PBIC's Charter was amended to remove the language discussing an IPS in January 2012.  Trial Ex. 72, PBIC Amended Charter 1.

[10] For instance, Putnam provided a number of additional services to Plan participants, including ongoing education about retirement planning and the various investment options available

Defendants point to discretionary contributions made to the Plan, totaling more than $40,000,000 during the class period, as well as a series of administrative expenses and services that the Defendants paid to the Plan and Plan participants.[11] Id.

Although these practices do not eliminate the Defendants' ability to breach the duty of loyalty, the Plaintiffs have failed to point to specific circumstances in which the Defendants have actually put their own interests ahead of the interests of Plan participants. The Plaintiffs' duty of loyalty claims are reduced almost exclusively to identifying instances of self-dealing. Pls.' Opp'n 4-6; Pls.' Trial Br. 7; SAC ¶¶ 119-120. As discussed above, however, pointing to self-dealing alone is insufficient for the Plaintiffs to meet their

---

in the Plan. See generally Trial Ex. 336, Preparing for the Unpredictable: The Benefits of Diversification (explaining importance of diversification in investment planning). Putnam also created the Lifetime Income Analysis Tool, which helps participants plan for retirement by modeling different retirement date scenarios. Trial Ex. 467, The Putnam Retirement Plan 4. Furthermore, Putnam hired Hewitt Associates, a human resource consulting firm, to redesign the Plan to encourage more participation, yielding an approximately ninety percent participation rate. 4/12/17 Trial Tr. 37:2-11. Putnam also paid all of the Plan's recordkeeping expenses. Stipulated Facts ¶ 37. This approach resulted in significant investment gains for Plan participants, including Brotherston and Glancy, who both kept their retirement savings in the Putnam 401(k) plan after leaving the company. 4/18/17 Trial Tr. 24:14-17, 67:8-14.

[11] With respect to the class representatives, Putnam made voluntary contributions of $854,000 to Glancy, 4/18/17 Trial Tr. 61:17-19, and $315,000 to Brotherston, id. at 26:20-22.

burden of persuasion to show by a preponderance of the evidence
a breach of the fiduciary duty of loyalty, particularly where
the practices are common within the industry.  See Dupree, 2007
WL 2263892, at *45; In re McKesson HBOC, Inc. ERISA Litig., 391
F. Supp. 2d at 834-35.  Evaluating the totality of the
circumstances, the Court holds that the Defendants have not
breached the duty of loyalty owed to the Plaintiffs' class.

### B.    Duty of Prudence

The Plaintiffs argue that the Defendants violated their
fiduciary duty of prudence by failing to implement or follow a
prudent objective process for investigating and monitoring the
individual merits of each of the Plan's investments in terms of
costs, redundancy, or performance.  Pls.' Opp'n 8.  In support,
the Plaintiffs point to PBIC's failure to remove funds from the
Plan that had repeatedly received "fail" designations in AAG
Reports.  Id. at 5, 9.  The AAG Reports alone, however, are
insufficient to carry the Plaintiff's burden of persuasion with
respect to the claim of breach.  See, e.g., 4/14/17 Trial Tr.
70:5-71:2 (testimony of Mr. Lenhardt that AAG reports are
"superficial and incomplete"); 4/13/17 Trial Tr. 5:5-15
(testimony of Mr. Goodfellow that the "investment professionals
on the committee . . . didn't think the [AAG Report] analytics
were very useful and that the organization had better
analytics"); 4/11/17 Trial Tr. 37:4-11 (testimony of Mr. Mullen

that "[a]s we looked into the AAG documents and we shared it with members of our investment professionals, we really determined that it was a flawed methodology").[12]

The Defendants counter that they fulfilled their fiduciary obligations by having Putnam's Investment Division, some senior members of which sat on PBIC, monitor the performance of Putnam's mutual funds, including those in which the Plan is invested. Defs.' Mem. 7. The record reflects the Investment Division's highly sophisticated, systematic review of all Putnam mutual funds. See, e.g., 4/14/17 Trial Tr. 20:15-21:5, 21:25-14, 23:9-24:1, 39:17-46:13. Such care for its mutual funds, however, is not sufficient to rebut the Plaintiff's claims of breach of fiduciary duty with respect to the Plan. Although Putnam is a defendant in the present lawsuit, it is in fact PBIC that is the named fiduciary of the Plan under ERISA. Trial Ex.

---

[12] The Plaintiffs also attempt to show the Defendants' lack of prudence by pointing out that "the majority of the Putnam-affiliated investments in the Plan were not included in any other large retirement plans, and the remainder (with one exception) were included in at most a handful of other plans out of more than 2,600 plans with $250 million in assets or more." Pl.'s Opp'n 4. Even if factually accurate, this argument is unavailing. The prudence of the Plan's investments is measured against what a prudent investor would do in Putnam's shoes. Tatum, 761 F.3d at 358 (ERISA requires fiduciaries to act prudently "consistent with that of a prudent man acting in [a] like capacity." (emphasis added) (internal quotation marks omitted)). It is irrelevant whether Putnam's competitors invested in Putnam's mutual funds.

10, PBIC Charter 1-2.  Other divisions within Putnam did not specifically owe ERISA fiduciary duties to the Plan even if they were acting as fiduciaries for other groups (e.g., shareholders of mutual funds, of which the Plan was a member).[13]

Although there is no "uniform checklist" for procedural prudence, Tatum, 761 F.3d at 358, it must be the case that prudence requires more than blindly to defer to the decisions of someone else, no matter how qualified.  Indeed, closely monitoring Putnam's mutual funds is not the same as closely monitoring the Plan's lineup.  The fact that some of the incentives of Putnam's Investment Division aligned with those of the Plan participants is not sufficient to remedy the situation.[14]  A direct contribution 401(k) retirement plan could well have specific interests and goals different from a given mutual fund (e.g., different levels of exposures to different

---

[13] The fiduciary duty of prudence under ERISA is only delegable if the named fiduciary explicitly names an investment manager to manage assets of a plan provided that the plan document so authorizes.  29 U.S.C. §§ 1102(c)(3), 1105(c)(3). Nothing in the record suggests, nor do the parties claim, that such explicit delegation ever took place here.

[14] Mr. Lenhardt's testimony, along with supporting internal documents, show that Putnam's compensation philosophy aims "to align the actions of our portfolio managers, our analysts, the investment team, with the long-term goals and benefit of shareholders."  4/14/17 Trial Tr. 82:3-8; Trial Ex. 558 (2016 Investment Division Performance Evaluation and Compensation Design).  Mr. Mullen further testified that no portfolio manager ever complained about their fund being excluded from the Plan. 4/11/17 Trial Tr. 124:25-125:7.

types of risk, short versus long term strategy). ERISA
fiduciaries ought take into consideration those differences in
managing and monitoring Plan assets. The fact that certain
members of the investment division served on PBIC and PBOC is
not sufficient to dispel concerns about lack of independent
monitoring. That those members wear two hats -- one of
portfolio manager and another of ERISA fiduciary -- says nothing
about which hat they were wearing when making decisions about
the Plan's investments.

Because the Defendants have not yet presented the entirety
of their case, the Court refrains from making conclusive
findings and rulings on whether the Defendants breached their
duty of prudence. The Court notes, however, that on this
record, it would be warranted in ruling that PBIC and PBOC
failed to monitor the Plan investments independently. The
seemingly informal delegation of that function to Putnam's
investment division does not seem sufficient to discharge PBIC
of its demanding fiduciary duty. The Court makes these remarks
tentatively, because it is perfectly conceivable that the
Defendants would present compelling evidence that they were in
fact in full compliance with their ERISA fiduciary duties.
Nevertheless, on this equivocal record, the Court must move on
to address the next issue.

### C. Prima Facie Case of Loss[15]

"[O]nce the ERISA plaintiff has proved a breach of fiduciary duty <u>and a prima facie case of loss to the plan</u> or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." <u>Martin</u>, 965 F.2d at 671 (emphasis added). Where the evidence presented is insufficient to sustain either the plaintiff's claim of breach of fiduciary duty or a prima facie case of loss to the plan, the plaintiff's claim fails. Because the Court refrains from making any conclusive ruling about the alleged breach of fiduciary duty of prudence before the Defendants have had the opportunity to put forward all of their evidence, the question here becomes whether the Plaintiffs have made out a prima facie case of loss.

To hold the Defendants liable for damages based on the alleged breach of fiduciary duty, the Court must first determine that the breach resulted in losses to the Plan. <u>See</u> <u>Plasterers'</u> <u>Local Union No. 96 Pension Plan</u> v. <u>Pepper</u>, 663 F.3d 210, 217

---

[15] In light of the close split among the circuits, which were divided 4-3 at the time of this trial, as well as the procedural posture of this case, this Court adopts the burden shifting framework for loss causation only for the purposes of this analysis. Thus, if the Plaintiffs make a prima facie showing of loss, the burden falls on the fiduciaries to prove no loss was caused by such violation, and the case continues.

(4th Cir. 2011) ("[W]hile certain conduct may be a breach of an
ERISA fiduciary's duties under § 1104, that fiduciary can only
be held liable upon a finding that the breach actually caused a
loss to the plan."); Allison v. Bank One—Denver, 289 F.3d 1223,
1239 (10th Cir. 2002) ("The phrase 'resulting from' indicates
that there must be a showing of 'some causal link between the
alleged breach . . . and the loss plaintiff seeks to
recover.'"). Specifically, an ERISA plaintiff must establish a
causal link between the breach and the damages claimed. See
Kuper, 66 F.3d at 1459 ("[A] fiduciary's failure to investigate
an investment decision alone is not sufficient to show that the
decision was not reasonable. Instead, . . . a plaintiff must
show a causal link between the failure to investigate and the
harm suffered by the plan."); Friend v. Sanwa Bank Cal., 35 F.3d
466, 469 (9th Cir. 1994) ("ERISA holds a trustee liable for a
breach of fiduciary duty only to the extent that losses to the
plan result from the breach."); Diduck v. Kaszycki & Sons
Contractors, Inc., 974 F.2d 270, 279 (2d Cir. 1992) ("The last
element in this cause of action is proof of a causal connection
between the fraud perpetrated and the loss complained of.");
Willett, 953 F.2d at 1343 ("Section [1109(a)] of ERISA
establishes than an action exists to recover losses that
'resulted' from the breach of fiduciary duty; thus the statute
does require that the breach of the fiduciary duty be the

proximate cause of the losses claimed . . . ."); <u>Brandt</u> v.

<u>Grounds</u>, 687 F.2d 895, 898 (7th Cir. 1982) ("[A] causal

connection is required between the breach of the fiduciary duty

and the losses incurred by the plan.").

The fundamental problem in this case is the broad sweep of

the Plaintiffs' "procedural breach" theory.  The Plaintiffs

argue that the alleged lack of an "objective process" by PBIC to

monitor the Plan investments makes <u>the entire</u> investment lineup

of the Plan imprudent.  Pls.' Opp'n 11, 13-14; Pls.' Trial Br.

21-23; <u>see also</u> Hearing Tr. 30:4-11, Apr. 20, 2017, ECF No.

186.[16]  Although the Plaintiffs contend that they "are not

required to prove that any individualized investment decision

was imprudent because no individualized investment decisions

were made," Pls.' Opp'n 11 (internal citations and quotation

marks omitted), this argument lacks legal support.  The

Plaintiffs mistakenly rely first on <u>Urakhchin</u> v. <u>Allianz Asset</u>

---

[16] While they present no evidence that any of the Plan
beneficiaries ever invested in the entire Putnam funds lineup --
the two named plaintiffs certainly did not -- the Plaintiffs
posit that if one tracked the performance of the entire Putnam
funds lineup over the class period, it did not outperform (and
over certain periods underperformed) a hypothetically comparable
index fund with far less in management fees.  4/19/17 Trial Tr.
122:12-19.  Such data, while interesting, appears unsurprising
to a multitude of mutual fund investors.  <u>See</u> Landon Thomas Jr.,
<u>Vanguard is Growing Faster than Everybody Else Combined</u>, NY
Times (Apr. 14, 2017),
https://www.nytimes.com/2017/04/14/business/mutfund/vanguard-
mutual-index-funds-growth.html?_r=0.

Management of America, L.P., No. SACV 15-1614-JLS (JCCx), 2016
WL 4507117, at *5 (C.D. Cal. Aug. 5, 2016), and Glass
Dimensions, Inc. v. State Street Bank & Trust Co., 285 F.R.D.
169, 175 (D. Mass. 2012) (Tauro, J.).  Pls.' Opp'n 11.  These
decisions, however, addressed only whether plaintiffs had
standing to challenge the inclusion of certain funds in a plan,
and have no bearing on the issue of a prima facie showing of
loss caused by a breach of fiduciary duty.

     The Plaintiffs then cite Dardaganis v. Grace Capital, 889
F.2d 1237, 1244 (2d Cir. 1989), and Liss v. Smith, 991 F. Supp.
278 (S.D.N.Y. 1998), in support of their theory that PBIC's
alleged lack of an objective process to monitor the Plan
investments is a "procedural breach" that renders the entire
lineup imprudent.  Hearing Tr. 25:1-20, Apr. 20, 2017, ECF 20;
Pls.' Opp'n 14.  These case are unpersuasive.  First, although
the court in Dardaganis upheld an averaging technique for
calculating damages where it was impossible to determine
individual stock purchase-level losses, 889 F.2d at 1243-44
("Where . . . the breach arises from a pattern of investment
rather than from investment in a particular stock, courts will
rarely be able to determine, with any degree of certainty, which
stock the investment manager would have sold or declined to buy
had he complied with investment guidelines."), this Court finds
no such difficulties here.

Liss, on the other hand, provides better support for the Plaintiffs' position.  See Liss, 991 F. Supp. at 295 (finding expert report sufficient to state a prima facie case of loss where "the allegations of fiduciary breaches relate to the overall investment strategy of the Funds (or the lack thereof) as opposed to the wisdom of a single transaction or investment").[17]  This Court, however, respectfully disagrees with its sister court's analysis in Liss.  Indeed, the weight of precedent supports the position that the Plaintiffs must point to a specific imprudent investment decision or decisions to make a showing of loss due to a breach of fiduciary duty.  See Bunch II, 555 F.3d at 7 ("'[The prudence test] [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight.'" (emphasis added) (quoting Roth, 16 F.3d at 917–18)); see also Plasterers' Local Union No. 96 Pension Plan, 663 F.3d at 218–19

_____

[17] The Defendants argue that Liss, which relies on Dardaganis, is not relevant to the present dispute because it was decided at the summary judgment stage, not in the midst of a bench trial.  Defs.' Suppl. Br. 6-7.  That distinction, however, does not reduce the potential relevance of Liss to this case.  The Defendants also attempt to distinguish Liss based on the fact that it involved allegations of "gross mismanagement" by fiduciaries, including allegations of kickback payments.  Defs.' Suppl. Br. 6.  While the present case does not involve similarly serious allegations, it is not clear that the Liss court relied on the severity of the allegations' cause to consider defendant's overall investment strategy instead of specific investments.

("It was incumbent on the district court to determine whether the [defendants'] failure to investigate caused them to make imprudent investments, such that there was a loss to the Plan for purposes of liability for those losses under § 1109(a)."); Bussian v. RJR Nabisco Inc., 223 F.3d 286, 300 (5th Cir. 2000) ("ERISA's obligations are nonetheless satisfied if the [investment] selected would have been chosen had the fiduciary conducted a proper investigation."); In re Unisys Sav. Plan Litig., 173 F.3d 145, 154 (3d Cir. 1999) ("[W]e are satisfied that the District Court's holdings that [the fiduciary] was prudent, and in the alternative, that a hypothetical prudent fiduciary would have made the same investments, are supported by the evidence."); Martin, 965 F.2d at 672 ("[T]he district court must determine the specific damages that resulted from each of the transactions in which ERISA fiduciary duties were breached."); Fink v. National Sav. & Tr. Co., 772 F.2d 951, 962 (D.C. Cir. 1985) ("It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former[.]"); Tussey v. ABB, Inc., No. 2:06-CV-04305-NKL, 2012 WL 1113291, at *3 (W.D. Mo. Mar. 31, 2012) ("[T]he Court rejects Plaintiffs' global damages theory which is based on the assumption that ABB's breaches infected all of its

investment decisions for the Plans . . . ."), aff'd in part, vacated in part, rev'd in part, 746 F.3d 327 (8th Cir. 2014).

This approach is also consistent with a plain reading of the statute, which ties the imposition of monetary penalties to actual losses to a plan resulting from a breach of fiduciary duty.  See 29 U.S.C. § 1109(a); see also Evans, 534 F.3d at 73 ("ERISA does not authorize suits for what the Seventh Circuit calls 'extracontractual damages' -- i.e., damages separate from the benefits to which the plan documents entitle the participants -- such as emotional distress resulting from a plan's failure to honor it [sic] obligations[.]"); Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987) ("If trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund.").  The Plaintiffs' theory that the procedural breach tainted all of the Defendants' investment decisions for the Plan constitutes an unwarranted expansion of ERISA's seemingly narrow focus on actual losses to a plan resulting from specific incidents of fiduciary breach.

Furthermore, the Plaintiffs' argument that PBIC's alleged lack of an "objective process" to monitor the Plan investments makes the entire Plan lineup imprudent is a non sequitur. Indeed, a person could lack an independent process to monitor his investment and still end up with prudent investments, even

if it was the result of sheer luck.  See Roth, 16 F.3d at 919

("Even if a trustee failed to conduct an investigation before

making a decision, he is insulated from liability [under

§ 1109(a)] if a hypothetical prudent fiduciary would have made

the same decision anyway.").  In the present case, however, luck

seems to have little to do with the Plan lineup.  It is clear

from the record before the Court that Putnam employs

sophisticated techniques to monitor its mutual funds.  Even if

these practices are not sufficient to meet the ERISA fiduciary

duties to the Plan, they are certainly sufficient to dispel the

unsupported allegation that the entire Plan investment lineup

was per se imprudent.[18]

For the same reasons, the Plaintiffs' claim for $37.3

million in ill-gotten proceeds, 4/19/17 Trial Tr. 97:22-98:3, is

legally insufficient.  Although section 1109(a) requires an

ERISA fiduciary "to restore to such plan any profits of such

fiduciary which have been made through use of assets of the plan

by the fiduciary," 29 U.S.C. § 1109(a), the Plaintiffs' argument

that the burden of proof shifts to the Defendants to show that

_____

[18] The Plaintiffs also rely on the analysis of their expert,
Dr. Pomerantz, to quantify the losses the Plan would have
suffered as a consequence of the alleged breach of fiduciary
duty by the Defendants.  Pls.' Opp'n 13-15.  Courts may
generally rely on the help of expert analysis to show damages
from fiduciary breach.  Evans, 534 F.3d at 74.  Dr. Pomerantz's
analysis, however, relies on this Court accepting the
Plaintiffs' "procedural breach" theory.

"some portion of the investment management fees do not represent profits to the Company," Pls.' Opp'n 20 (citing <u>Martin</u>, 965 F.2d at 671), erroneously assumes that they have made a prima facie showing.

PBIC's review of the Plan lineup was no paragon of diligence. But because the Plaintiffs have failed to establish a prima facie case of loss, counts I and IV must fail as matter of law.[19, 20] In light of the Plaintiffs' failure to establish loss, the Court further declines to grant other declaratory or injunctive relief under section 1132(a)(3) (count V). <u>See</u> <u>Drinkwater</u> v. <u>Metropolitan Life Ins. Co.</u>, 846 F.2d 821, 824 (1st Cir. 1988) (interpreting "[o]ther appropriate equitable relief" in section 1132(a)(3) to mean "declaratory or injunctive relief, not compensatory and punitive damages").

---

[19] Although this Court applied the burden shifting framework for the purposes of this analysis, the Court finds that the Plaintiffs fail to establish a prima facie case of loss. As a result, the question of whether the burden of persuasion on the loss element shifts to the fiduciary need not be resolved today.

[20] As the text explains, this Court rules that the Plaintiffs' theory that the "procedural breach" makes Putnam's entire mutual fund line up imprudent is simply legally insufficient on this record. It may be reviewed de novo. Were this a workable theory supported by adequate evidence, it would have been the Court's duty to finish the case since the Plaintiffs at this stage need only have laid out a prima facie case in order to shift the burden of proof to the Defendants.

## V.  CONCLUSION

For the foregoing reasons, the Court enters judgment for the Defendants on all remaining counts.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE
